# United States District Court
## For The District of Columbia

**FILED**

JAN 1 6 2008

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Professor Debabrata Saha,**
9409 Fairpine Lane
Great Falls, VA 22066
(703)757-5418

      **Plaintiff,**

v.

                               **Action No.**

**The George Washington University**
**SERVE : GWU President Steven Knapp**
2121 Eye Street, N.W., Washington, D.C. 20052

and

Case: 1:08-cv-00087
Assigned To : Lamberth, Royce C.
Assign. Date : 1/16/2008
Description: TRO/PI

**Mona E. Zaghloul,** Individually and in her capacity as (former) Chair,
Dept. of Electrical and Computer Engineering
The George Washington University
801 22nd Street, N.W., Phillips Hall 620, Washington, D.C. 20052

and

**Wasyl Wasylkiwskyj,** Individually and in his capacity
as member of ECE Personnel Committee,
Dept. of Electrical and Computer Engineering
The George Washington University
801 22nd Street, N.W., Phillips Hall 615,Washington, D.C. 20052

and

**Edward Della Torre,** Individually and in his capacity
as member of ECE Personnel Committee,
Dept. of Electrical and Computer Engineering
The George Washington University
801 22nd Street, N.W., Phillips Hall 621, Washington, D.C. 20052

and

**The (SAHA) Panel Chair, Prof. Joan Schaffner,** Individually and in her capacity as Panel Chair
GWU Law School , 2000 H. Street, N.W., Washington, D.C. 20052
(Members of the Panel : Prof. Joan Schaffner, Prof. Mark Klock, Prof. Ravi Achrol, Prof. Guillermo
Gutierrez, Prof. Brian Biles, Prof. Robert Dunn; each in individual capacity and as part of the Panel)

and

**Stephen Joel Trachtenberg,** Individually and in his capacity
as (former) President of the George Washington University
805  21st Street, N.W., Suite 600, Washington, D.C. 20052

      **Defendants.**

---------------------------------------------------------

1 of 40 pages

# COMPLAINT

**(RETALIATION AFTER WHISTLE BLOWING; COMPLAINT OF HARASSMENT AND DISCRIMINATION; CONSPIRACY FOR FURTHER RETALIATION; OSTRACISM AND LOSS OF NORMAL LIFE; DEFAMATION, PERP WALK AND HARM TO PROFESSIONAL REPUTATION AND SOCIAL LIFE; EMOTIONAL PAIN AND SUFFERING; INTIMIDATION; FINANCIAL RETALIATION; VIOLATION OF PROFESSIONAL ETHICS; BREACH OF CONTRACT)**

Debabrata Saha, plaintiff sues The George Washington University (hereinafter "GW"). Mona E. Zaghloul, Wasyl Wasylkiwskyj, Edward Della Torre, The (SAHA) Panel Chair Prof. Joan Schaffner of GWU Law School, and Stephen Joel Trachtenberg.

## I. PARTIES AND JURISDICTION

1. This Court has federal questions over claims under the clause of Diversity of Citizenship of Title 28, Section 1332 (28USC1332).

2. This Court has personal jurisdiction over the defendants pursuant to D.C. Code Section 13-423(a) because defendants transact business in the District of Columbia and caused tortuous injury in the District of Columbia by committing tortuous acts in the District of Columbia.

3. Plaintiff, Debabrata Saha is a resident of Virginia. He is employed as an Associate Professor in the Department of Electrical and Computer Engineering in GWU. Professor Saha was awarded tenure in 1992.

4. Defendant GWU is a resident of and has principal place of business in the District of Columbia .

5. Defendants Mona E. Zaghloul, Wasyl Wasylkiwskyj, Edward Della Torre, The (SAHA) Panel Chair Prof. Joan Schaffner of GWU Law School, and Stephen Joel Trachtenberg all have their principal place of business in the District of Columbia .

2

## II.  BACKGROUND FACTS

6. After graduation from the University of Michigan, Ann Arbor, Michigan, I joined the George Washington University in the Fall of 1986 as an Assistant Professor in the Department of Electrical Engineering and Computer Science (EECS). The Appointment Letter (Plaintiff Exhibit A), the Faculty Code (Plaintiff Exhibit B), the Faculty Handbook (First few pages : Plaintiff Exhibit C) constituted part of my employment contract with GWU. University teaching is a unique profession which supports the moral backbone of the society; therefore, the other part of the employment contract are the Normal and Customary practices of the University community, such as the AAUP Guidelines (First few pages: Plaintiff Exhibit D), the decency that goes with legal and moral rights of any civilized society, such as those protected under US Constitution  (First few pages :  Plaintiff Exhibit E ) and Federal and Local Rules. I am a tenured member of GWU faculty effective Fall 1993. Plaintiff Exhibit F is the Notification of granting tenure.

7. **Tenure : Its meaning, its objective and its maintenance :**

■ Tenure is commonly referred to as "Continued Appointment for life".

■ Tenure essentially serves two purpose : the protection of Academic freedom and the provision of Economic security. American Association of University Professors (**AAUP**) in its Policy Documents & Reports (tenth ed.) emphasizes its 1940 Statement of Principles :

" **Institutions of higher education are conducted for the common good**........**The Common good depends upon the free search for truth and its free exposition.** Academic freedom is essential to these purposes and applies to both teaching and research. .....

Tenure is a means to certain ends; specifically : (1) freedom of teaching and research and extramural activities, and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. **Freedom and economic security, hence, tenure are indispensable to the success of an institution in fulfilling its obligation to its students and to the society**."

■ AAUP guidelines on Academic Freedom, Tenure, and Due Process are widely accepted Normal Customs and Practices on the issue of maintaining and revoking tenure.

3

- Scholars and administrators, alike, have long recognized that tenure carries with it an expectation that, in absence of demonstrable cause for termination of faculty member's appointment, a tenured professor will enjoy the freedom of carrying out his/her obligation to the students and to the society, **which includes upholding the integrity of the Academic process and fairness to the students, without the fear of retaliation and dismissal by the administrators.**

- Tenure's "real concern is with arbitrary or retaliatory dismissal based on an administrator's or a trustee's distaste for the content of a professor's teaching or research, or even for positions taken completely outside the campus setting.....It is designed to foster our society's interest in the unfettered progress of research and learning by protecting professor's freedom of inquiry and instruction" Re. Browzin v. Catholic University, 527F.2d 843 (D.C. Cir 1975)

- It is well established that, under District of Columbia law, a faculty code such as GWU's faculty code defines the rights and obligations of the employee and the employer, and is a contract enforceable by the courts. Re. McConnel v. Howard Univ., 818 F.2d 58 (D.C. Cir 1987); Greene v. Howard Univ., 412 F.2d 1128 (D.C. Cir 1969); Howard Univ. v. Best, 484 A.2d 958 (D.C. 1984).

- "The University....is bound by the contracts it makes." Re. Howard Univ. v. Best, 484 A.2d  958; Katz v. Georgetown University, 246 F.3d 685 (D.C. Cir. 2001)

- "Contracts are written, and are to be read by reference to the norms of conduct and expectations founded upon them. This is specially true of contracts in and among a community of scholars, which is what a university is." Greene v. Howard Univ., 412 F.2d 1128.

8.      (a) Following joining GWU in 1986, I quickly established my program making contribution in teaching, research, advising doctoral students, taking charge of the Communications Laboratory and remodeling it, and establishing the confidence of the department in appointing me as one of the three undergraduate advisors of the EE program. In the first part of 1990s, at any given time, I had more than one hundred undergraduate advisees and over fifty graduate advisees; on a regular basis, Monday through Friday, I used to be in the Department 9:30 am to 6:30 pm. I maintained regular and punctual participation in the faculty meetings as well as the committee work. Outside I was professionally active and quickly became the Chairman of Washington DC-Northern Virginia chapter of IEEE Information

Theory Society. I organized an Information Theory Workshop at GWU, which I believe was the first and only one of that kind. Inside I was productive in publishing papers, graduating doctoral students, and getting a few patents. I got tenure and promotion in 1992, and everything seemed to work out fine in almost copy book style till 1995-1996 academic year.

(b) During 1995-1996 I observed rampant favoritism practiced by some senior and powerful faculty members, one of whom had the stature of the President of an International Society. I had information about such favoritism in my official capacity and warned the chairperson and the dean several times; but they refused to play honest with a junior faculty member as I was at that time. *It is the integrity of the academic process and the issue of fairness that compelled me to take a moral stand against the administration in 1996.* I exposed the wrong doing of the School through my "Dear Colleague Letter" (Plaintiff Exhibit G) and subsequently, School's actions led to what is known as **1996 GWU Qualifying Exam Scandal**.

## 9. Academic vandalism : 1996 GWU Qualifying Exam Scandal

**Spring'95 :** Professor Raymond L. Pickholtz of former EECS department gave undue favor to Mr. X (who never applied for admission and was never admitted into any GWU doctoral program) by allowing him to take doctoral qualifying exam. Later, with the help of Chairwoman Prof. Mona Zaghloul and Prof. Vojcic, he arranged a 'Passing Grade' for Mr. X.

**Fall'95 :** Prof. Pickholtz allowed another doctoral student, Mr. Y, to take the doctoral qualifying exam four times in a row, though the department rule allowed a maximum of two attempts. Prof. Pickholtz later even pleaded for a fifth attempt on behalf of his student.

**Spring'96 :** Prof. Zaghloul, in the capacity of the Chairwoman of EECS Department, allowed Mr. Z (a student of Prof. Robert J. Harrington) to take the doctoral qualifying exam in Telecommunications, though we had no such approved program in the School of Engineering and Applied Science (SEAS).

- I spoke against this violation of rules and violation of professional ethics that is essentially required as per faculty code.
- Chairwoman Zaghloul came forward to **Lie** (maintaining the literal meaning of "Lie" of Webster's Dictionary) about all three cases to protect her involvement in the wrong doings and save her own face and the face of Prof. Pickholtz and Prof. Harrington.
- I requested for an explanation from the GWU administration about such unethical activities and violations of faculty code; I held the Blue Books of the Qualifying Exam with the hope of getting a rational explanation from the administration.
- As per personal suggestion of President Trachtenberg, I returned the Blue Books to Vice President and General Counsel Dennis Blumer on May 16, 1996.
- In the meantime, with the support from the offices of Chairwoman Zaghloul and VP for Academic Affairs, Linda Salamon, the EECS faculty used their Democratic Power and passed all the doctoral students (more than a dozen) without looking into their answers. They saved their face without paying any respect to the fairness and integrity of the academic process.
- **Their Collective Moral Bankruptcy brought disgrace on the Academy of Higher Learning in the Capitol of the Nation. Perhaps, such collective indulgence in vandalizing the moral fabrics of the Academy never occurred in the United States.**
- The vandalism was thus committed through the pitfalls of Democracy. They vandalized the integrity and sanctity of the academia, they vandalized the sanctity of the George Washington University, they vandalized my moral conscience in most naked and savaged way, and still they had the audacity to claim they were the civilized western world. It is my fortune that I am neither eastern nor western, I am just a human being.
- First degree vandalism was carried out by VP Linda Salamon, Dean Gideon Frieder, Prof. Raymond L. Pickholtz, Prof. Murray Loew, and Chair Woman Mona Zaghloul; the second degree vandalism (through assistance) was carried out by Prof. Branimir Vojcic (a former student of mine in Information Theory).

■ Defendants **Mona E. Zaghloul, Wasyl Wasylkiwskyj, and Edward Della Torre** all were voting members of the infamous EECS faculty meeting on May 8, 1996 that took the decision of passing all the students.

10. President Stephen Joel Trachtenberg, in a one-to-one meeting with me in 1997, referred me as **whistle blower** and he thought administration of new Vice President Donald Lehman should have sent me a **"Thank you"** letter for my role in that matter. But Vice President Lehman chose to take a confrontational path and **1996 incident became the abrupt turning point** in my two decade long teaching career in GWU.

11. I spent most of my second decade here at GWU coping with extreme hostility full of ostracism, harassment, defamation and retaliation through four suspensions. Yet I was always available for teaching and taking care of students. Every semester I gave extra lectures in the weekends which I wasn't officially required to. In *my nineteen years of teaching here at GWU, I never missed even one lecture*. In spite of adverse situation created by the administration, *I always managed to submit final grades within 72 hours of the exam*. Even after the whistle blowing, I was available for meetings and committee work if they wanted me to do so; but unfortunately they did not ask me and I did not ask for their social interaction to make them uncomfortable. *I did not hear a single knock on my door for social interaction over a period of ten years*. In summary, I led my professional life in the department exactly the way they wanted me to lead. I did what they wanted me to do (such as teaching ) and I did not cross the boundary imposed by them to make them uncomfortable. *I kept a low profile as I was suggested by President Trachtenberg*.

12. Perhaps, GW's demonstrated ostracism practices over one decade (1996-2006) can be used as the definition of Twenty First Century ostracism  among  some Intellectuals in America. It clearly demonstrated that ostracism has nothing to do with our Ph. D. degrees; it is mostly to do with our inner bringing up. My long stand on the moral principles has never been  to aggravate the issue of ostracism but to correct it through a change in the inner thoughts of the opponents.

13. Allegation of discrimination by some University officials goes way back in Fall 1992 when EECS Chairman Prof. Robert Harrington excluded Prof. Saha from the tenured personnel committee in 1992-93. The then VP for Academic Affairs, Prof. Rod French intervened and supported my faculty rights; he allowed me to contribute my input as a faculty member. Discriminations and harassment's by Prof. Harrington and later by Chairwoman Mona Zaghloul continued till Fall of 1996. These matters were communicated to university officials,

> (a) Dean Gideon Frieder of SEAS
>
> (b) Prof. Lilien F. Robinson and Prof. Joseph Pelzman of Faculty Senate
> (c) President Trachtenberg of GWU

**14. Spring 95 through Spring 96** :

Prof. Saha brought to the attention of school authority through well documented cases of "irregularities and practice of favoritism" against some members of EECS faculty and the Chairwoman Mona Zaghloul.

Retaliation of Prof. Zaghloul which began in Fall'95 continued till Spring'96 when EECS Dept and SEAS together lead to the Qualifying Exam Scandal. My "Dear Colleague" letter of May 15, 1996 (Plaintiff Exhibit G) gives a brief summary of the Scandal. During the period of the ordeal, **I was working closely with the offices of President Trachtenberg, and VP and General Counsel Dennis Blumer. I maintained all the deadlines imposed by them.**

**15. Fall 1996 :**

Harassment by Chairwoman Mona Zaghloul continued to an increased level.

- Following the suggestion of the General Counsel and VP Dennis Blumer, I finally decided to bring charges of harassment against Chairwoman Mona E. Zaghloul and sent the allegation in writing to VP Blumer on Aug.16, 1996.

- On August 23, 1996 I brought the same charge against Professor Zaghloul and sent the allegation in writing to President Trachtenberg.

- **Harassment by Adhoc Committee** : Chairwoman Zaghloul and Dean Frieder used an Adhoc committee to harass me in order to divert and suppress the issues of wrong doings of the GWU academic officials.

- In response to my letter of Aug.23, **President Trachtenberg wrote me on September 3, 1996 asserting that he had requested VP for Acad. Affairs Dr. Lehman to look into the matter.** But nothing happened and Dr. Lehman never communicated with me (neither in writing nor over phone).


16. **Spring 1997** :

- While VP Lehman was supposed to look into the matter, I was suspended by VP Lehman (details in item 29A : **Unethical Actions of VP Dr. Lehman)**

- In the evening of May 1st, 1997 I scheduled a meeting with President Trachtenberg on Monday, May 12 at 4:00 pm in his office.

- On May 12, I had approximately 50 min long meeting with President Trachtenberg. During this meeting President Trachtenberg called me **"the Whistle Blower"**

  In an attempt to avoid any further complication, **he suggested that I avoid communicating with a number of faculty members who were directly involved with the incident of the Qualifying Exam.** The members who directly led to the scandal :

  1) Dr. Raymond L. Pickholtz, former EECS faculty

  2) Dr. Mona E. Zaghloul, former Chairwoman of EECS Dept.

  3) Dr. Gideon Frieder, former Dean of SEAS

  4) Dr. Branimir Vojcic, former EECS faculty


17. **Fall 1997** :

  After an Investigation by Ramakar-Wooldridge Committee, I was back to teaching after reinstatement but I was not given any report of the investigation committee that I was promised.

18. **Spring 1999 :**

I was scheduled to teach the normal load of three courses. On the first day of class on Monday, January 11, 1999 when I arrived in Tompkins Hall to teach (EE-203), Prof. Murray Loew, Chairman of EECS Dept. posed physical threat in entering the classroom. (It is noteworthy that during the period of 1996 Qualifying Exam Scandal, once Prof. Loew came to my office uninvited and started passing unpleasant remarks to pressure me in dropping the charges of corruption against Prof. Pickholtz. Finally, he had to be thrown out of my office for his misbehavior). Subsequently,

- Vice President Lehman brought charges of plagiarism and neglect of faculty responsibility against me and suspended me without pay.

- I communicated the problem to President Trachtenberg and after his intervention into the matter two investigations were launched resulting in following :

a) **Prof. Lehman had to drop the charge of plagiarism in writing**, and, as per Prof. Lehman, the case of Scientific Misconduct was closed.

(b) **EECS faculty personnel committee found no reason to take any action against me.** ( In fact, on the contrary, Prof. Della Torre, in the capacity of chairperson of the fact-finding sub-committee of EECS personnel committee, stated unequivocally that the University administration has no reason for suspension and **that Prof. Saha should be paid salary**).

Finally Prof. Lehman reinstated me but after substantial financial and mental agony.

19. **2000-2005 Spring :**

The School had a reorganization and EECS department broke into two : ECE and CS; I was placed in ECE Dept. without my input. Chairpersons of ECE during this period were :

1) Dr. Roger H. Lang

2) Dr. Branimir Vojcic

3) Dr. Mona E. Zaghloul

Prof. Vojcic and Prof. Zaghloul are the two of the three former EECS faculty members who were directly responsible for the Qualifying Exam Scandal of 1996. The third person, Prof. Raymond L.

Pickholtz is no longer working for GWU. As per suggestion of President Trachtenberg in May 12, '97 meeting, I maintained a low level interaction with Prof. Zaghloul and Prof. Vojcic.

20. **2005 Spring-Summer-Fall :**

- In the Spring of 2005, Lehman administration brought back **Prof. Mona Zaghloul** as interim chair of ECE department **only** for six months to carry out the secret ground work for initiating tenure revocation of Prof. Saha. **The choice was perfect because Prof. Zaghloul is one of those who carried out the first degree vandalism in 1996** ( see item 9 above).

- Chairwoman Mona E. Zaghloul, through a fact finding committee **secretly** brought charges of a series of professional negligence against me which VP Lehman and Dean Tong later used as the cause for initiating the process of revoking tenure.

- VP Lehman once again suspended me under fabricated pretext effective August 29, 2005 without any prior communication of any kind, written or telephonic.

- Lehman-Tong-Korman administration conspired to mislead me for false arrest in front of students in the classroom while I was teaching on Sept. 1st, 2005. They Perp walked twice once on Sept. 1st and then again on Sept. 2nd, 2005.

- After the tortuous acts of Sept. 1st and Sept. 2nd of 2005, the Defendants made an attempt of revoking Professor Saha's tenure via a fraudulent process.

- **The court should make a note of the fact that GWU, in its history of 185 years (1821-2006), never sought to revoke tenure of any tenured professor.**

- A faculty senate panel chaired by Prof. Joan Schaffner of GW Law School started the hearing in December, 2005. The Credibility of Defendant Lehman was shattered; the Faculty Senate Hearing was proved to be procedurally illegitimate and the deliberation was flawed. **The entire process of tenure revocation was rigged from the very beginning against Saha.**

21. **2006 Spring-Summer-Fall :**

The hearing continued throughout the Spring semester. Prof. Saha presented 30 exhibits and called, among others, President Trachtenberg and Vice President Lehman as witness. Panel deliberated on July 24. Following excerpts which is the "Introduction" of the deliberation summarizes the deliberation.

Decision of the Panel filed by Hearing Panel Chair : Joan E. Schaffner



### I. Introduction

This Hearing Panel's (panel) mandate is to decide whether the George Washington University (University) proved, by clear and convincing evidence, adequate cause for the tenure revocation of Professor Debabrata Saha on two grounds : "persistent neglect of professional responsibilities" and/or "gross personal misconduct that destroys academic usefulness." The Panel held 30 hours of testimony and 190 exhibits. The Panel unanimously finds that (1) the University met its burden on the first ground : Professor Saha has engaged in persistent neglect of professional responsibilities for an extended period and (2) the University failed to meet its burden on ground two : Professor Saha has not engaged in gross personal misconduct that destroys academic usefulness.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Note the panel, by its own admission, did not consider any of the 30 exhibits produced by Prof. Saha and considered 190 out of 192 exhibits produced by GWU.

22. Lehman-Tong administration of GWU mainly brought two charges against me : (1) Personal neglect of professional responsibilities, and (2) Gross and Personal misconduct that destroys academic usefulness. Because of lack of evidence, the Schaffner panel had to acquit me of the second charge. But the panel upheld the first charge. The GWU faculty code admits four possible adequate causes for tenure revocation : (a) **Incompetence** - *not a charge in Saha case*, (b) **Lack  of scholarly integrity** - *not a charge in Saha case*, (c) **Persistent neglect of professional responsibilities**- *upheld charge against*

*Saha*, and (d) **gross personal misconduct that destroys academic usefulness** - *failed charge against Saha*.

It should be pointed out that VP Lehman already tried the avenue (b) of **Lack of scholarly integrity** in 1999 and had to withdraw the charge of **plagiarism** after investigation. He also tried avenue (a) of **Incompetence** in 2005 but the evidence he presented was found to have no merit and he couldn't go far enough; he only proved his own incompetence. **Thus, VP Lehman already tried three of the four adequate causes and failed**. However, the Schaffner panel sided with Lehman through unfair means; the failure of the Schaffner panel lies in a long list of grave unfairness.

23. Prof. Saha appealed to the Senate Dispute Resolution committee, but the committee **rubber stamped** the deliberation of the Schaffner panel without properly addressing the issues. The committee was secretly formed without proper notification and without any opportunity to challenge the conflict of interest. Also, this committee provided no analysis or report of their decision.

24. Prof. Saha appealed to GWU President Stephen Joel Trachtenberg against the flawed deliberation of faculty hearing, and as result, ***Executive Vice President Defendant Lehman recused himself***. President Trachtenberg communicated this development to the Plaintiff through his Memorandum dated December 27 and letter dated December 28, 2006.

25. Without any resolution to the Appeal, or any notification of termination of appointment , ***the tenure revocation process fell short of completion. The letter of appointment and the letter granting tenure continue to hold.*** But, without any notification, ***GWU unlawfully stopped pay cheque of Prof. Saha retroactively effective March 1st, 2007.***

26. On March 15, 2007, without any notification, Prof. Saha was denied entry to his ECE office due to changed lock. This act of harassment and denial of faculty rights further enhanced the original grievance against the Administration that was filed in December 2005.

27.

(a) GWU failed to produce any evidence WHATSOEVER to establish that Plaintiff's tenure had been revoked. Faculty status and teaching assignment during Fall, 2007 and Spring 2008 (Plaintif Exhibit H ) is a reiteration of the fact that tenure was not revoked.

(b) Plaintiff maintains that his contractual status of employment with GWU is governed by the following :

     (1) His letter of Appointment (Plaintiff Exhibit A)

     (2) The Faculty Code (Plaintiff Exhibit B)

     (3) Notification of Tenure (Plaintiff Exhibit F), and

     (4) Nov. 18, 2005 letter of VP Lehman

In other words, Plaintiff is on **" paid suspension till further notice".**

*(c) Recently on January 3rd, 2008, GWU Faculty Senate, amongst the opposition of GW administration, instituted a Formal Grievance Procedure against Executive Vice President Donald Lehman and the George Washington University. The completion of Grievance Procedure may take months or even a year.*

## 28. Debabrata Saha : A Brief Background

**Employed in GWU :** Since Fall 1986
**Date of Tenure :** Effective Fall 1993
**Current Position :** Associate Professor

**Professional Society :**
> Senior Member of IEEE
> Former Chairman of Washington D.C.- Northern Virginia Section of IEEE
> Information Theory Society
> Former President and Co-founder of Students' Governing Body Union, The
> University Colleges of Science and Technology, Univ. of Calcutta

## Academic Background :

| Discipline | Degree | Institution | Major Area | Year |
|---|---|---|---|---|
| Science | B.Sc. | Univ. of Calcutta India | Physics (1st Class Hons.) | 1976 |
| Technology | B.Tech. | Univ. of Calcutta India | Radio Physics & Electronics (1st Class) | 1980 |
| Applied Sc. | M.A.Sc. | Univ. of Toronto Canada | Communications | 1982 |
| Engineering | Ph.D. | Univ. of Michigan Ann Arbor | Computer, Information & Control Engrg. | 1986 |

## Awards and Honors :

> 1972-1975 : National Scholarship, Gov. of India
> 1976-1979 : National Scholarship, Gov. of India
> 1980-1982 : Rai Bahadur Jogendra Nath Ghosh Overseas Scholar, Univ. of Calcutta
> 1983-1985 : University of Michigan CICE Fellowship

**Courses taught by Professor Saha in the George Washington University over the period 1986-2006 :**

*Graduate Courses :*
1) ECE-203 : Probability Theory and Stochastic Processes
2) ECE-241 : Information Theory
3) ECE-242 : Coding Theory
4) ECE-243 : Communication Theory - I
5) ECE-244 : Communication Theory - II
6) ECE-246 : Digital Communication
7) ECE-248 : Computer Networking - I
8) ECE-249 : Computer Networking - II
9) Information Theory-II (Special Topic Course, prerequisite ECE-241)

*Undergraduate Course :*
10) EE-12 : Circuit Theory (in former EECS Dept.)
11) ApSc-114/Math-112 : Engineering Mathematics
12) EECS-146 : Undergraduate Communications Lab

**Research :**
Engineering Research in the area  of digital communications;
US Patents in the area of digital modulation techniques;
Supervision of Doctoral theses in the area of Digital Communications, Networking, and
        multiple-access communication
Engineering consulting in local industry
Theoretical Research in the area of Information and Probability theories.

### III. Vendetta and Retaliations

## 29. Vendetta and Retaliations by Lehman administration

## A. Unethical Actions Of VP Dr. Lehman

## 1997

- After I brought the charges of harassment against Dr. Mona Zaghloul to President Trachtenberg through my letter of August 23, 1996, and again through letter of Nov.11, 1996, President Trachtenberg wrote me that he asked VP Dr. Lehman to look into the matters. But Dr. Lehman never communicated with me.

- In the Spring of 1997, I was assigned to teach three courses and continued to teach all courses and maintained each and every office hour till February 6, 1997. On February 6, 1997, I went to teach the course EE-204 in the Corcoran Hall (Rm. #205) around 6:00pm. Dr. Lehman, without giving any prior notice (written or telephonic), used University Police to remove me from my class room in front of my student(s).

- After the February 6 "Police Incident", President Trachtenberg sent me copies of three letters related to my status. These three letters were written by Dr. Donald R. Lehman and addressed to me but never reached me. First two of these letters were supposed to be sent by registered mail. My question was if the office of VP Lehman did not receive the return receipts of the registered letters, why they did not try to contact me by other means. I was in the school on a regular basis, without missing a single lecture or an office hour. This raised lot of questions!!

- A copy of the third letter dated February 5, 1997 was sent by courier. It is ironic that one of my colleagues in the EECS Dept. had a copy of this confidential (!!) letter and he read it over the phone in the morning of Feb.7 even before it reached me through the President's office on the same day.

- As per February 5 letter of Dr. Lehman, I was on administrative leave, pending further investigation which he expected to be completed within 30 days. But I didn't receive any communication from Dr. Lehman within that thirty day period.

## 2005

17

**Suspension and Police Actions in September 2005 :** Without any prior communication, written or telephonic, VP Lehman put me on unpaid suspension effective August 29, 2005. On August 29 and August 30, I went to school and did routine things : got the teaching assignments and enrollments in my courses from the department, prepared handout etc. On September 1st, I went to give the first lecture in the Gelman library; after 10/15 minutes into the lecture, police officers entered my classroom, interrupted my lecture and then escorted me out of Gelman library. The next morning I went to my office; after 15/20 minutes, police officers came into my office, served Bar Notice prohibiting me from the campus property, took away the key of my office and escorted me to the parking area and then escorted me out. All this time I didn't know what was going on; I was told by the police officers that I had been suspended by VP Lehman and they had the instruction to escort me out. **This Police incident is a repetition of what VP Lehman did in 1997**.

# B. 1999 Lehman-Loew conspiracy

After submitting the final grades of Fall 1998, Prof. Saha prepared the handouts of the three courses : Mon-EE203(10), Wed-EE242(10), Thurs-EE242(VA) that he was scheduled to teach for Spring 1999; then he went out of the country to visit his parents. He came back in the weekend before January 11, 1999, the first day of the class. He went to give the first lecture of EE-203(10) in Tompkins Hall on Monday evening and he was told to go to VA campus to teach EE-211, a course which he never taught before and was not in his special area. The following day Tuesday he was scheduled to teach another new course EE-248 which he never taught before. Prof. Loew changed the teaching schedule once again; by the end of first week, Prof. Saha was scheduled to teach three new courses that he hadn't taught before and only one course that he taught before. Also these changes were not communicated to Prof. Saha in timely fashion; as a result when Prof. Saha failed to show up in the class, Vice President Lehman used that excuse to suspend Prof. Saha on Jan 22, 1999.

After the suspension became effective, Prof. Lehman brought charges of plagiarism and scientific misconduct against Prof. Saha to have some leverage in quieting Prof. Saha. After intervention of

18

President Trachtenberg, investigation was launched and **Prof. Lehman was forced to drop the charge of plagiarism, and, as per Prof. Lehman, the case of Scientific Misconduct was closed.**

After the suspension on the charge of neglecting teaching responsibility, the EECS personnel committee investigated the matter and acquitted Prof. Saha of any wrong doing; the committee even asked GWU to pay salary for the months Prof. Saha was suspended. Prof. Lehman reinstated Prof. Saha but refused to pay.

Charges of plagiarism and scientific misconduct in 1999 affected Prof. Saha's research profoundly. Prof. Saha now keeps all his research related matters only confined to himself. The research on Information Theory he has been carrying out for some years is now not shared with any body but himself and he will continue to do so till he finishes the work up to his satisfaction. It should be noted Lehman testified in the Senate Hearing that he did not take any step to repair the professional reputation of Prof. Saha even after the case of Scientific misconduct was closed.

VP Lehman didn't stop there, he used the suspension and the charges of plagiarism and scientific misconduct to twist arms and blackmail Prof. Saha in 1999 to sign a contract with eleven conditions which contradict the usefulness of the faculty code. For a tenured faculty member such as Prof. Saha, any attempt of replacing faculty code by a contract designed by an administrator without any due process should be considered as a violation of the faculty code. **This violation alone by Vice President Lehman should call for his resignation from the administrative position.**

# C. Intimidation by Executive VP Donald R. Lehman of GWU

## A Statement by Professor Debabrata Saha of the George Washington University.

# 1999

In the Spring of 1999, Prof. Lehman suspended Prof. Saha without any pay on charges which were later found meritless by the EECS personnel committee; the committee even asked GWU to pay salary for the months he was suspended. Prof. Lehman refused to pay.

## Intimidation :

In the middle of the suspension period, Prof. Lehman brought charges of plagiarism and scientific misconduct against Prof. Saha to have some leverage in quieting Prof. Saha. After intervention of President Trachtenberg, investigation was launched and **Prof. Lehman was forced to drop the charge of plagiarism,** and, as per Prof. Lehman, the case of Scientific Misconduct was closed.

# 2005

Under false fabricated pretext during the Summer months when Prof. Saha was not even on pay roll, Prof. Lehman cooked up reason to suspend Prof. Saha in the beginning of Fall. After suspending and barring Prof. Saha from GWU campus property, Prof. Lehman got into negotiation mode and held meetings with Prof. Saha.

## Intimidation :

In one of this meetings, he pressured Prof. Saha to achieve an objective that he failed to achieve since 1997 when he took the office. With a determined but low voice he said to Prof. Saha :

*"You have to drop the charges about the exam ( The infamous Qualifying Exam Scandal of 1996)"*

The short script and the determination in Lehman's voice reminded Prof. Saha **Marlo Brando in God Father; but Brando's style, voice and delivery was much superior.**

20

# D. Itemized list of Retaliations by GWU

- In one morning during Christmas period of 1996, a blood-tainted copy of my own GW memorandum (the "Dear colleague letter" of May 15, 1996, Plaintiff Exhibit G) was found at the door step of my residence at 2947 Waterford Court, Vienna, VA where me and my wife used to live with two small children.

- We moved to a different neighborhood. During the period of 1998-2003, GWU sent people to our residence at 9409 Fairpine Lane, Great Falls, VA many times to post open letters and memorandum on our front door, garage door, and garbage container; they also made disturbing noise on our private property.

- In the office at the Academic Center, Prof. Saha was ex-communicated and treated with social isolation : no invitation to social gathering, no invitation to any seminar, no news about hiring and new addition to faculty, no news about passing away of colleagues (I got to know passing away of Dean Liebowitz, who hired me, two/three years after his death), **not a single knock on my door for social interaction over a period of ten years** (except three or four knocks by Prof. Lang during his chairmanship for official matters only), total exclusion from thesis committees, total exclusion from contributing questions for the qualifying exams, total exclusion from department and school committees (though in the Senate hearing they produced only one evidence of committee assignment in one particular year), (as per statement from a faculty member) spreading rumors and gossips behind my back.

- Vengeance to harm professional development : Administration allowed systematic acts of discriminations and ex-communication to ostracize Prof. Saha in his working place. After the whistle blowing, GW administration isolated Prof. Saha from advising doctoral students; most of the students were not taken care of; some of them went to other school to get Ph.D. and some of them discontinued. GW administration purposely implemented this to hurt Prof. Saha's resources to research and professional development.

- Vengeance to harm professional development : Immediately after the whistle blowing, without any faculty input or consultation, Lehman administration, in a very unorthodox manner, took away the directorship of a graduate course (Probability Theory and Stochastic Process ), and replaced me by a

part-time/adjunct faculty in teaching of another graduate course (Information Theory) though I was a tenured professor and the course director.

- Vengeance to harm faculty life : Before the 1996 Qualifying Exam scandal, I used to advise about 110 undergraduate students and about 55 graduate students. Immediately after the whistle blowing, GW administration took away advising responsibility of each and every student; they thus isolated me from the student community.

- **1999 Conspiracy : 1999 Lehman-Loew conspiracy** ( Item 29B)

- **2005 Conspiracy :** Denial of Due Process : Procedurally Illegitimate Hearing and Flawed Deliberation ( Item 29G)

- After the whistle blowing Prof. Saha has been suspended in 1997, 1999, 2003 and 2005. Four suspensions over eight years by VP Lehman shows a pattern of retaliation. Most importantly, suspensions were followed by reinstatement without due process or any apology; in some situations VP Lehman had to drop the charges in writing. Capricious disciplinary actions of Lehman administration succeeded in keeping Prof. Saha in constant fear and worry about the timing of next Lehman striking.

- Last time Prof. Saha took sabbatical leave was in 1993-94; he is entitled to more sabbatical leave. Yet he is afraid to apply for because of possible capricious retaliatory actions by Lehman in his absence.

- Instead of punishing the characters behind 1996 Qualifying Exam Scandal, GW administration awarded them with Chair position (**Loew, Vojcic, Zaghloul**)

- Lehman refused to give Prof. Saha any raise in salary for over a decade (1996-2007).

- GW spread rumors of possible violence and physical threat from Prof. Saha and secretly installed panic buttons in two locations to hype the rumors.

- GW secretly tried to establish doubts about Prof. Saha's mental fitness. Prof. Murray Loew tried that in Spring of 1996 and was thrown out of Prof. Saha's office. Once again Loew tried that in February 9, 2005 ECE meeting that was held secretly.

- Administration assigned more classes to VA campus to isolate Prof. Saha from main campus and creating harassment for Prof. Saha on a regular basis in VA campus. The ordeal of Virginia Campus

22

can be best described as **intellectual execution of oppression of minds, tenacity and will power of retaliated faculty member(s)** (see Item 29E).

- Harassment by abrupt changes in teaching schedule without giving any time to prepare.

- Eliminating Prof. Saha's course on Probability Theory and giving it to Prof. Pickholtz, taking away directorship of other courses. Removal from teaching a course on Information Theory (EE-241) and replacing Prof. Saha by a part-time/visiting faculty member, though Prof. Saha was the course director and had been teaching it for ten years.

- Refusal to give grade sheets for the courses he taught in the VA campus; Prof. Saha often had to create grade sheets of his own to avoid inconvenience of the students.

- Censoring mail and creating a secret mail box in VA campus to divert mail.

- Discriminating Prof. Saha through exclusion from all ECE departmental committees.

- Continued discrimination (since Fall 1993) through exclusion from the tenure personnel committee of ECE/EECS department.

- Conspiracy for retaliation : Lehman and Tong administration revealed that they have at their disposal many letters that were written for themselves only to create a record for action against Prof. Saha; the contents of the letters are false and were never shared with Prof. Saha. GWU failed to produce an important letter written by Lehman even after request from the hearing committee.

- Retaliation and unethical misconduct : VP Lehman refused to follow the faculty recommendation of paying Prof. Saha his salary during the suspension period of Jan.22-March31, 1999 though Lehman had to reinstate Prof. Saha after being unable to prove the validity of his allegation.

- Day-to-day harassment : (a) Lights in Prof. Saha's office were not fixed  for years after repeated request, (b) assigned classrooms of inadequate size with no usable board : in one semester Saha had to use seven classrooms (on empty basis) to complete the semester (c) Prof. Saha's office was opened and used by others without his permission or knowledge; in one occasion the room walls were littered with some reddish substance that had to be cleaned and disinfected by maintenance. (d) Prof. Saha's picture was removed from ECE display board.

- In 1999, after the reorganization of former EECS Department, Prof. Saha's office was moved to another room without his knowledge; Prof. Saha, during that move, lost some important documents.

23

# E. List of Improper Activities in the GW Virginia Campus:
## Execution of minds, tenacity and will power of retaliated faculty member(s) : Intellectual Style !!

As Directly and Personally Observed by Me : Debabrata Saha
Observation Period : Five Years (1999-2004)

■ Wining and dining in my scheduled classroom : had to give lecture in a different room; a student who was working for the Navy brought me back to the classroom to point out open wine bottles on many tables. From the appearance the dinner didn't seem to be cheap after all; looked like GWU always maintains class even when it does illegal things; serving alcohol in University activities in classroom is illegal (isn't it?). In another occasion I met a person in the elevator with open bottle of liquor; it could be any thing, but had a strong smell of liquor.

■ I remember another occasion when plenty of food such as baklava, cakes, cookies, drinks and plates were scattered on tables all around the room; we had to clean the room, arrange the tables and chairs before I could start the lecture.

■ Frequently classrooms were locked; I and the students had to search for administrative personnel to open the room; on many days we ended up spending 10/15 minutes of lecture time in doing such things the responsibility of which lies with the administration.

■ Without any list of students, I had no way of knowing whether I was dealing with a registered student, a terrorist or a spy.

■ The most obscene was the refusal to give the "Grade Sheets" for almost three years or so; I had to type out the name and social security number information (collected from the students) and use that print out to submit the final grades. The Registrar's office has documentation of all these grade

24

sheets. It is possible, though I am not claiming so, that other parties manipulated the grades and/or took credit for teaching that course; but it is just a speculation.

- In two consecutive semesters, on each and every scheduled lecture day, the tables, the chairs and everything else were intentionally kept in haphazard condition so that it took 10/15 minutes of manual labor to fix them. I had to arrive there early to take care of these things.

- On numerous occasions, when the students went out during the five minute break in the lecture, they couldn't come back because the doors were locked on all entrances.

- They fabricate the number of real committed enrollments in courses; in one semester the class ended with only one student.

- The administration, particularly the registrar, has been notified about some of these things. Nothing has been taken care of.

- The final exam of ECE-243(AL) was on May 4, Tuesday, 2004. On that day the classroom was locked; student Navneet Singh went to call logistic people; they said there was no room on the schedule for ECE-243(AL). However, after some waiting one person came and opened the door. This just represents the state of affairs there.

- It was very inconvenient and disturbing that in may occasions courses scheduled by Foggy Bottom administration to be taught in the Virginia campus was canceled by the Virginia campus administration without any prior notice to the faculty member and  in some situation the course continued even though it was canceled by the Foggy Bottom administration.

February 19, 2004

May 4, Tuesday, 2004

25

## F. Irresponsible and Unethical Misconduct of Dean Tong

Timothy W. Tong, Ph.D. assumed the office of SEAS Dean in Fall of 2000, five years before he joined Lehman in bringing Fall 2005 complaint against Prof. Saha. During his five years of service in GWU, he never cared to meet Prof. Saha or offer an invitation to the SEAS faculty meeting; the only communication and/or meeting Prof. Saha had with Dean Tong was after Prof. Saha was suspended out of the school in the September of 2005.

In spite of such detachment from Prof. Saha as a member of SEAS faculty, Dean Tong did not find it distasteful or against common sense of decency to go to Prof. Saha's office room in his absence and serve the notice of suspension on his table. Prof. Saha received the notice only after the police incident in his classroom on September 1st, 2005. More distasteful is his own admission in his joint meeting with Prof. Saha and Prof. Korman that after his arrival in GWU he met each of the remaining SEAS faculty on a one-on-one basis; he only didn't care to meet Prof. Saha. In that joint meeting he handed over a letter written by him addressed to Prof. Saha; in that letter of March 28, 2002 he warned Prof. Saha of possible initiation of tenure revocation.

Prof. Saha's testimony as well as his September 9, 2005 response clearly pointed out that content of Dean Tong's March 28, 2002 letter was false. Dean Tong demonstrated very irresponsible conduct in writing that letter. Also his admission of secret entry into Prof. Saha's office illustrates his sense of decency is quite strange! **It is not yet known whether he stole any thing from Prof. Saha's office.**

# G. Denial of Due Process : Procedurally Illegitimate Hearing and Flawed Deliberation

It is important that the Court take a note of the sequence of events to observe the way the tenure revocation attempt was tainted.

(1) ECE Chair Vojcic during his tenure till Fall 2004 declined to form any subcommittee to investigate Prof. Saha.

(2) GWU administration appointed Prof. Zaghloul as interim chair after Prof. Vojcic for only six months to assist VP Lehman and Dean Tong to obtain some sort of approval of ECE faculty to build a case against Prof. Saha. Prof. Kyriakopoulos testified that GWU Administration (VP Lehman / Dean Tong) told the faculty through the Chair of the Department that the faculty had "to do something about Professor Saha"

(3) The whole operation was conducted secretly without any knowledge of Prof. Saha. It should be noted that Prof. Loew offered a big hand by false representation of mental and physical ability of Prof. Saha very early in the game in February 9, 2005 meeting. This secret meeting was revealed only after strong cross-examination in the hearing.

(4) At the end of Spring 2005, the faculty resolution of May 2nd, 2005 personnel committee meeting under false pretenses and false representation reached the table of Dean Tong and then the table of VP Lehman.

(5) During the Summer of 2005, VP Lehman orchestrated an unfair mechanism to suspend Prof. Saha in the beginning of Fall 2005. Lehman's testimony and confession in the Senate Hearing proved that he was **disingenuous** in writing the August 29, 2005 suspension letter that was responsible for embarrassment, humiliation, and violation of civil rights of Prof. Saha on Sept. 1st evening and Sept. 2nd morning.

(6) After suspending Prof. Saha in the beginning of Fall 2005, Lehman wrote the letter of complaint dated Sept 16, 2005 to revoke Prof. Saha's tenure. A simple straight forward reading of the complaint shows the impetus of the letter was derived from the faculty report of May 2nd, 2005 meeting. Also, GW Counsel confessed in writing that Lehman sought faculty input for taking action against Prof. Saha.

(7) In March 6 hearing, GW administration (Lehman, Tong, Zaghloul) failed to establish that Prof. Saha received the notice of May 2nd meeting. On March 14, 2006 the Hearing Panel deliberated to strike the May 2nd, 2005 meeting and the vote of the faculty at that meeting from the record.

(8) VP Lehman testified on March 20 on the issue of May 2nd, 2005 meeting. His testimony is well summarized by Chair Schaffner in the following response to a question from Prof. Saha's counsel :

**Hearing Chair Schaffner** : "I think you have already asked what the significance of the May 2nd meeting was, and I think he (i.e. Lehman) already testified that it wasn't in his belief, so I think that has been asked and answered."

The only conclusion one can draw from the above sequence of events is *that VP Lehman and his counsel Mishkin flip-flopped after the panel deliberated and decided to strike the May 2nd, 2005 meeting and the vote of the faculty at that meeting from the record.*

(9) More irony is that Schaffner panel did not have any objection to such flip-flop though Chair Schaffner, on the Notice Issue, on March 6, went on to say : *"We understand that is perhaps more relevant to our considerations than sort of this just traditional notice ----if he (i.e. Plaintiff Saha) didn't have notice, he lacked due process, and therefore, we can't even really revoke tenure during this proceeding ------"*

*Thus VP Lehman and Mr. Mishkin flip-flopped. Also, the hearing was initiated via a fraudulent process, because without the May 2nd meeting VP Lehman wouldn't have faculty input in his June 15, 2005 meeting, and wouldn't write June 27 & July 26 letter to Prof. Saha and wouldn't finally write Sept. 16, 2005 complaint for tenure revocation.*

(10) In addition, GW falsified a document which, in the assessment of GWU, was very important for making a decision towards revoking tenure of Prof. Saha.

The falsified document as well as the original will be made available upon request of the court.

(11) Any claim of Lehman and Tong that they did not resort to faculty input lacks merit as explained previously; also, testimony of other administrator would contradict that claim. The explanation is more strengthened by the revelation from the testimony that the two allegations Lehman and Tong brought against Saha and deliberated on by Schaffner Panel are identical in words to the allegations of four Professors of ECE Department who remained detached from Saha over many years since 1996 scandal. It is also believed that each of these four members was a voting member of the infamous EECS faculty

meeting on May 8, 1996  and whose collective moral bankruptcy led to the infamous Qualifying Exam Scandal of GWU.

(12)  In absence of May 2nd meeting from the record, the substance of merit in the letter of complaint for tenure revocation reduces to almost nothing; after crossing out portions that are relevant to or derived from May 2nd meeting and/or objected to by the GW witness body themselves, the complaint essentially becomes almost a blank paper.

(13) The Defendant GWU initiated the process of revocation of Plaintiff's tenure through an internal procedure that is governed  by the GW Faculty Code. Though both parties agreed that **"The Root Cause"** behind the ten year old controversy was the 1996 Qualifying Exam incident, yet, during Senate hearing (Sept.2005-July 2006), the Defendant GWU as well as the faculty panel vigorously insisted on relying only on post April 1999 events for deliberation. The panel deliberation was based on time-barred events; the cut-off date was conveniently chosen as April 30, 1999. Thus all events, evidence and documents on the following issues were excluded:

*(i)  1996 Whistle Blowing on corruption and favoritism that compromised the integrity of higher learning,*

*(ii) 1997 inappropriate Police Action and Escorting Professor Saha out of his classroom, violating his civil rights,*

*(iii) Evidence of 1999 conspiracy by Defendant Lehman and Retaliation  against Plaintiff through a FALSE charge of Scientific Misconduct, which was later dropped,*

*(iv) Perjury on 1999 event that can be easily proven by existing audio tapes at the disposal of Plaintiff, and*

*(v) Other complaints and evidence of harassment, discrimination, and retaliations against Plaintiff.*

**Time Barring :**

It is acknowledged by both parties that four suspensions of Plaintiff Saha started with the Root Cause of 1996 Qualifying Exam Scandal; each time, however, VP Lehman had to reinstate Saha after failing to prove any fault with Saha. The complaint for tenure revocation relied on events that date

back to 1996. Yet the Senate Panel, very selectively, chose to exclude the crucial facts, evidence and documents *by time-barring allowable events.* It is to be noted that **GWU Faculty code doesn't allow such time barring**.

Therefore, it was improper to exclude pre-1999 events and evidence in deciding GWU's attempt of revoking Saha's tenure. Courts routinely allow background evidence as proof of unlawful intent and defendants' long term behavioral tendencies:

*McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) : "Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities;"

*Andrews v. City of Philadelphia*, 895 F.2d 1469, Third Circuit Court (1990) : "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."

In the present case, Plaintiff Saha's previous arrest in 1997, the evidence on 1996 Qualifying Exam Scandal and the associated reports, Personal committee's 1999 acquittal of Prof. Saha from any wrong doing, 1999 harassment through false charge of Scientific Misconduct, and evidence on Character Assassination of Plaintiff all are relevant and should be admissible in the court. The story the court should be relying upon is an uninterrupted continuous story, not a story of convenience of the Defendants.

Defendants' **corrupt academic practices and collective moral bankruptcy** over 1996 Qualifying Exam Scandal and **retaliations to cover up** are, perhaps, just few of those **"dark secrets"** that President Stephen Joel Trachtenberg referred to in a recent address to the **Board of Trustee of the George Washington University** [ May 19, 2006].

(14) GWU applied D.C. statute of limitation to prevent promotion of Prof. Kyriakopoulos in *external* D.C. court legal proceedings (*Kyriakopoulos v. George Washington University*, 866 F. 2d 438 (D.C. Cir. 1989), while, upon acknowledging that three-year statute of limitations does not apply to *internal* proceedings governed by GWU faculty code, applied the same notion *anyway* to time-bar the allowable events and evidence in Saha case.

**Legal Principle that guided GWU** : "apply statute of limitations where it is available for use in favor of GWU, and unlawfully implant statute of limitations where it is not available if it benefits GWU".

Legal principles are supposed to enlighten the moral principles of the society. Treating a patient for its secondary symptom only without addressing the **"root cause"** can neither be a moral principle nor an acceptable legal principle. **GWU vandalized the Moral fabrics of the Society**. A number of faculty members of GW Law School guided and strengthened the above mentioned "Legal Principle" that guided GWU. They are all well educated by virtue of their distinguished degrees from reputed universities. Unfortunately, those degrees did not help them distinguishing right from wrong. On the other hand, a well known gentleman lawyer, who helped building this nation, when first elected to the Congress wrote in the Congressional directory that his education was defective, perhaps because he had no formal university degree (unlike those Law Professors of GW Law School). He had lot of common sense though Voltaire, many centuries back, found common sense is not so common. The point here the Plaintiff is trying to make that hiring, retention, and firing process in GWU does not have any checks and balances with respect to moral behavior and tendencies of the administrators and faculty members. GWU President Stephen Joel Trachtenberg, in a one-to-one meeting in 1997, agreed to the Plaintiff on this point. The Plaintiff respectfully request the court to address the issue of  **"Legal Principle that guided GWU "** in the context of the present case.

*On a broader perspective, Plaintiff's stand in 1996 on the integrity of higher learning was indeed a challenge to the immoral persuasions of GWU. Academia is supposed to be nobler than every other institution. It is very sad that President Stephen Joel Trachtenberg, after staying at the helm for almost two decades, in his recent address to the Board of Trustee of GWU, had to acknowledge "Dark Secrets of GWU".*

**The Plaintiff argues that Defendants (GWU) initiated the faculty hearing through a fraudulent process, rigged the outcome of the panel deliberation against the Plaintiff and used that deliberation to retaliate against the Plaintiff.**

31

## IV. Complaints and Damages with specificity

### A. Specific Complaints

1. GW breached its employment contract with Prof. Saha by refusing to pay him salary from effective March 1st, 2007 without any prior notification or any letter of termination of employment (Re. Plaintiff Exhibit I : Letter to Steven Knapp)

2. GW breached its employment contract with Prof. Saha by locking him out of his office at Phillips Hall 618, 801 22nd Street N.W., Washington D.C. 20052 since March 15, 2007 without any prior notification.

3. GW breached its employment contract with Prof. Saha by suspending him in the Fall of 2005 through fraudulent and dishonest means used by its administrators and a group of faculty members (fact finding subcommittee of four members of ECE Personnel Committee chaired by Prof. Wasyl Wasylkiwskyj) each of whom directly took part (as voting member) in the 1996 GWU Qualifying Exam Scandal. It is GWU's concerted effort of retaliation against Prof. Saha because he blew whistle on the scandal.

4. GW breached its employment contract with Prof. Saha by deliberately denying him the due process; Prof. Wasyl Wasylkiwskyj did not hesitate to secretly seek input from previous Chairs of the Department while denying Saha to present his side of the story.

5. The vote at the Feb. 9, 2005 **secret** meeting of the ECE Personnel committee was tainted by Prof. Loew's defamatory remarks, suggesting he perceived Prof. Saha to be disabled because of physical and mental problems; Loew did so without disclosing that in Spring of 1996, to pressure Prof. Saha to drop the charges related to Qualifying Exam Scandal, Prof. Loew told Saha that he (Saha) should see a psychiatrist. In an environment where Prof. Saha has remained ostracized since whistle blowing in 1996, such discriminatory comments of Loew and similar comment of Prof. Vojcic tipped the balance in favor of appointing a subcommittee chaired by Prof. Wasyl Wasylkiwskyj. GW's seeking attempt to revoke Saha's tenure because of perceived disability violates the District of Columbia Human Rights Act and the Americans with Disability Act. GW thus breached the employment contract with Prof. Saha and is liable for Discrimination.

( Plaintiff requests the Court to consider the above in the light of the additional facts : (a) Prof. Zaghloul, Loew, and Vojcic all were involved with first degree vandalism in 1996 Qualifying Exam Scandal, (b) GWU administration appointed Prof. Zaghloul as interim chair after Prof. Vojcic for only six months to assist VP Lehman and Dean Tong to obtain some sort of approval of ECE faculty to build a case against Prof. Saha, (c) Prof. Kyriakopoulos testified that GWU Administration (VP Lehman / Dean Tong) told the faculty through Chair Zaghloul that the faculty had "to do something about Professor Saha" )

6. The Schaffner Panel violated its professional ethics by refusing to hear "Taped Dialogue from 1999" that would prove GW's (written) perjury which constitutes GW's breach of its employment contract with Prof. Saha;  Schaffner panel thus deliberately failed to follow GW faculty code.

7. The Schaffner Panel, by its own admission, did not consider any of the 30 exhibits produced by Prof. Saha and considered 190 out of 192 exhibits produced by GWU. The panel thus violated the trust that was bestowed upon them, and deliberately failed to follow the wisdom of the faculty code. Plaintiff respectfully request the court to consider this serious misconduct and all other irregularities, such as time-barring the allowable events (see 29G),  in conducting the hearing, and rule on whether overall proceedings and deliberation constitute "gross misconducts" liable for revocation of tenure of each member of the panel. The other members of the Panel were Prof. Mark Klock, Prof. Ravi Achrol, Prof. Guillermo Gutierrez, Prof. Brian Biles, and Prof. Robert Dunn.

8. GW breached its employment contract with Prof. Saha in allowing its Executive Vice President Don Lehman in pressuring me (i.e. armtwisting after suspending Prof. Saha) to drop the 1996 charges which according to (former) GW President Trachtenberg was **Whistle Blowing**. On the contrary, President Trachtenberg thought Don Lehman should have written me a "Thank You" letter for my role.

(After my refusal to drop the charges, Don Lehman went for his next Retaliatory Assault, theTenure Revocation Attempt in Fall 2005)

9. GW breached its employment contract with Prof. Saha by refusing to address the issues of 1996 GWU Qualifying Exam Scandal while harassing and retaliating against Prof. Saha over the period of almost a decade since his Whistle Blowing in 1996 (see 29D and 29E).

10. GW breached its employment contract with Prof. Saha by discriminating him in refusing to give him any raise in the salary over more than one decade since his Whistle Blowing in 1996. His salary in 2007

remained the same as he had in the beginning of 1996, except for a difference of few hundred dollar. He received a **77%** increase in salary in first nine years of employment (1986-1995) before Whistle Blowing, while received an increase of only **0.59%** in following eleven years (1996-2007) after whistle blowing . GW is thus liable for **Retaliatory Discrimination** against Prof. Saha.

11. GW breached its employment contract with Prof. Saha by threatening him unreasonably (in writing) several times before 2005 that his tenure would be revoked; each time they failed to write the complaint because of lack of legitimate causes. This retaliatory threats kept Prof. Saha in constant fear.

12. GW breached its employment contract with Prof. Saha by **ostracizing** him in almost all aspects of faculty life and professional relations that is so essential in carrying out the faculty responsibilities in a meaningful way (see itemized list 29D and 29E).

13. GW breached its employment contract with Prof. Saha in suspending him in Fall of 2005; VP lehman's confession during Senate Hearing proved beyond any doubt that Lehman was **disingenuous** in writing the August 29, 2005 suspension letter.

14. GW breached its employment contract with Prof. Saha in embarrassing and humiliating Prof. Saha by **misleading** him to go to the class on Sept. 1st, 2005, and then **PERP WALKING** him in front students, staff, and the University Community on Sept. 1st, 2005.

15. GW breached its employment contract with Prof. Saha by violating  civil rights of Prof. Saha on Sept. 1st, 2005 evening and Sept. 2nd, 2005 morning through False Arrest and Imprisonment, Invasion of Privacy and Public humiliation.

16. GW breached its employment contract with Prof. Saha by **DEMONSTRATING** its vengeance, its malice, and total disregard for civility of the society by not giving him instruction on Sept.1st, 2005 evening during his false arrest and PERP walk about his bar-status from the Campus; this could avoid humiliation, imprisonment and Perp Walk on Sept. 2nd morning. By not giving Prof. Saha any instruction on Sept. 1st evening, Lehman Administration  of GW, beyond any doubt, clearly established its acts of continued vengeance and malice to cover up its **Moral Bankruptcy (1996 Scandal)** in  a naked  and abominable way that is detrimental to our society and the moral bringing up of our students . **Prof. Saha suffered emotional trauma and (perhaps) irreparable damage in his reputation as a professional due to incidents on those two days.**

17. GW breached its employment contract with Prof. Saha by **allowing** a procedurally illegitimate Hearing which was rigged from the very beginning against Saha (see 29G).

18. GW breached its employment contract with Prof. Saha **during** the Senate Hearing by (a) time barring the allowable events and documents though GWU faculty code doe not allow time barring, (b) misrepresenting the facts about Saha through an **incomplete** record, and (c) refusing to produce many important documents in which Saha had the right to access to, and most significantly in refusing to produce **VP Lehman's October 30, 1997 letter** which he used in his complaint for tenure revocation.

19. GW breached its employment contract with Prof. Saha by falsifying a document to enhance its attempt of revocation of Prof. Saha's tenure.

20. GW breached its employment contract with Prof. Saha by refusing to comply with the AAUP Guidelines governing revocation of tenure; these guidelines reflect the customary practices in the university teaching community across the country.

21. GW breached its employment contract with Prof. Saha through defamation and creation of an impression of him as a violent person. GWU drew parallelism between the conduct of Prof. Saha and that of the **Mass Killer at the Concordia University and installed two panic buttons in the office area on sixth floor Academic Center.** Plaintiff Saha came to know about the existence of these panic buttons only in Fall 2005 after reading an e-mail of VP Lehman. *GWU never used these panic buttons in last one decade for any cause related to Prof. Saha.*

22. GW breached its employment contract with Prof. Saha by refusing to allow him in normal faculty participation which includes teaching though the Tenure Revocation attempt fell short of completion and no letter of termination issued.

23. GW breached its employment contract with Prof. Saha by intentionally causing inconvenience and hindrance against his teaching responsibilities (see 29D and 29E) on a regular basis.

24. GW breached its employment contract with Prof. Saha by retaliating against him through a false charge of Scientific Misconduct, and then neglecting the responsibility of repairing the damage in the professional reputation already caused inside and outside GWU community.

25. GW breached its employment contract with Prof. Saha by withdrawing all resources of doing research with the students.

35

26. GW breached its employment contract with Prof. Saha when VP Don Lehman refused to respond to a set of Interrogatories which was served by Prof. Saha during Senate Hearing, under the rules governing Senate Proceedings Prof. Saha was entitled to "all the relevant documents in the control of the other party". Answer to these Interrogatories were expected to throw some light on a few issues of fairness/discrimination policies of GWU.

27. GW breached its employment contract with Prof. Saha through its concerted effort in covering up the Civil Rights Violations on Sept.1st and Sept. 2nd, 2005 through a number signed false declarations/ affidavits.

28. GW breached its employment contract with Prof. Saha by denying Saha any relief whatsoever with respect to his Complaint of Harassment and Discrimination filed with

    (a) Vice President and General Counsel Dennis Blumer on May 30, 1996

    (b) President Trachtenber on November 11, 1996, and

    (c) Ramaker-Wooldridge investigation committee in Spring of 1997.

29. As direct and proximate consequences of Defendant's Retaliatory Actions in all of the above items (1) through (28), I suffered emotional injury, loss of enjoyment of normal life, damages to my reputation, embarrassment and humiliation. Defendants acted willfully, wantonly, maliciously, and in reckless disregard of my rights and reputation, and breached the employment contract with Prof. Saha in a naked way, thereby making themselves liable for compensatory and punitive damages.

30. Items (1) through (29) above convincingly establish that GW breached its employment contract with Prof. Saha by vandalizing the sense of decency, legal and moral rights that are not only imbedded in the faculty code but also guaranteed in any "civilized society" under its constitution; in the present case, the "civilized society" is the society we live in and the society which is protected by the United States Constitution.

## B. Specific Damages due to Retaliations

1. Intimidation in 1999 and 2005 caused enormous anxiety and mental stress.

2. Damage to Professional Life and Professional Development over one decade : due to ostracism in the Department and forced isolation from the student community (which took away resources from doing research with the students).

3. Damage to Professional Reputation : Lehman confessed he didn't do anything to repair the damage after withdrawing the charge of Scientific misconduct.

4. Financial ruin : While in 1997 Trachtenberg suggested that I stay home during the summer months without doing consulting, the administration stopped increment in salary. My salary in 2007 remained the same as I had in the beginning of 1996, except for a difference of few hundred dollar I received a **77%** increase in salary in first nine years of employment (1986-1995) before whistle blowing , while received an increase of only **0.59%** in following ELEVEN years (1996-2007) after whistle blowing. Following suggestion of Trachtenberg I did not pursue consulting over one decade.

In addition to that I had to go through four suspensions over eleven years because of reckless flood of retaliations by VP Don Lehman and his administration. The financial and mental stress caused irreparable damage to the development of my family and two children who grew from ages 5&7 to 16&18 during this turmoil.

5. Defamation :

**Professional :** Charge of Scientific Misconduct, Irresponsible comment and criticism about my research during Senate hearing (though it was not an issue in the complaint),

**Social :** drawing similarity with a mass killer (in writing), installing panic buttons, spreading rumor of violent personality verbally and in writing.

The effect of this defamation together with ostracism resulted in my withdrawal from social and professional life from the department.The net result has been loss of enjoyment of normal life of a teacher.

6. Harassment :

Capricious assignment of teaching schedule of courses, inadequate room assignment, disconnecting phone service, letting my office used by others in my absence, lack of lights in office room, creating trouble in the classrooms, locking the classroom on a semi-regular basis, wining and dining in the scheduled classroom, no student list or grade sheets for VA campus, diversion of mail to secret mail box in VA campus, taking away directorship of courses, replacing me (a tenured full time faculty) by a part-time/adjunct professor, littering unknown chemicals or dye on my office walls, writing obscene words on my office door, sliding trashy magazines underneath my door, and so on caused enormous mental stress. On the top of that remained Ostracism and forced isolation from the student (advisee) community.

These caused mental stress, emotional shut down and constant fear of retaliation. Out of fear of retaliation, I haven't taken any sabbatical leave (which I was entitled to for two times) since 1993-94 academic year. These harmed profoundly my personal life and overall well being as a normal human being.

7. Denial of due process : in 2005 tenure revocation initiation ( lack of notice for Feb 9 & May 2nd, 2005 meetings); rigging during 2005-2006 Senate Hearing. This caused immense mental stress, partial withdrawal from social life and financial ruin.

8. Denial of payment : during 1999 suspension (though EECS personnel committee cleared me of any wrong doing and asked the administration to pay) and since March 1st, 2007 till today though I am on paid suspension as per Lehman's Fall 2005 letter.

9. Other intent(s) of harm : (believed to be) by GW agents (Confidential : to be conferred with the judge only)

10. Intimidation, Harassment and Disturbance on our personal property, residences at 2947 Waterford Court, Vienna, VA-22181 and 9409 Fairpine Lane, Great Falls, VA-22066 caused mental stress for the whole family.

## A Summary :

The decade long retaliatory ordeal through four suspension and tenure revocation attempt affected me profoundly : (a) almost stopping my professional development which includes unfinished

research and book writing on Information Theory (b) financial ruin (c) mental stress and worry causing reduced social life and withdrawal from professional life, and most significantly (d) not being able to give as much attention as I wanted to give to the bringing up of my two children because of financial and mental stress.

As direct and proximate consequences of Defendant's retaliatory actions, I suffered emotional injury, loss of enjoyment of normal life, constant fear of retaliation, and damages to my reputation. My civil rights were violated and I suffered embarrassment and humiliation. The Defendants harmed me financially through retaliatory suspensions and discriminations with an intent to strangulate me financially; the financial hardship and mental stress caused by the Defendants caused irreparable damage to my personal life and damage to the well being of my family. The Defendants also harmed me in my professional development and professional earning through harassments, discriminatory withdrawal of resources and defamation. Defendants acted willfully, wantonly, maliciously, and in reckless disregard of my rights and reputation, thereby making themselves liable for both compensatory and punitive damages.

**WHEREFORE**, plaintiff demands judgment against the defendants, jointly and severally, for the amount of $25,000,000 in compensatory damages and for the amount of $25,000,000 in punitive damages, plus interests, reasonable attorney's fees, and cost.

**WHEREFORE**, plaintiff request the court to issue **INJUNCTION** for granting **IMMEDIATE permanent relief to the Plaintiff** by ordering Defendant GWU to reinstate salary of the Plaintiff effective March 1st, 2007 till the resolution of the court on this matter.

Plaintiff further requests that the Court grants such other and further relief as the Court deems appropriate, proper and just.

Respectfully submitted,

Debabrata Saha
9409 Fairpine Lane
Great Falls, VA 22066
January 16, 2008

# List of Enclosed Exhibits

Plaintiff Exhibit     A: 1986 Appointment Letter
                                   B : Faculty Code
                                   C : Faculty Hand Book and Faculty Organization Plan
                                   D : AAUP Policy Documents and Reports, Tenth Edition
                                   E : US Constitution
                                   F : 1992 Tenure Award Notification
                                   G : Saha's 1996 "Dear Colleague letter" on Qualifying Exam Scandal
                                   H : Faculty Status and Teaching Assignment in Fall 2007, Spring 2008
                                   I : Letter to new GWU President Steven Knapp
                                   J : November 18, 2005 letter of VP LEhman



**THE
GEORGE
WASHINGTON
UNIVERSITY**

*Washington, D.C. 20052 / Vice President for Academic Affairs*

**Plaintiff Exhibit A**
1 page

June 11, 1986

Mr. Debabrata Saha
1629 Cram Circle, Apt. 4
Ann Arbor, Michigan  48105

Dear Mr. Saha:

It is a pleasure to approve the recommendation of the Depart-
ment of Electrical Engineering and Computer Science and the
Dean of the School of Engineering and Applied Science that
you be offered an appointment to the faculty of the George
Washington University as Assistant Professor of Engineering
and Applied Science with a salary of $42,000 for the academic
year 1986-87.  This is a non-tenure-accruing appointment, for
the first year of a contractual period of two years, and is
contingent upon your maintaining the appropriate visa status
throughout the appointment period.

It is understood that your rank and salary are contingent
upon your completing all requirements for the doctorate by
September 1, 1986.

The Department of Electrical Engineering and Computer Science
and the Dean of the School of Engineering and Applied Science
have recommended you for a tenure-accruing position.  Should
you obtain permanent resident status during this period, your
appointment will be converted to tenure-accruing and a tenure
decision date established.

Copies of the Faculty Code and the Faculty Handbook are en-
closed.  These two documents are included as statements of
the condition of employment to which you agree by signing and
returning to us the enclosed copy of this letter.

Sincerely yours,

Roderick S. French
Vice President for Academic Affairs

08 0087

Enclosures:
  Faculty Code
  Faculty Handbook
  Faculty Organization Plan

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Plaintiff Exhibit B**
18 pages

The George Washington University

# Faculty Code

## 1996





The George Washington University
WASHINGTON DC

08 0087

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The Board of Trustees of The George Washington University has authorized the publication of this recodification (first printing, 1937; second printing, 1945; third printing, 1958; fourth printing, 1964; fifth printing, 1976; sixth printing, 1980; seventh printing, 1986; eighth printing, 1996) of the Faculty Code governing the academic personnel, together with Procedures for the Implementation thereof.

This recodification was adopted by the Board of Trustees at its meeting on October 25, 1996, as recommended in part by the Committee on Professional Ethics and Academic Freedom of the Faculty Senate, the Faculty Senate, and the President of the University. The University is indebted to several committees of the Faculty and of the Board of Trustees and to the administrative officers for their work in compiling and revising these rulings, which constitute the statement of the rights and privileges, and the responsibilities, of the academic personnel of the University.

October, 1996

Jean Antoine Houdon (1741-1828)
*George Washington*
Cast bronze by The Gorham Foundry
6' 8" h.
The George Washington University
Permanent Collection

## Contents

Faculty Code . . . . . . . . . . . . . . . . . . . . . . . . . 2

   I. Grades of Academic Personnel . . . . . . . . . 2

   II. Academic Freedom . . . . . . . . . . . . . . . . . 3

   III. Professional Responsibilities . . . . . . . . . . . 3

   IV. Appointment, Reappointment,
      Tenure, and Promotion . . . . . . . . . . . . . 5

   V. Termination of Service . . . . . . . . . . . . . . 10

   VI. Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   VII. Retirement . . . . . . . . . . . . . . . . . . . . . . . 14

   VIII. Retirement Annuity . . . . . . . . . . . . . . . 15

   IX. Faculty Role in University
      Decision Making . . . . . . . . . . . . . . . . . . 15

   X. Rights, Privileges, and Resolution
      of Disputes Under This Code . . . . . . . . . 16

   XI. Health Service . . . . . . . . . . . . . . . . . . . . 17

   XII. Construction . . . . . . . . . . . . . . . . . . . . 18

   XIII. Effective Date. . . . . . . . . . . . . . . . . . . . 18

Procedures for the Implementation
of the Faculty Code . . . . . . . . . . . . . . . . . . . . 19

## Faculty Code
Governing the Academic
Personnel of the University

The Board of Trustees of The George Washington University, by virtue of the authority vested in it by the University Charter, hereby establishes the following Faculty Code. The Faculty Code applies to all University faculty in all schools, divisions, departments, and comparable educational divisions. Constitutions, by-laws, and established procedures of governance devised by subdivisions of the University are subordinate to the letter and spirit of the Faculty Code.

## I. GRADES OF ACADEMIC PERSONNEL
The grades of academic personnel are:

### A. Retired Status
University professor emeritus, professor emeritus, professor emeritus in residence, associate professor emeritus, associate professor emeritus in residence, and retired (in any given rank for age or disability).

### B. Active Status
**1. Regular:** University professor, professor, associate professor, assistant professor, and instructor. Each of the regular, active-status ranks may be tenure-accruing or non-tenure-accruing as specified in the original letter of appointment. However, the proportion of regular, active-status faculty serving in non-tenure-accruing appointments shall not exceed 25 percent in any school, nor shall any department have fewer than 50 percent of its regular, active-status faculty appointments either tenured or tenure-accruing. The foregoing shall not apply to the Medical Center faculty who are stationed at affiliated institutions, nor to the faculty of the Law School.

**2. Limited Service:** Adjunct professor, adjunct associate professor, adjunct assistant professor, adjunct instructor, clinical professor, professorial lecturer, associate clinical professor, associate professorial lecturer, assistant clinical professor, assistant professorial lecturer, clinical instructor, lecturer, studio instructor, special lecturer, fellow, teaching fellow, and graduate teaching assistant.

**3. Visiting:** Visiting professor, visiting associate professor, visiting assistant professor, and visiting instructor.

**4. Research Staff:** Members of the research staff may be appointed, upon recommendation of the appropriate faculty and officers of the administration, as research professor, associate research professor, assistant research professor, and research instructor. Such appointments do not provide tenure.

## II. ACADEMIC FREEDOM
A. A faculty member shall enjoy freedom of investigation subject only to legal restrictions and such guidelines as shall be recommended by the Faculty Senate and adopted by the University.

B. A faculty member shall enjoy freedom of expression. In the classroom, a faculty member's exposition shall be guided by requirements of effective teaching, adherence to scholarly standards, and encouragement of freedom of inquiry among students. In speaking and writing outside the University, a faculty member shall not attribute his or her personal views to the University.

## III. PROFESSIONAL RESPONSIBILITIES
A. Members of the faculty shall perform well their academic duties, strive for professional development, and apply their talents to the service of their professions and their community.

B. Members of the faculty are responsible for maintaining standards of professional ethics and for the fulfillment of faculty responsibilities.

C. Members of the faculty shall not permit their research to interfere with their teaching duties. In the classroom, they shall be responsible for the character of the instruction, the maintenance of good order,

2

3

and the observance of University regulations. Faculty members shall make adequate preparation for their classes and conduct them in a dignified, courteous manner. They shall meet classes on time, hold classes for the full period, evaluate academic performance fairly and reasonably and report evaluations promptly, and report promptly to the appropriate dean matters requiring disciplinary action and matters relating to the physical condition of classrooms and laboratories. If a student alleges an instance of arbitrary or capricious academic evaluation, the allegation shall be heard and reviewed through orderly faculty peer review procedures established by the dean and faculty of the school in which the contested academic evaluation takes place; should such peer review processes find in favor of and uphold the complaint of the student, yet the faculty member persists in refusing to alter the academic evaluation at issue, the Dean's Council and dean shall afford the student an appropriate remedy after consultation with the peer review body.

D. Members of the faculty shall perform their other academic duties conscientiously; they shall attend faculty meetings, commencement exercises, convocations, and other academic events; serve on faculty or University committees; assist in the administrative work of their departments and in the general administrative work of the University; and serve as general or departmental advisers to students.

E. Members of the active-status faculty shall strive to grow in professional competence by means of effective teaching and sound scholarship. They shall strive for the advancement of knowledge in their fields by individual research and by participation in the activities of professional societies.

F. Regular, active-status members of the faculty shall have the primary responsibility of devoting their time, thought, and energy to the service of the University. No such member of the faculty shall accept an outside teaching appointment during the academic year or engage in any other regular activity of a remunerative nature without the approval of the Uni-

4

versity. Even when officially approved, such employment shall not be permitted to interfere with a faculty member's responsibility to the University.

## IV. APPOINTMENT, REAPPOINTMENT, TENURE, AND PROMOTION

### A. Appointment

#### 1. Statements of Terms and Conditions

a) New faculty appointments shall be made by a letter signed by the appropriate corporate officer of the University. The appointee may accept the appointment by signing a copy of the letter of appointment and returning it to the University. A copy of this Code and the Procedures for the Implementation of the Faculty Code shall accompany or precede the letter of appointment and shall be considered part of the agreement between the faculty member and the University.

b) Tenured members of the faculty and faculty members (except those appointed in the Medical Center) whose appointments do not expire or whose appointments will be renewed shall be notified in writing annually, on or about May 15, of changes in rank or of other terms and conditions of service for the next academic year and further shall be notified annually in writing of changes in salary, no later than November 1.

#### 2. Limited Service Appointments

All appointments to limited service active status (as defined in Article I, Section B, Paragraph 2) shall be for a specified period of a year or less. Such appointments may be renewed an unlimited number of times.

#### 3.1 Regular Tenure-Accruing Appointments

a) All appointments or reappointments to regular, active-status positions shall be for a specified term except for those that confer tenure.

5

b) The total of such terms, including all full-time ser-vice at the rank of instructor or higher in this or other recognized institutions of higher learning, shall not exceed seven years. The following provisions apply:

1) A faculty member with more than three years' previous full-time service at another institution may be appointed at any rank below that of professor without tenure for four years as a term or condition of his or her initial appointment, even though his or her total period of service in the academic profession is thereby extended beyond seven years.

2) Leaves of absence to engage in authorized teaching or research activities at another institution shall be included in this seven-year period.

3) Leaves for study toward a degree, leaves for military or for personal reasons, and defense leave shall not be included in this period. A partial leave for family or medically related purposes of sufficient duration may justify an appropriate partial extension of the probationary period.

c) A faculty member of the rank of assistant professor or higher who will not be granted tenure at the end of the final year of his or her maximum term of appointment shall be so notified in writing no later than June 30 preceding the year in which his or her appointment will expire in accordance with Article V, Section B, hereof. Any such faculty member who is not so notified shall acquire tenure at the end of the term.

## 3.2 Regular Non-Tenure-Accruing Appointments

a) Letters of appointment to positions that will not normally lead to the consideration of the appointee for tenure shall include a statement to that effect.

b) Members of the faculty who are stationed at affiliated institutions and assigned to educational programs of the Medical Center and who have been appointed to regular, active-status positions without tenure prior to the effective date of this Code may continue to be appointed without tenure.

## 4.1 Stated Periods by Rank for Regular Tenure-Accruing Appointments

a) Instructors
   Instructors shall be appointed for an initial period of one year and may be reappointed for not more than three additional one-year periods. No reappointments shall, except by special action of the Board of Trustees upon recommendation by the appropriate faculty body and the appropriate officers of administration, extend any individual's total period as an instructor beyond four years. Tenure shall not be conferred at this grade.

b) Assistant Professors
   Assistant Professors may be appointed for a period of not more than three years and may be reappointed, with or without tenure, for one or more additional periods.

c) Associate Professors
   Associate Professors may be appointed, with tenure or for a period of not more than four years without tenure, and may be reappointed, with or without tenure, for one or more additional periods.

d) Professors
   Professors may be appointed with tenure, or for a period of not more than three years without tenure.

e) University Professors
   University Professors shall be appointed with tenure. The process of making such appointments shall be as follows:

   1) The candidate shall be recommended by one or more departments or schools; and

   2) The candidate shall be recommended by the Executive Committee of the Faculty Senate and/or by a faculty committee appointed by the President; and

   3) The candidate shall be recommended by the Vice President for Academic Affairs and by the President, the appointment to be approved by the Board of Trustees.

## 4.2 Stated Periods by Rank for Regular Non-Tenure-Accruing Appointments

Faculty members with regular, non-tenure-accruing appointments at any rank may be reappointed to the same rank or to a higher one as many times as the needs of the University may require.

## 5. Criteria and Procedures for Appointments

Each school or comparable educational division shall establish and publish criteria on which regular faculty appointments will be based. Additional criteria that may exist in the departments shall also be published. Each department or nondepartmentalized school shall establish and publish the procedures to be followed for recruitment, assembling all relevant information, and making recommendations for appointments to the regular faculty.

## B. Promotion

1. Promotion shall be dependent upon professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service.

2. As general practice, a promotion shall be accompanied by an appropriate increase in salary.

3. Each school or comparable educational division shall establish and publish criteria on which promotion will be based. Additional criteria that may exist in departments shall also be published. Each department or nondepartmentalized school shall establish and publish the procedures followed for making decisions concerning promotions.

4. Each department or school shall establish procedures for periodically informing faculty members whether they are making satisfactory progress toward promotion.

## C. Tenure

1. Tenure shall be dependent upon professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service. Upon a specific showing that the academic needs of the University have changed with respect to a particular position, that factor may also be considered in determining whether tenure shall be granted.

2. Each school or comparable educational division shall establish and publish criteria on which the granting of tenure will be based to implement the factors itemized in Paragraph 1. Such criteria shall be stated separately from the criteria for promotion. Any additional criteria for tenure that may exist in departments shall also be published. Each department or nondepartmentalized school shall establish and publish the procedures followed for making decisions concerning tenure.

3. To aid faculty members in assessing their potential for achieving tenure, each department, division, or comparable program shall establish procedures for informing individual faculty members, upon request, concerning probable status with regard to tenure. Such information will not constitute a commitment to recommend tenure.

## D. School-Wide Personnel Committees

To implement the procedures required in Sections B.3 and C.2 above, each school shall establish a school-wide personnel committee, either as an elected standing committee or of the school faculty acting as a committee of the whole, to consider recommendations for appointments with tenure, for promotion, or for tenure of regular full-time faculty. Such committees may request additional information, documentation, or clarification respecting such recommendations. Further:

1. An elected standing committee, sitting in review of recommendations originating from a department or equivalent unit, shall advise the dean of that school

whether the candidate has met the relevant school and department criteria and whether it has identified any "compelling reasons" that may exist for not following the departmental or unit recommendation. Such advisories shall not be construed as "faculty recommendations" as defined by Section B.3. of the Procedures for Implementation of the Faculty Code.

2. When the faculty of a school, sitting as a committee of the whole, serves as the school's personnel committee and initiates recommendations to the dean for appointments and actions affecting renewal of appointments, promotion, tenure designation, and termination of service, such recommendations shall be construed as "faculty recommendations" in the sense of the Procedures, Section B.3.

### E. Nondiscrimination

Appointments, renewals, terminations, promotions, tenure, compensation, and all other terms and conditions of employment shall be made solely on the basis of merit and without regard to race, color, religion, sex, national origin, or other considerations prohibited by law.

## V. TERMINATION OF SERVICE

### A. Expiration of Definite Period Appointments

All appointments for a definite period of service expire automatically with the completion of such period of service, subject, as appropriate, to the safeguards specified in this Article and in Article IV.

### B. Termination of Non-Tenured Appointments

#### 1. Notice of Nonrenewal of Appointment

Written notice that an appointment is not to be renewed shall be given to a regular, active-status faculty member in advance of the expiration of his or

her appointment, according to the following minimum periods of notice:

a) Not later than March 1 of the first academic year of faculty service in the University in the case of a one-year appointment;

b) Not later than December 1 of the second academic year of such service in the case of a two-year appointment or the renewal of a one-year appointment;

c) Not later than June 30 preceding the final academic year after two or more academic years of service in the University.

#### 2. Notice by Member of Termination or Declination of Renewal

A member of the faculty who desires to terminate an existing appointment or to decline a renewal shall give notice in writing no later than April 1 if the faculty member's rank is instructor or assistant professor, and no later than March 1 if the rank is higher, or within thirty days after receiving notice of the terms and conditions of service for the next academic year, whichever date is later; but the faculty member may properly request a waiver of this requirement in case of hardship or in a situation that might entail the denial of substantial professional advancement.

#### 3. Dismissal and Late Notice

Dismissal of a faculty member during a non-tenured appointment, or the nonrenewal of an appointment with less than the required advance notice, shall be preceded by a statement of reasons, and shall be subject to the provisions of Article X of this Code.

### C. Termination of Tenure

Grounds for termination: Until retirement of a faculty member in accordance with other provisions of this Code, and subject to the provisions of Article X, an appointment with tenure shall be terminable by the University only for adequate cause, termination of program, or on account of extraordinary financial

exigency, in the latter two cases after not less than twelve months' notice to the faculty member.

## 1. Adequate Cause

Adequate cause shall mean unfitness to perform academic duties because of:

a) incompetence;

b) lack of scholarly integrity;

c) persistent neglect of professional responsibilities under this Code; or

d) gross personal misconduct that destroys academic usefulness.

## 2. Termination of Program

The University may be required to terminate the appointments of tenured faculty members as a result of the termination of an entire instructional program because of a substantial decline in enrollment in the program or because of the expiration of grants, contracts, or other sources of funding on which the program's financial viability depends.

## 3. Extraordinary Financial Exigency

The University may be required to terminate the appointments of tenured faculty members because of extraordinary financial exigency. This drastic measure shall be considered only as a last resort, after every effort has been made by the University administration and the Board of Trustees to meet the need in other ways.

## 4. Obligations of the University

a) Tenured faculty members shall not be dismissed because of termination of their program or extraordinary financial exigency until every effort has been made to place them in suitable positions elsewhere in the University.

b) If an appointment with tenure is terminated because of termination of a program or an extraordinary financial exigency, and, within two years, the program is reinstituted or funds become available to restore the position, the released faculty

member's place shall not be filled until he or she has been offered and declined reappointment.

c) Faculty members whose tenured appointments are terminated because of the termination of their program or because of an extraordinary financial exigency shall be provided severance payment of one year's salary beyond the date of termination of employment.

## VI. LEAVE

A. At any time, for study or for any other valid reason, a leave of absence without salary, or a partial leave for family or medically related purposes with reduced salary, may be granted to a member of the faculty by the appropriate corporate officer.

B. When circumstances permit, the Board of Trustees shall grant sabbatical leave to a member of the faculty who has served six or more continuous years in a college or university in regular active-status, three years of which must have been served in this University, or who has served six or more years in regular active-status after a preceding grant of sabbatical leave. The request for sabbatical leave must be accompanied by an outline of the education, research, and/or self-improvement program the applicant proposes to follow if the leave is granted. Such leave must be recommended by the department or other appropriate unit, concurred in by the appropriate administrative official of the corresponding school and the Vice President for Academic Affairs, approved by the President of the University, and granted by the Board of Trustees of the University. By accepting a grant of sabbatical leave, faculty members obligate themselves to continue in the service of the University for at least one year following their leave unless the University agrees to some other arrangement. When faculty members are eligible for sabbatical leave, but for reasons of school or departmental convenience or necessity have their leave deferred, their next eligibility for sabbatical leave shall be computed from the time they became eligible for such leave, not from the date the

leave was actually granted. The University shall pay members of the faculty while on sabbatical leave 60% of their salary for two semesters or all of their salary for one semester. (The salary is paid as a compensation for the benefits received by the University from the efforts of the faculty member on leave.)

C. In the event of a national emergency, regular, active-status faculty members will be granted defense leave in accordance with the following provisions:

1. Members of the faculty given defense leave for the duration of an emergency will have the privilege of returning to the service of the University at the beginning of the semester following their release from service.

2. Members of the faculty on defense leave in a civilian status may be requested to return to the University and their defense leave terminated on sixty days' notice.

3. The return to University service of members of the faculty from defense leave is conditioned upon their mental, moral, and physical competence to resume their positions in the University.

## VII. RETIREMENT

A. Subject to the needs of the University, a full-time member of the faculty who is fully retired may be invited by the appropriate officers of the University to continue on a part-time basis and appointed for a renewable period not to exceed one academic year. Such appointee shall be designated "emeritus (or retired) in residence."

B. A member of the faculty with long and distinguished service to the University may, upon retirement, be awarded emeritus status. Emeritus status is recommended by the regular, active-status members of the faculty concerned and, with the concurrence of the administration, is awarded by the Board of Trustees. Those eligible for consideration for emeritus status are University professors, professors, adjunct professors, clinical professors, research professors, associate professors, and associate clinical professors. Faculty members in emeritus status shall

14

be entitled to use facilities as arranged with the administration of the University and to participate in faculty meetings without the right to vote. They may serve on committees and may perform such other services as are in keeping with their desires and with the needs of the University.

C. A retired faculty member may use facilities as arranged with the administration of the University and participate in faculty meetings without the right to vote.

D. Subject to programmatic needs, full-time tenured members of the faculty with ten years of continuous full-time service who are above 60 years of age may elect to continue for a mutually agreed period on a half-time or two-thirds time regular, active-status basis. Benefits and conditions of this reduced service will be as specified in the Faculty Handbook at the time the election is made to retire partially.

## VIII. RETIREMENT ANNUITY

The retirement plan for faculty and staff is a defined contribution plan with investment options provided under agreements with TIAA and other carriers. Full-time and regular part-time members of the faculty (as defined in the Faculty Handbook) and those continuing in reduced service under the provisions of Article VII, Section D, are eligible to participate.

## IX. FACULTY ROLE IN UNIVERSITY DECISION MAKING

A. The regular, active-status faculty shares with the officers of administration the responsibility for effective operation of the departments and schools and the University as a whole. In the exercise of this responsibility, the regular, active-status faculty plays a role in decisions on the appointment and promotion of members of the faculty and the appointment of the President, deans, departmental chairs, and other administrative officials with authority over academic matters. The regular, active-status faculty

15

also participates in the formulation of policy and planning decisions affecting the quality of education and life at the University. This participation includes an active role in the development, revision, or elimination of curricular offerings of each department or school. The regular, active-status members of the faculty of a school are also entitled to an opportunity to make recommendations on proposals concerning the creation, consolidation, or elimination of departments, institutes, or other academic or research units making up a part of that school. The Faculty Senate or an appropriate committee thereof is entitled to an opportunity to make recommendations on proposals concerning the creation, consolidation, or elimination of schools or other major components of the University.

B. The faculty cannot perform an effective and responsible role in University decision making without the cooperation of the administrative officers of the University. This cooperation includes the provision of such information as is necessary to the development of sound, well-informed recommendations. Faculty bodies charged with responsibilities for particular policy and planning areas are entitled, to the extent feasible, to be informed sufficiently in advance of important decisions within their areas of competence to be able to provide their advice or recommendations to the appropriate University officials.

## X. RIGHTS, PRIVILEGES, AND RESOLUTION OF DISPUTES UNDER THIS CODE

### A. Rights and Privileges Under This Code

The rights, privileges, and responsibilities of a faculty member, as conferred by this Code, shall be carefully safeguarded in accordance with the highest accepted principles, practices, and procedures of the academic community. An alleged infringement of such rights or privileges or an alleged violation of such responsibilities shall first be considered by the faculty member or members concerned, or by appropriate

16

representatives of the faculty, in cooperation with the responsible administrative officers. If such consideration does not lead to an adjustment satisfactory to the parties involved, the procedures for the implementation of this Article shall be fully utilized.

### B. Grievances

To maintain a grievance, the complaining party must allege that he or she has suffered a substantial injury resulting from a violation of professional rights or privileges concerning academic freedom, research or other scholarly activities, tenure, promotion, reappointment, dismissal, or sabbatical or other leave, arising from:

1. Acts of discrimination prohibited by federal or local law;

2. Failure to follow the Faculty Code, or Faculty Handbook, or other rules, regulations, and procedures established by the University;

3. Arbitrary and capricious University actions; or arbitrary and capricious applications of federal or local statutes and regulations; or

4. Retaliation for exercise of Code-protected rights.

## XI. HEALTH SERVICE

A. The University, recognizing the importance of the health of the teacher to professional competence, shall contribute to the cost of the current and any future basic health care program for all members of the faculty.

B. The facilities of the Emergency Room are available to members of the faculty in emergencies resulting from accidents or sudden, serious illness while on campus.

17

## XII. CONSTRUCTION

As used in this Code and the Procedures for Implementation, words that may imply the masculine gender shall be construed to refer to both the masculine and the feminine genders.

## XIII. EFFECTIVE DATE

Having been approved by the Board of Trustees of the University on October 25, 1996, this Code shall, as of that date, supersede all former codes and ordinances. The Board of Trustees of the University directs that this revised Faculty Code be published.

# Procedures for the Implementation of the Faculty Code

## A. Governance of Departments and Schools*

The regular, active-status faculty and tenured limited-service faculty of each department, school, or comparable educational division shall establish written procedures for the governance of that unit.

## B. Faculty Participation in Action Concerning Faculty Membership

1. The regular, active-status faculty of each school or comparable educational division shall establish procedures enabling an elected standing committee or committee of the whole to submit its recommendations on the allocation of regular-service, tenure-accruing appointments within that unit.

2. The regular, active-status faculty of the rank of assistant professor or higher of a department or of a nondepartmentalized school or comparable educational division shall, subject to such limitations or guidelines as may be established by the faculties of the respective schools, establish procedures enabling an elected standing committee or a committee of the whole to submit its recommendations for appointments. Recommendations for actions other than appointments concerning instructors, assistant professors, or associate professors shall be determined by the tenured members of the faculty of higher rank or of equal and higher rank, as the faculty may have determined by previously established procedures. Recommendations for actions other than appointments concerning professors shall be determined by tenured members of the rank of professor.

3. Appointments and actions affecting renewal of appointments, promotion, tenure designation, and

*In the governance of the Medical Center, all faculty eligible for membership in the Medical Center Faculty Assembly shall be eligible to participate whenever the term "regular" faculty appears in this document.

18

19

termination of service shall normally follow faculty recommendations. Departures from this standard shall be limited to those cases involving compelling reasons. The appropriate administrative officer shall notify the Executive Committee of the Faculty Senate of any departures from faculty recommendations and the compelling reasons therefor. The faculty or the appropriate unit thereof shall also be notified unless the Board of Trustees determines that such notification would be contrary to the best interest of the individual or individuals concerned.

4. Faculty recommendations concurred in by the appropriate administrative officers shall be transmitted by them to the President, who shall transmit them to the Board of Trustees. Variant or nonconcurring recommendations from an administrative officer, together with supporting reasons, shall be sent by that officer to the Executive Committee of the Faculty Senate through the appropriate superior administrative officers. The Executive Committee may seek information and advice and make recommendations to the faculty or the appropriate unit thereof and to the appropriate administrative officers. If concurrence cannot be obtained after opportunity for reconsideration in the light of the recommendations of the Executive Committee, the recommendations of the appropriate administrative officers, accompanied by the recommendation of the faculty and the report of the Executive Committee, shall be transmitted to the Board of Trustees through the President, except that, at its discretion, the originating faculty unit may instead elect to leave the decision to the President.

## C. Faculty Consultation and Recommendation in the Selection and Continuance of Academic Administrative Officers

### 1. Department Chairs

The regular, active-status faculty members of a department of the rank of assistant professor and higher shall, subject to such limitations or guidelines as may be established by the faculties of the respective schools, formulate procedures for making recommendations for filling vacancies in the post of department chair. The procedures shall provide for an elected committee of the regular, active-status members of the department, or an appropriate interdepartmental committee, to recommend a candidate for the position. Normally, the appointment shall be made in accordance with the recommendation. Should the appointing official not concur with the committee's recommendation, that official shall so inform the department concerned and shall indicate the reasons therefor. The committee shall, after consultation with the appointing official, make alternative recommendations until a nomination acceptable to both the department and the appointing official is reached.

### 2. Deans, Associate Deans, Assistant Deans, and Similar Academic Administrative Officers

a) The academic administrative officers, such as deans, associate deans, assistant deans, Vice President for Medical Affairs, or other academic administrative officers of similar rank of a school or other academic unit shall be qualified for faculty membership by training and experience.

b) Appointments to such positions shall be made only after a special or standing committee, elected by the regular, active-status faculty involved from among the faculty's tenured members, has established criteria (subject to the approval of that faculty as a whole), considered nominations, and reported its recommendations in accordance with the procedures established under Section A, above, to the faculty that elected it or to the appropriate academic administrative officer.

c) Such appointees shall hold office only as long as they retain the confidence of the faculty concerned. A formal proceeding to question the continued confidence of the faculty of a school in an academic administrative officer shall be instituted only after faculty members have made a reasonable effort to bring the substance of their concerns to

20

21

the attention of such officers informally. The formal proceeding shall be conducted as follows:

1) A petition signed by one-third of the regular, active-status members of the rank of assistant professor or higher of the faculty concerned shall be submitted to the Chair of the Executive Committee of the Faculty Senate.

2) The Chair of the Executive Committee shall call a special meeting of the faculty concerned for consideration of the matter. The meeting shall be held within twenty days (on which classes are regularly held in the University) of the time the petition is submitted. Notice of the meeting shall be given to all of the faculty members eligible to vote on the matter.

3) The Chair of the Executive Committee shall preside over the meeting. At this meeting, procedures for balloting shall be determined.

4) Within ten days (on which classes are regularly held in the University) of the first special meeting, a secret ballot of the regular, active-status faculty of the rank of assistant professor or higher shall be taken at a special meeting or by mail on the question of confidence in the administrator involved. The balloting shall be supervised by the Executive Committee of the Faculty Senate.

5) The affirmative vote of a majority of faculty members eligible to vote shall be necessary for the passage of a vote of no confidence. If the resolution passes, the Chair of the Executive Committee shall forward the results of the proceedings to the President of the University for appropriate action.

### 3. Vice President for Academic Affairs, Associate or Assistant Vice Presidents for Academic Affairs

Appointments to the position of Vice President for Academic Affairs or Associate or Assistant Vice President for Academic Affairs shall be made only after consultation with the Executive Committee of the Faculty Senate. The Executive Committee may submit names of proposed candidates for these positions and may advise concerning names proposed by

administrative officers. Appointees to these positions shall be qualified for faculty membership by training, experience, and continued interest in teaching and research. They shall retain office only as long as they retain the confidence of the Faculty Assembly.

### 4. Other Administrative Officers

a) The faculty of a school, division, or other organizational unit or group of units shall be consulted for its recommendations regarding the appointment of administrative officers whose concern with academic matters is limited to that unit or group of units. The regular, active-status faculty members of the rank of assistant professor and higher of the organizational unit or units concerned shall establish procedures and criteria for the formulation of such recommendations.

b) The Executive Committee of the Faculty Senate shall be consulted for its recommendations regarding the appointment of administrative officers whose concern with academic matters comprehends all or substantially all of the University.

### 5. President of the University

The Faculty Assembly shall elect a committee to advise and consult with the Board of Trustees or appropriate members thereof in the selection of a President.

## D. Faculty Participation in Action Concerning Curriculum

The regular, active-status faculty members of the rank of assistant professor and higher of each school shall establish procedures for their participation, directly or through elected standing committees, in decisions relating to the addition, revision, or elimination of curricular offerings.

22

23

## E. Procedures for Implementation of Article X of the Faculty Code

### 1. Dispute Resolution Committee

The Faculty Senate shall elect a Dispute Resolution Committee of fifteen tenured, active-status faculty members, no more than three of whom shall be members of the faculty of any one school (except that four may be members of the faculty of Columbian School) and none of whom may be serving as academic administrators. The members of the Committee shall serve three-year staggered terms so that the terms of five of the members shall expire each year. The Faculty Senate shall designate the Chair of the Committee from among the members of the Committee. Alternate temporary members may be appointed at any time by the Executive Committee to facilitate the dispute resolution procedures.

### 2. Preliminary Proceedings

a) Before instituting any formal proceedings concerning an alleged violation of the Faculty Code, the aggrieved party or parties shall exhaust all reasonable efforts to achieve a resolution of the situation through informal consultation with the appropriate faculty members and administrative officers.

b) If informal consultation fails to resolve the matter, the aggrieved party shall refer the dispute to the Faculty Senate by means of a letter addressed to the Chair of the Executive Committee. The Executive Committee, once it has made its own determination that all reasonable efforts to achieve a resolution through informal consultation have been exhausted, shall appoint either a special mediator or a special mediation committee of three members, none of whom shall be members of the Dispute Resolution Committee; and this mediator or mediation committee shall conduct an informal investigation of the matter and attempt to effect expeditiously a mutually satisfactory resolution. The appointment shall be recorded in the minutes of the Faculty Senate.

c) The special mediator or mediation committee shall report to the Executive Committee, with copies to the parties, only that a mutually satisfactory solution has been achieved, in which case the report should set forth the basis of the settlement or that it has been concluded that further efforts at mediation would be futile.

### 3. Formal Proceedings

a) Commencement of Proceedings

1) If the preliminary proceedings do not result in a mutually satisfactory resolution of the dispute, any party to the dispute may commence formal proceedings by means of a complaint addressed to the Chair of the Dispute Resolution Committee, with copies sent to the Chair of the Executive Committee of the Faculty Senate and the other party or parties.

2) The complaint shall set forth with particularity the nature of the dispute, specifying the rights or privileges under the Faculty Code alleged to have been violated, the specific act or acts alleged to constitute the violation, the identity of the remedy sought, and the reasons alleged to justify the remedy. No grievance may be maintained on the basis of error that did not affect the substantial rights of the complainant.

3) Within twenty calendar days of the receipt of the complaint, the other party or parties to the dispute shall reply in writing, sending copies of the reply to the Chair of the Dispute Resolution Committee, the Chair of the Executive Committee of the Faculty Senate, and the complaining party or parties. The reply shall set forth with particularity the position of the replying party or parties with respect to each allegation of the complaint.

b) Hearing Committee and Hearing Officer

1) Upon receipt of the complaint and reply, the Chair of the Dispute Resolution Committee shall, with the advice of the Executive Committee of the Faculty Senate, appoint a Hearing Committee of three members from among the

24

25

members of the Dispute Resolution Committee, and a presiding Hearing Officer from a panel of names previously approved by the Executive Committee. The Hearing Officers shall be chosen from among University personnel of appropriate experience and training but need not be attorneys. The role of the Hearing Officer throughout these procedures is to assure an orderly, expeditious, and relevant hearing; to assure the development of a complete, fair, and reliable record; and to advise the Hearing Committee as to issues of substance and procedure. The Hearing Committee may request the replacement of the Hearing Officer at any time.

2) No member of the same department as a party shall sit on the Hearing Committee. Any party to a dispute may disqualify one member of the Hearing Committee by peremptory challenge. Any party may also seek to disqualify any member of the Hearing Committee for cause. The Dispute Resolution Committee shall hear and decide any challenges for cause. The Chair of the Dispute Resolution Committee shall, from among the remaining members of the Dispute Resolution Committee, fill any vacancies on the Hearing Committee created by challenges.

3) When all challenges have been decided and vacancies filled, and as soon as reasonably possible after receipt of respondent's reply, the Chair of the Dispute Resolution Committee shall convene the Hearing Committee to review the complaint. If a majority of the Hearing Committee, after an opportunity for informal argument by the parties, finds that the complaint does not allege facts sufficient to state a grievance under the Code, or that the complaint is based upon evidence or allegations substantially the same as those that have been previously heard and decided, or that could have been presented in a previous hearing, the complaint shall be automatically referred to the Dispute Resolution Committee for consideration at the earliest reasonable time. If a majority of the Dispute Resolution Committee concludes that for

any of the reasons set out in this section a hearing is not warranted, the complaint shall be dismissed, in whole or in part, and the matters dismissed deemed closed.

4) On the determination that a hearing is warranted, the Hearing Committee shall be convened by the presiding Hearing Officer and shall establish a schedule for the hearing.

5) All three members of the Committee shall be present during the hearings and deliberations of the Committee, except that the presence of one of them during part of the proceedings may be waived by agreement of the parties.

6) It shall be the duty of the Hearing Officer to convene promptly the meetings of the Hearing Committee and to preside; to assure the expeditious disposition of the case; to rule on all questions of substance or procedure necessary to the conduct of the hearing, subject to being overridden by a majority vote of the Hearing Committee; to ask questions and to control the development of testimony and of evidence in the record as deemed appropriate; to prepare a draft opinion for the use of the Hearing Committee; and to advise the Hearing Committee in its deliberations on questions of substance and procedure. The Hearing Officer does not vote on the ultimate questions of fact, substance, procedure, or policy, as these are acted upon by the Hearing Committee. The Hearing Officer signs dispositive orders of the Hearing Committee only to authenticate them.

7) Members of Hearing Committees, members of the Dispute Resolution Committee, and the parties shall avoid ex parte communications bearing on the substance of the dispute.

c) Procedure for Hearings

l) The parties to the proceedings shall be entitled to appear in person and to be represented by counsel or other adviser.

2) A grievance procedure is not a formal judicial proceeding. Its purpose is to provide a fair evalua-

26

27

tion of an allegation that a right or a privilege has been violated. In order to achieve that end, the Hearing Committee shall have authority to call any material witness who is a member of the University faculty, administration, or staff and any other person who is willing to testify; to question parties and witnesses; to exclude matters it deems irrelevant; and to place reasonable limits on arguments, the presentation of evidence, and the questioning of witnesses by the parties. The University will make a reasonable effort to facilitate the appearance of witnesses.

3) The procedure at the hearings shall be informal but shall comply with the requirements of fairness to the parties. The Hearing Committee is not required to comply with rules of evidence applicable in courts of law and may receive any relevant evidence that is not privileged. The Hearing Committee may decline to consider evidence when its probative value is outweighed by considerations of unfair prejudice, confusion of the issues, undue delay, waste of time, or needless presentation of cumulative evidence. The parties shall be entitled to testify on their own behalf; to call as material witnesses any member of the University faculty, administration, or staff and any other person who is willing to testify; to present written and other evidence; and to cross-examine witnesses called by other parties. A party shall be entitled to inspect and copy, in advance of the hearing, any relevant documents in the control of the other party and not privileged and may offer such documents or excerpts therefrom in evidence. The University will make a reasonable effort to facilitate the appearance of witnesses.

4) The parties shall be entitled to present opening and closing statements.

5) A stenographic record of the hearings shall be made and one copy, which shall be available to all parties, kept on file by the University.

6) The hearings shall be open to the public unless, on the motion of a party or the Hearing Commit-

tee, the Hearing Committee shall determine that it is in the best interest of the University and the parties that the hearings be closed.

7) At the conclusion of the presentation of evidence and argument from both sides, the Committee shall deliberate and reach a decision in closed session. In rendering its decision, the Hearing Committee shall not substitute its judgment for that of the maker of the decision being challenged, but rather it shall determine whether the grievant has established by clear and convincing evidence that he or she has suffered a substantial injury resulting from: 1) acts of discrimination prohibited by federal or local law; 2) the decision maker's failure to follow the Faculty Code, or Faculty Handbook, or other rules, regulations, and procedures established by the University; 3) arbitrary and capricious University actions, or arbitrary and capricious applications of federal or local statutes and regulations; or 4) retaliation for exercise of Code-protected rights.

8) The Hearing Committee shall render its findings and recommendations in a written report that shall state the number of members subscribing to the report and shall include dissenting opinions, if any. This report shall be submitted to the Chair of the Executive Committee of the Faculty Senate, and copies shall be transmitted to the parties and to the Chair of the Dispute Resolution Committee.

9) The hearing procedures shall be concluded and the Hearing Committee's findings and recommendations shall be rendered as soon as practicable.

### 4. Appeals

a) Any party may appeal the decision of the Hearing Committee by filing a notice of appeal with the Chair of the Dispute Resolution Committee and sending copies thereof to the Chair of the Executive Committee of the Faculty Senate and to the other parties. The notice of appeal must be filed within ten calendar days of the receipt of the decision of the Hearing Committee.

b) An appeal shall be heard by members of the Dispute Resolution Committee who were not members of the Hearing Committee, provided that members of the Dispute Resolution Committee who were disqualified from sitting as members of the Hearing Committee and members of the same department as any of the parties shall not participate in the hearings of the appeal. A quorum for hearing an appeal shall be two-thirds of those members of the Dispute Resolution Committee eligible under the terms of this section.

c) The parties to an appeal shall be entitled to present written and oral argument. However, evidence not introduced in the hearing may not be considered on appeal.

d) The Dispute Resolution Committee shall decide by majority vote and render an opinion in writing, sustaining, modifying, or remanding the decision of the Hearing Committee. Copies of the opinion shall be transmitted to the parties and the Chair of the Executive Committee of the Faculty Senate.

**5. Disposition**

When the time for filing an appeal has expired without an appeal having been commenced, or when the appeal process has been completed and a final decision has been rendered, the record of the case, including the decisions of the Hearing Committee and the Dispute Resolution Committee, shall be transmitted to the President and the Board of Trustees for final disposition.

## F. Procedures for the Dismissal of a Faculty Member for Adequate Cause

**1. Commencement of Proceedings**

a) Proceedings to dismiss a tenured faculty member for adequate cause may be commenced by a complaint, addressed to the Chair of the Dispute Resolution Committee, signed by the Vice President for Academic Affairs and either the dean or the department chair who has administrative responsibility

for the faculty member concerned. The complaint shall set forth the grounds alleged to constitute adequate cause for dismissal. A copy of the complaint shall be delivered in hand to the faculty member concerned or shall be sent by registered mail to the faculty member's residence. A copy of the complaint shall also be sent to the Chair of the Executive Committee of the Faculty Senate.

b) Proceedings may also be commenced by a petition, setting forth the grounds alleged to constitute adequate cause for dismissal and signed by a majority of the tenured faculty of the school of the faculty member concerned, or by twenty tenured members of that faculty, whichever is the lesser. A copy of the executed petition shall be delivered in hand to the faculty member concerned or sent by registered mail to his or her residence. Copies shall also be sent to the Chair of the Dispute Resolution Committee, the Chair of the Executive Committee of the Faculty Senate, and the Vice President for Academic Affairs.

c) Within twenty calendar days of the receipt of the complaint, the faculty member concerned shall reply in writing, sending copies of the reply to the Chair of the Dispute Resolution Committee, the Chair of the Executive Committee of the Faculty Senate, and the Vice President for Academic Affairs. The reply shall set forth with particularity the responding faculty member's position with respect to each allegation of the complaint.

**2. Hearing Committee**

a) Upon receipt of the complaint, the Chair of the Dispute Resolution Committee shall, with the advice of the Executive Committee of the Faculty Senate, appoint a Hearing Committee of six members from among the members of the Dispute Resolution Committee.

b) No member of the same department as the faculty member concerned and no one who has signed a petition seeking that faculty member's dismissal shall sit on the Hearing Committee. The faculty

member concerned may disqualify two members of the Hearing Committee by peremptory challenge and may also seek to disqualify a member of the Hearing Committee for cause. The Dispute Resolution Committee shall hear and decide any challenges for cause. The Chair of the Dispute Resolution Committee shall, from among the remaining members of the Dispute Resolution Committee, fill any vacancies on the Hearing Committee created by challenges.

c) When all challenges have been decided and vacancies filled, the Hearing Committee shall convene, establish a schedule for the hearings, and elect a chair from among its members to preside during the formal proceedings.

d) All of the members of the Hearing Committee shall be present during the hearings and deliberations of the Committee except that the presence of one of them during part of the proceedings may be waived by agreement of the parties.

## 3. Procedure for Hearings

The procedure for the hearings shall be the same as provided in Part E of these Procedures, except that the hearing shall be closed on the motion of the faculty member concerned, and that the Hearing Committee may recommend the dismissal of the faculty member concerned only by the affirmative vote of two-thirds of its members.

## 4. Appeals

The faculty member concerned may appeal the decision of the Hearing Committee in accordance with the procedures provided in Part E, Paragraph 4, of these Procedures.

## 5. Attorneys' Fees and Expenses

If a faculty member prevails against charges brought against him or her, the University may, upon recommendation of the Hearing Committee, reimburse the faculty member concerned for all or part of attorneys' fees and expenses actually incurred in his or her defense.

**Plaintiff Exhibit C**
8 pages

# The George Washington University
# Faculty Handbook



Revised August 1999

08 0087



**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# FOREWORD

## SECTION 1: ABOUT THE UNIVERSITY

1-1   History
1-2   Factbook
       Enrollment
       Student Body
       Leadership
       Faculty
       Staff
       Alumni
1-3   Mission Statement
1-4   Programs
       Schools
1-5   Medical Center
       University Hospital
       Medical Faculty Associates
       University Health Plan
1-6   Administration
       President
       Vice Presidents
       Deans of the Schools
       Department Chairs
       Faculty
1-7   Institutional Policies
       University Policy on Equal Opportunity
       Policy and Procedures on Sexual Harassment
       Drug and Alcohol Policy
       Disability Services
       Smoking Policy

## SECTION 2: FACULTY APPOINTMENTS AND PERSONNEL POLICIES

2-1   Faculty Recruitment
2-2   Faculty Appointment Procedures
2-3   Employment Eligibility and Verification (I-9 Form)
2-4   Appointment of Relatives of Faculty Members
2-5   Appointment and Employment of Foreign Nationals
2-6   Most Frequently Used Non-Immigrant Classifications for Foreign Nationals
       H-1B Classification
       J-1 Classification (Exchange Visitor Program)
2-7   Employment of International Students
2-8   Moving Allowance for New Faculty
2-9   Faculty Housing Information
2-10  Terms of Service
2-11  Salary Payment Schedule
2-12  Overload Compensation
2-13  Summer Sessions Policies
2-14  Professional Responsibilities
2-15  Convocations
2-16  Consulting and other Professional Activities
2-17  Legal Matters
2-18  Travel to Meetings of Scholarly Organizations
2-19  Faculty Records

2-20 Annual Reports
2-21 Guidelines for Political Campaign Activities on Behalf of Candidates for Public Office
2-22 Faculty Leave
     Annual Leave
     Temporary Disability Leave
     Maternity Leave
     Family and Medical Leave
     Parental Leave
     Academic Leave
2-23 Partial Retirement

## SECTION 3: EMPLOYEE BENEFITS

3-1 General Guidelines on Eligibility and Enrollment
3-2 Benefits for Full-Time and Regular Part-Time Faculty
3-3 Retirement Plans
     Base Retirement Plan
     Supplemental Retirement Plan
     Matching Retirement Plan
3-4 Life Insurance
     Group Term Life and Accidental Death and Dismemberment
     Voluntary Life Insurance Plans
3-5 Health and Dental Insurance
     Health Plans
     Dental Services
3-6 Flexible Spending Accounts
3-7 Disability Plans
     Long-Term Disability Insurance
     Voluntary Short-Term Disability Income Plan
     Supplemental Long-Term Disability Plan
3-8 Educational Benefits
     Tuition Benefits for Programs at The George Washington University
     Regular Faculty
     Spouses
     Dependent Children
     Tuition Exchange Program
     Taxability of Tuition Benefits
3-9 Child Care and Elder Care Services
3-10 Benefits During Leave Periods
3-11 Faculty/Employee Assistance Program
3-12 Benefits During Partial Retirement
3-13 Benefits on Retirement
3-14 Emeriti Faculty
3-15 Resignation or Termination

## SECTION 4: OPERATIONAL GUIDELINES — TEACHING

4-1 Student Records
4-2 Student Advising and Registration
4-3 Schedules of Classes
4-4 Classroom Assignments
4-5 Classroom Maintenance, Security, and Emergencies
4-6 Classroom Instructional Resources
4-7 Class Lists
4-8 Graduate or Undergraduate Credit

4-9    Course Change and Withdrawal
4-10   Auditors
4-11   Class Attendance
4-12   Religious Accommodation
4-13   Adverse Weather Conditions
4-14   Student Referrals
4-15   Policy on Academic Integrity
4-16   The Grading System
      Course Information
      Incomplete
      Change of Grade
4-17   Posting of Grades
4-18   Final Grade Sheets
4-19   Examinations
      Schedule
      Preparation of Materials
      Conduct of Examinations
4-20   Retention of Graded Examinations and Papers Not Returned to Students
4-21   Theses and Dissertations
4-22   Curriculum Control
4-23   Office Hours

## SECTION 5: OPERATIONAL GUIDELINES — RESEARCH

5-1    University Policy on Research
5-2    Administrative Support Structure for Research
      Program Administration
      Proposal Review
      Allowable Compensation and Allocation of Effort
      Travel
      Leave for Research Faculty
      Handbook for Sponsored Programs
      The University Committee on Research
      The Advisory Council on Research
      The Medical Center Committee on Research
5-3    Scholarly Centers and Institutes
5-4    Patents and Copyrights
5-5    Conflicts of Interest
5-6    Misconduct in Research
5-7    Policy on Researchers with Teaching Appointments

## SECTION 6: ACADEMIC RESOURCES

6-1    Academic Publications
6-2    Center for Academic Technologies
6-3    Center for Distance and Mediated Learning
6-4    Center for Excellence in Learning and Teaching
6-5    Conference Management Services
6-6    Libraries
      Gelman Library
      Burns Law Library
      Eckles Library
      Himmelfarb Health Sciences Library
      Virginia Campus Library

6-7    Office of Fellowships and Graduate Student Support
6-8    Office of Information Technology
6-9    Scholarly and Professional Activities

## SECTION 7:  UNIVERSITY SERVICES

7-1    Alumni Relations Office
7-2    Automatic Teller Machines and Cashier
7-3    Bookstore
7-4    Development Office
7-5    Facilities
7-6    GWorld Card and Debit Dollars
7-7    Mail Services
7-8    NIH Federal Credit Union
7-9    Notary Public Service
7-10   Office Supplies and Equipment
7-11   Office of University Relations
7-12   Parking Services
7-13   Safety and Security
            Lost and Found
            Security Precautions
            Safety Measures
            Fire Safety
7-14   Telephone Services
7-15   University Club

## SECTION 8:  AROUND CAMPUS

8-1    Bicycle Parking
8-2    Carpool Information
8-3    Metrorail and Metrobus
8-4    Bookstore
8-5    Computer Supplies and Equipment
8-6    Marvin Center
8-7    Smith Center (Athletics and Recreation)
8-8    Wellness Program

## SECTION 9:  RESOURCE GUIDE

9-1    Handbooks and Manuals
            Manual of Personnel Policies for the Use of Supervisory Staff
            Financial Procedures Handbook
            Medical Resident Manual
9-2    Resource Locations and Telephone Numbers

## PAGE INDEX

## FOREWORD

This Handbook has been prepared for the information and use of the faculty of The George Washington University. The policies and procedures described herein may be revised by the University. It is the practice and intent that no substantive revisions will be made without consultation with the Faculty Senate.

A faculty member should also become familiar with the *Faculty Code*, which sets forth the rights and responsibilities of academic personnel, and the *Faculty Organization Plan*, which describes the bodies and functions of faculty governance. Copies of these publications and additional copies of the *Faculty Handbook* are available from the Faculty Personnel Office, Rice Hall, Room 811.



# THE GEORGE WASHINGTON UNIVERSITY

**Faculty
Organization
Plan**

**Washington, D.C.**

**1984**

Case 1:08-cv-00087-RCL   Document 1-2   Filed 01/16/2008   Page 28 of 45

# THE GEORGE WASHINGTON UNIVERSITY
# FACULTY ORGANIZATION PLAN

...riginally put in operation in 1960; as amended most recently in 1984.

## Article I. Purpose and Power

### SECTION 1. OBJECTIVE

...he objective of the Faculty Organization Plan is to enable the Faculty of The George Washington University, in keeping with sound principles of university ...ganization, to perform effectively its functions and responsibilities with respect ...educational policy and objectives of the University and related affairs in which ...e Faculty has a legitimate concern or interest. The provisions of the Plan shall ...interpreted and applied in accordance with the stated objective of the Plan.

### SECTION 2. STRUCTURE AND POWERS

...he Faculty Organization shall consist of two bodies: the Faculty Assembly ...hereafter "Assembly"), which shall consist of academic personnel holding the ...nk of professor, associate professor, assistant professor, or instructor who are ...full-time service and the administrative personnel provided for hereafter; and ...e Faculty Senate (hereafter "Senate"), which shall be a representative body ...ting for the Faculty as the whole in legislative and advisory capacities. The ...owers, duties, and privileges of the Assembly and Senate shall be exercised in ...ccordance with the Charter of the University and subject to the authority of the ...oard of Trustees, and they shall relate to matters that are of concern to more ...an one college, school, or division, or to the Faculty.

## Article II. The Faculty Assembly

### SECTION 1. MEMBERSHIP

...he Faculty Assembly shall consist of the academic personnel holding the rank of ...rofessor, associate professor, assistant professor, or instructor who are full-time ...mployees (or, in the School of Medicine and Health Sciences, the equivalent as ...fined in affiliation agreements) of a degree-granting college, school, or division ...the University and the President, the Vice President for Academic Affairs, the ...easurer, the University Librarian, the Registrar, the Director of Admissions, ...d the officers of administration appointed by the President to the Senate, Vice ...esidents and other academic personnel in full-time service, and professors and ...sociate professors emeriti, may attend meetings of the Assembly and shall be ...ivileged to speak; but they shall not have the right to make motions or to vote.

### SECTION 2. OFFICERS

The President shall be Chairman of the Assembly, the Vice President for Academic Affairs shall be the Vice Chairman, and the Registrar shall be the Secretary.

### SECTION 3. MEETINGS

(a) A regular meeting of the Assembly shall be held at least once during each semester of the academic year. A regular meeting may be called by the President, by request of the Senate, or by the petition of twenty or more members of the Assembly; and the agenda as prepared by the President shall include any matter requested by the Senate or by the Executive Committee of the Senate, or by petition of fifteen or more members of the Assembly. The call of a regular meeting shall contain the time, place, and agenda of the meeting; and it shall be mailed not later than the tenth day preceding the day of the meeting.

(b) A special meeting of the Assembly may be called by the President or by the Chairman of the Executive Committee of the Senate, or in the absence of the President by the Vice President for Academic Affairs, or by any of these at the request of fifty or more members of the Assembly, for any time and place, giving as much notice as the circumstances permit. The agenda for a special meeting shall be prepared by the person calling the meeting, in consultation with the Executive Committee of the Senate as far as practicable.

(c) A quorum for any meeting shall consist of 125 members of the membership of the Assembly.

(d) The Assembly shall act by affirmative vote of a majority of members present and voting, unless the action proposed is in adverse review of action taken by the Senate, in which case the affirmative vote of two-thirds of members present, or one representing a majority of the membership of the Assembly, whichever is the lesser, shall be required.

(e) The Bylaws and rules of procedure of the Assembly shall be subject to the provisions hereof and shall be prepared by the Executive Committee of the Senate, subject to confirmation and amendment by the Assembly.

### SECTION 4. FUNCTIONS

The functions of the Assembly shall be to:

(1) Receive information from the President, and such members of the University administration as he may designate, of matters of general University interest or faculty concern;

**Plaintiff Exhibit D**
5 pages

# AAUP

## AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS

# Policy Documents
# &
# Reports

TENTH
EDITION

08 0087

Published by the American Association of University Professors
Washington, D.C.
Distributed by the Johns Hopkins University Press
Baltimore

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# CONTENTS

## INTRODUCTION                                                      ix

## ACADEMIC FREEDOM, TENURE, AND DUE PROCESS

Introduction                                                         1

1940 Statement of Principles on Academic Freedom and Tenure
    with 1970 Interpretive Comments                             3
1958 Statement on Procedural Standards in Faculty Dismissal Proceedings   12
Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty
    Appointments                                                16
Recommended Institutional Regulations on Academic Freedom and Tenure    22
Committee A Statement on Extramural Utterances                       32
Statement on Professors and Political Activity                       33
Academic Freedom and Artistic Expression                             35
On Freedom of Expression and Campus Speech Codes                     37
On Collegiality as a Criterion for Faculty Evaluation                39
The "Limitations" Clause in the 1940 Statement of Principles on
    Academic Freedom and Tenure: Some Operating Guidelines      41
Academic Freedom and Electronic Communications                       45
Verification and Trust: Background Investigations Preceding Faculty Appointment   51
Standards for Notice of Nonreappointment                             54
On Crediting Prior Service Elsewhere as Part of the Probationary Period   55
On the Imposition of Tenure Quotas                                   57
Post-Tenure Review: An AAUP Response                                 60
Access to Faculty Personnel Files                                    67
The Status of Part-Time Faculty                                      73
Senior Appointments with Reduced Loads                               84
On Full-Time Non-Tenure-Track Appointments                           85
College and University Academic and Professional Appointments        93
Contingent Appointments and the Academic Profession                  98
Arbitration in Cases of Dismissal                                    115
Tenure in the Medical School                                         119
Academic Freedom in the Medical School                               125
The Assignment of Course Grades and Student Appeals                  127
Institutional Responsibility for Legal Demands on Faculty            129
Statement on Corporate Funding of Academic Research                  130

# COLLEGE AND UNIVERSITY GOVERNMENT

| | |
|---|---|
| Introduction | 133 |
| Statement on Government of Colleges and Universities | 135 |
| On the Relationship of Faculty Governance to Academic Freedom | 141 |
| Faculty Participation in the Selection, Evaluation, and Retention of Administrators | 145 |
| On Institutional Problems Resulting from Financial Exigency: Some Operating Guidelines | 147 |
| The Role of the Faculty in Budgetary and Salary Matters | 149 |
| Governance Standards in Institutional Mergers and Acquisitions | 153 |
| Joint Statement on Faculty Status of College and University Librarians | 155 |
| Statement on Intercollegiate Athletics | 157 |
| The Faculty Role in the Reform of Intercollegiate Athletics: Principles and Recommended Practices | 159 |

# PROFESSIONAL ETHICS

| | |
|---|---|
| Introduction | 169 |
| Statement on Professional Ethics | 171 |
| A Statement of the Association's Council: Freedom and Responsibility | 173 |
| Statement on Plagiarism | 175 |
| Statement on Recruitment and Resignation of Faculty Members | 177 |
| The Ethics of Recruitment and Faculty Appointments | 179 |
| On Preventing Conflicts of Interest in Government-Sponsored Research at Universities | 182 |
| Statement on Conflicts of Interest | 185 |
| Statement on Multiple Authorship | 187 |

# RESEARCH AND TEACHING

| | |
|---|---|
| Introduction | 189 |
| Statement on Faculty Workload with Interpretive Comments | 191 |
| The Work of Faculty: Expectations, Priorities, and Rewards | 196 |
| Statement on Teaching Evaluation | 200 |
| Observations on the Association's Statement on Teaching Evaluation | 204 |

# DISTANCE EDUCATION AND INTELLECTUAL PROPERTY

| | |
|---|---|
| Introduction | 209 |
| Statement on Distance Education | 211 |
| Statement on Copyright | 214 |

# WORK AND FAMILY

| | |
|---|---|
| Introduction | 217 |
| Statement of Principles on Family Responsibilities and Academic Work | 219 |
| Faculty Appointment and Family Relationship | 227 |
| Faculty Child Care | 228 |

# DISCRIMINATION

| | |
|---|---|
| Introduction | 229 |
| On Discrimination | 229 |
| On Processing Complaints of Discrimination | 230 |
| Affirmative-Action Plans: Recommended Procedures for Increasing the Number of Minority Persons and Women on College and University Faculties | 237 |
| Sexual Harassment: Suggested Policy and Procedures for Handling Complaints | 244 |
| Consensual Relations between Faculty and Students | 247 |
| Due Process in Sexual-Harassment Complaints | 248 |

# RETIREMENT AND LEAVES OF ABSENCE

| | |
|---|---|
| Introduction | 249 |
| Statement of Principles on Academic Retirement and Insurance Plans | 251 |
| Statement of Principles on Leaves of Absence | 254 |

# COLLECTIVE BARGAINING

| | |
|---|---|
| Introduction | 257 |
| Statement on Collective Bargaining | 259 |
| Statement on Academic Government for Institutions Engaged in Collective Bargaining | 261 |
| Arbitration of Faculty Grievances | 263 |
| Dismissal Proceedings in a Collective-Bargaining Setting Where Arbitration Substitutes for a Faculty Hearing | 267 |

# COLLEGE AND UNIVERSITY ACCREDITATION

| | |
|---|---|
| Introduction | 269 |
| The Role of the Faculty in the Accrediting of Colleges and Universities | 271 |

# STUDENT RIGHTS AND FREEDOMS

| | |
|---|---|
| Joint Statement on Rights and Freedoms of Students | 273 |
| Statement on Graduate Students | 280 |

# CONSTITUTION

Introduction                                                                    283

Constitution of the Association                                                  285

# APPENDICES

I.  1915 Declaration of Principles on Academic Freedom and Academic Tenure       291

II.  Association Procedures in Academic Freedom and Tenure Cases                  302

III. Standards for Investigations in the Area of College and University Government  305

IV. Selected Judicial Decisions and Scholarly Writings Referring to AAUP Standards  307

# INDEX

311

**Plaintiff Exhibit E**
3 pages



THE

# CONSTITUTION

*of*

## THE UNITED STATES

## OF AMERICA



APPLEWOOD BOOKS

BEDFORD, MASSACHUSETTS

08 0087

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The National Archives and Records Administration,
in Washington, DC, holds in Public Trust
the original Declaration of Independence, the Bill of
Rights, and the Constitution, as well as millions
of other permanently valuable records of the
Federal Government.

For information about this edition or for a free copy
of our catalog of other American reprints, write to:
Applewood Books, P.O. Box 365, Bedford, MA 01730.

ISBN 1-55709-105-6

# THE CONSTITUTION OF THE UNITED STATES OF AMERICA

WE THE PEOPLE OF THE UNITED STATES, *in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America.*

### ARTICLE 1

SECTION 1. All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

SECTION 2. The House of Representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature.

No person shall be a Representative who shall not have attained to the age of twenty five years, and been seven years a citizen of the United States, and who shall not, when elected, be an inhabitant of that state in which he shall be chosen.

1

Representatives and direct taxes shall be apportioned among the several states which may be included within this union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three years after the first meeting of the Congress of the United States, and within every subsequent term of ten years, in such manner as they shall by law direct. The number of Representatives shall not exceed one for every thirty thousand, but each state shall have at least one Representative; and until such enumeration shall be made, the state of New Hampshire shall be entitled to choose three, Massachusetts eight, Rhode Island and Providence Plantations one, Connecticut five, New York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

When vacancies happen in the Representation from any state, the executive authority thereof shall issue writs of election to fill such vacancies.

The House of Representatives shall choose their speaker and other officers; and shall have the sole power of impeachment.

SECTION 3. The Senate of the United States shall be composed of two Senators from each state, chosen by the legislature thereof, for six years; and each Senator shall have one vote.

Immediately after they shall be assembled in consequence

of the first election, they shall be divided as equally as may be into three classes.

The seats of the Senators of the first class shall be vacated at the expiration of the second year, of the second class at the expiration of the fourth year, and the third class at the expiration of the sixth year, so that one third may be chosen every second year; and if vacancies happen by resignation, or otherwise, during the recess of the legislature of any state, the executive thereof may make temporary appointments until the next meeting of the legislature, which shall then fill such vacancies.

No person shall be a Senator who shall not have attained to the age of thirty years, and been nine years a citizen of the United States and who shall not, when elected, be an inhabitant of that state for which he shall be chosen.

The Vice President of the United States shall be President of the Senate, but shall have no vote, unless they be equally divided.

The Senate shall choose their other officers, and also a President pro tempore, in the absence of the Vice President, or when he shall exercise the office of President of the United States.

The Senate shall have the sole power to try all impeachments. When sitting for that purpose, they shall be on oath or affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no person shall be convicted without the concurrence of two thirds of the members present.

Judgment in cases of impeachment shall not extend further



**The George Washington University**

WASHINGTON DC

Plaintiff Exhibit F

1 page

VICE PRESIDENT FOR ACADEMIC AFFAIRS

May 22, 1992

Dr. Debabrata Saha
2947 Waterford Court
Vienna, VA 22180

Dear Dr. Saha:

I am pleased to inform you that at its meeting on May 21 the Board of Trustees approved the recommendation of the Department of Electrical Engineering and Computer Science that you be awarded the status of continuous tenure effective with your 1993-94 appointment.

Sincerely,

Roderick S. French
Vice President for Academic Affairs

c: Acting Dean Gilmore

08 0087

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2121 EYE STREET, N.W. • WASHINGTON, D.C. 20052 • (202) 994-6510



**175TH ANNIVERSARY 1821-1996**

**Plaintiff Exhibit G**

1 page

DEPARTMENT OF ELECTRICAL ENGINEERING AND COMPUTER SCIENCE

The Colleagues
Dept. of Elec. Engineering and Comp. Science
The George Washington University

May 15, 1996

Dear Colleagues :

I assume that all of you are now familiar with the allegation of "practice of favoritism" against some members of faculty and administrators in this department. You received a memorandum from Prof. Zaghloul regarding my allegations. In plain English, that memorandum is full of lies; literally, lie starts with the first paragraph, and each of the four paragraphs of substance includes distortion of facts. I chose not to respond to that memo because I promised so to the higher administration involved in the investigation.

At this point, I would like to inform you that the issues are yet to be resolved by the administration. But I would like to re-confirm that I do have definite proof that Prof. Pickholtz knowingly and consciously allowed a doctoral student taking the Doctoral Qualifying Exam four times in a row. But the department continues to deny this and other allegations. Evidence shows that Prof. Pickholtz approved the fourth attempt without the approval of anybody but himself. Furthermore, his own hand-written note and e-mails will confirm that he even pleaded on behalf of the student for a fifth attempt.

In the mean time, I have been informed by the department that the students have been congratulated on passing the Qualifying Exam. What an irony !!, the students are allowed to pass the exam by a vote of Democracy, but what they wrote in the exam were not looked at !! It reminds me of a saying that human race has not come up with a system that works better than democracy; but democracy has its own pitfalls. We just witnessed such a pitfall; it is caused by the lack of patience on the part of administrators and eagerness of the administrators to save the face of a faculty member who doesn't have the moral courage to apologize for his mistaken past. As Lowell said, Democracy gives every man the right to be his own oppressor. In this case, indeed the democracy within the EECS department oppressed its own virtue and its own wisdom.

Sincerely,

Debabrata Saha

Debabrata Saha
Department of EECS
School of Engineering and Applied Science
The George Washington University

08 0087

**FILED**

JAN 1 6 2008



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT




*Information System*

**Plaintiff Exhibit H**
4 pages

Search          Go          RETURN TO MENU | SITE MAP | HELP | EXIT

# View Addresses and Phones - Select Type

Your active addresses are displayed in order by address type. To update an address, click **RETURN TO MENU** above, and then click **Update Addresses and Phones**.

**Current:** Your local address during the academic year if you do not live in a residence hall. For international students this should be your address in the U.S.

**Housing:** Your residence hall address.

**Permanent:** Address for general information mailings. Bills, grades, and diplomas will also go here unless you specify other addresses for them. For international students this should be your address outside of the U.S.

**Billing:** Address you want bills sent to (if different from Permanent address).

**Campus Office:** Your current work address if you are a faculty or staff member.

**Check & W4:** The address that appears on your paycheck. Your W-2 form will be sent here. Submit a new <u>W-4 form</u> to Payroll Services to change this address.

**Diploma:** Address you want your diploma sent to (if different from Permanent address).

**Grading:** Address you want your grades sent to (if different from Permanent address).

**Refund:** Address you want refunds sent to (if different from Current address).

Addresses and Phones

**Current**                          **Phones**
Current: 11/24/97 - (No end date)    Primary: 703-7575418
    9409 Fair Pine Lane
    Great Falls, Virginia  22066

**Campus Office**                    **Phones**
Current: 12/04/03 - (No end date)    Primary: 202-9947175
    Elec & Computer Engineering
    Phillips Hall 618
    801 22nd St NW
    Washington, District of Columbia  20052

**Check & W4 Address**               **Phones**
Current: 03/19/98 - (No end date)    Primary: None Provided
    9409 Fairpine Lane
    Great Falls, Virginia  22066

**08  0087**

RELEASE: 7.3

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

https://banweb.gwu.edu/BannerApp/ProdCartridge/bwgkogad.P_SelectAtypView

9/20/2007




Information System

Search          Go

# Update Emergency Contacts - Select Contact

ℹ️ *Your emergency contact information is listed in the table below. To update a contact click on the Name link. To add a new contact, click on the New Contact link.*

**Emergency Contacts**

| Order | Name | Address and Phone | Relationship |
|-------|------|-------------------|--------------|
| | Namita Saha | 9409 Fairpine Lane<br>Great Falls, VA 22066 | Spouse/Significant Other |
| | New Contact | | |

**RELEASE: 7.3**




Information System

Search          Go                                    RETURN TO MENU | SITE MAP | HELP | EXIT

# Faculty Detail Schedule

Fall 2007
09/20/07 10:59 am

🛈 *Listed below is your schedule for the term you selected. Be sure to check your room assignment(s) just prior to the beginning of your class(es) as room assignments are subject to change.*

**Madrid Study Center - 61173 - EXCH 130 - 60**

| | |
|---|---|
| Status: | Active |
| Available for Registration: | 03/29/07 - 09/15/07 |
| College: | Elliott Schl of Intl Affairs |
| Department: | Exchange Program |
| Part of Term: | 2 |
| Course Credits: | 1.000 |
| Course Levels: | Non-Degree, Undergraduate, Graduate, Consortium, Law, Medicine |
| Campus: | Abroad |
| Override: | No |
| Rosters: | Classlist |

**Enrollment Counts**

| | Maximum | Actual | Remaining |
|---|---|---|---|
| Enrollment: | 100 | 0 | 100 |
| Cross List: | 0 | 0 | 0 |

**Scheduled Meeting Times**

| Type | Time | Days | Where | Date Range | Schedule Type | Instructors |
|---|---|---|---|---|---|---|
| Class | TBA | | TBA | 09/04/07 - 12/10/07 | Self-Paced Course | Debabrata Saha (P) |

**Return to Previous**
**RELEASE: 7.3**

The Office Of The Registrar

Suite 101 Rice Hall 2121 I Street NW Washington, DC 20052
(202) 994-4900 | Fax: (202) 994-1448

HOME > MAIN CAMPUS - SPRING 2008 > ELECTRICAL & COMPUTER ENGRING

Prev Page                                    Result Page: 1 - 2 - 3 - 4

Useful Hints:
Subject: Click on the course number to view the Bulletin description
Bldg/Rm: Click on the building to view the street address
Link: Click to view the same course offered by another department
Find: Click to view associated discussions, labs, etc.

Click here if you are experiencing navigation issues

🖶PRINT ALL | 🖶PRINT THIS PAGE

| Status | CRN | Subj | Sect | Title | Bldg/Rm | Instructor | Date |
|---|---|---|---|---|---|---|---|
| OPEN | 90265 | ECE 399 | 19 | Dissertation Research | ARR | Korman | 01/14/08 – 04/30/08 |
| OPEN | 90266 | ECE 399 | 20 | Dissertation Research | ARR | Kyriakopoulos | 01/14/08 – 04/30/08 |
| OPEN | 90267 | ECE 399 | 21 | Dissertation Research | ARR | Lang | 01/14/08 – 04/30/08 |
| OPEN | 90268 | ECE 399 | 22 | Dissertation Research | ARR | Lee | 01/14/08 – 04/30/08 |
| OPEN | 90269 | ECE 399 | 23 | Dissertation Research | ARR | Loew | 01/14/08 – 04/30/08 |
| OPEN | 90270 | ECE 399 | 24 | Dissertation Research | ARR | Pardavi-Horvath | 01/14/08 – 04/30/08 |
| OPEN | 92015 | ECE 399 | 25 | Dissertation Research | ARR | El-Ghazawi | 01/14/08 – 04/30/08 |
| OPEN | 90271 | ECE 399 | 26 | Dissertation Research | ARR | Saha | 01/14/08 – 04/30/08 |
| OPEN | 90272 | ECE 399 | 27 | Dissertation Research | ARR | Subramaniam | 01/14/08 – 04/30/08 |
| OPEN | 90273 | ECE 399 | 28 | Dissertation Research | ARR | Vojcic | 01/14/08 – 04/30/08 |
| OPEN | 92017 | ECE 399 | 29 | Dissertation Research | ARR | Wasylkiwskyj | 01/14/08 – 04/30/08 |
| OPEN | 90274 | ECE 399 | 30 | Dissertation Research | ARR | Zaghloul | 01/14/08 – 04/30/08 |

Prev Page                                    Result Page: 1 - 2 - 3 - 4

HOME > MAIN CAMPUS - SPRING 2008 > ELECTRICAL & COMPUTER ENGRING

Last Revised : Nov 1. 2007 07:51:09 PM

©2007 The George Washington University 2121 I Street, N.W., Washington, D.C. 20052 - (202) 994-1000

**Debabrata Saha**
9409 Fairpine Lane
Great Falls, Viginia 22066, U.S.A.
(703)757-5418

Plaintiff Exhibit I
2 pages

Professor Steven Knapp
President, The George Washington University
2121 Eye Street, N.W.
Washington, D.C. 20052

December 7, 2007

Dear Professor Knapp :

Enclosed is a letter from Vice President Lehman. According to this letter I am on *paid suspension until further notice*. Vice President Lehman recused himself on matters that involve me, in December 2006. Shortly after that, GWU stopped paying my salary effective March 1st, 2007 *without any notice whatsoever*. This matter has been drawn out so long. Therefore, I request that you order the payroll department to reinstate my salary effective the day of March 1st, 2007. I am in desperate need of that fund; I would appreciate if you respond to me in a day or two.

Enclosed teaching schedule of Spring 2008 reflects that I have been assigned Dissertation Research ECE-399 only. I am available for regular teaching load.

For your information, I have enclosed a copy of *"A Grievance"* against VP Lehman that GWU Faculty Senate is currently pursuing for a formal proceeding.

Thank you for your attention.

Sincerely,

*Debabrata Saha*

Debabrata Saha
ECE Department, SEAS

08 0087

**FILED**

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Enclosures : 1. Nov. 18, 2005 letter of VP Lehman
2. Teaching Schedule, Spring 2008
3. *"A Grievance against* Execut. VP Don Lehman, Dean Timothy Tong, ..."

TO: PROF. KNAPP


**UNITED STATES POSTAL SERVICE**₀

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

### Search Results

**Label/Receipt Number: EQ96 3607 445U S**
**Status: Delivered**

Your item was delivered at 12:55 PM on December 8, 2007 in
WASHINGTON, DC 20052 to GWU 20052. The item was signed for by
R CURTIS.

Additional Details >     Return to USPS.com Home >

**Track & Confirm**

Enter Label/Receipt Number.

Go >

### Notification Options

**Track & Confirm by email**
Get current event information or updates for your item sent to you or others by email.     Go >

**Proof of Delivery**
Verify who signed for your item by email, fax, or mail.     Go >

---

EQ 963607445 US

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE₀

**Customer Copy**
Label 11-B, March 2004

**Post Office To Addressee**

| DELIVERY (POSTAL USE ONLY) | | |
| --- | --- | --- |
| Delivery Attempt . | Time | ☐ AM ☐ PM | Employee Signature |
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |
| Delivery Date | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |

| ORIGIN (POSTAL SERVICE USE ONLY) | |
| --- | --- |
| PO ZIP Code | Day of Delivery ☐ Next ☐ 2nd ☐ 3rd Del Day | Postage $ |
| Date Accepted | Scheduled Date of Delivery Month Day | Return Receipt Fee $ |
| Mo. Day Year | Scheduled Time of Delivery ☐ Noon ☐ 3 PM | COD Fee $ / Insurance Fee $ |
| Time Accepted ☐ AM ☐ PM | Military ☐ 2nd Day ☐ 3rd Day | Total Postage & Fees $ |
| Flat Rate ☐ or Weight lbs. ozs. | Int'l Alpha Country Code | Acceptance Emp. Initials |

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

☐ WAIVER OF SIGNATURE (Domestic Mail Only)
Additional merchandise insurance is void if
customer requests waiver of signature.
I wish delivery to be made without obtaining signature
of addressee or addressee's agent (if delivery employee
judges that article can be left in secure location) and I
authorize that delivery employee's signature constitutes
valid proof of delivery.

NO DELIVERY
☐ Weekend ☐ Holiday       Mailer Signature

**FROM:** (PLEASE PRINT)  PHONE (    )

**TO:** (PLEASE PRINT)  PHONE (    )

Professor Steven Knapp
President, GWU
2121 Eye Street, NW,
Washington, DC 20052

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call **1-800-222-1811**

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

EMS

12/8/2007



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

**Plaintiff Exhibit J**
1 page

EXECUTIVE VICE PRESIDENT FOR ACADEMIC AFFAIRS

November 18, 2005

Professor Debabrata Saha
9409 Fair Pine Lane
Great Falls, VA 22066

Dear Professor Saha:

Professor Korman informed me of your November 10, 2005 inquiry regarding your teaching status for the Spring 2006 semester. As I stated in my letter to you dated 29 August, as modified by my letter dated 3 October, you are on paid suspension until further notice.

If you have any questions, please feel free to call me.

Sincerely,

Donald R. Lehman

cc:    Professor Korman

**08  0087**

**FILED**

JAN 16 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

08-87
RCL

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS The George Washington University (SERVE: |
|---|---|
| Debabrata Saha | GWU President Steven Knapp), Mona E, Zaghloul, Wasyl |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF FAIRFAX
(EXCEPT IN U.S. PLAINTIFF CASES)

Wasylkiwskyj, Edward Della Torre, Joan Schaffner, Stephen J.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Trachtenberg
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

9409 FAIRPINE LN., GREAT FALLS
PRO SE     VA-22066
(703) 757-5418

Case: 1:08-cv-00087
Assigned To : Lamberth, Royce C.
Assign. Date : 1/16/2008
Description: TRO/PI

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

(P)

| ☐ A. Antitrust | ☒ B. Personal Injury/ Malpractice | ☐ C. Administrative Agency Review | ☐ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ☐ E. General Civil (Other) OR ☒ F. Pro Se General Civil |
|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (If not administrative agency review or Privacy Act |

(11)

| □ G. Habeas Corpus/ 2255 | □ H. Employment Discrimination | □ I. FOIA/PRIVACY ACT | □ J. Student Loan |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| □ K. Labor/ERISA (non-employment) | □ L. Other Civil Rights (non-employment) | □ M. Contract | □ N. Three-Judge Court |
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify)  □ Multi district Litigation  □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Breach of Employment Contract arising out of retaliations after whistle blowing : ostracism, defamation, harassment and retaliatory discrimination, and other civil right violations causing, emotional trauma and financial ruin.

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23  **DEMAND $** 50,000,000  Check YES only if demanded in complaint **JURY DEMAND:** □ YES  □ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☒ YES  □ NO  If yes, please complete related case form.

**DATE** 01/16/2008  **SIGNATURE OF ATTORNEY OF RECORD**

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.