## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEBABRATA SAHA, Ph.D.,               )
                                            )
Plaintiff,                         )
                                            )
v.                                )      C.A. NO. 1:08-00087 RCL
                                            )
GEORGE WASHINGTON UNIVERSITY, et al.   )
                                            )
Defendants.                      )
                                            )

## DEFENDANTS' MOTION TO DISMISS

Defendants The George Washington University, Mona E. Zaghloul, Wasyl Wasylkiwskyj, Edward Della Torre, Joan Schaffner and Stephen Joel Trachtenberg, by counsel, hereby move this Court pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss with prejudice the complaint filed by Plaintiff Debabrata Saha in the above-captioned case.

The grounds for this motion are set forth fully in the accompanying memorandum of points and authorities, which is incorporated herein by reference.

Douglas B. Mishkin, DC Bar # 338590
Pamela S. Richardson, DC Bar # 500564
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Counsel for Defendants

Dated: February 20, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBABRATA SAHA, Ph.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. NO. 1:08-00087 RCL |
| | ) |
| GEORGE WASHINGTON UNIVERSITY, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendant The George Washington University ("GWU" or the "University") revoked the tenure of Plaintiff Debabrata Saha ("Saha") and terminated his employment on March 1, 2007 after a duly-constituted hearing committee of six of Saha's tenured faculty peers ("Hearing Committee") found this to be "a case of egregious and persistent neglect of professional responsibilities:"

> For more than five years, Professor Saha has failed to engage with his colleagues or the administration. He attended no faculty meetings, served on no committees, submitted no annual reports, submitted no student evaluations, and published nothing. Moreover, he has had virtually no communications with his colleagues....The depth and breadth of his neglect of professional responsibilities cannot be tolerated as it places severe strain on the university administration as well as [on] Professor Saha's fellow colleagues. With the privilege of tenure comes obligation as well and to allow a tenured professor to blatantly disregard the obligations of tenure to this degree severely blemishes the institution of tenure. Moreover, the University has given Professor Saha ample notice of his neglect and several opportunities to correct this neglect over the years without success. In sum, this Panel finds that the University demonstrated by clear and convincing evidence that Professor Saha persistently neglected his professional responsibilities and thus has proven adequate cause for tenure revocation.

Ex. 1, Hearing Committee Decision at 13[1].

---

[1] This motion to dismiss may include the Hearing Panel Decision because Saha incorporates the Hearing Panel Decision by reference throughout his complaint, and actually quotes from it in one place. Complaint at p. 12; *Vanover v. Hartman*, 77 F.Supp.2d 91, 98 (D.D.C. 1999)(when document is referred to in complaint and is central to plaintiff's

Saha's new lawsuit[2] is noteworthy for what he does <u>not</u> allege. He does not allege that he <u>did</u> "engage with his colleagues or the administration," or that he did attend faculty meetings, serve on committees, submit annual reports, submit student evaluations or publish scholarly articles. In sum, Saha does not allege that he did <u>not</u> persistently neglect his professional responsibilities.

Instead, Saha lists 28 alleged breaches of his employment contract. Complaint at pp. 32-36. To the extent Defendants understand Saha's complaint, it appears that most of these alleged breaches are unrelated to the revocation of his tenure and the termination of his employment. Some involve matters that occurred well more than three years before the filing of this lawsuit, and thus are barred by the statute of limitations.[3] Others repeat allegations in Saha's already-pending lawsuit against the University for false imprisonment and invasion of privacy/false light arising out of his impermissible appearances on campus on September 1 and 2, 2005 in violation of his fourth suspension.[4] Still others are miscellaneous allegations that simply fail to state a claim, such as Saha's assertion that he was "ostracized" by the very colleagues with whom he refused to communicate for ten years.[5]

The remaining alleged breaches of contract appear to pertain, directly or indirectly, to the revocation of Saha's tenure[6] and the termination of his employment.[7] As with the allegations

---

claim, it may be attached to motion to dismiss without converting it to motion for summary judgment; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-153 (2d Cir. 2002)(complaint is deemed to include any written instrument attached as exhibit or any statements or documents incorporated in it by reference . . . Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint)(citations omitted).

[2]On August 26, 2006, Saha filed *Saha v. Lehman et al.*, C.A. No. 06-1493 (RCL). *Infra* at 5. Defendants' motion for summary judgment in that case is pending.

[3] *See* paragraph numbers 8-11, 24 and 28 in the complaint at pp. 33-36.

[4] *See* paragraph numbers 14-16, and 27 in the complaint at pp 33, 35.

[5] *See* paragraph numbers 12, 21-23, and 25 in the complaint at pp 34-35.

[6] *See* paragraph numbers 3-7, 13, 17-20, and 26 in the complaint at pp 32-36.

associated with the other alleged breaches, none contradicts the factual findings of the Hearing Committee that Saha persistently neglected his professional responsibilities, none cites a specific provision of the Faculty Code (or any other alleged source of contractual obligation) that supposedly was violated and none states a claim for breach of Saha's contract with the University.

In addition to suing the University, Saha has sued the former president of the University (Stephen Joel Trachtenberg), the law professor who chaired the Hearing Committee that recommended the revocation of his tenure (Joan Schaffner) and three professors (Mona Zaghloul, Wasyl Wasylkiwskyj and Edward Della Torre) in the University's Department of Electrical and Computer Engineering (Saha's former academic home). Saha has not identified any contract he allegedly had with any of these individuals, much less a contract that any of them allegedly breached, and has failed to state a claim for which any of these individuals can be liable. They, too, should be dismissed from this case.

## BACKGROUND

Saha was hired in June 1986 in a non-tenure-accruing faculty position in the University's Department of Electrical and Computer Engineering ("Department") within the School of Engineering and Applied Sciences ("SEAS"). Complaint at Ex. A. On May 22, 1992, Saha was granted tenure. Ex. 1 at 1.

The Faculty Code and the Faculty Handbook set forth the terms and conditions of employment for all University faculty, including Saha. Faculty Code - Governing the Academic Personnel of the University, Complaint at Ex. B; Complaint at Ex. C at 1. The Faculty Code specifies the professional responsibilities of all University faculty, including:

> Members of the faculty shall perform their other academic duties conscientiously; they shall attend faculty meetings, commencement exercises, convocations, and other academic events; serve on faculty

---

[7] *See* paragraph numbers 1-2 in the complaint at p. 32.

3

> or University committees; assist in the administrative work of their departments and in the general administrative work on the University; and serve as general or departmental advisers to students.

Faculty Code, Art. III, § D, Complaint at Ex. B, p. 6.

The Hearing Committee Decision, referenced throughout but not attached to Saha's complaint, recites the key points of his ten years of persistent neglect that led to the revocation of his tenure. From 1997 to 2003, Saha was suspended three times for neglecting his professional responsibilities – from February to August 1997, from January to April 1999 and again from January 1-13, 2003. Ex. 1 at 2, 4. Even after his third suspension and reinstatement, Saha continued to neglect his duties. Ex. 1 at 4.

The Hearing Committee noted the final sequence of events that triggered the University's request to revoke Saha's tenure. In November 2004, he gave three Departmental administrative assistants an envelope with strange contents: a document inexplicably entitled "Memoir # n+3" in which Saha recounted stalking the former Dean of GW's School of Engineering and Applied Sciences (SEAS) and made references to "Academic (!) Mafia Bosses;" a letter that Saha had given to his faculty colleagues eight years earlier accusing Defendant Professor Mona Zaghloul of lying about him; and a copy of a grade sheet he created in 2001 (in lieu of using the University-required grade sheet). Ex. 1 at 4-5. The Hearing Committee observed that "a reasonable person would be concerned by the receipt of these materials in a professional setting." Ex. 1 at 5.

Prompted by their concern about this episode, Saha's Departmental colleagues designated a subcommittee of tenured faculty members to investigate his conduct since April 1999, when he had been reinstated (following his second suspension) subject to eleven express conditions. Ex. 1 at 5. On May 2, 2005, that subcommittee unanimously found that Saha had engaged in persistent neglect of his professional responsibilities and in gross personal misconduct. Id.

After attempting unsuccessfully to resolve the situation amicably (Hearing Committee

Decision at 6), University Executive Vice President for Academic Affairs Donald R. Lehman and

SEAS Dean Timothy Tong filed a complaint with the Faculty Senate Dispute Resolution Committee

seeking the revocation of Saha's tenure for "persistent neglect of professional responsibilities" and

for "gross personal misconduct that destroys academic usefulness" pursuant to Article V of the

Faculty Code. Ex. 1 at 5; Faculty Code Art. V, § C(1) and Procedures for the Implementation of the

Faculty Code ("Faculty Code Procedures"), § F(1), Complaint at Ex. B, pp. 11-12, 30-31. The Chair

of the Faculty Senate Dispute Resolution Committee appointed a Hearing Committee comprising

six tenured faculty members. Ex. 1 at 6; Faculty Code Procedures § F(2)(a), Complaint at Ex. B, p.

31. Defendant Joan Schaffner, a professor on the law faculty, chaired the Committee. Ex. 1 at 1.

After seven days of hearings with 17 witnesses, the Hearing Committee

found that this was

> . . . an extreme case of neglect of professional duties. The undisputed
> facts establish that at least from 2000-2005, Professor Saha
> completely failed to meet all but one responsibility - the teaching of
> his classes. Professor Saha provided no service to the University nor
> participated in academic life. He attended no department meetings,
> participated in no department, school, or university committee, and
> submitted no annual reports or student evaluation of his classes . . .
> His colleagues all testified that they had virtually no contact with him
> and that, in fact, he avoided contact with them. Moreover, he
> published nothing during this time . . . Professor Saha explained that
> he has been working on a book since 1999 but provided no evidence
> of his progress when asked by the Panel to produce something.

Ex. 1 at 8-9. The Hearing Committee unanimously concluded that the University had demonstrated

by clear and convincing evidence that Saha "persistently neglected his responsibilities and thus has

proven adequate cause for tenure revocation." Ex. 1 at 13.[8]

---

[8] The Hearing Committee found that the University did not demonstrate by clear and convincing evidence that
Saha engaged in gross personal misconduct that destroys academic usefulness. Ex. 1 at 1.

Saha appealed the Hearing Committee Decision to the full Dispute Resolution Committee, pursuant to Faculty Code Procedures § F(4). Complaint at p. 13, ¶ 23; Faculty Code Procedures § F(4), Complaint at Ex. B, p. 32. While his appeal was pending, on August 24, 2006, Saha filed *Saha v. Lehman et al.*, C.A. No. 06-1493 (RCL)("First Lawsuit"). In the First Lawsuit, Saha sued Lehman, Tong and the University for false imprisonment and invasion of privacy/false light arising out of his impermissible presence on campus on September 1 and 2, 2005 in violation of his fourth and final suspension. Saha's complaint did not challenge any aspect of the work of the Hearing Committee, which had issued its decision the previous month.

On December 4, 2006, the Dispute Resolution Committee unanimously affirmed the Hearing Committee's Decision. Complaint at p. 13, ¶ 23; Ex. 2[9]. On January 1, 2007, Saha amended his complaint in the First Lawsuit to seek a declaratory judgment prohibiting the University from relying on events that had occurred more than three years earlier in considering revocation of Saha's tenure. Saha said nothing in the amended complaint about the one-month-old decision of the Dispute Resolution Committee rejecting his appeal.

Following the Dispute Resolution Committee's affirmance of the Hearing Committee Decision, the University revoked Saha's tenure and terminated his employment, effective March 1, 2007. Ex. 3[10]; Affidavit of John F. Williams, Jr.

---

[9] Saha references this decision of the Dispute Resolution Committee in his complaint at p. 13 ,¶23, making its inclusion in this motion appropriate. *See* n.1, *supra.*

[10] This termination letter was delivered to Saha via courier and regular mail; nevertheless, Saha does not acknowledge receipt. *See* Ex. 1 at 3 ("Professor Saha testified that he received virtually no communication from the university [sic] for the period 1997-2005... .The Panel finds it implausible that Professor Saha received virtually no communication from the University for a period of eight years."); Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment in First Lawsuit at pp. 1-2; Defendants' Reply In Support Of Motion For Summary Judgment in First Lawsuit at p.2 and n.1, p. 2. Thus, Defendants' inclusion of this termination letter technically may convert this motion to a motion for summary judgment. Fed. R. Civ. P. 12(b). Defendants note that Saha's denial of receipt of the termination letter does not salvage any of the claims in his complaint. Even if – implausibly – Saha did not receive the termination letter either by courier or by regular mail, that fact does not negate Saha's persistent neglect of his professional responsibilities and does not convert any of Saha's allegations into an actionable claim.

## ARGUMENT

Pursuant to Fed. R. Civ. P. 12(b)(6), dismissal is warranted if the plaintiff has not pleaded "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v Twombly*, 127 S.Ct. 1955, 1974 (2007); *Paul v Judicial Watch, Inc.*, No. 07-279, 2008 U.S. Dist. LEXIS 8266, at *2-3 (D.D.C. Feb. 6, 2008)[11] (Lamberth, J.) (citing *Bell Atlantic Corp.*, 127 S.Ct. at 1974). Although the plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged," *Barr v Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004), the Court "need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint." *Paul*, 2008 U.S. Dist. LEXIS 8266 at 3 (citing *Kowal v MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Saha's complaint is replete with such unsupported inferences and allegations.[12]

Most of the 28 allegations that Saha labels "breaches of contract" have nothing to do with the revocation of his tenure. Complaint at pp. 32-36. In Section I below, Defendants show that some of these alleged breaches are barred by the statute of limitations, some repeat claims from the First Lawsuit and none states a claim. In Section II, Defendants show that those alleged breaches that pertain, directly or indirectly, to the tenure revocation process also fail to state a claim. In Section III, Defendants show that, at a minimum, the individual defendants should be dismissed.

---

[11] A copy of this unreported decision is annexed hereto as Appendix A.

[12] Saha's 40-page complaint is not easy to read. It contains many allegations that are simply not relevant to this motion. To aid this Court, Defendants have limited this motion to those allegations that pertain to Saha's failure to state a claim. For purposes of this motion only, Defendants treat Saha's factual allegations as true, as must the Court in evaluating Defendants' arguments. *Street v Hedgepath*, 607 A.2d 1238, 1247-48 (D.C. 1992). Defendants feel compelled to note that they do not in fact admit – indeed, they vigorously contest – Saha's allegations of unlawful conduct.

I.    SAHA'S ALLEGED BREACHES INVOLVING MATTERS OTHER THAN
      REVOCATION OF TENURE ARE TIME-BARRED, DUPLICATIVE OF THE FIRST
      LAWSUIT OR FAIL TO STATE A CLAIM

      A.    Alleged Breaches Prior To January 2005 Are Barred By The Three-Year
            Statute Of Limitations
            (Complaint at p. 33-36, Nos. 8-11, 24, and 28)

      Claims of breach of contract are governed by a three-year statute of limitations. D.C. Code

§ 12-301. Thus, at least six of Saha's alleged breaches are time-barred. Saha frames each of the

following as an alleged breach of contract:

            No. 8:  that the University allowed Executive Vice President Lehman to pressure

Saha "to drop the 1996 charges" pertaining to Saha's complaint about the administration of the

Department's qualifying examination for its doctoral program;

            No. 9:  that the University "refus[ed] to address the issues of 1996 GWU Qualifying

Exam Scandal while harassing and retaliating against Prof. Saha over the period of almost a decade

since his Whistle Blowing in 1996."

            No. 10:  that the University did not give Saha a raise in salary "since his Whistle

Blowing in 1996."

            No. 11:  that the University "threaten[ed] him unreasonably (in writing) several times

before 2005 that his tenure would be revoked..."

            No. 24:  that the University "retaliat[ed] against [Saha] through a false charge of

Scientific Misconduct, and then neglect[ed] the responsibility of repairing the damage in the

professional reputation already caused inside and outside the GWU community."[13]

            No. 28:  that the University "den[ied] Saha any relief whatsoever with respect to his

Complaint of Harassment and Discrimination" filed with various officials in 1996 and 1997.

---

[13] Saha apparently is referring to his allegation in the complaint at p. 10, ¶ 18(a), involving a matter that
occurred in 1999.

Each of these alleged breaches pre-dates the January 16, 2008 filing of this lawsuit by well more than three years, and thus is barred by the statute of limitations. To the extent that any of these alleged breaches involves conduct that occurred within three years of the filing of this lawsuit, the allegation still fails to state a claim, because Saha has not alleged (and cannot allege) a violation of any particular section of the Faculty Code.

B.    **Alleged Breaches Pertaining To Saha's September 1 and 2, 2005 Appearances On Campus In Violation Of His Suspension Duplicate Saha's First Lawsuit** (Complaint at pp. 34, 36, Nos. 14-16 and 27)

Alleged breach Nos. 14, 15, 16 and 27 all pertain to the events on September 1 and 2, 2005 when Saha appeared on campus in violation of his fourth and final suspension, and was asked to leave a classroom and then his office by University personnel. Complaint at pp. 34, 36. These events are the subject of Saha's First Lawsuit in which he alleges that the University falsely imprisoned him, invaded his privacy (false light) and violated his rights under 42 U.S.C. §1983.[14]

A plaintiff has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Zerilli v. Evening News Asso.*, 628 F.2d 217, 222 (D.C. Cir. 1980); *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007) (citing *Zerilli*, 628 F.2d at 222) (dismissing plaintiff's duplicative lawsuit where plaintiff "had a full and fair opportunity to raise and litigate in her first action the claims she now asserts in this action" because a "[d]ismissal of the duplicative lawsuit, more so than the issuance of a stay or the enjoinment of proceedings, promotes judicial economy and the 'comprehensive disposition of litigation.'"). Here, alleged breach Nos. 14, 15, 16 and 27 involve "the same subject matter at the same time in the same court and against the same defendant" as the First Lawsuit. Saha's time for further amending his complaint in that lawsuit has long passed, because discovery closed on May 30,

---

[14] On August 3, 2007, Defendants filed a motion for summary judgment in the First Lawsuit. That motion, with Saha's opposition dated November 8, 2007 and Defendants' reply dated December 5, 2007, is pending.

2007 and Defendants' motion for summary judgment is pending. Saha should not be permitted to use this lawsuit to do what he can no longer do in the First Lawsuit – to apply a new legal theory (breach of contract) to "the same subject matter." For this reason, these alleged breaches should be dismissed.

Furthermore, none of these alleged breaches cites to a specific section of the Faculty Code that the University allegedly violated. Nor could they. The Faculty Code does not prohibit the University from using the University Police Department to inform a suspended professor who has appeared on campus in violation of his suspension that he must leave. For this reason also, these alleged breaches should be dismissed.

### C.    Various Alleged Breaches Fail To State Claims
(Complaint at pp. 34-35, Nos. 12, 21-23, and 25)

Five other alleged breaches share no theme except that none identifies a specific section of the Faculty Code that the University allegedly violated and each fails to state a claim. Saha's allegation that the University "ostraciz[ed]" him (Complaint at p. 34, No. 12) might puzzle his colleagues who Saha, by his own admission, "rarely communicated with" (Ex. 1 at 3), but it does not allege a violation of the Faculty Code by the University. Nor was it a breach of the University's contract with him for his Department colleagues to install panic buttons in the office area of the Department in response to their concerns about Saha's conduct. Complaint at p. 35, No. 21. Whatever Saha means by the assertion that the University "refus[ed] to allow him in normal faculty participation which includes teaching though the Tenure Revocation attempt fell short of completion and no letter of termination issued" (Complaint at p. 35, No. 22), it is not a breach of contract. Similarly, allegations that the University "intentionally caus[ed] inconvenience and hindrance against his teaching responsibilities" and "with[drew] all resources of doing research with the students" do not allege violations of the Faculty Code by the University and thus do not state claims for breach of contract. Complaint at p. 35, Nos. 23, 25.

For these reasons, these alleged breaches fail to state a claim.

## II.    SAHA'S ALLEGED BREACHES THAT PERTAIN TO REVOCATION OF TENURE OR TERMINATION OF EMPLOYMENT FAIL TO STATE A CLAIM (Complaint at pp. 32-36, Nos. 1-7, 13, 17-20, and 26)

Saha's remaining allegations appear to pertain, directly or indirectly, to the process by which the University revoked Saha's tenure and the consequences of his loss of employment. As set forth below, none of these allegations disputes the factual basis for the revocation of Saha's tenure, none alleges a violation of any provision of the Faculty Code and none states a claim.

The Faculty Code prescribes the procedure for revoking the tenure of a professor. Faculty Code Procedures §§ E and F, Complaint at Ex. B, pp. 24-32. Faculty Code Procedures § E(3)(c)(3) notes that "[t]he procedure at the hearings shall be informal but shall comply with the requirements of fairness to the parties. The Hearing Committee is not required to comply with rules of evidence applicable in courts of law and may receive any relevant evidence that is not privileged." Faculty Code Procedures § E(3)(c)(3), Complaint at Ex. B, p.28.

The University followed the Faculty Code Procedures. Executive Vice President Lehman and SEAS Dean Tong signed a complaint seeking the revocation of Saha's tenure. Faculty Code Procedures § F(1)(a), Complaint at Ex. B, pp. 30-31. A six-member Hearing Committee was assembled. Faculty Code Procedures § F(2)(a), Complaint at Ex. B, p. 31. Saha was represented by counsel. Faculty Code Procedures § E(3)(c)(1), Complaint at Ex. B, p. 27. Saha was provided with the opportunity to request documents and the identity of the University witnesses. Faculty Code Procedures § E(3)(c)(3), Complaint at Ex. B, p. 28; Ex. 1 at 6. Saha testified on his own behalf, questioned 16 witnesses, and submitted written testimony on his own. Faculty Code Procedures § E(3)(c)(3), Complaint at Ex. B p. 28; Ex. 1 at 7. Saha's attorney presented open and closing statements. Faculty Code Procedures § E(3)(c)(4), Complaint at Ex. B, p.28; Ex. 1 at 7.

11

Following the hearing, the Hearing Committee unanimously found that the University demonstrated by clear and convincing evidence that Saha "persistently neglected his responsibilities and thus has proven adequate cause for tenure revocation." Ex. 1 at 13.

Saha does not dispute any of the factual findings set forth in the Hearing Committee's Decision that establish his persistent neglect of his professional responsibilities. Nor does Saha dispute the University's compliance with the applicable procedural requirements of the Faculty Code. Instead, Saha's thirteen remaining alleged breaches can be categorized and addressed as follows:

**During The Hearing** (Complaint at pp. 33-36, Nos. 6-7, 13, 17-20, and 26).

\*　　　The University did not breach any contract with Saha when it "refus[ed] to comply with the AAUP [American Association of University Professors] Guidelines governing revocation of tenure." (Complaint at p. 35, No. 20). The Faculty Code does not incorporate or reference any AAUP Guidelines (which Saha does not identify), and Saha does not allege that it does.

\*　　　When Saha learned that Executive Vice President Lehman was not available to return as a witness on the last day of hearings, Saha's lawyer sought and received permission to submit written questions to "determine the extent to which [the University] seek[s] to rely on Professor Saha's perceived disability in orchestrating these proceedings." Ex. 1 at 7. Saha's lawyer then attempted to exceed that permission by propounding interrogatories far outside that limited scope, asking for the identity of every tenured faculty member "who did not submit an annual report for any of the years from 1999-present" or "who missed a majority of department meetings for any of the years from 1999-present." Id. The Hearing Committee, exercising the discretion granted by the Faculty Code to limit the consideration of evidence (Faculty Code Procedures § E(3)(c)(3), Complaint at Ex. B, p. 28), properly found that Saha's inquiries were overbroad. Id. The

12

University did not breach any provision of the Faculty Code in responding as it did, and Saha does not allege that it did. Complaint at p. 36, No. 26.

     \*     Saha asserts that Lehman's "confession during Senate Hearing proved beyond any doubt that Lehman was **disingenuous** in writing the August 29, 2005 suspension letter" (Complaint at p. 34, No. 13) (emphasis in original). But Saha fails to state what Lehman allegedly "confessed," or how any such alleged confession could change the facts set forth in the Hearing Committee Decision establishing Saha's persistent neglect of his responsibilities.

     \*     Although Saha complains about procedural matters regarding the hearing (Complaint at pp. 33, 35, Nos. 6-7, 17-18)[15], he does not identify any specific procedure required by the Faculty Code that the University allegedly violated.

---

[15] No. 6: "The Schaffner Panel violated its professional ethics by refusing to hear "Taped Dialogue from 1999" that would prove GW's (written) perjury which constitutes GW's breach of its employment contract with Prof. Saha; Schaffner panel thus deliberately failed to follow GW faculty code." Saha does not identify the participants to or substance of this alleged "Taped Dialogue," and thus fails to show how this alleged refusal pertains in any way to the Hearing Committee's unanimous finding that Saha persistently neglected his professional responsibilities. Saha also fails to assert how a violation of "professional ethics" constitutes a breach of some contract between him and Defendants.

No. 7   "The Schaffner Panel, by its own admission, did not consider any of the 30 exhibits produced by Prof. Saha and considered 190 out of 192 exhibits produced by GWU. The panel thus violated the trust that was bestowed upon them, and deliberately failed to follow the wisdom of the faculty code." Under Faculty Code Procedures §E(3)(c)(3), the Hearing Committee had the discretion to decline to consider evidence based on factors such as "undue delay, waste of time, or needless presentation of cumulative evidence." Faculty Code Procedures §E(3)(c)(3), Complaint at Ex. B, p. 28. Furthermore, Saha does not assert how any of the exhibits supposedly not considered by the Hearing Committee contradict the finding that he persistently neglected his professional responsibilities.

No. 17   "GW breached its employment contract with Prof. Saha by **allowing** a procedurally illegitimate Hearing which was rigged from the very beginning against Saha (see 29G)" (emphasis in original). This allegation is a conclusion and fails to state a claim for the same reason that the other allegations it encompasses fail to state a claim.

No. 18   "GW breached its employment contract with Prof. Saha **during** the Senate Hearing [the Hearing Committee] by (a) time barring the allowable events and documents though GWU faculty code doe [sic] not allow time barring, (b) misrepresenting the facts about Saha through an **incomplete** record, and (c) refusing to produce many important documents in which Saha had the right to access to, and most significantly in refusing to produce **VP Lehman's October 30, 1997 letter** which he used in his complaint for tenure revocation" (emphases in original). Defendants respond that the Faculty Code Procedures §E(3)(c)(3) give the Hearing Committee discretion to consider or exclude evidence. Faculty Code Procedures §E(3)(c)(3), Complaint at Ex. B, p. 28. Furthermore, Saha does not explain how "events and documents" prior to 2000 could negate the Hearing Committee's unanimous finding that since 2000 he had persistently neglected his professional responsibilities.

As with Saha's other allegations, none of these alleged breaches asserts a violation by the University of the Faculty Code and none states a claim.

\*        As for Saha's assertion that the University falsified a document (Complaint at p. 35, No. 19), Saha does not identify any such document by date, subject, author, recipient or content. More important, Saha does not suggest how the alleged falsification in any way did or could change the facts of his persistent neglect of his professional responsibilities as unanimously found by the Hearing Committee.

**Before The Hearing** (Complaint at pp. 32-33, Nos. 3-5). Saha complains about alleged activities of his Departmental colleagues in collecting information about or discussing his neglect of his duties (Complaint at pp. 32-33, Nos. 5, 4). Saha's assertions about these matters do not allege conduct by the University, much less any University violation of a specific provision of the Faculty Code. Saha's procedural rights are contained in the Faculty Code Procedures, and Saha does not allege that the University breached any particular Procedure. Faculty Code Procedures §§ E-F, Complaint at Ex. B, pp. 24-32; Ex. 1 at 30-32. Regarding his fourth and final suspension in September 2005 (Complaint at p. 32, No. 3), Saha does not allege how any aspect of this suspension violated any specific provision of the Faculty Code.

**After The Hearing** (Complaint at p. 32, Nos. 1-2). After his tenure was revoked and his employment was terminated, the University stopped paying Saha (Complaint at p. 32, No. 1) and stopped allowing him use of his former office (Complaint at p. 32, No. 2). These acts were not breaches of contract; they were the consequences of the termination of his employment. Saha does not identify any portion of his contract that required the University to continue to pay him after his tenure was revoked and his employment was terminated.

None of Saha's allegations addresses, much less disputes, his persistent neglect of his responsibilities. None of his speculation about documents not received or not considered, or alleged conspiracies by any combination of colleagues, changes the facts reported in the Hearing

14

Committee Decision: that since at least 2000, Saha "completely failed to meet all but one responsibility – the teaching of his classes." Ex. 1 at 8-9.

For these reasons, Saha has failed to state a claim based on any of these alleged breaches.

## III.   SAHA HAS FAILED TO STATE A CLAIM AGAINST ANY INDIVIDUAL DEFENDANT

Saha has not alleged that any of the individual defendants had any contractual relationship with him. (None did.) *Paul*, 2008 U.S. Dist. LEXIS 8266 at *3-4 (citing *Rittenberg v. Donohoe Constru. Co. Inc.*, 426 A.2d 338, 341 (D.C. 1981)) (no contract liability for agent for acts committed by disclosed principal). The complaint makes no serious attempt to articulate any theory of liability against former President Trachtenberg or Professors Schaffner, Zaghloul, Wasylkiwskyj or Della Torre, and should be dismissed as to all of them.

## CONCLUSION

For the foregoing reasons, Defendants, The George Washington University, Mona E. Zaghloul, Wasyl Wasylkiwskyj, Edward Della Torre, Joan Schaffner and Stephen Joel Trachtenberg respectfully request that this Court dismiss Plaintiff Debabrata Saha's complaint with prejudice, with costs.

Douglas B. Mishkin, DC Bar # 338590
Pamela S. Richardson, DC Bar # 500564
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Counsel for Defendants

Dated: February 20, 2008

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of February, 2008 a true and correct copy of the

foregoing Defendants' Motion to Dismiss was sent by regular mail, postage prepaid to the following:

Debabrata Saha
9409 Fairpine Lane
Great Falls, VA 22066

Plaintiff appearing *pro se*

_____
Douglas B. Mishkin

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEBABRATA SAHA, Ph.D.,                    )
                                          )
Plaintiff,                                )
                                          )
v.                                        )        C.A. NO. 1:08-00087 RCL
                                          )
GEORGE WASHINGTON UNIVERSITY, et al.      )
                                          )
Defendants.                               )
                                          )

## ORDER

Upon consideration of Defendants' Motion to Dismiss, Plaintiff Debabrata Saha's

opposition thereto and Defendants' reply in support thereof, it is, by the Court, this ____ day of

___, 2008 hereby

ORDERED, that Plaintiff's complaint be and is DISMISSED with prejudice; and it is

further

ORDERED, the Defendants' motion to dismiss be and is GRANTED, with costs.


_____
United States District Judge


Cc:

Debabrata Saha, *pro se*

Douglas B. Mishkin, Esq.

The George Washington University Faculty Dispute Resolution Committee
Debrabata Saha Hearing Panel

*In re* Complaint Against Debrabata Saha
Seeking Tenure Revocation

July 24, 2006

Douglas Mishkin, Washington D.C. for The George Washington University .
John F. Karl Jr., Washington, D.C., for Professor Debrabata Saha.

Before ACHROL, BILES, DUNN, GUTIERREZ, KLOCK, & SCHAFFNER, Panelists.
Decision of the Panel filed by Hearing Panel Chair, JOAN E. SCHAFFNER

JOAN E. SCHAFFNER, Chair:
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## I.  Introduction

This Hearing Panel's (Panel) mandate is to decide whether the George Washington
University (University) proved, by clear and convincing evidence, adequate cause for the tenure
revocation of Professor Debrabata Saha on two grounds: "persistent neglect of professional
responsibilities" and/or "gross personal misconduct that destroys academic usefulness."  The
Panel held seven hearing sessions between January and April 2006.[1]  The parties presented
approximately 30 hours of testimony and 190 exhibits. The Panel unanimously finds that (1)  the
University met its burden on the first ground: Professor Saha has engaged in persistent neglect of
professional responsibilities for an extended period and (2) the University failed to meet its
burden on ground two: Professor Saha has not engaged in gross personal misconduct that
destroys academic usefulness.

## II.  A Summary of the Facts

Professor Debrabata Saha was appointed to a faculty position[2] with the University's
Department of Engineering and Applied Sciences, signing the appointment letter on June 11,
1986.  *Exh. 1*.   The letter formed an agreement between Professor Saha and the University,
which includes the terms embodied in the Faculty Code and Faculty Handbook.  On May 22,
1992, Professor Saha was granted tenure in the Department of Electrical Engineering and

---

[1]     The dates of the hearings were: January 30, February 27, March 6, March 20, April 3,
April 17, and April 25, 2006.

[2]     The appointment was initially a non-tenure-accruing appointment to be converted to a
tenure-accruing position upon Professor Saha obtaining permanent resident status.

Computer Sciences. *Exh. 2*. Professor Saha's area of teaching and scholarship is in Communications and Information Theory. *Transcript at 87, 90 (4/3/06)*.

The record in this case contains evidence of misconduct or neglect by Professor Saha dating back to 1996 that arose out of a controversy surrounding the February 1996 qualifying examination for the Department's doctoral program in Communications and continues through Spring 2005. Professor Saha has had significant difficulty engaging in academic life with his colleagues within his department, school, and university since 1996. *See e.g. Transcript at 115-18 (4/17/06)*. Professor Saha strongly believed that serious flaws occurred in the qualifying examination process and brought complaints to his department chair, dean, and the university administration. During that time passions were high and there existed extreme tension between Professor Saha and the other professors involved in the controversy. *See e.g. Transcript at 54 (4/25/06)*. The University conducted an investigation and found that while there existed errors in the examination process, they were not so severe as to warrant further action. *Exh. 25*. Unfortunately Professor Saha refused to accept the result of the investigation. *Transcript at 57-58 (4/27/06)*. He was suspended for the Spring 1997 semester, *Exhs. 71, 75*, and reinstated in Fall 1997 with the anticipation that he would rejoin his colleagues as a "fully participating faculty member." *Exh 185*.

Unfortunately this did not transpire. Professor Saha, by his own admission, was unable to communicate with colleagues involved in the 1996 grading incident and avoided them at all cost. *Transcript at 184-85 (4/3/06)*. By Fall 1998, a second subcommittee to review Professor Saha's conduct was convened resulting in his suspension for neglect of professional responsibilities for the Spring 1999 semester. *Della Torre Statement ¶ 11; Exh. 99*. However, the University again chose not to revoke Professor Saha's tenure but rather reinstated him pursuant to the April 1999 letter of agreement signed by Vice President Lehman and Professor Saha. *Exh. 107*. The letter expressly enumerated eleven conditions for his continued employment at GW as a tenured faculty member. These conditions were not extraordinary but rather merely reflected the obligations that all GW tenured faculty have to the institution, including : accepting proper lines of authority, meeting with Department Chair and Dean, attending faculty meetings, serving on committees, communicating with colleagues and others within the university, and filing annual reports timely. *Exh. 107*.

This Panel views this letter as a new beginning, an opportunity for Professor Saha to reintegrate into the department and a willingness on the part of the University for Professor Saha to reintegrate. This agreement was a critical juncture as it established the last formal agreement between the parties to put the past incidents behind and move forward in a positive and productive manner. Thus, this Panel bases its decision regarding tenure revocation on Professor Saha's conduct following the April 1999 agreement.

In Fall 1999, the stage appeared set for Professor Saha to reintegrate into the department. Professor Lang was Chair of the Department and had not been involved in the 1996 controversy. In fact, Professor Saha testified that he was comfortable with Professor Lang, *Transcript at 207 (4/3/06)*, and that this was a turning point for him, an opportunity to get back on track. *Transcript at 37 (4/17/06)*. However, Professor Saha admitted he took no initiative to

reintegrate into the Department. *Transcript at 178-80 (4/17/06)*. He attended two faculty meetings but never attended another. Professor Saha explained that he felt very awkward and uncomfortable in the meetings because of the presence of those individuals who had been involved in the 1996 controversy. *Transcript at 184 (4/17/06)*. When asked if he was harassed or otherwise treated improperly at the meetings he explained no, he just found it difficult to associate with these people in any context. *Transcript at 185 (4/17/06)*. This was the **only** attempt by Professor Saha to comply with his professional responsibilities during Professor Lang's tenure as Chair other than to teach his assigned courses and hold office hours. Professor Saha never attended another faculty meeting, served on no committees of the department or university, submitted no annual reports for the period 1999-00 or 2000-01, and failed to have his students complete evaluations of his courses. *Transcript at 222-24 (4/3/06)*. Moreover, in September 2000 when Dean Timothy Tong assumed the position of Dean of the Department, from outside the University, Professor Saha did not meet with him despite requests by the Dean to do so. *Tong Statement ¶ 3*.

When confronted with these facts, Professor Saha claimed that it was not his fault but rather the University's fault: for not providing him with the forms for student evaluations, *Transcript at 209-10 (4/17/06)*, or informing him that Dean Tong wanted to meet, *Transcript at 23 (4/25/06)*, and Chair Lang's fault for not doing enough to help reintegrate him into the department. *Transcript at 38-40 (4/17/06)*. Furthermore, he claimed he was following President Trachtenberg's guidance from 1996 to avoid all individuals who had been involved in the 1996 controversy. *Transcript at 198 (4/17/06); see also Transcript at 181-81 (4/17/06)*.

The Panel finds these explanations unconvincing. These excuses formed part of a theme reflected throughout these proceedings: Professor Saha testified that he received virtually no communication from the university for the period 1997-2005. *Transcript at 234 (4/3/06)*. Since he refused to use e-mail, *Transcript at 238-39 (4/3/06)*, the only means of communication was through the university mail, regular mail, phone, or in-person. With every document that the university introduced—memoranda and letters addressed to Professor Saha either at work or at home—he claimed not to have received them. *See e.g. Resp. of Professor Saha to Req. for Stipulations ¶ 39-50*. Professor Saha claimed to have difficulty with the phone because "they didn't give me the password [for the voice mail];" although he made little effort to find out what it was. *Transcript at 241-42 (4/3/06)*. As for in-person meetings, he only met with students during his office hours and if any other individual wanted to meet, including his colleagues, they were required to make an appointment. *Transcript at 244-45 (4/3/06)*. However, he testified he never received any requests for appointments and that he, in fact, rarely communicated with his colleagues. *Transcript at 246-49 (4/3/06)*. The Panel finds it implausible that Professor Saha received virtually no communication from the University for a period of eight years. One of the most acute ironies of this case is the utter lack of communication by Professor Saha with his colleagues and his assertion that the university failed to communicate with him, yet he specializes in **Communications**. The Panel finds that Chair Lang acted appropriately in his dealings with Professor Saha, did not prevent him from reintegrating, and in fact encouraged his reintegration.

Finally, regarding President Trachtenberg's statement that Professor Saha should avoid the colleagues involved in the 1996 controversy, it is unimaginable to believe that one can avoid one's colleagues **indefinitely** and remain a productive faculty member. Professor Saha signed the April 1999 agreement that clearly required he communicate with his colleagues, including administrators, and that he follow proper lines of authority. The April 1999 agreement makes no mention of an exception for colleagues involved in the 1996 controversy or of any communication or agreement with President Trachtenberg. Professor Saha testified that he believed Trachtenberg's statement to be incorporated in the April 1999 agreement with Vice President Lehman. However Professor Saha did not mention this to Lehman at the time of their April 1999 agreement, much less include it in the written document. *Transcript at 174-76 (4/3/06).* Finally, it is particularly interesting that Professor Saha did make a handwritten notation on the April 1999 agreement clarifying that his signature did not constitute admission of any wrongdoing. *Transcript at 186 (4/3/06).* Surely if he thought to add this language, he would have added the Trachtenberg statement as well. Under no contract principle can the April 1999 agreement between Lehman and Saha incorporate Trachtenberg's statement from 1996. Moreover, it is apparent to the reasonable person that the statement was not intended to relieve Saha from ever communicating again with these colleagues or participating as an active faculty member in his department.

The situation did not improve when Professor Vojcic assumed Chairmanship of the Department in July 2001. Professor Saha continued in his neglect--he attended no faculty meetings, filed no annual reports, served on no committees, submitted no student evaluations, *Transcript at 206-07 (4/17/06),* refused to communicate directly with Chair Vojcic, *Transcript at 197-98, 202-04 (4/17/06),* and had little, if any, communication with his colleagues throughout Chair Vojcic's tenure which ended December 2004. *Transcript at 204 (4/3/05).* During this period there were also isolated instances of difficulties. These instances included creating his own grading sheet rather than using the grades sheets provided by the university (Fall 2001), *Exh. 119;* failure to attend the first class meeting of ECE 244-10 without notice (January 17, 2002) and not meeting with Vojcic to discuss this matter; *Vojcic Statement ¶¶ 16, 22;* and the receipt of two student complaints about his classroom behavior (October 2002). *Exhs. 125,126.* Professor Saha admitted that he would sometimes use class time to complain about the university administration about issues he found lacking, including the resources and use of the Virginia Campus. *See Transcript at 56-60, 121-24 (4/17/06).* Admittedly individually each situation is not egregious. Occasionally, students complain about teachers (especially if they fail to do well in their course--as was the case with these two students) or faculty sometimes make comments in class out of frustration with a given situation. But here the sum of these instances, in addition to the complete failure to participate in the department, is problematic. Moreover, Professor Saha admitted that he has not published anything since 1999 although he has been working on research for a book. However, Professor Saha presented no evidence of any progress on this project. *Transcript at 64-70 (4/17/06).*

Professor Saha was suspended for the third time for two weeks in January 2003 as a result of his neglect. *Exh. 129.* Upon his reinstatement, however, Professor Saha continued his neglect of responsibilities. *Transcript at 222-24 (4/3/06).* Moreover, in November 2004, Professor Saha distributed an envelope to three administrative assistants in the school containing

three documents–a personal note dated October 14, 2004 regarding former Dean Frieder, *Exh. 136*; a May 1996 letter from Professor Saha addressed to "Dear Colleagues" accusing Professor Zaghoul of lying about him, *Exh. 27*; and a copy of the grade sheet he created in 2001. *Exh. 119.* The note regarding the former Dean contained references to "Academic (!) Mafia Bosses." *Exh. 136.* The receipt of these materials, which contained no explanation from Professor Saha as to the materials' purpose, concerned the assistants. *See Exh. 137.* Although Professor Saha testified that he considered the assistants his friends and wanted to explain to them what had happened over the years, *Transcript at 140-48 (4/17/06)*, a reasonable person would be concerned by the receipt of these materials in a professional setting.

In January 2005, Professor Zaghoul replaced Professor Vojcic as interim Chair for the semester and established another subcommittee of faculty from the department to investigate Professor Saha's conduct since April 1999. *Zaghoul Statement ¶¶ 55, 59, Della Torre Statement ¶ 16, Tong Statement ¶ 9.* The subcommittee was a fact-finding committee to review the record and compile a report of Professor Saha's conduct since April 1999. *Della Torre Statement ¶ 16; Transcript at 114 (3/20/06).* The subcommittee performed no independent investigation but rather took the files given them by the Chair and compiled a record/report of Professor Saha's conduct. *Transcript at 115-17 (3/20/06).* The subcommittee did not meet with Professor Saha nor give him an opportunity to comment on the report. *Transcript at 88-89 (3/20/06).* On May 2, 2005, the Personnel Committee of the department met and voted unanimously that Professor Saha had engaged in persistent neglect of his professional responsibilities and had engaged in gross personal misconduct. *Della Torre Statement ¶ 16, Zaghloul Statement ¶ 60.* On September 16, 2006, Vice President Lehman commenced this proceeding to revoke Professor Saha's tenure. *Lehman Statement ¶ 30.*

## III.  The Principles/Law of this Case

### A.  Tenure–Essential to the protection of academic freedom

Tenure is a very important and revered institution. Tenure serves two primary purposes: the protection of academic freedom and the provision of economic security. Tenure protects faculty from "arbitrary or retaliatory dismissals based on an administrator's . . . distaste for the content of a professor's teaching or research . . . . It is designed to foster our society's interest in unfettered progress of research and learning by protecting the profession's freedom of inquiry and instruction." *Browzin v. Catholic University,* 527 F.2d 843, 846 (D.C. Cir. 1975). As such, tenure rights are closely protected and are not forfeited easily. The GW Faculty Code (Code), consistent with the principle of protecting tenure, requires a showing of adequate cause by the University by clear and convincing evidence before tenure can be revoked. *See GW Faculty Code, 11 (2004) [hereinafter Code].* The decision to revoke must be approached with the utmost care and careful consideration otherwise the institution will become meaningless and the academic freedom of faculty will be destroyed. Thus, only egregious instances of neglect and/or misconduct by a faculty member should warrant the revocation of tenure.

In return for the privilege of tenure, faculty are required to meet certain fundamental responsibilities to their students, colleagues, and the institution. These basic responsibilities

generally fall into three categories: teaching, scholarship and service. *See Code, 7, 8.* Each tenured faculty member is required to meet the basic standards of teaching, scholarship, and service in order to enjoy the benefits of tenure otherwise the reputation of the institution is severely tarnished. It is imperative that the public not think that tenure is a license to faculty to sit back and do little, relying on tenure to avoid being held accountable.

## B. Due Process–An opportunity to be heard

Not only is the standard for revocation high, but special procedural protections accompany the revocation of tenure as well. Many employment contracts are at-will, allowing the employer to fire an employee for any reason or no reason at all.[3] However, before tenure may be revoked, the University must demonstrate adequate cause and the faculty member given a reasonable opportunity to respond and defend his or her actions. *Code at 31-33.* The Code binds the university and its faculty. It comprises a significant part of the contractual agreement formed between the university and faculty member at the time of appointment. The Code not only defines the substantive terms for tenure revocation, cited above, but also the procedural terms.

The University and this Panel have complied with these procedural requirements. Vice President Lehman met with Professor Saha in September 2005 and offered to resolve the situation amicably, but Professor Saha found the offer unacceptable. *Transcript at 24 (4/25/06).* On September 16, 2005 this proceeding was commenced by the filing of the complaint signed by the Executive Vice President for Academic Affairs, Donald Lehman and the Dean of the School of Engineering and Applied Sciences, Timothy Tong. The complaint set forth the grounds alleged to constitute adequate cause for dismissal. *Code at 31.* Professor Saha was given adequate time to answer. *Code at 32.* The Hearing Panel was appointed by the Chair of the Dispute Resolution Committee in compliance with the requirements stipulated in Part XIII.F.2(b). Professor Saha was represented by counsel. Professor Saha first argued that the allegations of the complaint did not state with sufficient particularity the basis for tenure revocation. *Fax from John Karl (Dec. 5, 2005).* In response, the Panel requested that the University file a supplemental complaint and that Professor Saha reply. Professor Saha also submitted a lengthy document request on Dec. 5, 2005, which the Panel allowed. *Fax from John Karl (Dec. 5, 2005); Saha Panel Memorandum to Parties (Dec. 7, 2005).*

The Hearing Panel first convened a pre-trial status conference on December 20, 2005, in which questions of pleading, discovery, and timing for the exchange of document and witness lists were addressed. *Saha Panel Memorandum to Parties (Dec. 7, 2005).* Professor Saha was provided the opportunity to request documents and the identity of witnesses from the University and received such information before and during the hearing process. The Panel began the

---

[3]     William M. Howard, *Common-Law Retaliatory Discharge of Employee for Disclosing Unlawful Acts or Other Misconduct of Employer or Fellow Employees,* 105 A.L.R.5TH 351 (2003) ("At common law, an employee is generally considered to be employed "at will" and, in the absence of a contract, may be discharged by the employer for any reason whatsoever, or no reason at all.").

evidentiary hearings approximately six weeks later on January 30, 2006 and convened six additional times, ending April 25, 2006. During this period, Professor Saha testified on his own behalf, questioned 16 witnesses, and submitted written testimony of his own. His counsel presented open and closing arguments and a stenographic record was made of the proceedings. Counsel for each party received the hearing transcript after each hearing date. The process met the standard as defined in Part E.4.c(3): an "informal" proceeding that complies "with the requirements of fairness to the parties."

Professor Saha claims that these proceedings were defective because of the use of the supplemental complaint and the denial of full document production. The Panel disputes these contentions. First, as indicated above, the Panel requested that the University file the Supplemental Complaint **at the request of Professor Saha** who claimed the original complaint lacked sufficient particularity. If anything, this benefitted Professor Saha. Second, Professor Saha was entitled to inspect and copy . . . all relevant documents in control of the [University] and not privileged." *Code at 29.* The Panel provided ample opportunity both before the hearings began and during the hearings for Professor Saha to obtain all relevant documents. Moreover, the Panel has the authority to: "exclude matters it deems irrelevant; to place reasonable limits on arguments, the presentation of evidence, and the questioning of witnesses by the parties [and] may decline to consider evidence when its probative value is outweighed by considerations of unfair prejudice, confusion of the issues, undue delay, waste of time, or needless presentation of cumulative evidence." *Code at 28.*

The Panel did deny Professor Saha's last minute interrogatory request filed on April 27, 2006, following the final hearing on the basis that the request was untimely and over broad and that the documents requested were not sufficiently relevant to warrant the delay and expense of compliance. The Panel had granted Professor Saha an opportunity to submit questions to Vice President Lehman who was not available in-person on the last day of hearings, April 25, 2006, to "determine the extent to which they seek to rely on Professor Saha's perceived disability in orchestrating these proceedings." *Letter from John Karl (Apr. 20, 2006).* The interrogatories, however, went far beyond the scope of Mr. Karl's initial request. Specifically, he requested from the University: "Every tenured faculty member who did not submit an annual report for any of the years from 1999-present" and "Every tenured faculty member who missed a majority of department meetings for any of the years from 1999-present." *Letter from John Karl (Apr. 20, 2006).* This request was clearly untimely since Professor Saha knew from the filing of the complaint that among the alleged neglect was his failure to attend faculty meetings and file annual reports. It is over broad as it targets any faculty member who has missed filing only ONE annual report or missed a majority of faculty meetings in ONE year. However, the undisputed facts of this case are that Professor Saha missed EVERY faculty meeting from 2000-2005 and failed to file ANY annual reports during this same period. Nevertheless, the University did respond to the two requests that fell within the scope of the original inquiry. *Lehman Statement (May 2, 2006).* In sum, the Panel provided a fair process by granting Professor Saha more than ample opportunity for discovery and to be heard.

## C. Adequate Cause for Tenure Revocation

Both parties agree that the complaint filed by the University to revoke Professor Saha's tenure sounds in breach of contract. The contract between the University and Professor Saha, as outlined in the Code, provides that only upon a showing of adequate cause, by clear and convincing evidence, may tenure be revoked.

Adequate cause shall mean unfitness to perform academic duties because of:

    a)    incompetence;

    b)    lack of scholarly integrity;

    c)    persistent neglect of professional responsibilities under this Code; or

    d)    gross personal misconduct that destroys academic usefulness.

*Code at 11.*

The University alleges Professor Saha violated parts c and d: specifically that Professor Saha has persistently neglected his professional responsibilities under this Code and has engaged in gross personal misconduct that destroys academic usefulness.

### 1.    Persistent Neglect of Professional Responsibilities

The phrase "persistent neglect" in the Code/contract, as a matter of law, is "to be given [its] common meaning." *Kakaes v. George Washington Univ.*, 683 A.2d 128, 132 (DC 1996). If ambiguous, terms are to be construed in keeping with the general usage and custom at the University and within the academic community. *McConnell v. Howard University*, 818 F.2d 58, 64 (D.C. Cir 1987). Merriam-Webster's On-Line Dictionary defines "persistent" as "existing for a long or longer than usual time or continuously," and "neglect" as "to give little attention or respect to; to leave undone or unattended to especially through carelessness." A faculty member's responsibility to the University is to provide "professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service." *Code at 7, 8.* Thus "persistent neglect of professional responsibilities" would require a faculty member to carelessly or willfully disregard their duty to teach, write, and/or participate in service to the university repetitively for an indefinitely long period of time. This threshold is a high one and has two dimensions–breadth and depth. The breadth of one's neglect would involve the number of duties neglected, while the depth would involve the amount of time during which the neglect continued. For example, merely failing to comply with minor administrative duties for a limited period would not suffice to establish adequate cause for tenure revocation–the breadth and depth of neglect must be substantial before tenure is revoked to protect tenured faculty from overly zealous administrators.

This case is an extreme case of neglect of professional duties. The undisputed facts establish that at least from 2000-2005 Professor Saha completely failed to meet all

but one responsibility–the teaching of his classes. Professor Saha provided no service to the University nor participated in academic life. He attended no department meetings, participated on no department, school, or university committee, and submitted no annual reports or student evaluations of his classes. *Transcript at 222-230 (4/3/06)*. His colleagues all testified that they had virtually no contact with him and that, in fact, he avoided contact with them. Moreover, he published nothing during this time. *Transcript at 230-32 (4/3/06)*. Professor Saha explained that he has been working on a book since 1999 but provided no evidence of his progress even when asked by the Panel to produce something. *Transcript at 64-70 (4/17/06)*.

Professor Saha argues that his conduct must be reviewed reasonably in light of the mitigating circumstances,[4] specifically (1) whether Professor Saha acted reasonably in response to the appointment of Professor Vojcic as Chair; (2) whether Professor Saha took reasonable steps to minimize conflict with Professor Vojcic by maintaining a low profile; and (3) whether, under the circumstances, GW's lack of action to rectify the pre-1999 situation excuses some or all of Professor Saha's breach of his contractual obligations.

The Panel finds the answer to each question is "no." The pre-1999 events (specifically the events of 1996-97) obviously affected Professor Saha dramatically and perhaps rightfully so. This Panel does not hold his conduct during that trying time against him. However, a reasonable person must move forward and place the events of the past behind him or her in order to function effectively. Professor Saha failed to do this by his own choice. First, Professor Saha did not participate in the department prior to Professor Vojcic's appointment as chair even though Professor Lang, with whom Professor Saha had a good relationship, was chair. When Professor Vojcic was appointed chair, Professor Saha refused to communicate directly with him. *Transcript at 197-98 (4/17/06)*. This is not a reasonable response. The chair of a department is the first-level administrator, and a faculty member must communicate with his chair to be effective. The Panel rejects Professor Saha's attempt to justify his own failures by casting blame on various individuals who served as his department chair.

Second, Professor Saha did more than maintain a *low* profile, he maintained *no* profile within the department as he was virtually absent from the department when he was not teaching class or in his office for office hours to meet with students only. More importantly however, Professor Saha never explained what conflict he was trying to minimize. There was no evidence presented that Professor Vojcic treated Professor Saha any differently than any other faculty member during his tenure as chair. *Transcript at 197-98 (4/17/06)*.

---

[4]    *See McConnell v. Howard University*, 818 F.2d 58 (D.C. Cir. 1987) (faculty member's tenure revoked for neglect for failure to teach a class after a student calls the professor a "condescending, patronizing racist" and refuses to apologize, explain her continued refusal to speak with him about the incident, or leave the room when requested).

Finally, the evidence clearly demonstrates that GW did take efforts to rectify the pre-1999 situation. Vice President Salaman wrote a lengthy memorandum evaluating the 1996 incident and found that no serious wrong had been done. *Exh. 25.* Moreover, when allegations of plagiarism against Professor Saha were made, the University investigated and determined that they were not supported by the evidence. *Transcript at 74-76 (3/20/06).* Finally, the University entered into an agreement with Professor Saha in April 1999 in an effort to allow him to move forward and reintegrate into the department.[5] In sum, in light of all the circumstances, this Panel finds that Professor Saha acted unreasonably and his continued neglect of most of his professional responsibilities warrants adequate cause for tenure revocation.

Professor Saha argues that the statute of limitations for contract actions is three years and thus any conduct prior to May 2003 cannot form a basis for tenure revocation. This is a rather unusual argument in light of the specific situation here. When the basis for tenure revocation requires **persistent** neglect of duties, it would appear to be in the interest of the faculty member to argue that the university must demonstrate a lengthy neglect of duties–presumably more than three years of neglect. The cases cited by Professor Saha are cases by a faculty member against a university based upon a specific act of a university denying or revoking tenure or promotion.[6] These cases demonstrate that when the alleged breach is a single act of alleged misfeasance, the wronged party must raise the claim within three years. Here, the complaint is by a university against a faculty member and the alleged breach is continuing neglect by the faculty member. Thus, the Panel finds that more than three years of neglect by Professor Saha can be relied upon to support tenure revocation. However, the Panel does agree that returning to the events pre-1999 is inappropriate in this case given the agreement between the parties in April 1999 establishing a "new beginning" for Professor Saha. However, were the Panel limited to a three-year limitations period, Professor Saha neglected his professional responsibilities throughout this period and thus tenure revocation is warranted in any event. Furthermore, Professor Saha's claims that the university failed to rectify pre-1999 events would be untimely under his argument as well. In fact, at no time after 1997 did Professor Saha bring any complaint against the University for any alleged wrongdoing, mistreatment, or neglect.

Finally, Professor Saha argues that the entire process followed by the department in the Spring of 2005 was "rigged" and thus tenure revocation is inappropriate. Specifically, Professor Saha claims that: (1) the University never notified Professor Saha of the Spring 2005 Subcommittee established to review his record nor the Personnel Committee Meeting of May 2, 2005 at which the department's tenured faculty voted

---

[5]    *Id.* (university fails to address the slander of a professor by a student during class by transferring the student or assigning the faculty member to a different section even though the university stated its strong disapproval of the behavior by the student).

[6]    *See* Kyriakopoulos v. George Washington University, 866 F.2d 438 (D.C. 1989) (failure of university to promote faculty member).

unanimously that Professor Saha's conduct constituted adequate cause for tenure revocation; (2) Professor Saha was not provided an opportunity to present his side of the story to the Subcommittee or the Personnel Committee at the May 2005 meeting; (3) Professors Loew and Vojcic made remarks suggesting they perceived Professor Saha to be disabled at the February 9, 2005 Personnel Committee meeting, (3) Professor Zaghoul, while acting as interim chair for one semester and with animus towards Professor Saha, misrepresented to the faculty present at the May 2005 meeting that Professor Saha was "invited" yet he failed to appear; and (4) the University failed to produce the notes of the May 2005 meeting.

This Panel has spent significant time determining the relevance of these facts. Assuming, without finding, that every fact is true, the Panel finds they are not relevant to these proceedings. It is clear from the Code that the University may file a complaint for tenure revocation without the establishment of a department subcommittee to review the faculty's file or a vote by the department that the conduct establishes grounds for tenure revocation. The Code contemplates that the proceedings of THIS Panel are to be conducted pursuant to the principles of due process. *Code at 31-33.* Professor Saha has been given adequate notice and an opportunity to be heard during these proceedings. This Panel gave no deference to the 2005 Subcommittee's "findings" nor the vote of the faculty at the May 2005 meeting but rather reviewed the evidence presented de novo to determine if the University met its burden of proving by clear and convincing evidence that adequate cause exists for tenure revocation. Thus, procedural defects, if any, in the proceedings of the department in the Spring of 2005 are irrelevant.     The Panel seriously doubts that the proceedings were "rigged" or violated Professor Saha's due process rights in any event.[7]

## 2.     Gross Personal Misconduct That Destroys Academic Usefulness

The Panel finds that the University failed to demonstrate that Professor Saha engaged in "gross personal misconduct that destroys academic usefulness." Looking to the common definition of these terms, "gross personal misconduct" would refer to intentional or wanton flagrantly offensive and wrongful behavior relating to or affecting

---

[7]     For purposes of illustration, let us draw a broad analogy. In the criminal justice system, which involves legal standards far beyond those applicable to our Panel, an individual suspected of a federal crime has few, if any, rights to participate in the criminal investigation or grand jury proceeding. The criminal trial itself offers procedural protections to the accused, including the opportunity to present evidence and to testify personally. While the revocation of tenure is a serious deprivation, it does not rise to the level of a criminal penalty. Our proceedings afforded Professor Saha a generous opportunity to testify and present other evidence. We offer no judgment on the department's deliberations concerning Professor Saha, as they are not relevant under the university's rules to our Panel's work.

a person.[8] The Panel conducted a very brief review of cases invoking "gross personal misconduct" for judicial censure and disqualification for receipt of unemployment benefits after discharge from a job. Examples of gross personal misconduct found by the courts included: unsolicited offensive and embarrassing sexual advances,[9] battering one's wife,[10] lying to a judicial commission,[11] and actions constituting physical or emotional abuse.[12] A judge carrying a loaded gun into the courtroom and leaving it in the wastebasket near the bench during proceedings was not considered gross personal misconduct.[13]

The University presented evidence that Professor Saha withheld student blue books (Spring 1996), *Zaghloul Statement¶ 21-26; Exh. 26, 75*; counseled students not to take a departmental examination (Spring 1996), *Transcript at 54, 82-83 (4/25/06), Exh. 75*; disseminated to students a letter in which he disparaged faculty colleagues (Spring 1996), *Exhs. 27, 28*; threw Professor Loew out of his office after threatening to call the University Police Department (Spring 1996), *Transcript at 29-31 (4/25/06)*; created a grading sheet that violated federal law (Fall 2001), *Exh. 119*; slammed the door on a staff member and student (Spring 2004), *Donohue Statement ¶¶ 2, 7*; and engaged in inappropriate communications with staff including providing three staff members with "memoirs" and other documents relating to eight-year-old events that caused the staff members concern (Spring 2004), *Tong Statement ¶ 7, Vojcic Statement ¶ 26, Hood Statement ¶ 15-16, Swanson Statement ¶ 6, Exh. 137*.

This evidence fails to adequately prove gross personal misconduct. First, several of these instances occurred pre-1999, and the Panel believes that conduct prior to the April 1999 should not be used to constitute grounds for tenure revocation in this case. Second, the University failed to prove every act by clear and convincing evidence. Finally, while these actions, taken together, constitute egregious misconduct, the Panel does not find that they rise to the level of **gross personal** misconduct that destroys

---

[8]      Gross– "flagrant or extreme especially in badness or offensiveness: of very blameworthy character;" Personal–"of, relating to, or affecting a person;" and Misconduct–"intentional or wanton wrongful but usually not criminal behavior." Merriam-Webster's Dictionary of Law (1996).

[9]      Matter of Deming, 108 Wash.2d 82 (Wash.1987).

[10]      In the Matter of the Honorable Frank, 564 N.W.2d 785 (Wis. 1997)

[11]      In re Disciplinary Proceedings Against Waddick, 605 N.W.2d 861 (Wis. 2000).

[12]      Lancaster v. Black Mountain Center, 323 S.E.2d 760 (N.C.App.1984).

[13]      Matter of Disciplinary Proceedings Against Breitenbach, 482 N.W.2d 52 (Wis.1992)

Professor Saha's academic usefulness, as the terms have been defined and used in other cases.

## IV. Conclusion

This is the first time in the history of the George Washington University that a hearing Panel has been convened to determine if tenure revocation of a faculty member is warranted. Hopefully, this will be the last. Tenure is a cherished and important institution to the academy and must not be revoked lightly. It is imperative that the administration make every attempt to work with a faculty member before seeking tenure revocation and invoke tenure revocation only in the most egregious circumstances of neglect and/or misconduct.

Unfortunately, this Panel must agree with the University that this case represents such a case of egregious and persistent neglect of professional responsibilities. For more than five years, Professor Saha has failed to engage with his colleagues or the administration. He attended no faculty meetings, served on no committees, submitted no annual reports, submitted no student evaluations, and published nothing. Moreover, he has had virtually no communications with his colleagues. *See e.g. Kyriakopolous Statement ¶ 5, Lang Statement ¶¶ 17, 20, Vojcic Statement ¶ 7, Wasylkiwskyj Statement ¶ 5.* The depth and breadth of his neglect of professional responsibilities cannot be tolerated as it places severe strain on the university administration as well as Professor Saha's fellow colleagues. With the privilege of tenure comes obligation as well and to allow a tenured professor to blatantly disregard the obligations of tenure to this degree severely blemishes the institution of tenure. Moreover, the University has given Professor Saha ample notice of his neglect and several opportunities to correct this neglect over the years without success. In sum, this Panel finds that the University demonstrated by clear and convincing evidence that Professor Saha persistently neglected his professional responsibilities and thus has proven adequate cause for tenure revocation.

| From: | Kurt Darr [hsmkjd@gwumc.edu] |
|---|---|
| Sent: | Monday, December 04, 2006 4:48 PM |
| To: | lehman@gwu.edu; lfr@gwu.edu; saha@gwu.edu; jfklaw@igc.org; Mishkin, Douglas |
| Cc: | hdj@gwu.edu; pcook@gwu.edu; prof1@gwu.edu; taymans@gwu.edu; Katherine Kennedy; bcottrol@law.gwu.edu; rtuttle@law.gwu.edu; Gary Simon |
| Subject: | Decision of the Dispute Resolution Commitee on the Appeal of   Debabrata Saha |

The Dispute Resolution Committee of the Faculty Senate met on 20
November 2006 to hear oral argument on the appeal of Associate Professor
Debabrata Saha from the decision of the Hearing Committee appointed to
hear the complaint filed by the University seeking revocation of Dr.
Saha's tenure for "persistent neglect of professional responsibilities
under the Code."

Committee members participating were Patrick Cook, Robert Cottrol, Kurt
 Darr (Chair), Hugo Junghenn, Katherine Kennedy, Gary Simon, Paul
Swiercz, Juliana Taymans, and Robert Tuttle.

Appearances: John Karl for Appellant Saha; Douglas Mishkin and Richard
Weitzner for Appellee University

Prior to oral argument the members of the Committee had received and
reviewed appeals and response briefs from Appellant Saha and Appellee
University.

Following oral argument and questions to the parties the Committee
deliberated in executive session.

It is the unanimous decision of the Dispute Resolution Committee of the
Faculty Senate that the decision of the Hearing Committee should be, and
hereby is, AFFIRMED.

Pursuant to the Faculty Code the decision of the Dispute Resolution
Committee will be transmitted to the parties, the Chair of the Executive
Committee, and the ExVP for Academic Affairs.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEBABRATA SAHA, Ph.D.,             )

     Plaintiff,                       )

     v.                                 )      C.A. NO. 08-00087 RCL

GEORGE WASHINGTON UNIVERSITY, et al.   )

     Defendants.                     )

## DECLARATION OF JOHN F. WILLIAMS, JR.

     1.      My name is John F. Williams, Jr.

     2.      I am and was at all times material hereto the Provost of The George Washington University.

     3.      I am competent to execute this declaration, which I do upon personal knowledge.

     4.      Attached hereto is a true and correct copy of the March 1, 2007 letter (with attached memorandum from Dean Frederick M. Lawrence) that I sent to Professor Debabrata Saha in my capacity as Provost, notifying him that his tenure and faculty appointment was terminated by the University effective March 1, 2007.

     5.      I had this letter delivered to Professor Saha by courier and regular mail on March 1, 2007.

     I HEREBY CERTIFY under penalty of perjury that the foregoing is true and correct.

_____
John F. Williams, Jr.

Date: 2/20/08



**THE GEORGE**
**WASHINGTON**
**UNIVERSITY**
WASHINGTON DC

**Via Courier and First Class Mail**

March 1, 2007

Professor Debabrata Saha
9409 Fair Pine Lane
Great Falls, VA 22066

Dear Professor Saha:

I have been informed by President Stephen Joel Trachtenberg that Executive Vice President Donald Lehman recused himself from determining, under Section 7 of the Grievance Procedures, whether there are compelling reasons not to implement the Dispute Resolution Committee's decision to terminate your tenure for adequate cause. He has further informed me that Dean Frederick Lawrence, to whom that role was delegated, found no compelling reasons (as per the enclosed memorandum). Therefore, the decision will be implemented.

Your tenure, and your University faculty appointment, is terminated effective March 1, 2007.

Sincerely,

John F. Williams, Jr.
Provost

Cc:    Stephen Joel Trachtenberg
       Donald R. Lehman
       Timothy Tong

Enclosure

OFFICE OF THE
PROVOST
AND
VICE PRESIDENT FOR
HEALTH AFFAIRS

ROSS HALL

SUITE 713 EAST

2300 EYE STREET, NW
WASHINGTON, DC 20037

202-994-3727
FAX 202-994-9239



THE GEORGE
WASHINGTON
UNIVERSITY
LAW SCHOOL
WASHINGTON DC

FREDERICK M. LAWRENCE
DEAN AND
ROBERT KRAMER RESEARCH PROFESSOR OF LAW

## MEMORANDUM

**TO:**        Stephen Joel Trachtenberg, President

**FROM:**    Frederick M. Lawrence, Dean, Law School

**RE:**        In re Complaint Against Debabrata Saha Seeking Tenure Revocation

**DATE:**    February 23, 2007

By memorandum dated December 19, 2007, you appointed me to act in place of the Executive Vice President for Academic Affairs in the above-reference matter. Specifically, I was to review the decision of the six-member Hearing Committee that unanimously recommended the revocation of Professor Debabrata Saha's tenure (Hearing Committee). The Faculty Senate Dispute Resolution Committee unanimously affirmed this recommendation (Dispute Resolution Committee). Under the faculty grievance procedures contained in the *Faculty Code*, the Committee's decision "shall be deemed final and shall be implemented by the University unless the Vice President for Academic Affairs determines that there are compelling reasons not to implement the … Committee's decision." Faculty Code Article XIII (E)(7). I find that there are no such compelling reasons not to implement the decision of the Hearing Committee affirmed by the Dispute Resolution Committee.

In reviewing the Committees' decisions in this case, I reviewed the following documents:

- The George Washington University Complaint against Professor Saha
- The George Washington University Amended complaint against Professor Saha
- Post-Hearing Brief of Professor Saha to the Hearing Committee
- Post-Hearing Brief of The George Washington University to the Hearing Committee
- Decision of the Hearing Committee, July 24, 2006
- Appeal Brief of Professor Saha to the Dispute Resolution Committee
- Appeal Brief of The George Washington University to the Dispute Resolution Committee
- Appeal Reply Brief of Professor Saha to the Dispute Resolution Committee
- Decision of the Dispute Resolution Committee

2

- Professor Saha's submission to me entitled "A Compelling Account: Flawed Deliberation of Schaffner Panel," dated December 12, 2006, submitted to me on January 3, 2007
- Letter to me from John F. Karl, Jr., Esq. counsel for Professor Saha, dated January 6, 2007, with enclosures
- Letter to me from John F. Karl, Jr., Esq. counsel for Professor Saha, dated January 7, 2007, with enclosures

In conducting my review, I am mindful too of the highly deferential standard articulated by the *Faculty Code*. The decision of the Hearing Committee, affirmed by the Dispute Resolution Committee, is entitled to a presumption of correctness and my sole task is to determine if there are "compelling reasons" that the Committees' decisions ought not be implemented. In my view, the Hearing Committee carefully culled through extensive testimony and documentary submissions and applied the correct standard under the *Faculty Code*, that is, whether the University proved by clear and convincing evidence that Professor Saha's tenure should be revoked. The University alleged two grounds for revocation -- that Professor Saha engaged in persistent neglect of professional responsibilities for an extend period, and that Professor Saha engaged in gross personal misconduct that destroys academic usefulness. See *Faculty Code* Article V (C)(1). The Hearing Committee found that the University had met this high burden of proof with respect to the first charge, namely, that Professor Saha engaged in persistent neglect of professional responsibilities. Given the substantive support cited by the Hearing Committee for its conclusion, and the procedures followed by the Hearing Committee including, without limitation, providing Professor Saha with the opportunity to be present for the hearing, to be represented by counsel, to testify and present witnesses and to confront and cross-examine adverse witnesses, I find there are no "compelling reasons" that the Committees' decision should not be implemented.

The arguments raised by Professor Saha in his briefs to the Hearing Committee and to the Dispute Resolution Committee require no contrary result, nor does anything in the letters to me from his attorney, Mr. Karl. I shall briefly address one issue raised by in Professor Saha's submissions to the Committees and in his attorney's letter of January 7. Professor Saha and his attorney cite *Kyriakopoulos v. George Washington University*, 856 F. 2d 438 (D.C. Cir. 1989) for the proposition that the three year statute of limitations in the District of Columbia applies to actions between faculty and Universities. They would apply *Kyriakopoulos* to limit a University, not in a lawsuit but in its own internal personnel proceedings, to a three year period for evidence in support of a personnel action, here tenure revocation. *Kyriakopoulos* will not hold such a meaning. *Kyriakopoulos* involved litigation, and a claim on a contract brought by a professor against a University arising out the University's decision not to promote him. The District of Columbia's three-year statute of limitations, like all limitation provisions, prevents a plaintiff from commencing litigation after a period of time has expired since the claim accrued. In a sense, the statute of limitations deprives a court of jurisdiction over claims brought more than three years after the accrual of a claim. In Professor Saha's case, The George Washington University is not commencing litigation but rather is applying its own faculty code, a code that forms the basis of the contractual agreement

3

between the University and Professor Saha. This is not a legal claim before a court under the contract; this is an internal proceeding following the terms provided by a contract. Professor Saha is free to challenge this decision in Court – it is to such a challenge that the statute of limitations would apply, not the University's internal proceedings. In any event, I would note that the Hearing Committee stated that even if it were limited to evidence of the most recent three years of Professor Saha's behavior and performance, it would find that "Professor Saha neglected his professional responsibilities throughout this period and thus tenure revocation is warranted in any event." Decision of the Hearing Committee at 10. Thus either because as I have suggested the Kyriakopoulos precedent does not apply to this tenure revocation proceeding or because even if it did, three years of evidence of neglect more than adequately supports the Hearing Committee's conclusions, I find that there is no compelling reason to reject the decision of the Hearing Committee on the ground of the application of the District of Columbia Statute of Limitations.

Tenure lies at the heart of any academic institution. This is very much true at The George Washington University. I share the aspiration of the Hearing Committee that this will be the last case of tenure revocation of a GW faculty member, just as it is the first. Hearing Committee Decision at 13.

1 of 84 DOCUMENTS

**PETER F. PAUL, Plaintiff, v. JUDICIAL WATCH, INC, et al., Defendants.**

**Civil Action No. 1:07-279 (RCL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2008 U.S. Dist. LEXIS 8266*

**February 6, 2008, Decided**

**COUNSEL:** [*1] For PETER F. PAUL, Plaintiff: Daniel J. Dugan, LEAD ATTORNEY, SPECTOR GADON & ROSEN, P.C., Philadelphia, PA.

For JUDICIAL WATCH INC., THOMAS J. FITTON, PAUL ORFANEDES, Esquire, Defendants: Richard Wayne Driscoll, LEAD ATTORNEY, DRISCOLL & SELTZER, PLLC, Alexandria, VA.

**JUDGES:** Royce C. Lamberth, United States District Judge.

**OPINION BY:** Royce C. Lamberth,

**OPINION**

**MEMORANDUM OPINION**

This matter comes before the Court on defendants' motion [2] to dismiss, plaintiff's opposition, and the reply thereto. Upon consideration of the filings, the entire record herein, and the relevant law, defendants' motion [2] to dismiss will be GRANTED in part and DENIED in part.

**I. BACKGROUND**

Defendant Judicial Watch, Inc. ("Judicial Watch"), is a non-profit organization formed under the laws of the District of Columbia. (*See* Compl. P 8.) Defendant Thomas J. Fitton ("Fitton"), is President of Judicial Watch. (*See id.* P 9.) Defendant Paul J. Orfanedes ("Orfanedes") is the Secretary and a director of Judicial Watch. (*See id.* P 10.) This case arises out of defendants' representation of plaintiff Peter F. Paul ("Paul"), in connection with plaintiff's whistle-blowing activities directed at Hillary Rodham Clinton's 2000 Senate campaign. Judicial [*2] Watch and Paul entered into a legal representation agreement whereby Judicial Watch agreed to represent him in connection with his whistle-blowing activities. (*See id.* P 2.) According to Paul's complaint, the repre-

sentation included providing and/or paying for Paul's legal representation in actions he instituted, and defending him in actions brought against him alleging securities law and related violations of campaign financing laws and civil litigation. (*See id.*) The complaint further states that in return for providing him representation, Paul authorized Judicial Watch to solicit donations from the public for championing Paul's case, and to seek publicity for Paul in service of the public interest. (*See id.*) The relationship between the parties ended in early 2005 when defendants allegedly failed to prosecute and defend Paul's claims and interests, attempted to coerce Paul into modifying the contract, and unilaterally and without Paul's consent, withdrew from representing Paul. (*See* Pl.'s Opp'n at 2.) Plaintiff filed the instant suit on February 6, 2007, alleging claims for breach of contract, breach of fiduciary duty, violations of standards of professional conduct, unjust enrichment, [*3] Lanham Act violations, and appropriation of name and likeness.

Defendants subsequently filed a motion to dismiss on March 15, 2007, which was followed by plaintiff's opposition filed on April 16, 2007. Defendants' motion seeks an order from this Court dismissing the following claims: (1) breach of contract by Fitton and Orfanedes; (2) breach of fiduciary duty by Fitton; (3) violations of ethical standards of professional conduct; (3) violations of ethical standards of professional conduct; (4) unjust enrichment; (4) violations of the Lanham Act; and (5) appropriation of name and likeness.

**II. DISCUSSION**

**A. Legal Standard**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to *Rule 12(b)(6)*, this Court will dismiss a claim if the plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)* (abrogating the prior standard which required appearance,

beyond a doubt, that plaintiff can prove no set of facts in support of his claim that would entitle him to relief). This Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit [*4] of all inferences that can be derived from the facts alleged. *Barr v. Clinton, 361 U.S. App. D.C. 472, 370 F.3d 1196, 1199 (D.C. Cir. 2004)* (citing *Kowal v. MCI Commc'ns Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir.1994))*. However, the Court need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *Kowal, 16 F.3d at 1276.*

**B. Analysis**

**1. Breach of Contract by Fitton or Orfanedes**

In Count 1 of the complaint, plaintiff alleges that defendants breached the agreement with plaintiff when they: (1) withdrew from representing plaintiff in his criminal and civil matters (*see* Compl. P P 57, 59); (2) failed and/or refused to pay for plaintiff's legal fees (*see id.*); and (3) attempted to coerce plaintiff into modifying the agreement (*see id.* P 58). Defendants argue that Count 1 fails to state a claim for breach of contract by Fitton or Orfanedes because they were not parties to the agreement. (*See* Defs.' Mot. to Dismiss at 2--3.) Plaintiff contends that since the contract was for legal services, Fitton (a non-lawyer), and Orfanedes (a lawyer), are each liable for malpractice in tort and in contract. (*See* Pl.'s Opp'n at 4--5.)

It is a general principle [*5] of corporation law that the officers and employees of a corporate entity are its agents. *Ridgewells Caterer, Inc. v. Nelson, 688 F. Supp. 760, 762 (D.D.C. 1988)* (citing 2 FLETCHER CYC. CORP. § 434 (1982)). Under the law of the District of Columbia, an agent is not personally liable on a contract it executes on behalf of a principal so long as it identifies the principal and discloses the agency relationship. *Id.* (citing *Rittenberg v. Donohoe Constr. Co. Inc., 426 A.2d 338, 341 (D.C. 1981); Resnick v. Abner B. Cohen Advertising, Inc., 104 A.2d 254, 255 (D.C. 1954))*. Further, where a principal is disclosed, no liability will fall upon the agent for acts committed by the principal unless he binds himself for same by definite words or stipulation. *Rittenberg, 426 A.2d at 341* (citations omitted). Nor does liability attach to an agent of a disclosed principal for his act within the scope of the agency unless he binds himself by definite words or stipulation. *Id.* (citation omitted). The contract at issue here is clearly between Paul and Judicial Watch. Defendant Fitton signed the agreement in his capacity as President of Judicial Watch but neither he nor Orfanedes are listed as parties to [*6] the agreement. Moreover, plaintiff alleges no facts that Fitton or Orfanedes obligated themselves to the terms of the

agreement or otherwise gave consent to be personally bound. Nevertheless, plaintiff urges the Court to find that Fitton and Orfanedes were personally bound to the agreement by way of the duty of care implied in every contract for legal services. Plaintiff cites no authority, however, for his proposition that the duty of care owed to clients by all attorneys personally obligates attorneys under the terms of a contract to which they are a non-party. As such, personal liability for breach of contract may not be imposed upon the corporation's agents under these circumstances. Accordingly, defendants' motion to dismiss Count 1 as to Fitton and Orfanedes shall be GRANTED.

**2. Breach of Fiduciary Duty by Fitton**

Count 2 of plaintiff's complaint alleges that each of the defendants owed a fiduciary duty to provide faithful, competent, and vigorous legal representation to plaintiff and that they breached that duty when they withdrew their representation and failed to pay plaintiff's legal fees. (*See* Compl. P P 62--65.) Defendants move to dismiss Count 2 as to defendant Fitton on grounds [*7] that, as a non-lawyer, Fitton owed no fiduciary duty to Paul. Plaintiff urges this Court to embark upon a "'searching inquiry into the nature of [his relationship with Fitton], the promises made, the type of services or advice given and the legitimate expectations of the parties.'" (Pl.'s Opp'n at 7 (quoting *Church of Scientology Int'l v. Eli Lilly & Co., 848 F. Supp. 1018, 1028 (D.D.C. 1994))*.)

To state a claim for breach of fiduciary duty, a plaintiff must allege facts sufficient to establish the following: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the extent plaintiff seeks compensatory damages--the breach proximately caused an injury. *See Shapiro, Lifschitz & Schram, P.C. v. Hazard, 24 F. Supp. 2d 66, 75 (D.D.C. 1998)*. For the reasons set forth below, plaintiff's claim against defendant Fitton fails without moving beyond prong one of the analysis: existence of a fiduciary duty.

As a general rule, the mere existence of a contract does not create a fiduciary duty. *Steele v. Isikoff, 130 F. Supp. 2d 23, 36 (D.D.C. 2000)* (citing *Church of Scientology, 848 F. Supp. at 1028*). A fiduciary relationship could exist, however, where circumstances [*8] show that the parties extended their relationship beyond the limits of the contractual obligations to a relationship founded upon trust and confidence. *See Church of Scientology, 848 F. Supp. at 1028* (citing *Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 769 (S.D.N.Y. 1990))*. The complaint alleges a relationship with Fitton that spanned the period from September 2003 through April 2005, and which entailed the performance of substantial services to plaintiff. Plaintiff argues that Fitton, through his control of the litigation, advised plaintiff and was

entrusted with the management of his affairs. (Pl.'s Opp'n at 7.) The Court need not delve into the intricacies of plaintiff's relationship with Fitton since it is clear that Fitton's actions with respect to plaintiff were entirely within the scope of his employment with Judicial Watch. Throughout his relationship with plaintiff, Fitton acted solely on behalf of Judicial Watch, rather than in any personal or individual capacity. While *Scientology* held that the nature of the parties' relationship determines the existence of a fiduciary duty, that case involved no officers or directors as named defendants. Rather, that case dealt only [*9] with the liability of an organization under the terms of a contract to which it was a party. *Scientology* therefore provides no support for holding individual officers or employees liable for the alleged breaches of fiduciary duty of their employer-organization. Moreover, plaintiff has failed to establish why this Court should impose the fiduciary duties of a lawyer upon a non-lawyer. As such, defendant's motion to dismiss Count 2 as to defendant Fitton shall be GRANTED.

### 3. Violations of Standards of Professional Conduct

In Count 3, plaintiff alleges that defendants Judicial Watch, Orfanedes, and other individuals not named in the suit, are in breach of the applicable standards of professional conduct governing attorneys in the District of Columbia, the State of California, and the State of New York. (*See* Compl. P P 69--74.) Plaintiff further alleges that Fitton engaged in the unauthorized practice of law by providing legal advice to plaintiff, and making substantive legal decisions concerning strategy and tactics in the representation. (*See id.* P 75.) Accordingly, plaintiff seeks monetary damages for the alleged breaches of professional conduct standards and for Fitton's alleged unauthorized [*10] practice of law. Defendants challenge whether either of plaintiff's allegations create valid causes of action.

The Court will begin with the claims against Judicial Watch and Orfanedes for breach of the standards of professional conduct. Defendants seek to dismiss Count 3 on grounds that under the rules governing practice in the District of Columbia, California, and New York, a violation of the standards of professional conduct does not give rise to a civil cause of action. (*See* Defs.' Mot. to Dismiss at 5.) Plaintiff argues, however, that Count 3 is a claim for malpractice rather than an attempt to recover for violations of lawyer ethics rules. Under a malpractice theory, plaintiff must allege facts that establish: (1) the duty of care; (2) a breach of the duty; (3) proximate cause between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the alleged negligence. *Shapiro, 24 F. Supp. 2d at 75* (internal citations omitted). Defendants contend that plaintiff's claim fails on the third and fourth elements of the mal-

practice analysis. In paragraph 66 of the complaint, plaintiff alleges the following: "As a direct and proximate cause of the aforesaid [*11] breaches, Defendants cause Paul to suffer economic loss, physical and emotional distress and damages, and injuries and losses to his claims, reputation and good will." (Compl. P 66.) Plaintiff continues in paragraph 67: "As a direct and proximate cause of the aforesaid breaches, Paul suffered economic loss, physical and emotional distress and damages, and injuries and losses to his claims, reputation and good will." (*Id.* P 67.) Defendants have not established why these allegations showing causation and actual injury are insufficient for plaintiff's malpractice claim. To be sure, the allegations set forth in paragraphs 66 and 67 (1) were incorporated by reference by paragraph 68 of plaintiff's malpractice count and (2) refer to the same underlying conduct as that alleged in the malpractice claim. Construing these facts in the light most favorable to plaintiff and granting plaintiff the benefit of all inferences that can be derived from the facts alleged, this Court finds that plaintiff has pled sufficient facts to establish a malpractice claim and therefore defendants' motion to dismiss as to Judicial Watch and Orfanedes shall be DENIED. [1]

> 1   As to whether Orfanedes can, in fact, be sued [*12] for malpractice for alleged conduct that occurred while he was employed for a non-profit corporation that has agreed to perform legal representation, that question was not raised and the Court expresses no view herein on that issue.

Moving now to Paul's ability to collect monetary damages for Fitton's alleged unauthorized practice of law, the Court finds that Count 3 as to Fitton must be dismissed. In this diversity action, this Court has subject matter jurisdiction to consider complaints of unauthorized practice of law initiated by private parties. *See J.H. Marshall & Assocs., Inc. v. Burleson, 313 A.2d 587, 592 (D.C. 1973)* (recognizing that the court has authority to consider complaints of unauthorized practice of law and the power and responsibility to enjoin such activities). However, there is no authority in the District of Columbia that supports a damages award based on a claim for unauthorized practice of law. Thus, defendants' motion to dismiss count 3 as to Fitton for unauthorized practice of law and as to Judicial Watch and Orfanedes for aiding and abetting Fitton's alleged unauthorized practice of law, shall be GRANTED.

### 4. Unjust Enrichment

Count 4 of plaintiff's complaint [*13] alleges that defendants are unjustly enriched as a result of their retention of funds that were raised to support the litigation and other legal efforts of Judicial Watch on plaintiff's behalf. (*See* Compl. P P 77--82.) Defendants argue that Count 4

fails because the existence of an express contract bars any claim for unjust enrichment. (*See* Defs.' Mot. to Dismiss at 6.) Where parties have an express contract, the law does not recognize a right to claim unjust enrichment. *Schiff v. American Ass'n of Retired Persons, 697 A.2d 1193, 1194 (D.C. 1997).* Therefore, District of Columbia courts will not "resort to [quasi contract] when the evidence sustains the existence of a true contract, either express or implied in fact." *See Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co., 870 A.2d 58, 64 (D.C. 2005)* (internal quotation omitted). One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement. *Id.* In the instant matter, there is an express contract between Paul and Judicial Watch. As such, plaintiff is not entitled to recover on grounds that Judicial Watch [*14] has been unjustly enriched. Even if there were no express or implied contract between Paul and Judicial Watch, plaintiff's unjust enrichment claim would still fail. For a plaintiff to recover on an unjust enrichment claim, "he must show that [the defendant] was unjustly enriched at his expense and that the circumstances were such that in good conscience [the defendant] should make restitution." *News World Commc'ns, Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005)* (internal quotation omitted). Plaintiff has failed to establish that defendants were unjustly enriched at his expense. The Complaint alleges that the funds at issue were generated from Judicial Watch's donor base. (*See* Compl. P 77.) Plaintiff makes no allegation that he spent his own funds or efforts to solicit the donations from Judicial Watch's donors. Instead, he alleges that Judicial Watch solicited the funds from its own donor base. Accordingly, plaintiff's claim against defendants for unjust enrichment shall be dismissed.

Plaintiff's claim against Fitton and Orfanedes for unjust enrichment fails for yet another reason. Plaintiff has made no allegation that either Fitton or Orfanedes retained any of the donated funds [*15] for themselves. Based on the allegations in the complaint, Judicial Watch was the recipient of the contributions--not Fitton or Orfanedes. Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another. *Jordan Keys, 870 A.2d at 63.* Plaintiff having made no allegation that anyone other than Judicial Watch retained the funds, his claim against defendants Fitton and Orfanedes shall be dismissed. As such, defendants' motion to dismiss Count 4 shall be GRANTED.

## 5. Violation of Section 43(a) of the Lanham Act

Count 5 of plaintiff's complaint alleges that defendants made false and misleading representations and advertisements about plaintiff and about defendants' role in plaintiff's legal affairs. (*See* Compl. P P 84--93.) Plaintiff claims that defendants' activities therefore violate *section 43(a)* of the Lanham Act, *15 U.S.C. § 1125(a)* (the "Act"). Specifically, plaintiff's claims arise under the false association/false endorsement and the false advertising provisions of the Act. *15 U.S.C. § 1125(a)(1)(A)* and *(B)*. These claims rely on a 2005 solicitation for donations sent by Judicial Watch to its donors and a January 6, 2006 press release. [*16] (*See* Compl. Ex. B; Compl. P P 23, 51.) Both the solicitation and the press release refer to Paul as a former client. [2]

> 2   The complaint refers to the January 6, 2006 press release as "Exhibit H." (*See* Compl. P 51.) For whatever reason, the press release was not attached to the complaint as filed and neither defendants nor this Court have received a copy of the press release plaintiff references as "Exhibit H." However, for purposes of defendants' motion to dismiss, this Court's findings as to the press release may rely upon facts alleged in the complaint. In paragraph 51 of the complaint, plaintiff alleges that the press release refers to him as a "former client." (*See id.*) Plaintiff's allegation is sufficient for the Court's analysis at this phase.

To succeed on a false association/false endorsement claim under *15 U.S.C. § 1125(a)(1)(A)*, "a celebrity [3] must show that use of his or her name is likely to cause confusion among consumers as to the 'affiliation, connection, or association' between the celebrity and the defendant's goods or services or as to the celebrity's participation in the 'origin, sponsorship, or approval' of the defendant's goods or services." *Parks v. LaFace Records, 329 F.3d 437, 445--46 (6th Cir. 2003)* [*17] (quoting *15 U.S.C. § 1125(a)(1)(A)* (internal citations omitted)). "Consumer confusion occurs when consumers . . . believe that the products or services offered by the parties are affiliated in some way, or when consumers make an incorrect mental association between the involved commercial products or their producers." *Id. at 446* (internal quotations and citations omitted). Liability may attach "not just for descriptions that are literally false, but also for those that create a 'false impression.'" *Geisel v. Poynter Prods. Inc., 283 F. Supp. 261, 267 (S.D.N.Y. 1968); see Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 626 (S.D.N.Y. 1985)* (holding that "unauthorized use of a person's name or photograph in a manner that creates the false impression that the party has endorsed a product or service in interstate commerce violates the Lanham Act"). In such cases, "a showing of the likelihood of consumer confusion is sufficient to make out a claim." *Geisel, 283 F. Supp. at 267.* In the instant case, there is no such false impression or likelihood for confusion as to plaintiff's affiliation with Judicial Watch since both of

the documents at issue properly refer to plaintiff as a former Judicial [*18] Watch client. Further, plaintiff has made no allegation that either the solicitation or the press release represented that plaintiff endorsed Judicial Watch's work. As such, plaintiff's Count 5 for false association/false endorsement fails to state a claim and shall be dismissed.

> 3  Plaintiff describes himself as "a notable celebrity in the entertainment, political gadfly and non-profit worlds." (Pl.'s Opp'n at 14). Granting plaintiff the benefit of all reasonable inferences, this Court will accept plaintiff's assertion as true for the purposes of determining whether defendants' use of his name and likeness caused consumer confusion.

As for plaintiff's claim under the false advertisement provision of the Lanham Act, plaintiff must show that defendants "misrepresent[ed] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." *15 U.S.C. § 1125(a)(1)(B)*. For the same reasons that plaintiff's false association/false endorsement claim fails, plaintiff's false advertisement claims also fails to state a claim. Defendants having only referred to plaintiff as a former Judicial Watch client, made no misrepresentations [*19] under the Act and therefore plaintiff's claim for false advertisement shall be dismissed. [4]

> 4  Defendants also challenge whether plaintiff has standing to assert either his false association/false endorsement claim under *15 U.S.C. § 1125(a)(1)(A)* or his false advertising claim under *15 U.S.C. § 1125(a)(1)(B)*. According to defendants, standing to assert a claim under either of these provisions requires a plaintiff to claim a competitive or commercial injury--which defendants claim plaintiff has failed to allege. This inquiry is of no consequence since this Court has already found that assuming *arguendo* plaintiff is a celebrity under the Act, plaintiff has not established that defendants' communications caused consumer confusion or included misrepresentations about the organization's activities with plaintiff.

## 6. Appropriation of Name and Likeness

In Count 6 of the complaint, plaintiff alleges that defendants misappropriated his name and likeness for their own benefit. (*See* Compl. P P 94--96.) Specifically, plaintiff alleges that defendants benefitted from the use of his name and likeness in their promotional and fundraising efforts. (*See id.* P P 51, 52, 90, 91, 96.) Defendants argue that  [*20] plaintiff's claim fails since the

applicable statute of limitations has expired. District of Columbia courts interpret an allegation of appropriation of name and likeness as a claim for invasion of privacy. *See Grunseth v. Marriott, 872 F. Supp. 1069, 1074 (D.D.C. 1995)* (stating that a cause of action for invasion of privacy may be maintained on any one of four theories, including "appropriation of name or likeness for another's benefit"). Therefore, the one-year statute of limitations under *D.C. Code § 12-301(4)*, which governs libel, slander, and similar intentional torts, applies to any invasion of privacy claims because such claims are types of defamation. *Id.* Since the most recent allegation of defendants' use of plaintiff's name or likeness refers to Judicial Watch's January 6, 2006 press release, any claim filed after January 6, 2007, is time barred. Plaintiff did not file the instant action until February 6, 2007. Plaintiff counters, however, that the one-year statute of limitations cannot bar his claim since his complaint alleges a continuing violation.

This Court refuses to apply the doctrine of continuing violations in plaintiff's case for two reasons. First, plaintiff's complaint [*21] alleges no specific acts that demonstrate a continuing violation. Instead, the complaint states only that "defendants continue to misappropriate [his] files, documents and other irreplaceable evidence and exhibits relating to his cases, including [plaintiff's] likeness and name for their own use and benefit." (*See* Compl. P 96.) Viewing the facts in a light most favorable to plaintiff, this vague allegation is insufficient to show a continuing violation. Plaintiff alleges specific acts demonstrating a continuing violation for the first time in his opposition brief to defendants' motion to dismiss, rather than in his complaint. [5] (*See* Pl.'s Opp'n at 17.) It is therefore improper for the Court to consider those allegations as an expansion of the claim as alleged. Second, plaintiff has made no allegation that he was unaware of defendants' alleged appropriation until after the statute of limitations had run. Under the law of this Circuit, the continuing violations doctrine will not toll the statute of limitations where plaintiff is aware of the alleged violations. *See, e.g., Moore v. Chertoff, 437 F. Supp. 2d 156, 162--63 (D.D.C. 2006)* (finding that in the context of employment discrimination [*22] actions, "the law of this circuit . . . precludes applying the doctrine of continuing violations where plaintiffs are aware of the discriminatory nature of the acts if the basis for the continuing violation is a series of related acts"); *Butler v. Fairbanks Capital, Civ. A. 04-0367, 2005 U.S. Dist. LEXIS 44537, 2005 WL 5108537, at \*9 (D.D.C. Jan. 3, 2005)* (stating that in actions brought under the Truth in Lending Act, *16 U.S.C. § 1601 et seq.*, courts will only apply the continuing violations doctrine where plaintiff is "reasonably unaware of the violation"). Accordingly, the statute of limitations as to plaintiff's claim for appropriation of name and likeness began to run in January 2006

and therefore plaintiff's claim is time barred. Thus, defendants' motion to dismiss Count 6 of the complaint shall be GRANTED.

> 5    Plaintiff attaches to his opposition brief a document printed from Judicial Watch's website on April 11, 2007. The document itself has a release date of July 17, 2001. Plaintiff claims that the document shows that Judicial Watch, through its website, continues to broadcast images of Paul and Hillary Clinton at the 2000 Senate fundraiser.

## III. CONCLUSION

For the foregoing reasons, defendants' motion [2] [*23] to dismiss shall be GRANTED in part and DENIED in part.

A separate Order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on February 6, 2008.