## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEBABRATA SAHA, Ph.D.,                          )
                                                )
Plaintiff,                                      )
                                                )
v.                                              )        C.A. NO.  1:08-00087 RCL
                                                )
GEORGE WASHINGTON UNIVERSITY, et al.            )
                                                )
Defendants.                                     )
                                                )

## DEFENDANTS' OPPOSITION TO
## "PLAINTIFF'S REQUEST FOR RECONSIDERATION OF JUDGE LAMBERTH'S
## MARCH 12, 2008 MEMORANDUM AND ORDER"

Plaintiff Debabrata Saha's ("Saha") request for reconsideration ("Request") of this Court's

March 12, 2008 Memorandum and Order ("Order") denying his first three motions for an

injunction gives this Court no reason to reconsider its conclusions that "plaintiff has no chance of

success on the merits" and that "Plaintiff Saha has not shown . . . that he will suffer irreparable harm

without the injunction." Order at 2-3.  Saha's request rehashes his earlier unsuccessful arguments,

requiring only this brief response.

**The March 1, 2007 Letter of Termination.**  Saha repeats: the March 31, 2007 letter

terminating his employment from Dr. John Williams, Provost of the University, allegedly "bears no

name, no signature, and no affiliation of office." Request at 3.  As Defendants have shown in their

Opposition to Plaintiff's Fourth Motion for Preliminary Injunctive Relief filed March 21, 2008

("Opp."),[1] Dr. Williams' letter contained all of that information – except on the copy that Saha

doctored to delete that information before he filed it with the Court as an exhibit.  Opp. at 2-3.

---

[1] Saha's Request for Reconsideration and his Fourth Motion for Preliminary Injunctive Relief make virtually the same arguments and request the same relief – retroactive restoration of his salary more than a year after termination of his employment.  Defendants incorporate the Opposition by reference.

**Authority To Terminate Saha's Employment.** As Defendants have explained, Saha's assertion that Dr. Williams had no authority to sign the letter of termination is wrong. Opp. at 3-4. Specifically, Article V(C)(1) of the Faculty Code states that tenure may only be revoked for "Adequate Cause." Ex. A at 11. Saha's tenure was revoked based on the Hearing Committee's determination, affirmed on appeal by the Dispute Resolution Committee, that Saha's "persistent neglect of professional responsibilities" constituted "adequate cause." Ex. B at 8-9, 13. The Procedures for establishing "adequate cause" to revoke tenure are set forth in Section F, entitled "Procedures for the Dismissal of a Faculty Member for Adequate Cause." Ex. A at 31-33.

The University followed these Procedures in revoking Saha's tenure. Specifically, the process began with the filing of a complaint by Executive Vice President for Academic Affairs Donald R. Lehman and Dean Timothy Tong of the School of Engineering and Applied Science, pursuant to Section F(1)(a). Ex. B at 5; Ex. A at 31. Under Section F(3), the procedure for that hearing was as provided in Part E of those Procedures. Ex. A at 33. Section E(7), entitled "Final Disposition," provides that "[t]he decision of the relevant Committee [here, the Dispute Resolution Committee affirming on appeal the decision of the Hearing Committee] shall be deemed final and shall be implemented by the University unless the Vice President for Academic Affairs determines that there are compelling reasons not to implement the relevant Committee's decision." Id. at 31. As explained in Dr. Williams' March 1 letter (Ex. C), Donald R. Lehman, the Executive Vice President for Academic Affairs (who had signed the complaint seeking the termination of Saha's tenure, pursuant to Section F(1)(a)), recused himself from the "unless...compelling reasons" analysis following Saha's lawyer's demand that he do so. December 6, 2006 letter from John F. Karl, Ex. D. That role was assigned by University President Trachtenberg to G.W. Law School Dean Frederick Lawrence, who found no compelling reasons not to implement the Dispute Resolution Committee's

affirmance of the Hearing Committee's recommendation to revoke Saha's tenure and to terminate his employment. Ex. C.

Nothing in the Faculty Code Procedures prescribes that anyone in particular must sign such a letter to "implement" the "decision" on behalf of the University. Section E(7).[2]

For the foregoing reasons, and for the reasons previously set forth in Defendants' Opposition to Plaintiff's Fourth Motion for Preliminary Injunctive Relief, Defendants The George Washington University, Mona E. Zaghloul, Wasyl Wasylkiwskyj, Edward Della Torre, Joan Schaffner and Stephen Joel Trachtenberg request that this Court deny Plaintiff Debabrata Saha's Request for Reconsideration of Judge Lamberth's March 12, 2008 Memorandum and Order.

_(signature)_

Douglas B. Mishkin, DC Bar #338590
Pamela S. Richardson, DC Bar #500564
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Counsel for Defendants

Dated: April 1, 2008

---

[2] Saha ignores Section F; instead, he mistakenly relies on Section B(3) and (4). Those sections pertain generally to University Administration deference to Faculty recommendations involving matters of "[a]ppointments and actions affecting renewal of appointments, promotion, tenure designation, and termination of service...." Specifically, they describe the role of the Board of Trustees and the President in deciding cases where the University Administration does not concur in a recommendation of the Faculty. Ex. A at 18-19. In context, "termination of service" refers to termination of the service of non-tenured faculty; the termination of tenured faculty is governed specifically by Section F, as its title makes clear ("Procedures for the Dismissal of a Faculty Member for Adequate Cause"). Even if – contrary to the language of Section F and overall context – Sections B(3) and (4) do apply here, nothing in them suggests, much less requires, that a "faculty recommendation [to terminate a tenured faculty member that is] concurred in by the appropriate administrative officers" must be made or approved by the Board of Trustees. As Section B(4) expressly provides, such a decision is simply "transmitted" to the Board. What Saha overlooks in his reliance on this subsection is that a final "decision" must be made by either the Board or the President only where there is disagreement between the Faculty and the Administration (a "[v]ariant or nonconcurring recommendation"). In this respect, Sections B(4) and E(7) are consistent: the Board (or the President) decide on termination of faculty only when the Faculty and the Administration do not agree. In this case, the Faculty and the Administration agreed that Saha's tenure should be revoked, making it unnecessary for the Board to decide.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April, 2008 a true and correct copy of the foregoing Defendants' Opposition to "Plaintiff's Request for Reconsideration of Judge Lamberth's March 12, 2008 Memorandum and Order" was sent by regular mail, postage prepaid to the following:

> Debabrata Saha
> 9409 Fairpine Lane
> Great Falls, VA  22066
>
> Plaintiff appearing *pro se*

_____
Douglas B. Mishkin

EXHIBIT A

The George Washington University

# Faculty Code



## 2004

Amendments to the 2004
Edition of the *Faculty Code*

Amendments – February 8, 2008

By Action of the George Washington University Board of Trustees, February 8, 2008, Article VI, beginning on Page 12, was amended by the addition of the following section:

**D. Parental Childcare Leave:** A regular, active-status member of the faculty shall be entitled to parental childcare leave upon certifying that he or she will provide at least half of the child's care during the leave period, subject to the terms and conditions set forth in this section. Parental childcare leave shall include release from teaching responsibilities and service responsibilities for one semester with full salary and benefits, and such leave shall terminate within twelve months after a minor dependent child is born or adopted or enters the faculty member's home under a foster care arrangement. During such leave, faculty members shall continue providing thesis and dissertation advising to students whom they advised prior to the leave unless adequate alternative arrangements are made. For faculty members engaged in externally funded grant or contract related activities, parental childcare leave shall include release from responsibilities to the University, but shall not include release from responsibilities to the external funding sources unless alternative arrangements are approved by such sources. A regular, active-status faculty member is entitled to parental childcare leave for a maximum of two minor dependent children who are born or adopted or enter the faculty member's home as foster children after the starting date of the faculty member's appointment at the University. Parental childcare leave under other circumstances or for other faculty, including leave with full or partial salary, may be granted at the discretion of the Vice President for Academic Affairs, after consultation with the appropriate department chair (if applicable) and dean.

Amendments – February 6, 2004

By Action of the George Washington University Board of Trustees, February 6, 2004, Article IV, Section A.3.i., appearing on Page 5, was amended as follows:

a) Insert new sub-section "b) 3)" to read, "A one-year extension of the probationary period shall be granted to requesting faculty who become new parents and apply within twelve months of becoming new parents by submitting a request to the relevant academic officers setting forth his or her reason for requesting the extension. "New parents" for purposes of this provision are faculty members who become parents of a newborn or adopted child. The tenure clock extension may be elected regardless of whether the faculty member takes a full or partial leave in connection with becoming a new parent. However, no such request shall be granted if made after September 10 of the academic year in which the tenure decision would have been made by the department or school absent the extension requested. If a faculty member becomes a new parent a second time during the probationary period, a second tenure clock extension may be granted at the discretion of the Vice President for Academic Affairs, after consultation with the appropriate department chair (if applicable) and dean. Other requests for tenure clock extensions for family related purposes may be granted at the discretion of the Vice President for Academic Affairs, after consultation with the appropriate department chair (if applicable) and dean."

b) Change existing sub-section "b) 3)" to "b) 4)"

By action of The George Washington University Board of Trustees, effective October 13, 2006, the following changes to the *Faculty Code* were approved:

*That the Faculty Code be amended by adding the following new subsection at the end of Article I.B:*

5. **Special Service:** Special service faculty may be appointed, upon recommendation of the appropriate faculty and officers of the administration, as professor of practice, associate professor of practice, and assistant professor of practice, or with such other special service faculty designation as may be approved by the Vice President for Academic Affairs, in order to fulfill special teaching or program administration or development needs. Such appointments do not provide tenure, and special service faculty are not expected to generate productive scholarship.

*That the Faculty Code be further amended by adding the following new section after Article IV.A.5:*

6. **Criteria and Procedures for Appointments, Reappointments, and Promotion of Regular, Active-Status Faculty Serving in Non-Tenure-Accruing Appointments**

Each school and each department (except in the case of nondepartmentalized schools) shall take the following actions with regard to appointments, reappointments, and promotion of regular, active-status faculty serving in non-tenure-accruing appointments:

a) In accordance with this Article IV and Part B of the Procedures for the Implementation of the Faculty Code, the faculty of each of the foregoing units shall approve and publish the criteria to be applied in making decisions regarding appointments, reappointments, and promotion of regular, active-status faculty serving in non-tenure-accruing appointments. These criteria shall be based on the purpose(s) of the non-tenure-accruing appointments. Each letter of appointment for a regular, active-status faculty member serving in a non-tenure-accruing appointment shall include appropriate references

to the criteria and purpose(s) applicable to such appointment.

b) Decisions regarding appointments, reappointments, and promotion of regular, active-status faculty for non-tenure-accruing positions at a rank lower than the rank of professor may be based on published criteria that assign different weights to the factors of teaching ability, productive scholarship, and service to the University, professional societies and the public than the published criteria that would be applied to faculty members serving in tenure-accruing appointments in the applicable department or nondepartmentalized school; provided, however, that

1) none of the foregoing factors shall be assigned a weight of zero, and each regular, active-status faculty member serving in a non-tenure-accruing position shall be expected to generate evidence of teaching ability and productive scholarship; and

2) the weights to be applied to the foregoing factors shall be based on the purpose(s) of the particular non-tenure-accruing appointments, and such weights shall be explicitly stated in the applicable letters of appointment or reappointment; and

c) Decisions regarding appointments, reappointments, and promotion of regular, active-status faculty for non-tenure-accruing positions at the rank of professor shall be based on published criteria that are substantially comparable (though not necessarily identical) to the published criteria that would be applied to faculty members serving in tenure-accruing appointments in the applicable department or nondepartmentalized school.

d) Teaching loads and service assignments for all regular, active-status faculty in a department or nondepartmentalized school should be structured so that during the term of each appointment, consistent with the University's needs, each regular, active-status faculty member in that department or school has a reasonable opportunity

to generate evidence of teaching ability and productive scholarship.

*Contents*

**Faculty Code**

| | | |
|---|---|---|
| **I.** | **Grades of Academic Personnel** .. | 1 |
| A. | Retired Status ................. | 1 |
| B. | Active Status .................. | 1 |
| 1. | Regular ...................... | 1 |
| 2. | Limited Service ................ | 2 |
| 3. | Visiting ..................... | 2 |
| 4. | Research Staff ................. | 2 |
| **II.** | **Academic Freedom** ............ | 2 |
| **III.** | **Professional Responsibilities** .... | 2 |
| **IV.** | **Appointment, Reappointment,** | |
| | **Promotion and Tenure** ......... | 4 |
| A. | Appointment ................... | 4 |
| 1. | Statements of Terms | |
| | and Conditions ................ | 4 |
| 2. | Limited Service | |
| | Appointments ................. | 4 |
| 3.1 | Regular Tenure-Accruing | |
| | Appointments ................. | 5 |
| 3.2 | Regular Non-Tenure-Accruing | |
| | Appointments ................. | 6 |
| 4.1 | Stated Periods by Rank for Regular | |
| | Tenure-Accruing Appointments .... | 6 |
| 4.2 | Stated Periods by Rank for Regular | |
| | Non-Tenure-Accruing | |
| | Appointments ................. | 7 |
| 5. | Criteria and Procedures for | |
| | Appointments ................. | 7 |
| B. | Promotion .................... | 7 |
| C. | Tenure ...................... | 8 |
| D. | School-Wide Personnel | |
| | Committees ................... | 9 |
| E. | Nondiscrimination ............. | 9 |
| **V.** | **Termination of Service** ......... | 10 |
| A. | Expiration of Definite-Period | |
| | Appointments ................. | 10 |
| B. | Termination of Non-Tenured | |
| | Appointments ................. | 10 |
| 1. | Notice of Nonrenewal of | |
| | Appointment ................. | 10 |

| | | |
|---|---|---|
| 2. | Notice by Member of Termination or Declination of Renewal . . . . . . . | 10 |
| 3. | Dismissal and Late Notice . . . . . . . | 11 |
| C. | Termination of Tenure . . . . . . . . . | 11 |
| 1. | Adequate Cause . . . . . . . . . . . . . . | 11 |
| 2. | Termination of Program . . . . . . . . . | 11 |
| 3. | Extraordinary Financial Exigency . . . | 12 |
| 4. | Obligations of the University . . . . . | 12 |
| VI. | **Leave** . . . . . . . . . . . . . . . . . . . . . . | 12 |
| VII. | **Retirement** . . . . . . . . . . . . . . . . . . | 14 |
| VIII. | **Retirement Annuity** . . . . . . . . . . . . | 15 |
| IX. | **Faculty Role in University Decision Making** . . . . . . . . . . . . . . . | 15 |
| X. | **Rights, Privileges, and Resolution of Disputes Under This Code** . . . . . . . | 16 |
| A. | Rights and Privileges Under This Code . . . . . . . . . . . . . . . . . . . | 16 |
| B. | Grievances . . . . . . . . . . . . . . . . . . . | 16 |
| XI. | **Health Service** . . . . . . . . . . . . . . . | 17 |
| XII. | **Construction** . . . . . . . . . . . . . . . . | 17 |
| XIII. | **Effective Date** . . . . . . . . . . . . . . . | 17 |
| | **Procedures for the Implementation of the Faculty Code** . . . . . . . . . . . | 18 |
| A. | Governance of Departments and Schools . . . . . . . . . . . . . . . . . . | 18 |
| B. | Faculty Participation in Action Concerning Faculty Membership . . . | 18 |
| C. | Faculty Consultation and Recommendation in the Selection and Continuance of Academic Administrative Officers . . . . . . . . . . | 20 |
| 1. | Department Chairs . . . . . . . . . . . . . | 20 |
| 2. | Deans, Associate Deans, Assistant Dean, and Similar Academic Administrative Officers . . . . . . . . . . | 20 |
| 3. | Vice President for Academic Affairs, Associate or Assistant Vice Presidents for Academic Affairs . . . . . . . . . . . | 22 |
| 4. | Other Administrative Officers . . . . | 22 |
| 5. | President of the University . . . . . . . | 22 |
| D. | Faculty Participation in Action Concerning Curriculum . . . . . . . . . | 23 |

| | | |
|---|---|---|
| E. | Procedures for Implementation of Article X of the Faculty Code . . . . . | 24 |
| 1. | Informal Resolution . . . . . . . . . . . . | 24 |
| 2. | Dispute Resolution Committee . . . | 24 |
| 3. | Preliminary Proceedings . . . . . . . . . | 24 |
| 4. | Formal Proceedings . . . . . . . . . . . . | 25 |
| a) | Commencement of Proceedings . . . | 25 |
| b) | Hearing Committee and Hearing Officer . . . . . . . . . . . . . . . | 26 |
| c) | Procedure for Hearings . . . . . . . . . | 28 |
| 5. | Appeals . . . . . . . . . . . . . . . . . . . . . | 30 |
| 6. | Recommendations . . . . . . . . . . . . . | 30 |
| 7. | Final Disposition . . . . . . . . . . . . . . | 31 |
| F. | Procedures for the Dismissal of a Faculty Member for Adequate Cause . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| 1. | Commencement of Proceedings . . . . . . . . . . . . . . . . . . | 31 |
| 2. | Hearing Committee . . . . . . . . . . . . | 32 |
| 3. | Procedure for Hearings . . . . . . . . . | 33 |
| 4. | Appeals . . . . . . . . . . . . . . . . . . . . . | 33 |
| 5. | Attorneys' Fees and Expenses . . . . . . | 33 |

# Faculty Code
## Governing the Academic Personnel of the University

The Board of Trustees of The George Washington University, by virtue of the authority vested in it by the University Charter, hereby establishes the following Faculty Code. The Faculty Code applies to all University faculty in all colleges, schools, departments, and comparable educational divisions. Constitutions, by-laws, and established procedures of governance devised by subdivisions of the University are subordinate to the letter and spirit of the Faculty Code.

## I. GRADES OF ACADEMIC PERSONNEL

The grades of academic personnel are:

### A. Retired Status

University professor emeritus, professor emeritus, professor emeritus in residence, associate professor emeritus, associate professor emeritus in residence, and retired (in any given rank for age or disability).

### B. Active Status

**1. Regular:** University professor, professor, associate professor, assistant professor, and instructor. Each of the regular, active-status ranks may be tenure-accruing or non-tenure-accruing as specified in the original letter of appointment. However, the proportion of regular, active-status faculty serving in non-tenure-accruing appointments shall not exceed 25 percent in any school, nor shall any department have fewer than 50 percent of its regular, active-status faculty appointments either tenured or tenure-accruing. The foregoing shall not apply to the Medical Center faculty who are stationed at affiliated institutions, nor to the faculties of the Law School or of the College of Professional Studies.

**2. Limited Service:** Adjunct professor, adjunct associate professor, adjunct assistant professor, adjunct instructor, clinical professor, professorial lecturer, associate clinical professor, associate professorial lecturer, assistant clinical professor, assistant professorial lecturer, clinical instructor, lecturer, studio instructor, special lecturer, fellow, teaching fellow, and graduate teaching assistant.

**3. Visiting:** Visiting professor, visiting associate professor, visiting assistant professor, and visiting instructor.

**4. Research Staff:** Members of the research staff may be appointed, upon recommendation of the appropriate faculty and officers of the administration, as research professor, associate research professor, assistant research professor, and research instructor. Such appointments do not provide tenure.

## II. ACADEMIC FREEDOM

A. A faculty member shall enjoy freedom of investigation subject only to legal restrictions and such guidelines as shall be recommended by the Faculty Senate and adopted by the University.

B. A faculty member shall enjoy freedom of expression. In the classroom, a faculty member's exposition shall be guided by requirements of effective teaching, adherence to scholarly standards, and encouragement of freedom of inquiry among students. In speaking and writing outside the University, a faculty member shall not attribute his or her personal views to the University.

## III. PROFESSIONAL RESPONSIBILITIES

A. Members of the faculty shall perform well their academic duties, strive for professional development, and apply their talents to the service of their professions and their community.

B. Members of the faculty are responsible for maintaining standards of professional ethics and for the fulfillment of faculty responsibilities.

C. Members of the faculty shall not permit their research to interfere with their teaching duties. In the classroom, they shall be responsible for the character of the instruction, the maintenance of good order, and the observance of University regulations. Faculty members shall make adequate preparation for their classes and conduct them in a dignified, courteous manner. They shall meet classes on time, hold classes for the full period, evaluate academic performance fairly and reasonably and report evaluations promptly, and report promptly to the appropriate dean matters requiring disciplinary action and matters relating to the physical condition of classrooms and laboratories. If a student alleges an instance of arbitrary or capricious academic evaluation, the allegation shall be heard and reviewed through orderly faculty peer review procedures established by the dean and faculty of the school in which the contested academic evaluation takes place; should such peer review processes find in favor of and uphold the complaint of the student, yet the faculty member persists in refusing to alter the academic evaluation at issue, the Dean's Council and dean shall afford the student an appropriate remedy after consultation with the peer review body.

D. Members of the faculty shall perform their other academic duties conscientiously; they shall attend faculty meetings, commencement exercises, convocations, and other academic events; serve on faculty or University committees; assist in the administrative work of their departments and in the general administrative work of the University; and serve as general or departmental advisers to students.

E. Members of the active-status faculty shall strive to grow in professional competence by means of effective teaching and sound scholarship. They shall strive for the advancement of knowledge in their fields by individual research and by participation in the activities of professional societies.

2

3

F. Regular, active-status members of the faculty shall have the primary responsibility of devoting their time, thought, and energy to the service of the University. No such member of the faculty shall accept an outside teaching appointment during the academic year or engage in any other regular activity of a remunerative nature without the approval of the University. Even when officially approved, such employment shall not be permitted to interfere with a faculty member's responsibility to the University.

## IV. APPOINTMENT, REAPPOINTMENT, PROMOTION, AND TENURE

### A. Appointment

#### 1. Statements of Terms and Conditions

a) New faculty appointments shall be made by a letter signed by the appropriate corporate officer of the University. The appointee may accept the appointment by signing a copy of the letter of appointment and returning it to the University. A copy of this Code shall accompany or precede the letter of appointment and shall be considered part of the agreement between the faculty member and the University.

b) Tenured members of the faculty and faculty members (except those appointed in the Medical Center) whose appointments do not expire or whose appointments will be renewed shall be notified in writing annually, on or about May 15, of changes in rank or of other terms and conditions of service for the next academic year and further shall be notified annually in writing of changes in salary, no later than November 1.

#### 2. Limited Service Appointments

All appointments to limited service active status (as defined in Article I, Section B, Paragraph 2) shall be for a specified period of a year or less. Such appointments may be renewed an unlimited number of times.

### 3.1 Regular Tenure-Accruing Appointments

a) All appointments or reappointments to regular, active-status positions shall be for a specified term except for those that confer tenure.

b) The total of such terms, including all full-time service at the rank of instructor or higher in this or other recognized institutions of higher learning, shall not exceed seven years. The following provisions apply:

1) A faculty member with more than three years' previous full-time service at another institution may be appointed at any rank below that of professor without tenure for four years as a term or condition of his or her initial appointment, even though his or her total period of service in the academic profession is thereby extended beyond seven years.

2) Leaves of absence to engage in authorized teaching or research activities at another institution shall be included in this seven-year period.

3) Leaves for study toward a degree, leaves for military or for personal reasons, and defense leave shall not be included in this period. A partial leave for family or medically related purposes of sufficient duration may justify an appropriate partial extension of the probationary period.

c) A faculty member of the rank of assistant professor or higher who will not be granted tenure at the end of the final year of his or her maximum term of appointment shall be so notified in writing no later than June 30 preceding the year in which his or her appointment will expire. However, notwithstanding any other provision of Articles IV and V of the Faculty Code, if a decision on tenure has not become final by such June 30 deadline due to a failure to resolve an administrative nonconcurrence with a faculty recommendation, the June 30 deadline may be extended for up to 60 days, provided the appropriate administrative officer has given written notice of such extension to the faculty member no later than the original June 30 deadline. A faculty member who does not receive notice of denial of tenure

by the date required under the preceding two sentences shall not be granted tenure at the end of his or her pending term of appointment, but instead shall be granted a one-year extension of such term. If not notified by June 30 of the final year of the non-extended term of appointment that tenure will not be granted, he or she will acquire tenure at the end of the extended term.

### 3.2 Regular Non-Tenure-Accruing Appointments

a) Letters of appointment to positions that will not normally lead to the consideration of the appointee for tenure shall include a statement to that effect.

b) Members of the faculty who are stationed at affiliated institutions and assigned to educational programs of the Medical Center and who have been appointed to regular, active-status positions without tenure prior to the effective date of this Code may continue to be appointed without tenure.

### 4.1 Stated Periods by Rank for Regular Tenure-Accruing Appointments

a) Instructors
Instructors shall be appointed for an initial period of one year and may be reappointed for not more than three additional one-year periods. No reappointments shall, except by special action of the Board of Trustees upon recommendation by the appropriate faculty body and the appropriate officers of administration, extend any individual's total period as an instructor beyond four years. Tenure shall not be conferred at this grade.

b) Assistant Professors
Assistant Professors may be appointed for a period of not more than three years and may be reappointed, with or without tenure, for one or more additional periods.

c) Associate Professors
Associate Professors may be appointed with tenure or for a period of not more than four years without tenure, and may be reappointed, with or without tenure, for one or more additional periods.

d) Professors
Professors may be appointed with tenure or for a period of not more than three years without tenure.

e) University Professors
University Professors shall be appointed with tenure. The process of making such appointments shall be as follows:

1) The candidate shall be recommended by one or more departments or schools; and

2) The candidate shall be recommended by the Executive Committee of the Faculty Senate and/or by a faculty committee appointed by the President; and

3) The candidate shall be recommended by the Vice President for Academic Affairs and by the President, the appointment to be approved by the Board of Trustees.

### 4.2 Stated Periods by Rank for Regular Non-Tenure-Accruing Appointments

Faculty members with regular, non-tenure-accruing appointments at any rank may be reappointed to the same rank or to a higher one as many times as the needs of the University may require.

### 5. Criteria and Procedures for Appointments

Each school shall establish and publish criteria on which regular faculty appointments will be based. Additional criteria that may exist in the departments shall also be published. Each department or nondepartmentalized school shall establish and publish the procedures to be followed for recruitment, assembling all relevant information, and making recommendations for appointments to the regular faculty.

### B. Promotion

1. Promotion shall be dependent upon professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service.

2. As general practice, a promotion shall be accompanied by an appropriate increase in salary.

3. Each school or comparable educational division shall establish and publish criteria on which promotion will be based. Additional criteria that may exist in departments shall also be published. Each department or nondepartmentalized school shall establish and publish the procedures followed for making decisions concerning promotions.

4. Each department or school shall establish procedures for periodically informing faculty members whether they are making satisfactory progress toward promotion.

## C. Tenure

1. Tenure shall be dependent upon professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service. Upon a specific showing that the academic needs of the University have changed with respect to a particular position, that factor may also be considered in determining whether tenure shall be granted.

2. Each school or comparable educational division shall establish and publish criteria on which the granting of tenure will be based to implement the factors itemized in Paragraph 1. Such criteria shall be stated separately from the criteria for promotion. Any additional criteria for tenure that may exist in departments shall also be published. Each department or nondepartmentalized school shall establish and publish the procedures followed for making decisions concerning tenure.

3. To aid faculty members in assessing their potential for achieving tenure, each department, division, or comparable program shall establish procedures for informing individual faculty members, upon request, concerning probable status with regard to tenure. Such information will not constitute a commitment to recommend tenure.

## D. School-Wide Personnel Committees

To implement the procedures required in Sections B.3 and C.2 above, each school shall establish a school-wide personnel committee, either as an elected standing committee or of the school faculty acting as a committee of the whole, to consider recommendations for appointments with tenure, for promotion, or for tenure of regular full-time faculty. Such committees may request additional information, documentation, or clarification respecting such recommendations. Further:

1. An elected standing committee, sitting in review of recommendations originating from a department or equivalent unit, shall advise the dean of that school whether the candidate has met the relevant school and department criteria and whether it has identified any "compelling reasons" that may exist for not following the departmental or unit recommendation. Such advisories shall not be construed as "faculty recommendations" as defined by Section B.3 of the Procedures for Implementation of the Faculty Code.

2. When the faculty of a school, sitting as a committee of the whole, serves as the school's personnel committee and initiates recommendations to the dean for appointments and actions affecting renewal of appointments, promotion, tenure designation, and termination of service, such recommendations shall be construed as "faculty recommendations" in the sense of the Procedures, Section B.3.

3. In the College of Professional Studies, the Dean's Council shall take the place of the elected standing committee or committee of the whole described in this Part D.

## E. Nondiscrimination

Appointments, renewals, terminations, promotions, tenure, compensation, and all other terms and conditions of employment shall be made solely on the basis of merit and without regard to race, color, religion, sex, sexual orientation, national origin, or other considerations prohibited by law.

## V. TERMINATION OF SERVICE

### A. Expiration of Definite-Period Appointments

All appointments for a definite period of service expire automatically with the completion of such period of service, subject, as appropriate, to the safeguards specified in this Article and in Article IV.

### B. Termination of Non-Tenured Appointments

#### 1. Notice of Nonrenewal of Appointment

Written notice that an appointment is not to be renewed shall be given to a regular, active-status faculty member in advance of the expiration of his or her appointment, according to the following minimum periods of notice:

a) Not later than March 1 of the first academic year of faculty service in the University in the case of a one-year appointment;

b) Not later than December 1 of the second academic year of such service in the case of a two-year appointment or the renewal of a one-year appointment;

c) Not later than June 30 preceding the final academic year after two or more academic years of service in the University.

#### 2. Notice by Member of Termination or Declination of Renewal

A member of the faculty who desires to terminate an existing appointment or to decline a renewal shall give notice in writing no later than April 1 if the faculty member's rank is instructor or assistant professor, and no later than March 1 if the rank is higher, or within thirty days after receiving notice of the terms and conditions of service for the next academic year, whichever date is later; but the faculty member may properly request a waiver of this requirement in case of hardship or in a situation that might entail the denial of substantial professional advancement.

#### 3. Dismissal and Late Notice

Dismissal of a faculty member during a non-tenured appointment, or the nonrenewal of such an appointment with less than the required advance notice, shall be preceded by a statement of reasons and shall be subject to the provisions of Article X of this Code.

### C. Termination of Tenure

Grounds for termination: Until retirement of a faculty member in accordance with other provisions of this Code, and subject to the provisions of Article X, an appointment with tenure shall be terminable by the University only for adequate cause, termination of program, or on account of extraordinary financial exigency, in the latter two cases after not less than twelve months' notice to the faculty member.

#### 1. Adequate Cause

Adequate cause shall mean unfitness to perform academic duties because of:

a) incompetence;

b) lack of scholarly integrity;

c) persistent neglect of professional responsibilities under this Code; or

d) gross personal misconduct that destroys academic usefulness.

#### 2. Termination of Program

The University may be required to terminate the appointments of tenured faculty members as a result of the termination of an entire instructional program because of a substantial decline in enrollment in the program or because of the expiration of grants, contracts, or other sources of funding on which the program's financial viability depends.

### 3. Extraordinary Financial Exigency

The University may be required to terminate the appointments of tenured faculty members because of extraordinary financial exigency. This drastic measure shall be considered only as a last resort, after every effort has been made by the University administration and the Board of Trustees to meet the need in other ways.

### 4. Obligations of the University

a) Tenured faculty members shall not be dismissed because of termination of their program or extraordinary financial exigency until every effort has been made to place them in suitable positions elsewhere in the University.

b) If an appointment with tenure is terminated because of termination of a program or an extraordinary financial exigency, and, within two years, the program is reinstituted or funds become available to restore the position, the released faculty member's place shall not be filled until he or she has been offered and declined reappointment.

c) Faculty members whose tenured appointments are terminated because of the termination of their program or because of an extraordinary financial exigency shall be provided severance payment of one year's salary beyond the date of termination of employment.

### VI. LEAVE

A. When circumstances permit, for study or for any other valid reason, a leave of absence without salary, or a partial leave for family or medically related purposes with reduced salary, may be granted to a member of the faculty on approval of the department or other appropriate unit (if applicable), the appropriate dean(s), and the Vice President for Academic Affairs. Except for unpaid leaves of absence taken under the Family and Medical Leave Acts, unpaid leaves shall not normally exceed two consecutive academic years, although under unusual circumstances additional unpaid leave may be granted.

B. When circumstances permit, the Board of Trustees shall grant sabbatical leave to a member of the faculty who has served six or more continuous years in a college or university in regular active status, three years of which must have been served in this University, or who has served six or more years in regular active status after a preceding grant of sabbatical leave. The request for sabbatical leave must be accompanied by an outline of the education, research, and/or self-improvement program the applicant proposes to follow if the leave is granted. Such leave must be recommended by the department or other appropriate unit, concurred in by the appropriate administrative official of the corresponding school and the Vice President for Academic Affairs, approved by the President of the University, and granted by the Board of Trustees of the University. By accepting a grant of sabbatical leave, faculty members obligate themselves to continue in the service of the University for at least one year following their leave unless the University agrees to some other arrangement. When faculty members are eligible for sabbatical leave, but for reasons of school or departmental convenience or necessity have their leave deferred, their next eligibility for sabbatical leave shall be computed from the time they became eligible for such leave, not from the date the leave was actually granted. The University shall pay members of the faculty while on sabbatical leave 60% of their salary for two semesters or all of their salary for one semester. (The salary is paid as a compensation for the benefits received by the University from the efforts of the faculty member on leave.)

C. In the event of a national emergency, regular, active-status faculty members will be granted defense leave in accordance with the following provisions:

1. Members of the faculty given defense leave for the duration of an emergency will have the privilege of returning to the service of the University at the beginning of the semester following their release from service.

2. Members of the faculty on defense leave in a civilian status may be requested to return to the University and their defense leave terminated on sixty days' notice.

3. The return to University service of members of the faculty from defense leave is conditioned upon their mental, moral, and physical competence to resume their positions in the University.

## VII. RETIREMENT

A. Subject to the needs of the University, a full-time member of the faculty who is fully retired may be invited by the appropriate officers of the University to continue on a part-time basis and appointed for a renewable period not to exceed one academic year. Such appointee shall be designated "emeritus (or retired) in residence."

B. A member of the faculty with long and distinguished service to the University may, upon retirement, be awarded emeritus status. Emeritus status is recommended by the regular, active-status members of the faculty concerned and, with the concurrence of the administration, is awarded by the Board of Trustees. Those eligible for consideration for emeritus status are University professors, professors, adjunct professors, clinical professors, research professors, associate professors, and associate clinical professors. Faculty members in emeritus status shall be entitled to use facilities as arranged with the administration of the University and to participate in faculty meetings without the right to vote. They may serve on committees and may perform such other services as are in keeping with their desires and with the needs of the University.

C. A retired faculty member may use facilities as arranged with the administration of the University and participate in faculty meetings without the right to vote.

D. Subject to programmatic needs, full-time tenured members of the faculty with ten years of continuous full-time service who are above 60 years of age may elect to continue for a mutually agreed period on a half-time or two-thirds-time regular, active-status basis. Benefits and conditions of this reduced service will be as specified in the Faculty Handbook at the time the election is made to retire partially.

## VIII. RETIREMENT ANNUITY

The retirement plan for faculty and staff is a defined contribution plan with investment options provided under agreements with TIAA and other carriers. Full-time and regular part-time members of the faculty (as defined in the Faculty Handbook) and those continuing in reduced service under the provisions of Article VII, Section D, are eligible to participate.

## IX. FACULTY ROLE IN UNIVERSITY DECISION MAKING

A. The regular, active-status faculty shares with the officers of administration the responsibility for effective operation of the departments and schools and the University as a whole. In the exercise of this responsibility, the regular, active-status faculty plays a role in decisions on the appointment and promotion of members of the faculty and the appointment of the President, deans, departmental chairs, and other administrative officials with authority over academic matters. The regular, active-status faculty also participates in the formulation of policy and planning decisions affecting the quality of education and life at the University. This participation includes an active role in the development, revision, or elimination of curricular offerings of each department or school. The regular, active-status members of the faculty of a school are also entitled to an opportunity to make recommendations on proposals concerning the creation, consolidation, or elimination of departments, institutes, or other academic or research units making up a part of that school. The Faculty Senate or an appropriate committee thereof is entitled to an opportunity to make recommendations on proposals

concerning the creation, consolidation, or elimination of schools or other major components of the University.

B. The faculty cannot perform an effective and responsible role in University decision making without the cooperation of the administrative officers of the University. This cooperation includes the provision of such information as is necessary to the development of sound, well-informed recommendations. Faculty bodies charged with responsibilities for particular policy and planning areas are entitled, to the extent feasible, to be informed sufficiently in advance of important decisions within their areas of competence to be able to provide their advice or recommendations to the appropriate University officials.

## X. RIGHTS, PRIVILEGES, AND RESOLUTION OF DISPUTES UNDER THIS CODE

### A. Rights and Privileges Under This Code

The rights, privileges, and responsibilities of a faculty member, as conferred by this Code, shall be carefully safeguarded in accordance with the highest accepted principles, practices, and procedures of the academic community. An alleged infringement of such rights or privileges or an alleged violation of such responsibilities shall first be considered by the faculty member or members concerned, or by appropriate representatives of the faculty, in cooperation with the responsible administrative officers. If such consideration does not lead to an adjustment satisfactory to the parties involved, the procedures for the implementation of this Article shall be fully utilized.

### B. Grievances

To maintain a grievance, the complaining party must allege that he or she has suffered a substantial injury resulting from violation of rights or privileges concerning academic freedom, research or other scholarly activities, tenure, promotion, re-

appointment, dismissal, or sabbatical or other leave, arising from:

1. Acts of discrimination prohibited by federal or local law;

2. Failure to comply with the Faculty Code, or Faculty Handbook, or other rules, regulations, and procedures established by the University;

3. Arbitrary and capricious actions on behalf of the University, or arbitrary and capricious applications of federal or local statutes and regulations; or

4. Retaliation for exercise of Code-protected rights.

## XI. HEALTH SERVICE

A. The University, recognizing the importance of the health of the teacher to professional competence, shall contribute to the cost of the current and any future basic health care program for all members of the faculty.

B. The facilities of the Emergency Room are available to members of the faculty in emergencies resulting from accidents or sudden, serious illness while on campus.

## XII. CONSTRUCTION

As used in this Code and the Procedures for Implementation, words that may imply the masculine gender shall be construed to refer to both the masculine and the feminine genders.

## XIII. EFFECTIVE DATE

Having been approved by the Board of Trustees of the University on February 28, 2003, this Code shall, as of that date, supersede all former codes and ordinances. The Board of Trustees of the University directs that this revised Faculty Code be published.

16

17

# Procedures for the Implementation of the Faculty Code

## A. Governance of Departments and Schools*

The regular, active-status faculty and tenured limited service faculty of each department, school, or comparable educational division shall establish written procedures for the governance of that unit.

## B. Faculty Participation in Action Concerning Faculty Membership

1. The regular, active-status faculty of each school or comparable educational division shall establish procedures enabling an elected standing committee or committee of the whole to submit its recommendations on the allocation of regular-service, tenure-accruing appointments within that unit.

2. The regular, active-status faculty of the rank of assistant professor or higher of a department or of a nondepartmentalized school or comparable educational division shall, subject to such limitations or guidelines as may be established by the faculties of the respective schools, establish procedures enabling an elected standing committee or a committee of the whole to submit its recommendations for appointments. Recommendations for actions other than appointments concerning instructors, assistant professors, or associate professors shall be determined by the tenured members of the faculty of higher rank or of equal and higher rank, as the faculty may have determined by previously established procedures. Recommendations for actions other than appointments concerning professors shall be determined by tenured members of the rank of professor. In the College of Professional

Studies, the Dean's Council shall take the place of the elected standing committee or committee of the whole described in this paragraph 2.

3. Appointments and actions affecting renewal of appointments, promotion, tenure designation, and termination of service shall normally follow faculty recommendations. Departures from this standard shall be limited to those cases involving compelling reasons. The appropriate administrative officer shall notify the Executive Committee of the Faculty Senate of any departures from faculty recommendations and the compelling reasons therefor. The faculty or the appropriate unit thereof shall also be notified unless the Board of Trustees determines that such notification would be contrary to the best interest of the individual or individuals concerned.

4. Faculty recommendations concurred in by the appropriate administrative officers shall be transmitted by them to the President, who shall transmit them to the Board of Trustees. Variant or nonconcurring recommendations from an administrative officer, together with supporting reasons, shall be sent by that officer to the Executive Committee of the Faculty Senate through the appropriate superior administrative officers. The Executive Committee may seek information and advice and make recommendations to the faculty or the appropriate unit thereof and to the appropriate administrative officers. If concurrence cannot be obtained after opportunity for reconsideration in the light of the recommendations of the Executive Committee, the recommendations of the appropriate administrative officers, accompanied by the recommendation of the faculty and the report of the Executive Committee, shall be transmitted to the Board of Trustees through the President, except that, at its discretion, the originating faculty unit may instead elect to leave the decision to the President.

---

* In the governance of the Medical Center, all faculty eligible for membership in the Medical Center Faculty Assembly shall be eligible to participate whenever the term "regular" faculty appears in this document.

## C. Faculty Consultation and Recommendation in the Selection and Continuance of Academic Administrative Officers

### 1. Department Chairs

The regular, active-status faculty members of a department of the rank of assistant professor and higher shall, subject to such limitations or guidelines as may be established by the faculties of the respective schools, formulate procedures for making recommendations for filling vacancies in the post of department chair. The procedures shall provide for an elected committee of the regular, active-status members of the department, or an appropriate interdepartmental committee, to recommend a candidate for the position. Normally, the appointment shall be made in accordance with the recommendation. Should the appointing official not concur with the committee's recommendation, that official shall so inform the department concerned and shall indicate the reasons therefor. The committee shall, after consultation with the appointing official, make alternative recommendations until a nomination acceptable to both the department and the appointing official is reached.

### 2. Deans, Associate Deans, Assistant Deans, and Similar Academic Administrative Officers

a) The academic administrative officers, such as deans, associate deans, assistant deans, Vice President for Health Affairs, or other academic administrative officers of similar rank of a school or other academic unit shall be qualified for faculty membership by training and experience.

b) Appointments to such positions shall be made only after a special or standing committee, elected by the regular, active-status faculty involved from among the faculty's tenured members, has established criteria (subject to the approval of that faculty as a whole), considered nominations, and reported its recommendations in accordance with the procedures established under Section A, above, to the faculty that elected it or to the appropriate academic

administrative officer. In the College of Professional Studies, the special faculty committee performing this function shall be appointed jointly by the Vice President for Academic Affairs and the deans of the schools whose programs are most directly affected by the College of Professional Studies.

c) Such appointees shall hold office only as long as they retain the confidence of the faculty concerned. A formal proceeding to question the continued confidence of the faculty of a school in an academic administrative officer shall be instituted only after faculty members have made a reasonable effort to bring the substance of their concerns to the attention of such officers informally. The formal proceeding shall be conducted as follows:

1) A petition signed by one-third of the regular, active-status members of the rank of assistant professor or higher of the faculty concerned shall be submitted to the Chair of the Executive Committee of the Faculty Senate.

2) The Chair of the Executive Committee shall call a special meeting of the faculty concerned for consideration of the matter. The meeting shall be held within twenty days (on which classes are regularly held in the University) of the time the petition is submitted. Notice of the meeting shall be given to all of the faculty members eligible to vote on the matter.

3) The Chair of the Executive Committee shall preside over the meeting. At this meeting, procedures for balloting shall be determined.

4) Within ten days (on which classes are regularly held in the University) of the first special meeting, a secret ballot of the regular, active-status faculty of the rank of assistant professor or higher shall be taken at a special meeting or by mail on the question of confidence in the administrator involved. The balloting shall be supervised by the Executive Committee of the Faculty Senate.

5) The affirmative vote of a majority of faculty members eligible to vote shall be necessary for the passage of a vote of no confidence. If the resolution

passes, the Chair of the Executive Committee shall forward the results of the proceedings to the President of the University for appropriate action.

### 3. Vice President for Academic Affairs, Associate or Assistant Vice Presidents for Academic Affairs

Appointments to the position of Vice President for Academic Affairs or Associate or Assistant Vice President for Academic Affairs shall be made only after consultation with the Executive Committee of the Faculty Senate. The Executive Committee may submit names of proposed candidates for these positions and may advise concerning names proposed by administrative officers. Appointees to these positions shall be qualified for faculty membership by training, experience, and continued interest in teaching and research. They shall retain office only as long as they retain the confidence of the Faculty Assembly.

### 4. Other Administrative Officers

a) The faculty of a school, division, or other organizational unit or group of units shall be consulted for its recommendations regarding the appointment of administrative officers whose concern with academic matters is limited to that unit or group of units. The regular, active-status faculty members of the rank of assistant professor and higher of the organizational unit or units concerned shall establish procedures and criteria for the formulation of such recommendations.

b) The Executive Committee of the Faculty Senate shall be consulted for its recommendations regarding the appointment of administrative officers whose concern with academic matters comprehends all or substantially all of the University.

### 5. President of the University

The Faculty Assembly shall elect a committee to advise and consult with the Board of Trustees or appropriate members thereof in the selection of a President.

### D. Faculty Participation in Action Concerning Curriculum

1. The regular, active-status faculty members of the rank of assistant professor and higher of each school shall establish procedures for their participation, directly or through elected standing committees, in decisions relating to the addition, revision, or elimination of curricular offerings. In the College of Professional Studies, the Dean's Council shall establish procedures for faculty participation in such decisions.

2. At least half of the members of the Dean's Council of the College of Professional Studies shall be tenured faculty members of the schools affected most directly by the College, and those members of the Dean's Council shall be elected by the faculties of their respective schools.

3. The College of Professional Studies shall not initiate a degree program that duplicates a degree program offered by another school. The College shall not initiate a degree program that overlaps substantially with a degree program offered by another school, unless (a) the Dean's Council of the College has approved that program, and (b) the appropriate corporate officer of the University has authorized the College to initiate that program after consulting with the faculty of the other school.

4. The College of Professional Studies shall not confer any degree that duplicates a degree offered by another school. Each degree conferred by the College (whether at the associate's, bachelor's, or master's level) shall carry the designation "of Professional Studies."

5. Prior to the end of each academic year, the Dean's Council of the College of Professional Studies shall submit a written report to the Faculty Senate. Each annual report shall describe the procedures established and other actions taken by the Dean's Council to: (a) facilitate faculty participation in the appointment and promotion of faculty members and in decisions relating to the addition, revision or elimination of curricular offerings of the College;

and (b) address issues arising out of potential substantial overlaps between degree programs offered or proposed to be offered by the College and degree programs offered by other schools.

### E. Procedures for Implementation of Article X of the Faculty Code

#### 1. Informal Resolution

Before instituting a formal grievance, the aggrieved party shall make all reasonable efforts to achieve a resolution of the situation through informal consultation with the appropriate faculty members and administrative officers.

#### 2. Dispute Resolution Committee

The Faculty Senate shall elect a Dispute Resolution Committee of fifteen tenured, active-status faculty members, no more than three of whom shall be members of the faculty of any one school (except that four may be members of the faculty of Columbian College and four may be members of the Law School) and none of whom may be serving as academic administrators. The members of the Committee shall serve three-year staggered terms so that the terms of five of the members shall expire each year. The Faculty Senate shall designate the Chair of the Committee from among the members of the Committee. Alternate temporary members may be appointed at any time by the Executive Committee to facilitate the dispute resolution procedures.

#### 3. Preliminary Proceedings

If informal consultation fails to resolve the matter or if the aggrieved party concludes that such consultation is not feasible or would be futile, the aggrieved party shall refer the dispute to the Dispute Resolution Committee by means of a letter addressed to the Chair with copies sent to the Chair of the Executive Committee of the Faculty Senate and to the Vice President for Academic Affairs on behalf of the University. The letter shall identify the general nature and circumstances of the dispute. Unless either the University or the aggrieved party

objects, the Chair of the Dispute Resolution Committee shall promptly appoint a special mediator of appropriate qualifications to assist the University and the aggrieved party to resolve the dispute. The special mediator shall report to the Chair of the Dispute Resolution Committee that a mutually satisfactory solution has been achieved, in which case the grievance shall be dismissed, or that efforts at mediation were unsuccessful.

#### 4. Formal Proceedings

##### a) Commencement of Proceedings

1) If either party declines to mediate or to continue to mediate, or if efforts at mediation are unsuccessful, the aggrieved party may commence formal proceedings by means of a grievance sent to the Chair of the Dispute Resolution Committee, with copies sent to the Chair of the Executive Committee of the Faculty Senate and to the Vice President for Academic Affairs on behalf of the University.

2) The grievance shall identify the aggrieved party as the "Grievant" and shall name The George Washington University as the "Respondent." A grievance may not be brought against faculty members of the University, acting in their individual capacities as faculty members. Consistent with Article X.B., a grievance may only be maintained against the University for official acts. The Vice President for Academic Affairs shall identify the appropriate faculty member or administrative official who shall act on behalf of the University as Respondent.

3) The grievance shall set forth with particularity the nature of the dispute, specifying, consistent with Article X. B., the rights or privileges under the Faculty Code alleged to have been violated, the specific act or acts alleged to constitute the violation, and the remedy sought. The grievance shall also set forth the Grievant's efforts to resolve the dispute informally, or if no such efforts were made, the reasons for failing to make such efforts. No grievance may be maintained on the basis of error that did not affect the substantial rights of the Grievant.

24

25

4) Within twenty calendar days of receipt of the grievance the University shall reply in writing, sending copies of the reply to the Chair of the Dispute Resolution Committee, the Chair of the Executive Committee of the Faculty Senate, and the Grievant. The reply shall set forth with particularity the position of the University with respect to each allegation of the grievance.

b) Hearing Committee and Hearing Officer

1) Within a reasonably prompt period of time, ordinarily within ten calendar days of receipt of the grievance and reply, the Chair of the Dispute Resolution Committee shall appoint a Hearing Committee of three members from among the members of the Dispute Resolution Committee. The Chair of the Dispute Resolution Committee shall designate one member of the Hearing Committee to serve as the presiding Hearing Officer. The Hearing Officer shall have appropriate experience and training but need not be an attorney. The Hearing Officer, in addition to serving as a full member of the Hearing Committee, shall assure an orderly, expeditious, and relevant hearing, assure the development of a complete, fair, and reliable record, and advise the Hearing Committee as to issues of substance and procedure.

2) No member of the same department as the Grievant shall sit on the Hearing Committee. Any party to a dispute may disqualify one member of the Hearing Committee by peremptory challenge. Any party may also seek to disqualify any member of the Hearing Committee for cause. The Chair of the Dispute Resolution Committee shall decide any challenges for cause, based on written submissions from the parties. The Chair of the Dispute Resolution Committee shall, from among the remaining members of the Dispute Resolution Committee, fill any vacancies on the Hearing Committee created by challenges.

3) When all challenges have been decided and vacancies filled, and as soon as reasonably possible after receipt of the grievance and reply, the Hearing Officer shall convene the Hearing Committee to review the grievance. If a majority of the Hearing Committee, after an opportunity for argument by the parties, finds that the grievance does not allege facts sufficient to state a grievance under the Code, or that the grievance is based on evidence or allegations substantially the same as those that have previously been heard or decided, or that could have been presented in a previous hearing, the grievance shall be automatically referred to the Dispute Resolution Committee for consideration at the earliest reasonable time. If a majority of the Dispute Resolution Committee, after an opportunity for argument by the parties, agrees that for any of the reasons set out in this section a hearing is not warranted, the grievance shall be dismissed, in whole or in part, and the matters dismissed shall be deemed closed.

4) On the determination that a hearing is warranted, the Hearing Officer shall promptly convene the Hearing Committee, which shall establish a schedule for the hearing. Grievances shall be heard and decided with reasonable dispatch, and, ordinarily, shall be completed by the Hearing Committee within three months after the determination that a hearing is warranted. However, due consideration shall be given to the University's normal academic calendar.

5) Members of the Hearing Committee shall be present during the hearings and deliberations of the Committee, except that the presence during part of the proceedings of one of the two not serving as the Hearing Officer may be waived by agreement of the parties.

6) It shall be the duty of the Hearing Officer to convene promptly the meetings of the Hearing Committee and to preside; to assure the expeditious disposition of the case; to rule on all questions of procedure necessary to the conduct of the hearing, subject to being overridden by the other two members of the Hearing Committee; to control the development of testimony and of evidence in the record; to prepare or assign the writing of an opinion on behalf of the Hearing Committee; and to

advise the Hearing Committee in its deliberations on questions of substance and procedure. The Hearing Officer is a full member of the Hearing Committee, and the Hearing Committee shall decide all ultimate questions of fact, substance, procedure, or policy, by majority vote. The Hearing Officer shall sign dispositive orders on behalf of the Hearing Committee.

7) Members of the Hearing Committee, members of the Dispute Resolution Committee, and the parties shall avoid ex parte communications bearing on the substance of the dispute.

c) Procedure for Hearings

1) The parties to the proceedings shall be entitled to appear in person and to be represented by counsel or other adviser.

2) A grievance procedure is not a formal judicial proceeding. Its purpose is to provide a fair evaluation of an allegation that a right or privilege has been violated. In order to achieve that end, the Hearing Committee shall have authority to call any material witness who is a member of the University faculty, administration, or staff and any other person who is willing to testify; to question parties and witnesses; to exclude matters it deems irrelevant; to place reasonable limits on arguments, the presentation of evidence, and the questioning of witnesses by the parties. The University will make a reasonable effort to facilitate the appearance of all faculty, administration, and staff reasonably called to testify.

3) The procedure at the hearings shall be informal but shall comply with the requirements of fairness to the parties. The Hearing Committee is not required to comply with rules of evidence applicable in courts of law and may receive any relevant evidence that is not privileged. The Hearing Committee may decline to consider evidence when its probative value is outweighed by considerations of unfair prejudice, confusion of the issues, undue delay, waste of time, or needless presentation of cumulative evidence. The parties shall be entitled to testify on their own behalf; to call as material wit-

nesses any member of the University faculty, administration, or staff and any other person who is willing to testify; to present written and other evidence; and to cross-examine witnesses called by other parties. A party shall be entitled to inspect and copy, in advance of the hearing, all relevant documents in the control of the other party and not privileged and may offer such documents or excerpts therefrom in evidence.

4) The parties shall be entitled to present opening and closing statements.

5) A stenographic record or tape recording of the hearings shall be made and one copy, which shall be available to all parties, kept on file by the University.

6) The hearings shall be open to the public unless, on the motion of a party or the Hearing Committee, the Hearing Committee shall determine that it is in the best interest of the University and the parties that the hearings be closed.

7) At the conclusion of the presentation of evidence and argument from both sides, the Committee shall convene in closed session to deliberate and reach a decision. In rendering its decision, the Hearing Committee shall not substitute its judgment for that of the maker of the decision being challenged. Rather it shall determine whether the Grievant has established by clear and convincing evidence that he or she has suffered a substantial injury pursuant to Article X, Section B.

8) The Hearing Committee shall render its findings and recommendations in a written opinion that shall state the number of members subscribing to the opinion and shall include dissenting opinions, if any. This opinion shall be submitted to the Chair of the Dispute Resolution Committee, and copies shall be transmitted to the parties and to the Chair of the Executive Committee of the Faculty Senate.

9) The hearing procedures shall be concluded and the Hearing Committee's findings and recommendations shall be rendered as soon as practicable.

### 5. Appeals

a) Any party may appeal the findings and recommendations of the Hearing Committee by filing a notice of appeal with the Chair of the Dispute Resolution Committee and sending copies thereof to the Chair of the Executive Committee of the Faculty Senate and to the other parties. The notice of appeal must be filed within ten calendar days of the receipt of the decision of the Hearing Committee.

b) An appeal shall be heard by members of the Dispute Resolution Committee who were not members of the Hearing Committee, provided that members of the Dispute Resolution Committee who were disqualified from sitting as members of the Hearing Committee and members of the same department as the Grievant shall not participate in the hearings of the appeal. A quorum for hearing an appeal shall be two-thirds of those members of the Dispute Resolution Committee eligible under the terms of this section.

c) The parties to an appeal shall be entitled to present written and oral argument. However, evidence not introduced in the hearing may not be considered on appeal.

d) The Dispute Resolution Committee shall decide by majority vote and render an opinion in writing, sustaining, modifying, overruling, or remanding the decision of the Hearing Committee.

### 6. Recommendations

A Hearing Committee and the Dispute Resolution Committee may recommend that the University action being challenged be upheld, modified, reconsidered or remanded under specified conditions, or reversed, in whole or in part. A Hearing Committee and the Dispute Resolution Committee may not include as part of their recommendations any monetary damages, punitive damages, or any other actions or measures outside of the scope of the underlying University action being challenged.

### 7. Final Disposition

In the absence of a timely appeal filed by either party from a decision of a Hearing Committee, or after a decision of the Dispute Resolution Committee, such decision shall be transmitted to the parties, to the Chair of the Executive Committee of the Faculty Senate, and to the Vice President for Academic Affairs. The decision of the relevant Committee shall be deemed final and shall be implemented by the University unless the Vice President for Academic Affairs determines that there are compelling reasons not to implement the relevant Committee's decision. In the event of such a determination, the Vice President shall transmit his or her determination (including an explanation of such compelling reasons) and recommendation, and the record of the case, through the President of the University to the Board of Trustees, or, at the election of the Grievant, solely to the President, with copies to the Grievant and the Chairs of the Dispute Resolution Committee and the Executive Committee of the Faculty Senate, for a prompt decision of the President or the Board of Trustees.

### F. Procedures for the Dismissal of a Faculty Member for Adequate Cause

### 1. Commencement of Proceedings

a) Proceedings to dismiss a tenured faculty member for adequate cause may be commenced by a complaint, addressed to the Chair of the Dispute Resolution Committee, signed by the Vice President for Academic Affairs and either the dean or the department chair who has administrative responsibility for the faculty member concerned. The complaint shall set forth the grounds alleged to constitute adequate cause for dismissal. A copy of the complaint shall be delivered in hand to the faculty member concerned or shall be sent by registered mail to the faculty member's residence. A copy of the complaint shall also be sent to the Chair of the Executive Committee of the Faculty Senate.

b) Proceedings may also be commenced by a petition, setting forth the grounds alleged to constitute adequate cause for dismissal and signed by a majority of the tenured faculty of the school of the faculty member concerned, or by twenty tenured members of that faculty, whichever is the lesser. A copy of the executed petition shall be delivered in hand to the faculty member concerned or sent by registered mail to his or her residence. Copies shall also be sent to the Chair of the Dispute Resolution Committee, the Chair of the Executive Committee of the Faculty Senate, and the Vice President for Academic Affairs.

c) Within twenty calendar days of the receipt of the complaint, the faculty member concerned shall reply in writing, sending copies of the reply to the Chair of the Dispute Resolution Committee, the Chair of the Executive Committee of the Faculty Senate, and the Vice President for Academic Affairs. The reply shall set forth with particularity the responding faculty member's position with respect to each allegation of the complaint.

### 2. Hearing Committee

a) Upon receipt of the complaint, the Chair of the Dispute Resolution Committee shall, with the advice of the Executive Committee of the Faculty Senate, appoint a Hearing Committee of six members from among the members of the Dispute Resolution Committee.

b) No member of the same department as the faculty member concerned and no one who has signed a petition seeking that faculty member's dismissal shall sit on the Hearing Committee. The faculty member concerned may disqualify two members of the Hearing Committee by peremptory challenge and may also seek to disqualify a member of the Hearing Committee for cause. The Dispute Resolution Committee shall hear and decide any challenges for cause. The Chair of the Dispute Resolution Committee shall, from among the remaining members of the Dispute Resolution Committee, fill any vacancies on the Hearing Committee created by challenges.

c) When all challenges have been decided and vacancies filled, the Hearing Committee shall convene, establish a schedule for the hearings, and elect a chair from among its members to preside during the formal proceedings.

d) All of the members of the Hearing Committee shall be present during the hearings and deliberations of the Committee except that the presence of one of them during part of the proceedings may be waived by agreement of the parties.

### 3. Procedure for Hearings

The procedure for the hearings shall be the same as provided in Part E of these Procedures, except that the hearing shall be closed on the motion of the faculty member concerned, and that the Hearing Committee may recommend the dismissal of the faculty member concerned only by the affirmative vote of two-thirds of its members.

### 4. Appeals

The faculty member concerned may appeal the decision of the Hearing Committee in accordance with the procedures provided in Part E, Paragraph 5, of these Procedures.

### 5. Attorneys' Fees and Expenses

If a faculty member prevails against charges brought against him or her, the University may, upon recommendation of the Hearing Committee, reimburse the faculty member concerned for all or part of attorneys' fees and expenses actually incurred in his or her defense.



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

**Via Courier and First Class Mail**

March 1, 2007

Professor Debabrata Saha
9409 Fair Pine Lane
Great Falls, VA 22066

Dear Professor Saha:

I have been informed by President Stephen Joel Trachtenberg that
Executive Vice President Donald Lehman recused himself from
determining, under Section 7 of the Grievance Procedures, whether
there are compelling reasons not to implement the Dispute Resolution
Committee's decision to terminate your tenure for adequate cause. He
has further informed me that Dean Frederick Lawrence, to whom that
role was delegated, found no compelling reasons (as per the enclosed
memorandum). Therefore, the decision will be implemented.

Your tenure, and your University faculty appointment, is terminated
effective March 1, 2007.

Sincerely,

John F. Williams, Jr.
Provost

Cc:    Stephen Joel Trachtenberg
       Donald R. Lehman
       Timothy Tong

Enclosure

OFFICE OF THE
PROVOST
AND
VICE PRESIDENT FOR
HEALTH AFFAIRS

ROSS HALL

SUITE 713 EAST

2300 EYE STREET, NW

WASHINGTON, DC 20037

202-994-3727

FAX 202-994-9239



**THE GEORGE
WASHINGTON
UNIVERSITY
LAW SCHOOL**
WASHINGTON DC

FREDERICK M. LAWRENCE
DEAN AND
ROBERT KRAMER RESEARCH PROFESSOR OF LAW

## MEMORANDUM

**TO:**    Stephen Joel Trachtenberg, President

**FROM:**   Frederick M. Lawrence, Dean, Law School

**RE:**    In re Complaint Against Debabrata Saha Seeking Tenure Revocation

**DATE:**   February 23, 2007

By memorandum dated December 19, 2007, you appointed me to act in place of the Executive Vice President for Academic Affairs in the above-reference matter. Specifically, I was to review the decision of the six-member Hearing Committee that unanimously recommended the revocation of Professor Debabrata Saha's tenure (Hearing Committee). The Faculty Senate Dispute Resolution Committee unanimously affirmed this recommendation (Dispute Resolution Committee). Under the faculty grievance procedures contained in the *Faculty Code*, the Committee's decision "shall be deemed final and shall be implemented by the University unless the Vice President for Academic Affairs determines that there are compelling reasons not to implement the ... Committee's decision." Faculty Code Article XIII (E)(7). I find that there are no such compelling reasons not to implement the decision of the Hearing Committee affirmed by the Dispute Resolution Committee.

In reviewing the Committees' decisions in this case, I reviewed the following documents:

- The George Washington University Complaint against Professor Saha
- The George Washington University Amended complaint against Professor Saha
- Post-Hearing Brief of Professor Saha to the Hearing Committee
- Post-Hearing Brief of The George Washington University to the Hearing Committee
- Decision of the Hearing Committee, July 24, 2006
- Appeal Brief of Professor Saha to the Dispute Resolution Committee
- Appeal Brief of The George Washington University to the Dispute Resolution Committee
- Appeal Reply Brief of Professor Saha to the Dispute Resolution Committee
- Decision of the Dispute Resolution Committee

2

- Professor Saha's submission to me entitled "A Compelling Account: Flawed Deliberation of Schaffner Panel," dated December 12, 2006, submitted to me on January 3, 2007
- Letter to me from John F. Karl, Jr., Esq. counsel for Professor Saha, dated January 6, 2007, with enclosures
- Letter to me from John F. Karl, Jr., Esq. counsel for Professor Saha, dated January 7, 2007, with enclosures

In conducting my review, I am mindful too of the highly deferential standard articulated by the *Faculty Code*. The decision of the Hearing Committee, affirmed by the Dispute Resolution Committee, is entitled to a presumption of correctness and my sole task is to determine if there are "compelling reasons" that the Committees' decisions ought not be implemented. In my view, the Hearing Committee carefully culled through extensive testimony and documentary submissions and applied the correct standard under the *Faculty Code*, that is, whether the University proved by clear and convincing evidence that Professor Saha's tenure should be revoked. The University alleged two grounds for revocation -- that Professor Saha engaged in persistent neglect of professional responsibilities for an extend period, and that Professor Saha engaged in gross personal misconduct that destroys academic usefulness. See *Faculty Code* Article V (C)(1). The Hearing Committee found that the University had met this high burden of proof with respect to the first charge, namely, that Professor Saha engaged in persistent neglect of professional responsibilities. Given the substantive support cited by the Hearing Committee for its conclusion, and the procedures followed by the Hearing Committee including, without limitation, providing Professor Saha with the opportunity to be present for the hearing, to be represented by counsel, to testify and present witnesses and to confront and cross-examine adverse witnesses, I find there are no "compelling reasons" that the Committees' decision should not be implemented.

The arguments raised by Professor Saha in his briefs to the Hearing Committee and to the Dispute Resolution Committee require no contrary result, nor does anything in the letters to me from his attorney, Mr. Karl. I shall briefly address one issue raised by in Professor Saha's submissions to the Committees and in his attorney's letter of January 7. Professor Saha and his attorney cite *Kyriakopoulos v. George Washington University*, 856 F. 2d 438 (D.C. Cir. 1989) for the proposition that the three year statute of limitations in the District of Columbia applies to actions between faculty and Universities. They would apply *Kyriakopoulos* to limit a University, not in a lawsuit but in its own internal personnel proceedings, to a three year period for evidence in support of a personnel action, here tenure revocation. *Kyriakopoulos* will not hold such a meaning. *Kyriakopoulos* involved litigation, and a claim on a contract brought by a professor against a University arising out the University's decision not to promote him. The District of Columbia's three-year statute of limitations, like all limitation provisions, prevents a plaintiff from commencing litigation after a period of time has expired since the claim accrued. In a sense, the statute of limitations deprives a court of jurisdiction over claims brought more than three years after the accrual of a claim. In Professor Saha's case, The George Washington University is not commencing litigation but rather is applying its own faculty code, a code that forms the basis of the contractual agreement

3

between the University and Professor Saha. This is not a legal claim before a court under the contract; this is an internal proceeding following the terms provided by a contract. Professor Saha is free to challenge this decision in Court — it is to such a challenge that the statute of limitations would apply, not the University's internal proceedings. In any event, I would note that the Hearing Committee stated that even if it were limited to evidence of the most recent three years of Professor Saha's behavior and performance, it would find that "Professor Saha neglected his professional responsibilities throughout this period and thus tenure revocation is warranted in any event." Decision of the Hearing Committee at 10. Thus either because as I have suggested the Kyriakopoulos precedent does not apply to this tenure revocation proceeding or because even if it did, three years of evidence of neglect more than adequately supports the Hearing Committee's conclusions, I find that there is no compelling reason to reject the decision of the Hearing Committee on the ground of the application of the District of Columbia Statute of Limitations.

Tenure lies at the heart of any academic institution. This is very much true at The George Washington University. I share the aspiration of the Hearing Committee that this will be the last case of tenure revocation of a GW faculty member, just as it is the first. Hearing Committee Decision at 13.

12/06/2006 18:25 FAX 2024291851          KARL & TARONE                        ☑001

EXHIBIT D

LAW OFFICES

**KARL & TARONE**

A PARTNERSHIP CONSISTING OF PROFESSIONAL CORPORATIONS

SUITE 1250

900 SEVENTEENTH STREET, N. W.

WASHINGTON, D.C. 20006

**(202) 293-3200**

FAX: (202) 429-1851

JOHN F. KARL, JR.°
C. MICHAEL TARONE^

^ ALSO ADMITTED IN NY
° ALSO ADMITTED IN FL

December 6, 2006

BY FAX 457-6482

Doug Mishkin, Esquire
Patton Boggs
2550 M Street, N.W
Washington, D.C.  20037

Re: *Saha v. GW University*

Dear Doug:

I am writing to request that Vice President Lehman recuse
himself from making any further determination and/or recommendation
in this matter and that a neutral decision-maker be appointed to
fulfill his duties in "¶7. Final Disposition" of the Faculty Code.

In view of Vice President Lehman's role in this matter, it
does not appear that he can be objective in advising President
Trachtenberg and the Board of Trustees what final decision to make.

Thank you.

Very truly yours,

John F. Karl, Jr.

cc:  Debabrata Saha, Ph.D.
     Professor Kurt Darr
          416-0075
     Professor Lilien F. Robinson
          Chair, Senate Executive Committee

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEBABRATA SAHA, Ph.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      C.A. NO.  1:08-00087 RCL |
| | ) |
| GEORGE WASHINGTON UNIVERSITY, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER

Upon consideration of "Plaintiff's Request for Reconsideration of Judge Lamberth's March 12, 2008 Memorandum and Order" and Defendants' opposition thereto, it is, by the Court, this ____ day of _____, 2008, hereby

ORDERED, that Plaintiff Debabrata Saha's "Plaintiff's Request for Reconsideration of Judge Lamberth's March 12, 2008 Memorandum and Order" be and is DENIED.

_____

United States District Judge


cc:     Douglas B. Mishkin, Esq.

        Debabrata Saha, *pro se*

The George Washington University Faculty Dispute Resolution Committee
Debrabata Saha Hearing Panel

*In re* Complaint Against Debrabata Saha
Seeking Tenure Revocation

July 24, 2006

Douglas Mishkin, Washington D.C. for The George Washington University .
John F. Karl Jr., Washington, D.C., for Professor Debrabata Saha.

Before ACHROL, BILES, DUNN, GUTIERREZ, KLOCK, & SCHAFFNER, Panelists.
Decision of the Panel filed by Hearing Panel Chair, JOAN E. SCHAFFNER

JOAN E. SCHAFFNER, Chair:
************************************************************************

## I. Introduction

This Hearing Panel's (Panel) mandate is to decide whether the George Washington University (University) proved, by clear and convincing evidence, adequate cause for the tenure revocation of Professor Debrabata Saha on two grounds: "persistent neglect of professional responsibilities" and/or "gross personal misconduct that destroys academic usefulness." The Panel held seven hearing sessions between January and April 2006.[1] The parties presented approximately 30 hours of testimony and 190 exhibits. The Panel unanimously finds that (1) the University met its burden on the first ground: Professor Saha has engaged in persistent neglect of professional responsibilities for an extended period and (2) the University failed to meet its burden on ground two: Professor Saha has not engaged in gross personal misconduct that destroys academic usefulness.

## II. A Summary of the Facts

Professor Debrabata Saha was appointed to a faculty position[2] with the University's Department of Engineering and Applied Sciences, signing the appointment letter on June 11, 1986. *Exh. 1.* The letter formed an agreement between Professor Saha and the University, which includes the terms embodied in the Faculty Code and Faculty Handbook. On May 22, 1992, Professor Saha was granted tenure in the Department of Electrical Engineering and

---

[1]    The dates of the hearings were: January 30, February 27, March 6, March 20, April 3, April 17, and April 25, 2006.

[2]    The appointment was initially a non-tenure-accruing appointment to be converted to a tenure-accruing position upon Professor Saha obtaining permanent resident status.

Computer Sciences. *Exh. 2.* Professor Saha's area of teaching and scholarship is in Communications and Information Theory. *Transcript at 87, 90 (4/3/06).*

The record in this case contains evidence of misconduct or neglect by Professor Saha dating back to 1996 that arose out of a controversy surrounding the February 1996 qualifying examination for the Department's doctoral program in Communications and continues through Spring 2005. Professor Saha has had significant difficulty engaging in academic life with his colleagues within his department, school, and university since 1996. *See e.g. Transcript at 115-18 (4/17/06).* Professor Saha strongly believed that serious flaws occurred in the qualifying examination process and brought complaints to his department chair, dean, and the university administration. During that time passions were high and there existed extreme tension between Professor Saha and the other professors involved in the controversy. *See e.g. Transcript at 54 (4/25/06).* The University conducted an investigation and found that while there existed errors in the examination process, they were not so severe as to warrant further action. *Exh. 25.* Unfortunately Professor Saha refused to accept the result of the investigation. *Transcript at 57-58 (4/27/06).* He was suspended for the Spring 1997 semester, *Exhs. 71, 75,* and reinstated in Fall 1997 with the anticipation that he would rejoin his colleagues as a "fully participating faculty member." *Exh 185.*

Unfortunately this did not transpire. Professor Saha, by his own admission, was unable to communicate with colleagues involved in the 1996 grading incident and avoided them at all cost. *Transcript at 184-85 (4/3/06).* By Fall 1998, a second subcommittee to review Professor Saha's conduct was convened resulting in his suspension for neglect of professional responsibilities for the Spring 1999 semester. *Della Torre Statement ¶ 11; Exh. 99.* However, the University again chose not to revoke Professor Saha's tenure but rather reinstated him pursuant to the April 1999 letter of agreement signed by Vice President Lehman and Professor Saha. *Exh. 107.* The letter expressly enumerated eleven conditions for his continued employment at GW as a tenured faculty member. These conditions were not extraordinary but rather merely reflected the obligations that all GW tenured faculty have to the institution, including: accepting proper lines of authority, meeting with Department Chair and Dean, attending faculty meetings, serving on committees, communicating with colleagues and others within the university, and filing annual reports timely. *Exh. 107.*

This Panel views this letter as a new beginning, an opportunity for Professor Saha to reintegrate into the department and a willingness on the part of the University for Professor Saha to reintegrate. This agreement was a critical juncture as it established the last formal agreement between the parties to put the past incidents behind and move forward in a positive and productive manner. Thus, this Panel bases its decision regarding tenure revocation on Professor Saha's conduct following the April 1999 agreement.

In Fall 1999, the stage appeared set for Professor Saha to reintegrate into the department. Professor Lang was Chair of the Department and had not been involved in the 1996 controversy. In fact, Professor Saha testified that he was comfortable with Professor Lang, *Transcript at 207 (4/3/06),* and that this was a turning point for him, an opportunity to get back on track. *Transcript at 37 (4/17/06).* However, Professor Saha admitted he took no initiative to

Page 2 of 13

reintegrate into the Department. *Transcript at 178-80 (4/17/06)*. He attended two faculty meetings but never attended another. Professor Saha explained that he felt very awkward and uncomfortable in the meetings because of the presence of those individuals who had been involved in the 1996 controversy. *Transcript at 184 (4/17/06)*. When asked if he was harassed or otherwise treated improperly at the meetings he explained no, he just found it difficult to associate with these people in any context. *Transcript at 185 (4/17/06)*. This was the only attempt by Professor Saha to comply with his professional responsibilities during Professor Lang's tenure as Chair other than to teach his assigned courses and hold office hours. Professor Saha never attended another faculty meeting, served on no committees of the department or university, submitted no annual reports for the period 1999-00 or 2000-01, and failed to have his students complete evaluations of his courses. *Transcript at 222-24 (4/3/06)*. Moreover, in September 2000 when Dean Timothy Tong assumed the position of Dean of the Department, from outside the University, Professor Saha did not meet with him despite requests by the Dean to do so. *Tong Statement ¶ 3*.

When confronted with these facts, Professor Saha claimed that it was not his fault but rather the University's fault: for not providing him with the forms for student evaluations, *Transcript at 209-10 (4/17/06)*, or informing him that Dean Tong wanted to meet, *Transcript at 23 (4/25/06)*, and Chair Lang's fault for not doing enough to help reintegrate him into the department. *Transcript at 38-40 (4/17/06)*. Furthermore, he claimed he was following President Trachtenberg's guidance from 1996 to avoid all individuals who had been involved in the 1996 controversy. *Transcript at 198 (4/17/06); see also Transcript at 181-81 (4/17/06)*.

The Panel finds these explanations unconvincing. These excuses formed part of a theme reflected throughout these proceedings: Professor Saha testified that he received virtually no communication from the university for the period 1997-2005. *Transcript at 234 (4/3/06)*. Since he refused to use e-mail, *Transcript at 238-39 (4/3/06)*, the only means of communication was through the university mail, regular mail, phone, or in-person. With every document that the university introduced—memoranda and letters addressed to Professor Saha either at work or at home—he claimed not to have received them. *See e.g. Resp. of Professor Saha to Req. for Stipulations ¶ 39-50*. Professor Saha claimed to have difficulty with the phone because "they didn't give me the password [for the voice mail];" although he made little effort to find out what it was. *Transcript at 241-42 (4/3/06)*. As for in-person meetings, he only met with students during his office hours and if any other individual wanted to meet, including his colleagues, they were required to make an appointment. *Transcript at 244-45 (4/3/06)*. However, he testified he never received any requests for appointments and that he, in fact, rarely communicated with his colleagues. *Transcript at 246-49 (4/3/06)*. The Panel finds it implausible that Professor Saha received virtually no communication from the University for a period of eight years. One of the most acute ironies of this case is the utter lack of communication by Professor Saha with his colleagues and his assertion that the university failed to communicate with him, yet he specializes in Communications. The Panel finds that Chair Lang acted appropriately in his dealings with Professor Saha, did not prevent him from reintegrating, and in fact encouraged his reintegration.

Finally, regarding President Trachtenberg's statement that Professor Saha should avoid the colleagues involved in the 1996 controversy, it is unimaginable to believe that one can avoid one's colleagues indefinitely and remain a productive faculty member. Professor Saha signed the April 1999 agreement that clearly required he communicate with his colleagues, including administrators, and that he follow proper lines of authority. The April 1999 agreement makes no mention of an exception for colleagues involved in the 1996 controversy or of any communication or agreement with President Trachtenberg. Professor Saha testified that he believed Trachtenberg's statement to be incorporated in the April 1999 agreement with Vice President Lehman. However Professor Saha did not mention this to Lehman at the time of their April 1999 agreement, much less include it in the written document. *Transcript at 174-76 (4/3/06)*. Finally, it is particularly interesting that Professor Saha did make a handwritten notation on the April 1999 agreement clarifying that his signature did not constitute admission of any wrongdoing. *Transcript at 186 (4/3/06)*. Surely if he thought to add this language, he would have added the Trachtenberg statement as well. Under no contract principle can the April 1999 agreement between Lehman and Saha incorporate Trachtenberg's statement from 1996. Moreover, it is apparent to the reasonable person that the statement was not intended to relieve Saha from ever communicating again with these colleagues or participating as an active faculty member in his department.

The situation did not improve when Professor Vojcic assumed Chairmanship of the Department in July 2001. Professor Saha continued in his neglect–he attended no faculty meetings, filed no annual reports, served on no committees, submitted no student evaluations, *Transcript at 206-07 (4/17/06)*, refused to communicate directly with Chair Vojcic, *Transcript at 197-98, 202-04 (4/17/06)*, and had little, if any, communication with his colleagues throughout Chair Vojcic's tenure which ended December 2004. *Transcript at 204 (4/3/05)*. During this period there were also isolated instances of difficulties. These instances included creating his own grading sheet rather than using the grades sheets provided by the university (Fall 2001), *Exh. 119*; failure to attend the first class meeting of ECE 244-10 without notice (January 17, 2002) and not meeting with Vojcic to discuss this matter; *Vojcic Statement ¶¶ 16, 22*; and the receipt of two student complaints about his classroom behavior (October 2002). *Exhs. 125,126*. Professor Saha admitted that he would sometimes use class time to complain about the university administration about issues he found lacking, including the resources and use of the Virginia Campus. *See Transcript at 56-60, 121-24 (4/17/06)*. Admittedly individually each situation is not egregious. Occasionally, students complain about teachers (especially if they fail to do well in their course–as was the case with these two students) or faculty sometimes make comments in class out of frustration with a given situation. But here the sum of these instances, in addition to the complete failure to participate in the department, is problematic. Moreover, Professor Saha admitted that he has not published anything since 1999 although he has been working on research for a book. However, Professor Saha presented no evidence of any progress on this project. *Transcript at 64-70 (4/17/06)*.

Professor Saha was suspended for the third time for two weeks in January 2003 as a result of his neglect. *Exh. 129*. Upon his reinstatement, however, Professor Saha continued his neglect of responsibilities. *Transcript at 222-24 (4/3/06)*. Moreover, in November 2004, Professor Saha distributed an envelope to three administrative assistants in the school containing

three documents–a personal note dated October 14, 2004 regarding former Dean Frieder, *Exh. 136*; a May 1996 letter from Professor Saha addressed to "Dear Colleagues" accusing Professor Zaghoul of lying about him, *Exh. 27*;and a copy of the grade sheet he created in 2001. *Exh. 119*. The note regarding the former Dean contained references to "Academic (!) Mafia Bosses." *Exh. 136*. The receipt of these materials, which contained no explanation from Professor Saha as to the materials' purpose, concerned the assistants. *See Exh. 137*. Although Professor Saha testified that he considered the assistants his friends and wanted to explain to them what had happened over the years, *Transcript at 140-48 (4/17/06)*, a reasonable person would be concerned by the receipt of these materials in a professional setting.

In January 2005, Professor Zaghoul replaced Professor Vojcic as interim Chair for the semester and established another subcommittee of faculty from the department to investigate Professor Saha's conduct since April 1999. *Zaghoul Statement ¶¶ 55, 59, Della Torre Statement ¶ 16, Tong Statement ¶ 9*. The subcommittee was a fact-finding committee to review the record and compile a report of Professor Saha's conduct since April 1999. *Della Torre Statement ¶ 16; Transcript at 114 (3/20/06)*. The subcommittee performed no independent investigation but rather took the files given them by the Chair and compiled a record/report of Professor Saha's conduct. *Transcript at 115-17 (3/20/06)*. The subcommittee did not meet with Professor Saha nor give him an opportunity to comment on the report. *Transcript at 88-89 (3/20/06)*. On May 2, 2005, the Personnel Committee of the department met and voted unanimously that Professor Saha had engaged in persistent neglect of his professional responsibilities and had engaged in gross personal misconduct. *Della Torre Statement ¶ 16, Zaghloul Statement ¶ 60*. On September 16, 2006, Vice President Lehman commenced this proceeding to revoke Professor Saha's tenure. *Lehman Statement ¶ 30*.

### III.  The Principles/Law of this Case

#### A.  Tenure–Essential to the protection of academic freedom

Tenure is a very important and revered institution. Tenure serves two primary purposes: the protection of academic freedom and the provision of economic security. Tenure protects faculty from "arbitrary or retaliatory dismissals based on an administrator's . . . distaste for the content of a professor's teaching or research . . . . It is designed to foster our society's interest in unfettered progress of research and learning by protecting the profession's freedom of inquiry and instruction." *Browzin v. Catholic University*, 527 F.2d 843, 846 (D.C. Cir. 1975). As such, tenure rights are closely protected and are not forfeited easily. The GW Faculty Code (Code), consistent with the principle of protecting tenure, requires a showing of adequate cause by the University by clear and convincing evidence before tenure can be revoked. *See GW Faculty Code, 11 (2004) [hereinafter Code]*. The decision to revoke must be approached with the utmost care and careful consideration otherwise the institution will become meaningless and the academic freedom of faculty will be destroyed. Thus, only egregious instances of neglect and/or misconduct by a faculty member should warrant the revocation of tenure.

In return for the privilege of tenure, faculty are required to meet certain fundamental responsibilities to their students, colleagues, and the institution. These basic responsibilities

generally fall into three categories: teaching, scholarship and service. *See Code, 7, 8.* Each tenured faculty member is required to meet the basic standards of teaching, scholarship, and service in order to enjoy the benefits of tenure otherwise the reputation of the institution is severely tarnished. It is imperative that the public not think that tenure is a license to faculty to sit back and do little, relying on tenure to avoid being held accountable.

## B. Due Process–An opportunity to be heard

Not only is the standard for revocation high, but special procedural protections accompany the revocation of tenure as well. Many employment contracts are at-will, allowing the employer to fire an employee for any reason or no reason at all.[3] However, before tenure may be revoked, the University must demonstrate adequate cause and the faculty member given a reasonable opportunity to respond and defend his or her actions. *Code at 31-33.* The Code binds the university and its faculty. It comprises a significant part of the contractual agreement formed between the university and faculty member at the time of appointment. The Code not only defines the substantive terms for tenure revocation, cited above, but also the procedural terms.

The University and this Panel have complied with these procedural requirements. Vice President Lehman met with Professor Saha in September 2005 and offered to resolve the situation amicably, but Professor Saha found the offer unacceptable. *Transcript at 24 (4/25/06).* On September 16, 2005 this proceeding was commenced by the filing of the complaint signed by the Executive Vice President for Academic Affairs, Donald Lehman and the Dean of the School of Engineering and Applied Sciences, Timothy Tong. The complaint set forth the grounds alleged to constitute adequate cause for dismissal. *Code at 31.* Professor Saha was given adequate time to answer. *Code at 32.* The Hearing Panel was appointed by the Chair of the Dispute Resolution Committee in compliance with the requirements stipulated in Part XIII.F.2(b). Professor Saha was represented by counsel. Professor Saha first argued that the allegations of the complaint did not state with sufficient particularity the basis for tenure revocation. *Fax from John Karl (Dec. 5, 2005).* In response, the Panel requested that the University file a supplemental complaint and that Professor Saha reply. Professor Saha also submitted a lengthy document request on Dec. 5, 2005, which the Panel allowed. *Fax from John Karl (Dec. 5, 2005); Saha Panel Memorandum to Parties (Dec. 7, 2005).*

The Hearing Panel first convened a pre-trial status conference on December 20, 2005, in which questions of pleading, discovery, and timing for the exchange of document and witness lists were addressed. *Saha Panel Memorandum to Parties (Dec. 7, 2005).* Professor Saha was provided the opportunity to request documents and the identity of witnesses from the University and received such information before and during the hearing process. The Panel began the

---

[3]    William M. Howard, *Common-Law Retaliatory Discharge of Employee for Disclosing Unlawful Acts or Other Misconduct of Employer or Fellow Employees,* 105 A.L.R.5TH 351 (2003) ("At common law, an employee is generally considered to be employed "at will" and, in the absence of a contract, may be discharged by the employer for any reason whatsoever, or no reason at all.").

evidentiary hearings approximately six weeks later on January 30, 2006 and convened six additional times, ending April 25, 2006. During this period, Professor Saha testified on his own behalf, questioned 16 witnesses, and submitted written testimony of his own. His counsel presented open and closing arguments and a stenographic record was made of the proceedings. Counsel for each party received the hearing transcript after each hearing date. The process met the standard as defined in Part E.4.c(3): an "informal" proceeding that complies "with the requirements of fairness to the parties."

Professor Saha claims that these proceedings were defective because of the use of the supplemental complaint and the denial of full document production. The Panel disputes these contentions. First, as indicated above, the Panel requested that the University file the Supplemental Complaint **at the request of Professor Saha** who claimed the original complaint lacked sufficient particularity. If anything, this benefitted Professor Saha. Second, Professor Saha was entitled to inspect and copy . . . all relevant documents in control of the [University] and not privileged." *Code at 29.* The Panel provided ample opportunity both before the hearings began and during the hearings for Professor Saha to obtain all relevant documents. Moreover, the Panel has the authority to: "exclude matters it deems irrelevant; to place reasonable limits on arguments, the presentation of evidence, and the questioning of witnesses by the parties [and] may decline to consider evidence when its probative value is outweighed by considerations of unfair prejudice, confusion of the issues, undue delay, waste of time, or needless presentation of cumulative evidence." *Code at 28.*

The Panel did deny Professor Saha's last minute interrogatory request filed on April 27, 2006, following the final hearing on the basis that the request was untimely and over broad and that the documents requested were not sufficiently relevant to warrant the delay and expense of compliance. The Panel had granted Professor Saha an opportunity to submit questions to Vice President Lehman who was not available in-person on the last day of hearings, April 25, 2006, to "determine the extent to which they seek to rely on Professor Saha's perceived disability in orchestrating these proceedings." *Letter from John Karl (Apr. 20, 2006).* The interrogatories, however, went far beyond the scope of Mr. Karl's initial request. Specifically, he requested from the University: "Every tenured faculty member who did not submit an annual report for any of the years from 1999-present" and "Every tenured faculty member who missed a majority of department meetings for any of the years from 1999-present." *Letter from John Karl (Apr. 20, 2006).* This request was clearly untimely since Professor Saha knew from the filing of the complaint that among the alleged neglect was his failure to attend faculty meetings and file annual reports. It is over broad as it targets any faculty member who has missed filing only ONE annual report or missed a majority of faculty meetings in ONE year. However, the undisputed facts of this case are that Professor Saha missed EVERY faculty meeting from 2000-2005 and failed to file ANY annual reports during this same period. Nevertheless, the University did respond to the two requests that fell within the scope of the original inquiry. *Lehman Statement (May 2, 2006).* In sum, the Panel provided a fair process by granting Professor Saha more than ample opportunity for discovery and to be heard.

## C.  Adequate Cause for Tenure Revocation

Both parties agree that the complaint filed by the University to revoke Professor Saha's tenure sounds in breach of contract. The contract between the University and Professor Saha, as outlined in the Code, provides that only upon a showing of adequate cause, by clear and convincing evidence, may tenure be revoked.

Adequate cause shall mean unfitness to perform academic duties because of:

a)  incompetence;
b)  lack of scholarly integrity;
c)  persistent neglect of professional responsibilities under this Code; or
d)  gross personal misconduct that destroys academic usefulness.

*Code at 11.*

The University alleges Professor Saha violated parts c and d: specifically that Professor Saha has persistently neglected his professional responsibilities under this Code and has engaged in gross personal misconduct that destroys academic usefulness.

### 1.  Persistent Neglect of Professional Responsibilities

The phrase "persistent neglect" in the Code/contract, as a matter of law, is "to be given [its] common meaning." *Kakaes v. George Washington Univ.*, 683 A.2d 128, 132 (DC 1996). If ambiguous, terms are to be construed in keeping with the general usage and custom at the University and within the academic community. *McConnell v. Howard University*, 818 F.2d 58, 64 (D.C. Cir 1987). Merriam-Webster's On-Line Dictionary defines "persistent" as "existing for a long or longer than usual time or continuously," and "neglect" as "to give little attention or respect to; to leave undone or unattended to especially through carelessness." A faculty member's responsibility to the University is to provide "*professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service." Code at 7, 8.* Thus "persistent neglect of professional responsibilities" would require a faculty member to carelessly or willfully disregard their duty to teach, write, and/or participate in service to the university repetitively for an indefinitely long period of time. This threshold is a high one and has two dimensions–breadth and depth. The breadth of one's neglect would involve the number of duties neglected, while the depth would involve the amount of time during which the neglect continued. For example, merely failing to comply with minor administrative duties for a limited period would not suffice to establish adequate cause for tenure revocation–the breadth and depth of neglect must be substantial before tenure is revoked to protect tenured faculty from overly zealous administrators.

This case is an extreme case of neglect of professional duties. The undisputed facts establish that at least from 2000-2005 Professor Saha completely failed to meet all

but one responsibility–the teaching of his classes. Professor Saha provided no service to the University nor participated in academic life. He attended no department meetings, participated on no department, school, or university committee, and submitted no annual reports or student evaluations of his classes. *Transcript at 222-230 (4/3/06).* His colleagues all testified that they had virtually no contact with him and that, in fact, he avoided contact with them. Moreover, he published nothing during this time. *Transcript at 230-32 (4/3/06).* Professor Saha explained that he has been working on a book since 1999 but provided no evidence of his progress even when asked by the Panel to produce something. *Transcript at 64-70 (4/17/06).*

Professor Saha argues that his conduct must be reviewed reasonably in light of the mitigating circumstances,[4] specifically (1) whether Professor Saha acted reasonably in response to the appointment of Professor Vojcic as Chair; (2) whether Professor Saha took reasonable steps to minimize conflict with Professor Vojcic by maintaining a low profile; and (3) whether, under the circumstances, GW's lack of action to rectify the pre-1999 situation excuses some or all of Professor Saha's breach of his contractual obligations.

The Panel finds the answer to each question is "no." The pre-1999 events (specifically the events of 1996-97) obviously affected Professor Saha dramatically and perhaps rightfully so. This Panel does not hold his conduct during that trying time against him. However, a reasonable person must move forward and place the events of the past behind him or her in order to function effectively. Professor Saha failed to do this by his own choice. First, Professor Saha did not participate in the department prior to Professor Vojcic's appointment as chair even though Professor Lang, with whom Professor Saha had a good relationship, was chair. When Professor Vojcic was appointed chair, Professor Saha refused to communicate directly with him. *Transcript at 197-98 (4/17/06).* This is not a reasonable response. The chair of a department is the first-level administrator, and a faculty member must communicate with his chair to be effective. The Panel rejects Professor Saha's attempt to justify his own failures by casting blame on various individuals who served as his department chair.

Second, Professor Saha did more than maintain a *low* profile, he maintained *no* profile within the department as he was virtually absent from the department when he was not teaching class or in his office for office hours to meet with students only. More importantly however, Professor Saha never explained what conflict he was trying to minimize. There was no evidence presented that Professor Vojcic treated Professor Saha any differently than any other faculty member during his tenure as chair. *Transcript at 197-98 (4/17/06).*

---

[4]    *See* McConnell v. Howard University, 818 F.2d 58 (D.C. Cir. 1987) (faculty member's tenure revoked for neglect for failure to teach a class after a student calls the professor a "condescending, patronizing racist" and refuses to apologize, explain her continued refusal to speak with him about the incident, or leave the room when requested).

Finally, the evidence clearly demonstrates that GW did take efforts to rectify the pre-1999 situation. Vice President Salaman wrote a lengthy memorandum evaluating the 1996 incident and found that no serious wrong had been done. *Exh. 25.* Moreover, when allegations of plagiarism against Professor Saha were made, the University investigated and determined that they were not supported by the evidence. *Transcript at 74-76 (3/20/06).* Finally, the University entered into an agreement with Professor Saha in April 1999 in an effort to allow him to move forward and reintegrate into the department.[5] In sum, in light of all the circumstances, this Panel finds that Professor Saha acted unreasonably and his continued neglect of most of his professional responsibilities warrants adequate cause for tenure revocation.

Professor Saha argues that the statute of limitations for contract actions is three years and thus any conduct prior to May 2003 cannot form a basis for tenure revocation. This is a rather unusual argument in light of the specific situation here. When the basis for tenure revocation requires persistent neglect of duties, it would appear to be in the interest of the faculty member to argue that the university must demonstrate a lengthy neglect of duties–presumably more than three years of neglect. The cases cited by Professor Saha are cases by a faculty member against a university based upon a specific act of a university denying or revoking tenure or promotion.[6] These cases demonstrate that when the alleged breach is a single act of alleged misfeasance, the wronged party must raise the claim within three years. Here, the complaint is by a university against a faculty member and the alleged breach is continuing neglect by the faculty member. Thus, the Panel finds that more than three years of neglect by Professor Saha can be relied upon to support tenure revocation. However, the Panel does agree that returning to the events pre-1999 is inappropriate in this case given the agreement between the parties in April 1999 establishing a "new beginning" for Professor Saha. However, were the Panel limited to a three-year limitations period, Professor Saha neglected his professional responsibilities throughout this period and thus tenure revocation is warranted in any event. Furthermore, Professor Saha's claims that the university failed to rectify pre-1999 events would be untimely under his argument as well. In fact, at no time after 1997 did Professor Saha bring any complaint against the University for any alleged wrongdoing, mistreatment, or neglect.

Finally, Professor Saha argues that the entire process followed by the department in the Spring of 2005 was "rigged" and thus tenure revocation is inappropriate. Specifically, Professor Saha claims that: (1) the University never notified Professor Saha of the Spring 2005 Subcommittee established to review his record nor the Personnel Committee Meeting of May 2, 2005 at which the department's tenured faculty voted

---

[5]    *Id.* (university fails to address the slander of a professor by a student during class by transferring the student or assigning the faculty member to a different section even though the university stated its strong disapproval of the behavior by the student).

[6]    *See* Kyriakopoulos v. George Washington University, 866 F.2d 438 (D.C. 1989) (failure of university to promote faculty member).

unanimously that Professor Saha's conduct constituted adequate cause for tenure revocation; (2) Professor Saha was not provided an opportunity to present his side of the story to the Subcommittee or the Personnel Committee at the May 2005 meeting; (3) Professors Loew and Vojcic made remarks suggesting they perceived Professor Saha to be disabled at the February 9, 2005 Personnel Committee meeting, (3) Professor Zaghoul, while acting as interim chair for one semester and with animus towards Professor Saha, misrepresented to the faculty present at the May 2005 meeting that Professor Saha was "invited" yet he failed to appear; and (4) the University failed to produce the notes of the May 2005 meeting.

This Panel has spent significant time determining the relevance of these facts. Assuming, without finding, that every fact is true, the Panel finds they are not relevant to these proceedings. It is clear from the Code that the University may file a complaint for tenure revocation without the establishment of a department subcommittee to review the faculty's file or a vote by the department that the conduct establishes grounds for tenure revocation. The Code contemplates that the proceedings of THIS Panel are to be conducted pursuant to the principles of due process. *Code at 31-33.* Professor Saha has been given adequate notice and an opportunity to be heard during these proceedings. This Panel gave no deference to the 2005 Subcommittee's "findings" nor the vote of the faculty at the May 2005 meeting but rather reviewed the evidence presented de novo to determine if the University met its burden of proving by clear and convincing evidence that adequate cause exists for tenure revocation. Thus, procedural defects, if any, in the proceedings of the department in the Spring of 2005 are irrelevant.    The Panel seriously doubts that the proceedings were "rigged" or violated Professor Saha's due process rights in any event.[7]

## 2.    Gross Personal Misconduct That Destroys Academic Usefulness

The Panel finds that the University failed to demonstrate that Professor Saha engaged in "gross personal misconduct that destroys academic usefulness." Looking to the common definition of these terms, "gross personal misconduct" would refer to intentional or wanton flagrantly offensive and wrongful behavior relating to or affecting

---

[7]    For purposes of illustration, let us draw a broad analogy. In the criminal justice system, which involves legal standards far beyond those applicable to our Panel, an individual suspected of a federal crime has few, if any, rights to participate in the criminal investigation or grand jury proceeding. The criminal trial itself offers procedural protections to the accused, including the opportunity to present evidence and to testify personally. While the revocation of tenure is a serious deprivation, it does not rise to the level of a criminal penalty. Our proceedings afforded Professor Saha a generous opportunity to testify and present other evidence. We offer no judgment on the department's deliberations concerning Professor Saha, as they are not relevant under the university's rules to our Panel's work.

a person.[8] The Panel conducted a very brief review of cases involving "gross personal misconduct" for judicial censure and disqualification for receipt of unemployment benefits after discharge from a job. Examples of gross personal misconduct found by the courts included: unsolicited offensive and embarrassing sexual advances,[9] battering one's wife,[10] lying to a judicial commission,[11] and actions constituting physical or emotional abuse.[12] A judge carrying a loaded gun into the courtroom and leaving it in the wastebasket near the bench during proceedings was not considered gross personal misconduct.[13]

The University presented evidence that Professor Saha withheld student blue books (Spring 1996), *Zaghloul Statement ¶ 21-26; Exh. 26, 75*; counseled students not to take a departmental examination (Spring 1996), *Transcript at 54, 82-83 (4/25/06), Exh. 75*; disseminated to students a letter in which he disparaged faculty colleagues (Spring 1996), *Exhs. 27, 28*; threw Professor Loew out of his office after threatening to call the University Police Department (Spring 1996), *Transcript at 29-31 (4/25/06)*; created a grading sheet that violated federal law (Fall 2001), *Exh. 119*; slammed the door on a staff member and student (Spring 2004), *Donohue Statement ¶¶ 2, 7*; and engaged in inappropriate communications with staff including providing three staff members with "memoirs" and other documents relating to eight-year-old events that caused the staff members concern (Spring 2004), *Tong Statement ¶ 7, Vojcic Statement ¶ 26, Hood Statement ¶ 15-16, Swanson Statement ¶ 6, Exh. 137*.

This evidence fails to adequately prove gross personal misconduct. First, several of these instances occurred pre-1999, and the Panel believes that conduct prior to the April 1999 should not be used to constitute grounds for tenure revocation in this case. Second, the University failed to prove every act by clear and convincing evidence. Finally, while these actions, taken together, constitute egregious misconduct, the Panel does not find that they rise to the level of **gross personal** misconduct that destroys

---

[8]        Gross– "flagrant or extreme especially in badness or offensiveness: of very blameworthy character;" Personal–"of, relating to, or affecting a person;" and Misconduct–"intentional or wanton wrongful but usually not criminal behavior." Merriam-Webster's Dictionary of Law (1996).

[9]        Matter of Deming, 108 Wash.2d 82 (Wash.1987).

[10]        In the Matter of the Honorable Frank, 564 N.W.2d 785 (Wis. 1997)

[11]        In re Disciplinary Proceedings Against Waddick, 605 N.W.2d 861 (Wis. 2000).

[12]        Lancaster v. Black Mountain Center, 323 S.E.2d 760 (N.C.App.1984).

[13]        Matter of Disciplinary Proceedings Against Breitenbach, 482 N.W.2d 52 (Wis.1992)

Page 12 of 13

Professor Saha's academic usefulness, as the terms have been defined and used in other cases.

## IV.  Conclusion

This is the first time in the history of the George Washington University that a hearing Panel has been convened to determine if tenure revocation of a faculty member is warranted. Hopefully, this will be the last. Tenure is a cherished and important institution to the academy and must not be revoked lightly. It is imperative that the administration make every attempt to work with a faculty member before seeking tenure revocation and invoke tenure revocation only in the most egregious circumstances of neglect and/or misconduct.

Unfortunately, this Panel must agree with the University that this case represents such a case of egregious and persistent neglect of professional responsibilities. For more than five years, Professor Saha has failed to engage with his colleagues or the administration. He attended no faculty meetings, served on no committees, submitted no annual reports, submitted no student evaluations, and published nothing. Moreover, he has had virtually no communications with his colleagues. *See e.g. Kyriakopolous Statement ¶ 5, Lang Statement ¶¶ 17, 20, Vojcic Statement ¶ 7, Wasylkiwskyj Statement ¶ 5.* The depth and breadth of his neglect of professional responsibilities cannot be tolerated as it places severe strain on the university administration as well as Professor Saha's fellow colleagues. With the privilege of tenure comes obligation as well and to allow a tenured professor to blatantly disregard the obligations of tenure to this degree severely blemishes the institution of tenure. Moreover, the University has given Professor Saha ample notice of his neglect and several opportunities to correct this neglect over the years without success. In sum, this Panel finds that the University demonstrated by clear and convincing evidence that Professor Saha persistently neglected his professional responsibilities and thus has proven adequate cause for tenure revocation.