# United States District Court
# For The District of Columbia

-----------------------------------------------------

Debabrata Saha,

      **Plaintiff,**

v.

                                        **Civil Action No. 1:08-cv-00087-RCL**

The George Washington University,
Mona E. Zaghloul, Wasyl Wasylkiwskyj,
Edward Della Torre, Joan Schaffner, and
Stephen Joel Trachtenberg,

      **Defendants.**

-----------------------------------------------------

## Motion : Plaintiff's Opposition to Defendants' Feb. 20, 2008 "motion to dismiss"

On Feb. 20, 2008, Defendants, pursuant to Fed. R. Civ. P. 12(b)(6), brought "motion to dismiss" Plaintiff's complaint. Defendants argued Plaintiff failed to state claim upon which relief can be granted. Plaintiff resolutely opposes Defendants' motion. The factual Allegations in the Complaint, and all reasonable inferences drawn from the facts state plausible liability under Bell Atlantic v. Twombly 127 S. Ct. 1955; 167 L. Ed. 2d 929 (2007). Plaintiff alleged that the Defendants violated the applicable Faculty Code and plotted a termination of Plaintiff's service in the Spring of 2007. Plaintiff argues that **(a)** plaintiff's **tenure was NEVER revoked** and his **service was NEVER terminated**; rather, Defendants' plot constitutes a **Fraud**, **(b)** Defendants relied on false statements that are not supported by facts, and **(c)** Defendants allowed pretensions (false) that Plaintiff failed to state claims. **Plaintiff's complaint is based on** *Defendants' violations of faculty code and handbook, several federal and local rules, a number of perjuries by high ranking officials, and a number of false declarations introduced by the Defendants.*

Plaintiff moves that the court denies Defendants' "motion to dismiss". Grounds and rationales in support of this motion are furnished in the accompanying memorandum of points and authorities.

      Respectfully submitted,

                                    *Debabrata Saha*

                                    Debabrata Saha
                                    9409 Fairpine Lane

**RECEIVED**

                                    Great Falls, VA-22066

MAR **3 1** 2008

                                    Ph : (703) 757-5418
                                    March 31, 2008

**PAGE INDEX FOR
MEMORANDUM OF POINTS AND AUTHORITIES**

| | Page |
|---|---|
| MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION | 3 |
| **Background** | 3 |
| A. Foundation of "Motion to Dismiss" : A False claim based on Fraud | 4 |
| B. "Whether Prof. Saha published in last few years" : An irrelevant issue Defendants wrongfully emphasized | 6 |
| C. Three Fundamental elements of Fraud behind the Cause of Action | 7 |
| D. GWU's Collective Moral Bankruptcy and its attempt to cover up | 8 |
| **Deficiencies in Defendants' Motion** | 12 |
| E. Mountain of Lies and Deceptions that establish Defendants' motive and behavioral tendencies against plaintiff since his 1996 Whistle Blowing | 12 |
| F. List of underlying false statements Defendants' "Motion to Dismiss" relied on | 14 |
| G. Violations by Defendants | 16 |
| H. Issues of the complaint Defendants failed to answer | 17 |
| **Allegations and Pleadings** | 18 |
| I. Plaintiff's Allegations | 18 |
| Damages Caused by the Defendants | 22 |
| J. Claim against Defendants in both Individual and Official Capacity | 25 |
| K. Breach of Contract and Claims | 26 |
| **Conclusions** | 41 |
| Affidavit B-1 : On Three year Statute of Limitation and GWU's Legal Principle | |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF PLAINTIFF'S MOTION**

# Background

Contrary to the claim of Defendants in its Feb. 20, 2008 response, this is not a case of "Saha's neglect in professional responsibilities". This case stemmed from an attempt to correct certain policies that compromised the integrity of higher learning in the University where I came to teach and received tenure. The foundation of Plaintiff's complaint rests on **"truth"** which has been smeared by **"pack of Lies"** of Defendants. **Lie** starts with **the very first sentence** of Defendants' February 20 Memorandum of Points and Authorities on tenure revocation. **The truth is Prof. Saha's tenure was never revoked and service was never terminated.**

**Plaintiff Saha** maintains : **"The truth does not have to show respect to any administration, to any institution, or even to any society. Rather, society, institution, and administration have to bow down and show respect to the truth."**

Since Plaintiff's 1996 Whistle Blowing on "corrupt academic practices that compromised the integrity of higher learning", many relevant University officials who participated in the process during last one decade **lied** (maintaining the literal meaning of Lie of Websters' Dictionary) to advance the cause of individual and administrative interests. In this complaint, the plaintiff addresses only **those lies which are provable with certainty through evidence and documents**. These Lies are important and are **Legally** relevant because **they relate to the violation of faculty code and due processes,** and hence to the **Breach of Contract**.

GWU administration went even further and submitted a number of false declarations (Ref. to Plaintiff's  Affidavit # 1 through Affidavit #7 submitted with reference to Civil Rights Law suit  1: 06-cv-01493-RCL) from its employees; for example, among many lies and inconsistent statements, they claimed to have confiscated my University ID; but in fact, my University ID is still in my possession. Defendants also **used their counsel Douglas Mishkin to Lie and cover up lies** (Ref. to Plaintiff's Declaration, Document 25),  distort the truth, and divert the attention to **non-issues such as "whether Prof. Saha published in last few years"** and score palatable points of persuasion from that diversion. It

3

should be noted that in the past, GWU VP for Academic Affairs, Donald R. Lehman, in 1999, brought charges of plagiarism and Scientific Misconduct against the Plaintiff. After investigation, Lehman had to **"drop that serious charge in writing"**. It was an abuse of administrative power against the Plaintiff to teach him a lesson for his Whistle Blowing in 1996. Attached as Plaintiff Exhibit O, is an academic paper *"Still Teaching is noble in America !"* *by* Debabrata Saha, The George Washington University, 801 22nd Street, N.W., Washington, D.C. 20052, U.S.A., September 3, 2006. **This paper touches upon what this case is all about.**

Defendants acted willfully, wantonly, maliciously, and in reckless disregard to faculty code, faculty Hand Book, Civil rights law, DC Human Rights Act and The Americans with Disability Act, and, above all, to the decency that everyone is entitled to or protected under US Constitution. Therefore, Defendants' arguments for resorting to Fed. R. Civ. P. 12(b)(6) lack merit. Accordingly, Defendants' motion to dismiss the complaint should be denied as moot.

Though plaintiff's complaint addresses only the harm and breach of contract caused by the defendants against the Plaintiff, *it does not address the harm the defendants caused on the moral bringing up of our children (GWU students) through their direct and proximity influence on our children*; it is up to the **Society at large** to bring such complaint.

## A. Foundation of "Motion to Dismiss" : A False claim based on Fraud

The **very first sentence** of Defendants' February 20 Memorandum of Points and Authorities is :

*"Defendants The George Washington University ("GWU" or the "University") revoked the tenure of Plaintiff Debabrata Saha ("Saha") and terminated his employment on March 1, 2007 after a duly-committed hearing committee of six of Saha's tenured faculty peers ("Hearing Committee") found this to be "a case of egregious and persistent neglect of professional responsibilities. "*

**The truth is Prof. Saha's tenure was never revoked and service was not terminated.** Affidavit #1 (Document 25) has been submitted to clarify Plaintiff's present Contractual status of employment with GWU. **Affidavit #2** (Document 25) has been submitted to establish that GWU failed to follow Faculty code and Plaintiff's tenure was never revoked. Plaintiff **Exhibit H** (Docket 1) points out Plaintiff's faculty status in Fall 2007, and teaching assignments in Fall 2007 and Spring 2008.

This reconfirms that **neither Tenure was revoked  nor Service was terminated**; GWU never issued any letter in this regard.

What happened is that GWU's complaint of tenure revocation (Plaintiff Exhibit Q, Document 25) was heard by Schaffner Panel which acquitted Plaintiff of the charge of "gross personal misconduct that destroys academic usefulness', while upheld the charge of "persistent neglect of professional responsibilities". The Panel denied Saha Due Process and the opportunity to be heard : **Saha did not admit to any of these neglects of professional responsibilities** and GWU failed to produce requested evidence to prove the claims of neglect (Re. Plaintiff's Hearing Brief dated May 23, 2006 and Sept. 11, 2006).  Because of the upheld second charge, the Panel agreed with GW VP Lehman for revocation of Plaintiff's tenure. Later, this recommendation was rubber stamped by Dispute Resolution Committee. **But this was just a recommendation**. For revocation under Faculty code, this recommendation had to be further acted upon by President Trachtenberg. Plaintiff then brought evidence of fraud and rigging to the attention of GWU President.  As a result, **Executive VP Lehman, who wrote the complaint of tenure revocation, recused himself.** Thereafter, President Trachtenberg simply did not send the recommendation to the Board of Trustee for any approval. **Thus Plaintiff's tenure was never revoked and service was not terminated because GWU's decision maker, its President, did not do so**. Please refer to **Affidavit #2** (Document 25).

After staying silent for almost a year, without producing any letter of termination, GW on Feb. 20, 2008, **for the first time**, shed light on the termination of service by submitting to this Court a letter of some **John F. Williams, Jr.** (Plaintiff Exhibit L, Docket 25); this letter bears no name, no signature, and no affiliation of office. All common sense tells that this letter is a fraudulent attempt on the  part of GWU to deceive Prof. Saha as well as to deceive this Court. Besides, it is not the unprofessional style of the letter that raises the question; it is the fact **John Williams has no authority to write that letter**. The faculty code mandates that Termination of service requires approval of Board of Trustee. Without that approval, termination of service was never made effective. Plaintiff Exhibit H (Docket 1) points out Plaintiff's faculty status in Fall 2007, and teaching assignments in Fall 2007 and Spring 2008. This reconfirms that neither Tenure was revoked  nor Service was terminated. GWU's violation of Faculty

Code is a breach of contract. Plaintiff 's **Affidavit #2** (Document 25) establishes GWU's failure to follow Faculty Code and its engagement in fraudulent acts.

*A Conclusion* : Foundation of **"Motion to Dismiss" is Fraud.** GWU did not follow Faculty Code to take advantage of the benefit of Schaffner Panel deliberation which itself was acquired through fraud. **Panel deliberation lost its relevance** in attributing any merit **whatsoever** to any claim Defendants may have based on the deliberation. Plaintiff argues that in deciding this complaint, *Schaffner Panel Hearing should be considered only as a Circus designed by GWU to build an accessory for committing Fraud.* Perhaps, Schaffner Panel Circus deserves a place in "Ripleys' Believe it or not"!!

Defendants submitted 43 page document in support of the "Motion to Dismiss", **of which 19 pages (13** pages in part-3, 1 page in part-4, and 5 pages in part-5) **are based on the merits of Panel deliberation. Therefore, this 19 page document looses its relevance to this case and lacks merits for any further consideration.** Part-6, the Appendix of six pages, is a case citation. Defendants' only arguments in the 43 page document, therefore, lies in its **first fifteen pages long "Memorandum of Points and Authorities"**. Of these fifteen pages, the only pages in which defendants did not directly emphasize Schaffner Panel deliberation are **page 7 through 10**; almost all of these four pages are spent on pointing out "Saha's alleged failure to state claim". Plaintiff disagrees and illustrates the claims in a section that follows. However, **the bottom line** is the **"Fraudulent foundation"** of Defendants' motion to dismiss. **Plaintiff argues that Defendants' "motion to dismiss" should be denied with the prejudice of utter dishonesty.**

**B. "Whether Prof. Saha published in last few years"** : **An irrelevant issue Defendants wrongfully emphasized**

During hearing on attempted tenure revocation, Defendant GWU went at considerable length to address this non-issue. On pages marked 1, 2, and 5 in Feb. 20 Memorandum of Points and Authorities and on page 9 of 13 in Exhibit 1, Defendants repeatedly hammered the issue that Prof. Saha did not publish in recent years. It should be noted that Faculty code **no where** mandates tenured members of Faculty to publish **in any time bound fashion**. This is an essence of the tenure for a good cause indeed:

6

*Tenure's "real concern is with arbitrary or retaliatory dismissal based on an administrator's or a trustee's distaste for the content of a professor's teaching or research, or even for positions taken completely outside the campus setting.....It is designed to foster our society's interest in the unfettered progress of research and learning by protecting professor's freedom of inquiry and instruction"* Re. Browzin v. Catholic University, 527F.2d 843 (D.C. Cir 1975).

## Saha's Status of Research :

It is an information measure (unconventional) he has been working on for some years. It may take a few more years' time to complete. Since 1920s, a few attempts have been made to establish a general measure of information  but not with any success. Prof. Saha believes he has made some progress in his approach but **he does not claim any final result yet.**

Research community that waited for more than eighty years without seeing any success will not be harmed if Saha takes a few more years in his endeavor and then share his knowledge. This is the academic freedom and is the very essence of tenure which AAUP defends to promote the progress of knowledge in the society. Prof. Saha welcomed VP for Academic Affairs of GWU to qualify his position on Saha's research (Ref. to Saha's May 10, 2007 letter in Plaintiff Exhibit N, Document 25) but VP Lehman failed to respond as a matter of courtesy even on this matter of academic interest.

## C. Three Fundamental elements of Fraud behind the Cause of Action

**The cause of action of this complaint** is the set actions taken by the Defendants in the Spring of 2007; this includes locking Plaintiff out of his office, plotting a fake termination of his service and stopping plaintiff's pay cheque while keeping him on teaching schedule in Fall 2007 and Spring 2008.

**(1) Conspiracy for suspension and Entrapment to Perp Walk the Plaintiff in Fall 2005** : In the summer of 2005 when Prof. Saha was not on GWU payroll (because of nine month contract), Lehman administration resorted to an unfair mechanism to suspend Prof. Saha and then misled him to go to class to perp walk him on the campus twice. **Affidavit #4** (Document 25) addresses the Conspiracy for suspension and the Entrapment.

**(2) Fraud in initiating the tenure revocation process :**  VP Lehman's complaint (Plaintiff Exhibit Q, Document 25) on Saha's tenure revocation derived its impetus from the resolution of May 2nd, 2005 meeting of ECE personnel committee. During Senate hearing when Schaffner panel deliberated to strike

out the May 2nd meeting and the vote in that meeting from the record, Lehman testified that his complaint did not rely on May 2nd meeting. **Later President Trachtenberg came forward and testified to contradict Lehman**. In simple words, Trachtenberg's testimony (Plaintiff Exhibit M, Document 25) proved that VP Lehman flip-flopped and lied to Schaffner panel to maintain the legitimacy of his complaint. Plaintiff's tenure revocation was thus initiated through a fraudulent process. **Plaintiff's Declaration and Affidavit #2** (Document 25) address the fraud in initiating the tenure revocation process.

(3) **Fraud in terminating Plaintiff's service** : GWU administration resorted to anything but faculty code to plot a **fake** termination of his service and stop Plaintiff's pay cheques. **Affidavit #2** (Document 25) addresses this fraud; GWU has been failing to honor its own contractual **Agreement** that was reached through negotiation,

- **GWU's Agreement** : GWU, based on negotiations with the Plaintiff on Sept. 30, 2005, made commitment through its Nov. 18, 2005 letter of VP Donald R, Lehman (Plaintiff Exhibit J, Document 25) to keep Plaintiff on payroll till the matters are resolved. Presently, the Grievance procedure is under way. Therefore, Plaintiff is on **"Paid Suspension until further notice"** as indicated in the Nov. 18 letter.


## D. GWU's Collective Moral Bankruptcy and its attempt to cover up


**I. Moral Bankruptcy  1996:** During 1995-1996, the Plaintiff observed rampant favoritism in EECS Doctoral Qualifying Exam practiced by some senior and powerful faculty members of the School of Engineering and Applied Science (SEAS); one of the alleged senior faculty members was Raymond L. Pickholtz  who had the stature of the President of an International Society. Plaintiff, in his official capacity, had information about such favoritism  in the EECS Department,  and warned the EECS chairperson and SEAS dean several times; but they refused to play honest with a junior faculty member as the Plaintiff was at that time. *It is the integrity of the academic process and the issue of  fairness that compelled the Plaintiff to take a moral stand against the administration in 1996.* He exposed the wrong doing of the School through his "Dear Colleague Letter" (Plaintiff Exhibit G, Document 1)  and subsequently, the School's actions became what is known as **1996 GWU Qualifying Exam Scandal**.

Plaintiff asked the administration for plausible explanation of violation of rules and professional ethics mandated by the Faculty Code. The relevant administration consisted of EECS Chair woman Mona E. Zaghloul, SEAS Dean Gideon Frieder, and Vice President for Academic Affairs Linda Salamon. None of the administration took the responsibility; rather they denied all the allegations. Plaintiff held the Blue Books of the Qualifying Exam in an attempt to put pressure on the administration. As per personal suggestion from President Trachtenberg, I returned the Blue Books to Vice President and General Counsel Dennis Blumer on May 16, 1996. In the meantime, with the support from the offices of Prof. Zaghloul and VP for Academic Affairs, Linda Salamon, **the EECS faculty used their Democratic Power to vote in favor of passing all the doctoral students (more than a dozen) without looking into their answers.**

The faculty thus collectively vandalized the integrity of academic process in higher learning to save their face and the face of the administration. **The vandalism was thus committed through the pitfalls of Democracy. They vandalized the integrity and sanctity of the academia, they vandalized the sanctity of the George Washington University, they molested the moral conscience of the Plaintiff in most naked and savaged way, and still they had the audacity to claim they were the civilized western world.** It is Plaintiff's fortune that he is neither eastern nor western, he is just a human being. Even in the midst of such demonstrated "**Collective Moral Bankruptcy**", Vice President Salamon did not hesitate to come forward to claim that Plaintiff's stand was in violation of what American Civil Liberty stands for.

**First degree vandalism was carried out by VP Linda Salamon, Dean Gideon Frieder, Prof. Raymond L. Pickholtz, Prof. Murray Loew, and Chair Woman Mona Zaghloul; the second degree vandalism (through assistance) was carried out by Prof. Branimir Vojcic.**

The details of the "**Collective Moral Bankruptcy**" is written in black and white in the 37-page report that Plaintiff submitted to the Ramakar-Wooldridge Committee in 1997 and a set of critical evidence including memo and handwritten notes of Prof. Pickholtz. These are attached as Plaintiff Exhibit R-2 and R-3. It is important to observe that GWU, in last one decade, never contradicted the evidence of wrong

9

doing demonstrated in R-2 and R-3; **the administration simply refused to talk directly about the evidence on its "Collective Moral Bankruptcy"** .

President Stephen Joel Trachtenberg, in a one-to-one meeting with me in 1997, however, referred me as **whistle blower** and he thought administration of new Vice President Donald Lehman should have sent me a **"Thank  you"** letter for my role in that matter. But Vice President Lehman chose to take a confrontational path and **1996 incident became the abrupt turning point** in Plaintiff's two decade long teaching career in GWU. The second decade (1996-2006) is marked by Lehman administration's vengeance, malice and retaliation.

Plaintiff spent most of  second decade here at GWU coping with extreme hostility full of ostracism, harassment, defamation and retaliation through four suspensions. Among other aspects of character assassination, Lehman administration drew parallelism between Plaintiff and a **mass killer**, and installed two panic buttons to hype the story that Plaintiff is a violent character. The administration, however, never used those panic buttons for any cause related to Plaintiff Saha. GW's demonstrated ostracism practices over one decade (1996-2006) can be used as the definition of Twenty First Century ostracism among some Intellectuals in America. It clearly demonstrated that ostracism has nothing to do with their Ph. D. degrees; it is mostly to do with their inner bringing up. Plaintiff's long stand on the moral principles has never been to aggravate the issue of ostracism but to correct it through a change in the inner thoughts of the opponents. GWU's attempt to cover up its 1996 **"Collective Moral Bankruptcy"** is choreographed in Plaintiff's academic paper *"Still Teaching is noble in America !"* (attached Plaintiff Exhibit O).

The following list of alleged violations by the Defendants illustrates the degree of  **GWU's determined malice of retaliation** against its Whistle Blower;  Plaintiff alleged Defendants violated and compromised the essence of the following :

(1) GWU Faculty Code (in termination of service, failing to provide due process, failing to follow local and federal rules of discrimination & civil rights in initiating tenure revocation attempt)

(2) GWU Faculty Handbook (on the matters of Annual Reports)

(3) AAUP Guidelines (in failing to follow customary practices of academic community mandated by GWU Faculty Code)

(4) Violation of 42 U.S.C. -1983

(5) DC Human Rights Act of 1977

(6) The Americans with Disabilities Act of 1990

(7) Violation of local and federal rules on " fraud as means for plotting a termination of service"

(8) Denial of Employee Benefits (upon fraudulent termination of service) including Health Insurance (Article XI of GWU Faculty Code and Section 3 of Faculty Handbook)

## II. Ten Years later in 2006 : Another "Collective Moral Bankruptcy"

This "Collective moral bankruptcy" is the Schaffner Panel Deliberation in Summer 0f 2006; again, through vote of democracy, GWU administration managed to acquire a flawed deliberation through a procedurally illegitimate hearing (Ref. to Plaintiff's academic paper : Plaintiff Exhibit 38, *A Compelling Account :Flawed Deliberation of Schaffner Panel*, Civil Law suit 1:06-cv-01493). The Defendants then used this deliberation as an accessory of Fraud in plotting revocation of Plaintiff's tenure and Termination of Plaintiff's service.

**Whatever it was, the deliberation was just a recommendation**. For revocation under Faculty code, this recommendation had to be further acted upon by President Trachtenberg. When Plaintiff brought evidence of fraud and rigging to the attention of GWU President, **Executive VP Lehman, who wrote the complaint of tenure revocation, recused himself.** Thereafter, President Trachtenberg simply did not send the recommendation to the Board of Trustee for any approval. Without the approval of the Board of Trustee, Schaffner Panel Deliberation lost its legal merit for any use whatsoever.   Thus Plaintiff's **tenure was never revoked and service was never terminated**. However, GWU stopped Prof. Saha's pay check effective March 1st, 2007 and locked him out of his office since March 15, 2007.

Perhaps, this "Collective Moral Bankruptcy" is one of the "Dark Secrets" that GWU President Trachtenberg referred to in his May 19, 2006 address to the Board of Trustee ( Ref. Plaintiff Exhibit 47, Case 1"06-cv-01493-RCL).

## III. GW's Fraud and John Williams' Letter :

After staying silent for almost a year without producing any letter of termination, GW on Feb. 20, 2008, for the first time, shed light on the termination of service through the **letter of John F. Williams,**

11

Jr., which bears no name, no signature, and no affiliation of office (Plaintiff Exhibit L, Doc.25). All common sense tells that this letter is a fraudulent attempt on the part of GWU to deceive Prof. Saha as well as to deceive the Court. It is a breach of contract. It is **GW's Fraud,** a fraud of an institution which is supposed to be noble and supposed to be the backbone of moral bringing up of our children (students).

In **185** years history of GWU, no tenure was attempted to be revoked and, when for the first time, it was attempted against a Whistle Blower on **"Collective Moral Bankruptcy"**, GWU used members of its Law School Faculty to build the accessory of fraud. **The Schaffner Panel Circus, which already lost its legal merit, will remain as a legal precedence in the history of GWU for a better cause to deter similar moral bankruptcy in the generations to come and educate our administrators and faculty members alike.**

# Deficiencies in Defendants' Motion

## E. Mountain of Lies and Deceptions that establish Defendants' motive and behavioral tendencies against plaintiff since his 1996 Whistle Blowing

In the following, Plaintiff addresses only those lies and deceptions which are provable with certainty through evidence and documents. These Lies are important and are **Legally** relevant because **they relate to the violation of faculty code and due processes,** and hence to the **Breach of Contract**.

(1) Claim of Tenure being revoked and Service being terminated : *A fraud*

(2) Secrecy of Feb.9, 2005 ECE Personnel Committee meeting  ~ *denial of due process and  a violation of faculty code*

(3) False Characterization of Plaintiff's disability in secret ECE Personnel Committee meeting of Feb. 9, 2005 ~ *denial of due  process; wrongful discrimination in the light of DC Human Rights Act of 1977 and The Americans with Disabilities Act of 1990.*

(4) Lack of notification of May 2nd, 2005 ECE Personnel Committee meeting ~ *denial of due process and faculty rights; it is noteworthy that Schaffner Panel deliberated to strike out this meeting and the vote of this meeting from the record.*

12

(5) Lack of Notification of July 27 and June 26, 2005 letters of Lehman~ *denial of due process and faculty rights; VP Lehman's confession of being disingenuous in writing Aug.29 suspension letter.*

(6) GW's false Declaration on confiscating my University ID *(my ID is still in my possession)*

(7) GW's False Declaration about parking of my car on the night of Sept. 1st, 2005 (it is important in the context of falsification of facts related to civi rights violation on that night)

(8) VP Lehman's lie (proven by contradiction of President Trachtenberg's testimony) on the initiation of tenure revocation.

(9) GW Counsel Douglas Mishkin's Lie *(his e-mail and statements during hearing)*

(10) Douglas Miskin's falsification of document

(11) On 1996 Whistle Blowing : Lies of high ranking University officials (that can be proven with records and evidence). *To avoid jeopardizing the usefulness of the evidence, specific names are not mentioned at this time.*

(12) Lies associated with the entrapment of the Plaintiff in Fall 2005.

(13) VP Lehman and Schaffner Panel's unsubstantiated comments to tarnish Prof. Saha's research.

(14) VP Lehman's false allegation of plagiarism and scientific misconduct against plaintiff

(15) Dean Tong's false written allegation of neglect in responsibilities against Plaintiff

(16) Deception and violation of privacy through creation of secret mail box to deprive Plaintiff of his legitimate mail

(17) Denial of due process through "denial of opportunity to prove GWU's perjury by audio tape"

(18) ECE Chair (former)  Mona Zaghloul's lies in 1996, 1997, 2005, and in the testimony during hearing.

(19) VP for Acad. Affairs (former) Linda Salamon's lies on factual matters on 1996 Whistle Blowing

(20) GWU's Lies in comparing Plaintiff with a mass killer and installing panic buttons

(21) Lies associated with Plaintiff's character assassination (in letters, e-mails, recorded verbal comments and gossips)

(22) VP Lehman and ECE Chair Murray Loew's lies and plot of disingenuous suspension  of Plaintiff in 1999; ECE personnel committee acquitted Prof. Saha of any wrong doing.

13

## F. List of underlying false statements Defendants's "Motion to Dismiss" relied on

The Defendants made a number of false statements or assertions, and exploited them to paint a wrong picture in their attempt to resort to Fed. R. Civ. P. 12(b)(6).

## Defendants' False Assertions:

- (1) **Defendants' claimed that Plaintiff Saha's tenure has been revoked and his employment with GWU terminated on March 1st, 2007.**

  *Plaintiff's answer :* Plaintiff disagrees; see Affidavit #2 (Document 25).

- (2) **Defendants claimed on p-2 of Feb.20 Memorandum of Points : "Saha does not allege that he did <u>not</u> persistently neglect his professional responsibilities.**

  *Plaintiff's answer :* Plaintiff disagrees; see Plaintiff's Hearing Brief (Schaffner Panel) dated May 23, 2006 and Sept. 11, 2006; also, pp 13-23 of Plaintiff Exhibit O, "*Still Teaching is noble in America !*"

- (3) **GWU rightfully suspended Plaintiff Saha in Fall 2005**

  *Plaintiff's answer :* Plaintiff disagrees; see Affidavit #4 (Document 25).

- (4) **GWU's initiation of tenure revocation of Saha followed all the guidelines of Faculty code**

  *Plaintiff's answer :* Plaintiff disagrees; see Plaintiff's Declaration (Document 25).

- (5) **Schaffner Panel hearing decision followed the guidelines of the faculty code**

  *Plaintiff's answer:* Plaintiff argues Schaffner Panel hearing was procedurally illegitimate; see pp 13-23 of Plaintiff Exhibit O, "*Still Teaching is noble in America !*"; *also* see Plaintiff's Hearing Brief (Schaffner Panel) dated May 23, 2006 and Sept. 11, 2006.

- (6) **Three year Statute of Limitation bars all events and evidence that occurred prior to Jan 16, 2005**

  *Plaintiff's answer :* Plaintiff disagrees; see attached Affidavit B-1.

- (7) **<u>In Individual Capacity,</u>** Defendants Mona E. Zaghloul, Wasyl Wasylkiwskyj, Edward Della Torre, Joan Schaffner, and Stephen Joel Trachtenberg *did not violate any rules or professional ethics that caused harm to the Plaintiff, and/or advanced GWU's breach of contract with the Plaintiff.*

14

*Plaintiff's answer* : Plaintiff disagrees; see section J. Claim against Defendants in both Individual and Official Capacity

- **(8) Defendants on p-5 of Feb.20 Memorandum of Points claimed VP Lehman tried to resolve the situation amicably before bringing the complaint of Plaintiff tenure revocation.**

- *Plaintiff's answer* : Plaintiff disagrees. **Defendants made factually INCORRECT statement.** VP Lehman and Dean Tong  initiated revocation of Saha's tenure on Sept. 16, 2005 by handing over the complaint in a meeting with Dean Tong on the same day.  Plaintiff Saha did not have any meeting or telephone conversation with Lehman before that meeting. The first time Lehman offered a resolution was on Sept 19, 2005 over phone. His offer was 'Nine month salary with Saha's resignation at the end of that nine month period". Thus Defendants **Lied** in their claim that VP Lehman tried to resolve the situation amicably. Lehman made the offer after filing the complaint of tenure revocation. Plaintiff Saha refused to accept that offer right way on "moral grounds". It was not at all an amicable approach of resolution; quite contrary Lehman followed the style of an **arm twisting , intimidating, dishonest executive of big city operations.**

- **(9) Saha failed to show violation of faculty code ( p-3,9,11 of Feb. 20 Memorandum of Points)**

   *Plaintiff's answer* : Plaintiff disagrees; see above (A) Foundation of Motion to Dismiss:A False claim based on Fraud, (C) Three Fundamental elements of Fraud.

   Rights and Privileges of faculty members under the code is clearly mentioned on p.16 of Faculty Code (Plaintiff Exhibit B, Document 1) and is reproduced below :

   *"The rights, privileges, and responsibilities of a faculty member as conferred by this Code, shall be carefully safeguarded in accordance with the **highest accepted principles, practices, and procedures of the <u>academic community,</u> "***


**The Court should make a note of the following two :**

(1) The set of AAUP guidelines is a good representation of customary practices of the Academic Community. Attached Plaintiff Exhibit R-1 includes a few relevant pages of AAUP Guidelines on Dismissal and Termination of tenured faculty members. GWU failed to follow these guidelines too.

(2) None of GWU Faculty Code, Faculty Handbook, AAUP Guidelines, local and federal rules allow Fraud as means for plotting a termination of service.

- **(10) Defendants feel Present complaint of "Breach of Contract" is identical to Saha's "Civil Right Law suit" and is unnecessary.**

*Plaintiff's answer :* Plaintiff 's Civil Right Law suit pertains to violation of civil rights on Sept. 1st and Sept. 2nd, 2005 and its cause of action stemmed from unfair plot of suspension by GWU and entrapment of GWU to Perp Walk the Plaintiff ( Ref. to Affidavit #4, Document 25). Whereas, the cause of action for the present complaint is a set of actions taken by GWU in 2007 and it pertains to a series of breach of contract. The two cases are different.

*Plaintiff argues that Defendants' "motion to dismiss" relied on above mentioned false assertions. Defendants' arguments for resorting to Fed. R. Civ. P. 12(b)(6) lack merit and be denied.*

### G. Violations by Defendants

Plaintiff argues Defendants violated and compromised the essence of the following :

(1) GWU Faculty Code (in termination of service, failing to provide due process, failing to follow local and federal rules of discrimination & civil rights, in initiating tenure revocation attempt)

(2) GWU Faculty Handbook (on the matters of Annual Reports)

(3) AAUP Guidelines (in failing to follow customary practices of academic community mandated by GWU Faculty Code)

(4) Violation of 42 U.S.C. -1983

(5) DC Human Rights Act of 1977

(6) The Americans with Disabilities Act of 1990

(7) Violation of local and federal rules on "fraud as means for plotting a termination of service"

(8) Denial of Employee Benefits (upon fraudulent termination of service) including Health Insurance (Article XI of GWU Faculty Code and Section 3 of Faculty Handbook)

## H.  Issues of the complaint Defendants failed to answer

(1) Defendants failed in its Feb. 20 response to address its **fraudulent initiation of tenure revocation** (which fell short of completion).

(2) Defendants failed  in its Feb. 20 response to address its **Collective Moral Bankruptcy**  over the issues of 1996 Qualifying Exam Scandal, and its **Collective Moral Bankruptcy** ten years later in its conducting the Schaffner Panel Hearing (one of many irregularities : **the panel considered 190 GWU Exhibits while failed to consider any of the 30 Saha Exhibits**).

(3) Defendants and   their Counsel Mishkin failed to address their **Noble** (!!) acts of "Lying and flip-flopping", falsification of document and alteration of date of creation of records.

(4) Defendants failed in its Feb. 20 response to answer issues of discrimination including GW's seeking attempt to revoke Saha's tenure because of perceived disability which violates the District of Columbia Human Rights Act and the Americans with Disability Act.

(5) Defendants failed  in its Feb. 20 response to answer on "denial of due process in orchestrating Plaintiff's 2005 suspension and GWU's 2005 attempt of tenure revocation ".

(6) Defendants failed  in its Feb. 20 response to answer on **numerous counts of *"breach of contract"***

(7) Defendants failed  to address a number of perjuries by High ranking GWU officials and a number of False Declarations (1:06-cv-01493-RCL).

17

# Allegations and Pleadings

In this section, Plaintiff first lines up **the allegations** with reference index for cause of action, pleadings, exhibits, affidavits, and the count number in the Complaint (Docket 1), and then outlines the **"Damages Caused by the Defendants"**. Next, the **issue of individual and official capacity** of allegation against five Defendants is addressed. Lastly, **statement of claim and pleading** is furnished for each of the Thirty Counts of the Complaint.

# I. Plaintiff's Allegations

| Allegations | Reference Index for Cause of Action Pleading(s), Exhibit(s), Affidavit(s) & Count no. in the Complaint (Docket 1) |
|---|---|
| 1. John Williams' fraudulent letter & **GW's Fraud** in plotting Revocation of Tenure and termination of Service | Section A of this Response, Plaintiff Exhibit L (Document 25), Affidavit #2 (Document 25) |
| 2. **GW's Fraudulent claim** that Plaintiff's **Tenure was revoked** and his **Service was terminated** | Document 14-2, Section A of this Response, Affidavit #1 (Document 25), Count 1 & corresponding claim in Section K of this response |
| 3. **GW's Fraud** in initiating Plaintiff's Revocation of Tenure | Section C of this Response, Affidavit #2 & 4 (Document 25), Plaintiff Exhibit M (Document 25) |
| 4. **VP Lehman's disingenuous** suspen-sion of Plaintiff in Fall 2005 | Section C of this Response, Plaintiff's Declaration (Document 25), Affidavit 4 (Document 25), Count 13 & corresponding claim in Section K of this response |
| 5. **GW's Breach** of Negotiated Agreement and failure to pay Plaintiff's salary since March 1st, 2007 though **tenure was never revoked and service was never terminated** | Count 1 & corresponding claim in Section K of this Response, Section C of this Response, Affidavit #1 (Document 25) |

18

6. **GW's Denial** of Plaintiff's right to access to his office since March 15, 2007 though **Tenure was not revoked and Service was never terminated**

Count 2 & corresponding claim in Section K of this response,
Plaintiff Exhibit H (Document 1)

7. **GW's discrimination** in refusing to give Plaintiff any raise in salary since his Whistle Blowing in 1996

Count 10 &corresponding claim in Section K of this response,
Affidavit #3 (Document 25)

8. **GW's denial of Plaintiff's right** to due process in attending Feb.9 and May 2nd, 2005 ECE personnel committee meetings

Section G of Complaint (Document 1),
Plaintiff's Declaration (Document 25),
Count 5,6,17 & corresponding claim in Section K of this response

9. **GW's denial of Plaintiff's right** to the due process in providing input to the Sub-committee of Prof. Wasylkiwskyj that investigated Plaintiff

Count 4,17 & corresponding claim in Section K of this response

10. **Procedural illegitimacy** of the Schaffner Panel Hearing

Section G of Complaint (Document 1),
Plaintiff's Declaration (Document 25),
Count 6,**7**,**17**,18,26 & corresponding claim in Section K of this response

11. Denial of due process, violation of Professional Ethics, and flawed deliberation of Schaffner Panel : **Panel's Gross Misconducts** constitute adequate cause for tenure revocation of each member of the Panel

Section G of Complaint (Document 1),
Count 6,**7**,**17**,18,26 & corresponding claim in Section K of this response

12. **GW's wrongful attempt** to exploit Schaffner Panel Deliberation though, without the **appro--val of the Board of Trustees**, the deliberation **lost its legal merit**

Section A, C, K of this response
Affidavit #1,2  (Document 25),
Count 1,2 & corresponding claim in in Section K of this response

13. **GW's entrapment** to Perp Walk the Plaintiff on Sept. 1st, 2005

Section C of this response,
Affidavit #4 (Document 25),
Count 14,15,16 & corresponding claim in Section K of this response

14. **GW's violation** of Plaintiff's Civil Rights : 42 U.S.C. -1983; false arrest and imprisonment, violation of privacy

Section C of this response,
Affidavit #4 (Document 25),
Count 14,15,16 & corresponding claim in Section K of this response

15. **GW's Denial** in addressing the issues of **Corrup-tion** in Academic practices that compromised the integrity of higher learning in violation of Faculty Code **(Plaintiff's Whistle Blowing)**

Count 9 & corresponding claim in Section K of this response, Plaintiff Exhibit O : *"Still Teaching is noble in America !"* (attached to this document)

16. **GW's retaliatory discrimination** against Plaintiff in 1996 and 1997 for his Whistle Blowing; **violation** of Faculty code and AAUP Guidelines, and local and federal laws of **retaliatory discrimination**

Background Facts in Complaint (Doc. 1), Count 28 & corresponding claim in Section K of this response

17. **GW's violation** of Faculty code, AAUP Guidelines and local and federal laws of **discrimination and harassment** causing Plaintiff's false arrest in 1997

Item 16, Background Facts in Complaint, Unethical Actions of VP Lehman in Plaintiff Exhibit O: *"Still Teaching is noble in America!"* Count 29 & corresponding claim in Section K of this response

18. **GW's violation** of Faculty code, AAUP Guidelines and local and federal laws of **discrimination and harassment** in harassing Plaintiff in 1999 through false charge of Scientific Misconducts.

Count 24 & corresponding claim in Section K of this response, 1999 Lehman-Loew Conspiracy in Plaintiff Exhibit O: *"Still Teaching is noble in America!"*

19. **Lehman-Loew conspiracy for** Plaintiff's Spring 1999 suspension : **GW's violation** of Faculty code, AAUP Guidelines, local and federal laws of **discrimination and harassment**

1999 Lehman-Loew Conspiracy in Plaintiff Exhibit O: *"Still Teaching is noble in America!"* Item 29 in Vendetta and Retaliation by Lehman Administration, Complaint (Doc.1), Count 6 & corresponding claim in Section K of this response

20. **GW's Intimidation :** VP Lehman in 2005 & 1999, Dean Tong in 2002, and Dean Frieder in 1996; **GW's violation** of Faculty code, AAUP Guidelines and local and federal laws of **discrimination and harassment**

Vendetta and Retaliation by Lehman Adm., in Complaint (Doc.1), Intimidation by Lehman in Plaintiff Exhibit O: *"Still Teaching is noble in America!"* Counts **8, 29** & corresponding claims in Section K of this response

21. **GW's discrimination** against Plaintiff, its expressed perception of disability of Plaintiff tainted the Feb. 9, 2005 **Secret** ECE meeting and caused the harassment of tenure revocation attempt (which fell short of completion) : **GW's Violation of DC Human Rights Act of 1977 & The Americans with Disabilities Act of 1990**

Section G of Complaint (Document 1), Counts **5, 17** & corresponding claim in Section K of this response,

22.  **GWU's Ostracism** : liable for discrimination against Plaintiff for ostracizing the Plaintiff from the Department life since his Whistle Blowing in 1996

Count 12 & corresponding claim in Section K of this response, Section 29D and 29E under "Vendetta and Retaliations" in Complaint (Doc.1)

23.  **GW's Retaliation and Harassment :** GW orchestrated a systematic and consistent style of retaliation against the Plaintiff over last **ONE Decade** for his Whistle Blowing in 1996 : **violation** of Faculty code, AAUP Guidelines and local and federal laws of **retaliatory discrimination and harassment**

Section D. (p. 10) : Itemized List of Retaliation by GWU and Section E. (p-13) : List of Improper Activities in the GW Virginia Campus,  in Plaintiff Exhibit O : *Still Teaching is noble in America !*

24.  **GW's Character Assassination** of Plaintiff through a comparison with a Mass Killer and installation of panic buttons : **violation** of Faculty code, AAUP Guidelines and local and federal laws of **retaliatory discrimination and harassment**

**Affidavit #10** in Civil Lawsuit 1:06-cv-01493, Counts **21**, **29** & corresponding claims in Section K of this response

25.  **Wrongful comments** by VP Lehman and Schaffner Panel to taint Prof. Saha's research in **violation** of Faculty code, AAUP Guidelines and local and federal laws of **discrimination and harassment**

Section B in the Background Section of this response, Count  29 & corresponding claims in Section K of this response

26.  VP Lehman and Counsel Mishkin's **fraud** during Schaffner Panel Hearing

Plaintiff's Declaration in Docum. 25

27.  **GW's violation of Privacy** of Prof. Saha in creating **a secret mail box** to divert his legitimate mail

GWU Senate Hearing Testimony. Plaintiff Exhibit52 of Civil Lawsuit 1:06-cv-01493; it is a Jan.4, 2002 Memo that got exposed in Fall 2005 and revealed the existence of a **SECRET Mail Box designated for** Plaintiff (without his previous knowledge)

28.  GW's Denial in addressing **its "Collective Moral Bankruptcy"** in violation of Faculty Code and AAUP Guidelines.

Counts **9, 10, 28, 29** & corresponding  claims in Section K of of this response

# Damages Caused by the Defendants

1. **Enormous anxiety and mental stress** due to Lehman's Intimidation's in 1999 and 2005.

2. **Damage to Professional Life and Professional Development over one decade** : due to ostracism in the Department and forced isolation from the student community (which took away resources from doing research with the students).

3. **Damage to Professional Reputation :** Lehman confessed he didn't do anything to repair the damage after withdrawing the charge of Scientific misconduct.

4. **Financial ruin :** While in 1997 Trachtenberg suggested that I stay home during the summer months without doing consulting, the administration stopped increment in salary. My salary in 2007 remained the same as I had in the beginning of 1996, except for a difference of few hundred dollars. I received a **57%** increase in salary in first nine years of employment (1986-1995) before whistle blowing , while received an increase of only **0.59%** in the following ELEVEN years (1996-2007) after whistle blowing. Following suggestion of Trachtenberg I did not pursue consulting over one decade. **I kept my Word**.

In addition to that I had to go through four suspensions over eleven years because of reckless flood of retaliations by VP Don Lehman and his administration. The financial and mental stress caused irreparable damage to the development of my family and two children who grew from ages 5&7 to 16&18 during this turmoil.

5. **Defamation :**

**Professional :** Charge of Scientific Misconduct, Irresponsible comment and criticism about my research during Senate hearing (though it was not an issue in the complaint),

**Social :** drawing similarity with a **mass killer** (in writing), installing **panic buttons**, spreading rumor of violent personality verbally and in writing.

The effect of this defamation together with ostracism resulted in my withdrawal from social and professional life from the department. The net result has been loss of enjoyment of normal life of a teacher.

22

**6. Harassment :**

Capricious assignment of teaching schedule of courses, inadequate room assignment, disconnecting phone service, letting my office be used by others in my absence, lack of lights in my office room, creating trouble in the classrooms, locking the classrooms on a semi-regular basis, wining and dining in the scheduled classroom, providing no student list or grade sheets for VA campus, diverting mail to secret mail box in VA campus, taking away directorship of courses, replacing me (a tenured full time faculty) by a part-time/adjunct professor, littering unknown chemicals or dye on my office walls, writing obscene words on my office door, sliding trashy magazines underneath my door, and so on caused enormous mental stress. On the top of that remained Ostracism and forced isolation from the student (advisee) community.

These caused mental stress, emotional shut down and constant fear of retaliation. Out of fear of retaliation, I haven't taken any sabbatical leave (which I was entitled to for twice) since 1993-94 academic year. These harmed profoundly my personal life and overall well being as a normal human being.

**7. Denial of due process** : Lack of notice for Feb 9 & May 2nd, 2005 meetings in  initiating 2005 tenure revocation attempt; rigging during 2005-2006 Senate Hearing. These caused immense mental stress, partial withdrawal from social life and financial ruin.

**8. Denial of payment** : during 1999 suspension (though EECS personnel committee cleared me of any wrong doing and asked the administration to pay) and since March 1st, 2007 till today (though I am on paid suspension as per Lehman's Fall 2005 letter).

**9. Other intent(s) of harm :** (believed to be) by GW agents (Confidential : to be conferred with the judge only)

**10. Intimidation, Harassment and Disturbance on our personal property**: GWU's vandalism on our residences at 2947 Waterford Court, Vienna, VA-22181 and 9409 Fairpine Lane, Great Falls, VA-22066 caused mental stress for the whole family.

## A Summary :

The decade long retaliatory ordeal through four suspensions and tenure revocation attempt affected me profoundly : (a) almost stopping my professional development which includes unfinished research and book writing on Information Theory, (b) financial ruin, and  (c) mental stress and worry causing reduced

social life and withdrawal from professional life, and most significantly (d) not being able to give as much attention as I wanted to give to the bringing up of my two children because of financial and mental stress.

As direct and proximate consequences of Defendant's retaliatory actions, I suffered emotional injury, loss of enjoyment of normal life, constant fear of retaliation, and damages to my reputation. My civil rights were violated and I suffered embarrassment and humiliation.  The Defendants harmed me financially through retaliatory suspensions and discriminations with an intent to strangle me financially; the financial hardship and mental stress caused by the Defendants caused irreparable damage to my personal  life and damage to the well being of my family. The Defendants also harmed me in my professional development and professional earning through harassment, discriminatory withdrawal of resources and defamation. Defendants acted willfully, wantonly, maliciously, and in reckless disregard of my rights and reputation, thereby making themselves liable for both compensatory and punitive damages.

## J. Claim against Defendants in both Individual and Official Capacity

GWU Faculty Code and Handbook mandate that "the University structure is based on shared Governance". The faculty plays a role in the administration through Faculty Assembly and Faculty Senate. Unlike the industry or corporate environment, the academic community is unique. In University setting, each faculty member has dual role : (a) a role in official capacity as an agent of the University, and (b) a role in individual capacity as a single entity who enjoys academic freedom and freedom of expression, and exercise his or her vote or will without being under the authority and influence of the administration.

Often a faculty member acts as part of an appointed administrative committee or a representative of the University, and has the obligation of maintaining the guidelines of and reporting back to the administration. In such a situation the faculty member may be considered as an appointed agent of the University and he/she should be considered as acting in official capacity. While in another situation, where individual faculty member is not holding a position appointed by the administration, or not appointed to act as a liaison between administration and general faculty, his or her actions and voting privilege should be considered as that of individual capacity. In both situations the faculty member is bound by the rules of the faculty code and the handbook. In the latter situation, however, faculty member's individual position on an issue or individual voting privilege may influence the decision about another faculty member or a decision on a policy matter, but his/her actions, *because of the absence of supervision of the administration*, would not be considered as those of the university. Thus, each faculty member acts in both individual and official capacity, and, therefore, liable for the results they cause by their actions in each of the two capacities. It is important to observe that Faculty Code itself acknowledges each member of the faculty as an individual and, thereby, gives the member the right to grieve against the administration, while, at the same time, mandates faculty's role in the governance of the University.

# K. Breach of Contract and Claims

Almost all of Defendants' Arguments (page 7 through 16 of Memorandum of Points and Authorities) relies on the promise of Schaffner Panel Deliberation. In the Background section, Plaintiff established that GWU failed to follow Faculty Code to take advantage of the benefit of Schaffner Panel deliberation which itself was acquired through fraud. It is important to take notice that **VP of Academic Affairs Donald R. Lehman, who wrote the complaint of Plaintiff's tenure revocation, recused himself** after the allegations of fraud and rigging surfaced **and President Trachtenberg did not send the recommendation (deliberation) to Board of Trustee.** Without the approval of the Board of Trustee, **the Panel deliberation lost its relevance** in attributing any merit **whatsoever** to any claim the Defendants may have. Plaintiff argues that *the deliberation of Schaffner Panel Hearing, because of lack of approval of the Board of Trustee, has no legal merits for consideration in External Court Proceedings.*

*In addition, the arguments that follow are based on following established facts :*

A. Foundation of "Motion to Dismiss" is a False claim based on Fraud

B. Plaintiff did not have any contractual binding to publish his research in any time bound fashion

C. Three Fundamental elements of Fraud that led to the Cause of Action of this complaint are:

    (1) Conspiracy for suspension and Entrapment to Perp Walk the Plaintiff in Fall 2005

    (2) Fraud in initiating the tenure revocation process

    (3) Fraud in plotting a termination of Plaintiff's service

D. Defendant GWU's denial of providing employment benefits including Health Insurance though termination of service was never made effective following the faculty code.

Also, Plaintiff argues, in spite of three year statute of limitation in the D.C. code (12-301), events and evidence which occurred **before Jan.16, 2005** would be proper and relevant to establish Defendants' motive and behavioral tendencies against Plaintiff since his 1996 Whistle Blowing. **The story the court should be relying upon is an uninterrupted continuous story, not a time-barred story of convenience of the Defendants.**

## Specific Counts of Complaint (Docket 1) and Claims

In what follows, each of 30 counts of Plaintiff's Complaint (Docket 1) is separately addressed and a statement of claim is furnished in each case.

**Count 1.** GW breached ......... by refusing to pay him salary from effective March 1st, 2007 .........

**Plaintiff's statement of claim:**

- GWU did not follow the Faculty Code and AAUP Guidelines (Plaintiff Exhibit R-1) as well. GWU used a fraudulent means to plot a termination of service. **Neither tenure was revoked nor service was terminated.** GWU has been failing to maintain its contractual agreement with the Plaintiff since March 1st, 2007 when it stopped Plaintiff's pay cheque. Defendant GWU has also been failing to maintain its contractual agreement by denying Plaintiff and his family legitimate employment benefits including Health Insurance though termination of service was never made effective following the faculty code. Refer to Affidavit #1 (Document 25) for details.

**Count 2.** GW breached ......... by locking him out of his office ......... since March 15, 2007.........

**Plaintiff's statement of claim:**

- **Plaintiff's service was never terminated.** Plaintiff Exhibit H (Document 1) of GW Web faculty status in Fall 2007 clearly showed his Campus Office to be following.

**Elec & Computer Engineering**
**Philips Hall 618**
**801 22nd Street NW**
**Washington, District of Columbia 20052**

GWU breached the faculty rights by denying plaintiff access to and use of his legitimate office.

**Count 3.** GW breached ......... by suspending him in the Fall of 2005 through fraudulent ......... It is GWU's concerted effort of retaliation against Prof. Saha because he blew whistle on the scandal.

**Plaintiff's statement of claim:**

- In the Summer of 2005 when Prof. Saha was not on GWU payroll and was absent from the campus, GWU's Executive VP for Academic Affairs Donald R. Lehman orchestrated a deceitful plan to suspend Prof. Saha without any communication with him. Lehman already confessed during GWU Hearing on tenure revocation that he was disingenuous in writing the August 29, 2005 suspension letter that ultimately led to the tenure revocation hearing. Thus GWU breached the employment

27

contract firstly by denying the Plaintiff the due process as required by customary practice mandated by Faculty Code and AAUP Guidelines, and secondly by fraudulently suspending him in Fall 2005 (Ref. to Plaintiff's Declaration and Affidavit #4 in Document 25 for details).

**Count 4.** GW breached ......... denying him the due process; Prof. Wasyl Wasylkiwskyj did not.........

**Plaintiff's statement of claim:**

- The 2005 Subcommittee of ECE Personnel committee, Chaired by Prof. Wasyl Wasylkiwskyj , broke with its past practice and violated Prof. Saha's contractual rights by denying him the opportunity to present his side of the story to the Subcommittee (Hearing, 4/3/06, at p.12). GW never offered any convincing explanation to justify why a review should be limited to an incomplete historical record or why the committee violated its past practice of allowing Prof. Saha to speak to the committee. The Subcommittee limited its analysis to ensure the creation of a paper record that support revocation of tenure. Although the Subcommittee issued its report on April 22, 2005, Chairwoman Zaghloul never gave Saha a copy of the report and he did not receive it until September 2005 after his suspension and revocation of tenure being initiated. ECE Chair, Prof. Korman testified he voted in favor of these proceedings because he believed that all of the facts found by the Subcommittee were true (Hearing, 1/30/05 at p.117)

**Count 5.** The vote at the Feb. 9, 2005 **secret** meeting ......... tainted ......... comments of Loew and similar comment of Prof. Vojcic tipped the balance......... the District of Columbia Human Rights Act and the Americans with Disability Act. GW thus breached the employment contract with Prof. Saha and is liable for Discrimination.

**Plaintiff's statement of claim:**

- By keeping the meeting secret and not issuing the notice to the Plaintiff, who had legitimate right to attend the meeting, GWU denied the Plaintiff his contractual right and, therefore, breached the contractual agreement.

- The Discriminatory comments of Prof. Loew and similar comment of Prof. Vojcic in Feb. 9, 2005 **SECRET** meeting made a far reaching **sequential** impact

- The Comments tipped the balance in favor of appointing a subcommittee chaired by Prof. Wasyl Wasylkiwskyj,

which led to the May 2nd, 2005 meeting (of which notice was not served to the Plaintiff), the resolution of which led to

a meeting among VP Lehman, Dean Tong, Zaghloul, Wasylkiwskyj, and Korman, which led to August 29, 2005 suspension and then Sept.16, 2005 initiation of Plaintiff's tenure revocation.

- GW is thus liable for the discrimination by Prof. Loew and Prof. Vojcic. *Griffin v. Washington Convention Center, 142 F.3d 1308. 1312 (D.C. Cir 1998) ("evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence"); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990) (committee functioned as the supervisor's "cat's-paw") (reversing summary judgment); Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2nd Cir 1992); Cariglia v. Hertz Rental Corp., 363 F.3d 77, 85-89 (1st Cir. 2004) (analyzing cases); Reeves v. Safeway Stores, Inc. 15 Cal. Rptr 3d 717, 731-733; Cal. App. 4th 95, 113-117(Ct. Ap. Cal.2004).*

- [ Additional facts to establish Defendants' motive : (a) Prof. Zaghloul, Loew, and Vojcic all were involved in the 1996 Qualifying Exam Scandal, (b) Prof. Vojcis who remained ECE Chair till Fall of 2004 declined to investigate Saha, (c) GWU administration appointed Prof. Zaghloul as interim chair after Prof. Vojcic for only six months to assist VP Lehman and Dean Tong to obtain some sort of approval of ECE faculty to build a case against Prof. Saha, (d) Prof. Kyriakopoulos testified that GWU Administration (VP Lehman / Dean Tong) told the faculty through Chair Zaghloul that the faculty had "to do something about Professor Saha" ]

*Count 6, 7, 17, 18, 19, 20 : all are tied to Schaffner Panel Senate Hearing. Before addressing them individually, Plaintiff offers the following to reflect on the importance of Senate Hearing on the Breach of Contract of employment.*

# Senate Hearing and the Contract of employment

First let us observe GW Faculty Code in the light of Law of District of Columbia, and the role of Faculty in the Governance of GWU. Under the Law of District of Columbia, the terms of the Faculty Code must be construed in keeping with general usage and custom at the University and within the academic community *McConnell*, 818 F.2d at 64.

29

In the absence of an express term to the contrary, the usual customs and practices surrounding a contractual relationship become part of the contractual obligation. Bason v. American University, 414 A.2d 522, 525 (D.C. 1980); Pride v. Howard University, 384 A.2d 31, 35(D.C.1978); Browzin v. Catholic University, 527 F.2d at 845-46 (using recommended regulations promulgated by the AAUP to determine contractual rights); Greene, 412 F.2d at 1133 n.7 (using the policy of the AAUP on matters of academic tenure to interpret contractual terms).

**Thus** **the entire employment contract consists not only of GWU Faculty Code and Handbook, but also GW's customary practices and the practices of the academic community such as those of AAUP.**

GW Handbook (p.17) and GW Faculty Code (p.15, Plaintiff Exhibit B) mandate that "the University structure is based on shared Governance". GW Faculty Code (p.3) demands : " Members of the faculty are responsible for maintaining standards of professional ethics .....". Faculty Code further demands (p. 16) "The rights, privileges, and responsibilities of a faculty member as conferred by this Code, shall be carefully safeguarded in accordance with the highest accepted principles, practices, and procedures of the academic community." Thus, **high standard professional ethics of maintaining fairness and due process are parts of the contractual employment agreement of each member of faculty with the University which is run under joint Governance**. Therefore, Schaffner Panel's lack of professional ethics, lack of commitment to due process, and negligence in carrying out the hearing in an impartial manner constitute **Breach of Contract of employment**.

Plaintiff already argued that the deliberation of Schaffner Panel Hearing, because of lack of approval of the Board of Trustee, has no legal merits for consideration in External Court Proceedings. *Yet, the irregularities, rigging and fraud associated with the hearing are important to establish "the motive of the Defendants and the extent the Defendants were ready to build an accessory of fraud" in terminating the service of the Plaintiff.* In 185 years history of GWU, no tenure was attempted to be revoked and, when for the first time, it was attempted against a Whistle Blower on Collective Moral Bankruptcy, GWU used members of its Law School Faculty to build the accessory of fraud. **The Schaffner Panel Circus, which already lost its legal merit, will remain as a legal precedence in the history of GWU for a better cause to deter similar moral bankruptcy in the generations to come.**

30

Now, let us return to individual counts of the Complaint (without considering the implication of **"Zero legal merit of Schaffner Panel deliberation for consideration in External Court Proceedings"**).

**Count 6.** The Schaffner Panel violated its professional ethics by refusing to hear "Taped Dialogue ........."
**Plaintiff's statement of claim:**

- GW denied Professor Saha notice (Feb. 9 and May 2nd meeting) and an opportunity to meet with the Subcommittee investigating him. The Subcommittee denied Prof. Saha an opportunity to present his side of the case as he had done in 1999. The Personnel Committee vindicated Prof. Saha in 1999. The Panel Chair Prof. Schaffner of GWU Law School repeatedly denied Prof. Saha a full and fair opportunity to make an evidentiary record of pre-April, 1999 events (Re. Transcript of April 3, 2006 Hearing at pp. 108, 110, 114, 115, 119, 120). The Panel limited Prof. Saha's testimony on pre-April, 1999 events and prevented him from playing the recordings of his 1999 meetings with the Personnel Committee. In doing so, Chair Schaffner and the Panel was unfair, biased (in favor of Lehman administration) and established its neglect of professional responsibilities that tainted the Hearing, and, thereby, Prof. Saha's employment contract was breached.

**Count 7.** The Schaffner Panel ......... did not consider any of the 30 exhibits produced by Prof. Saha and considered 190 out of 192 exhibits produced by GWU. ......... constitute "gross misconducts" liable for revocation of tenure of each member of the panel.........

**Plaintiff's statement of claim:**

Chairman Schaffner and the Panel were prejudiced and acted as biased agents of GWU administration as illustrated below ( Ref. pp. 11-24, Plaintiff Exhibit O, *"Still Teaching is noble in America !"*; Plaintiff's Hearing Briefs dated May 23, 2006 and Sept. 11, 2006). **The Panel let itself become an accessory to fraud** that Defendant GWU committed in plotting the termination of Plaintiff's service. The Panel violated GW faculty code, AAUP Guidelines (as customary practices of academic community), and local and federal laws that deal with fraud in working place. Biased and flawed deliberation of Prof. Schaffner (in the capacity of Chair of the Panel) constitutes "gross misconducts and neglect in professional responsibilities" that make GWU and Prof. Schaffner liable for punitive and compensatory damages for the Plaintiff. In

addition, Plaintiff argues **"gross misconducts and neglect in professional responsibilities"** of each member of the whole Panel comprised of Professors Joan Schaffner, Mark Clock, Ravi Achrol, Guillermo Gutierrez, Brian Biles, and Robert Dunn constitute **adequate cause (in the light of Faculty Code) for revocation of tenure of each member of the panel.**

- Panel did not acknowledge that the Hearing was acquired through fraud

- The Panel erred in allowing GWU to amend the Complaint and thus violated the Faculty Code. The Panel itself raised the issue of Prof. Saha's research which was not a part of the original complaint. The Panel joined GWU administration to taint Prof. Saha's unpublished research, though GWU Faculty Code no where mandates tenured faculty member to publish in any time bound fashion.

- The Panel failed to obtain a copy of VP **Lehman's Oct. 30, 1997 (fraudulent !)** letter which Lehman relied on to write the original complaint.

- Panel deliberately failed to acknowledge that Plaintiff was denied by the administration the Due process guaranteed by Faculty code and AAUP guidelines.

- Panel Chair Prof. Schaffner of GWU Law School repeatedly denied Prof. Saha a full and fair opportunity to make an evidentiary record of pre-April, 1999 events (Re. Transcript of April 3, 2006 Hearing at pp. 108, 110, 114, 115, 119, 120).

- The Panel limited Prof. Saha's testimony on pre-April, 1999 events and prevented him from playing the recordings of his 1999 meetings with the Personnel Committee which would prove GWU's perjury. The Panel deliberately relied on biased incomplete record.

- **Panel, by its own admission, did not consider any of the 30 exhibits produced by Prof. Saha and considered 190 out of 192 exhibits produced by GWU and did not give any explanation for doing so. The Panel thus proved itself to be BIASED by every thinkable standard.**

- Though **71%** (132 of 192) of GWU Exhibits came from pre-April 1999 events, the Panel failed to consider 1996 Whistle Blowing and GWU's retaliations, intimidations, discrimination, and ostracism against the Plaintiff. The Panel deliberately kept its guard down in "making absolutely no comment" on the "evidence introduced by Plaintiff on GWU's corruption in 1996 Qualifying Exam Scandal" that established **"GWU's Collective Moral Bankruptcy".**

- Plaintiff Saha introduced compelling evidence, Plaintiff Exhibit 30, but the Panel refused to allow Prof. Saha to pursue this line of questioning further or to fully consider how such evidence taints the entire process. The Panel refused to order the Administration to produce the notice and minutes relating to the February 9, 2005 meeting or the notes from the May 2, 2005 meeting.

- The Panel failed to prevent GWU in obstructing the process of fair hearing in denying Saha full document production, including notes and drafts, e-mails and minutes which GWU witness promised while they were on witness stand.

- In recommending revocation of tenure, the Panel violated the Faculty Code that requires the Panel to be careful to "not substitute its judgment for that of the maker of the decision being challenged." Faculty Code (p. 29, Plaintiff Exhibit B). The Panel offered no reason for overruling Chairman Vojcic's judgment and decision when he was Chair (till Fall 2004) that there was no justification for creating a Subcommittee to investigate Prof. Saha. The Panel also violated the Code in substituting its judgment for that of the Personnel Committee that met in 2002, but decided no further action should be taken against Saha based on those events. See March 6, 2006 Hearing at p.418.

- The Panel denied Saha Due Process and the opportunity to be heard by improperly relying on written testimony prepared by GW's counsel. Allowing counsel for GWU to prepare written direct testimony for the Administration's witness turned the trial into a contest between artful ventriloquists and denied panel the opportunity to hear witness speaking for themselves and to determine the most credible witness. Based on the pre-1999 written testimony and documents, the Panel apparently concluded that Saha was at fault but denied him due process by limiting his testimony on pre-1999 events (panel did not allow playing the recorded conversation that would prove GWU's perjury), even though the Panel heard and considered all of GW's statements, 132 exhibits, and testimony of pre-1999 period.

- The Panel erred in ruling the "notice" issue was irrelevant and in limiting testimony surrounding the Feb. 9, 2005 meeting and the reasons why Saha was not invited to attend the meeting (it is important to observe this Feb. 9 meeting occurred in less than two months after Zaghloul was brought as ECE Chair for only six months to give VP Lehman a helping hand to develop a case against Saha. During 1996 scandal, Zaghloul gave the administration a helping hand at the cost of demonstrating herself to be a perfect "Liar"). The Panel further erred in limiting testimony on events surrounding the May 2, 2005

meeting and whether Saha's colleagues would have voted to support revocation of Saha's tenure if they had known that Zaghloul's representation that Saha had been "invited" to the May 2, 2005 meeting was false.

**Count 8.** GW breached.......... Don Lehman in pressuring .......... Whistle Blowing. .........

**Plaintiff's statement of claim:**

- The incident of pressuring and intimidation took place in the Fall of 2005 after Plaintiff's suspension; therefore, it is not time barred by the statute of limitation due to D.C. Code.

**Count 9.** GW breached its ......... retaliating against Prof. Saha over the period.........since his Whistle......... Blowing in 1996 (see 29D and 29E).

**Plaintiff's statement of claim:**

- 1996 Whistle Blowing is the root cause behind the ten year ordeal. GWU made " absolutely no comment" on the "evidence introduced by Plaintiff on GWU's corruption in 1996 Qualifying Exam Scandal". Plaintiff argues that, in spite  of some of the events being outside three year statute of limitation, all events should be admissible in the Court to establish the motives and behavioral tendencies of the defendants. By refusing to address the issues while retaliating against him over one decade (Ref. to 29D and 29E in the Complaint), GWU denied Plaintiff the due process and violated (1) GWU faculty code, (2)AAUP Guidelines, (3) 42 U.S.C. -1983 (4) DC Human Rights Act of 1977, (5) The Americans with Disabilities Act of 1990 and (6)  local and federal rules on fraud as means for plotting a termination of service.


**Count 10.** GW breached ......... refusing to  give  him  any  raise  in  the  salary......... **Retaliatory Discrimination** against Prof. Saha.

**Plaintiff's statement of claim:**

- GWU committed discrimination against Plaintiff violating Faculty Code, AAUP Guidelines, local and federal laws of discriminations. The long history of discrimination should be admissible in the Court to establish the motive even though it is outside the three year statute of limitation; note period of Jan 2005-2008 does not fall in that limitation. For details, see Affidavit #3 (Document 25).

**Count 11.** GW breached .........by threatening him unreasonably (in writing) ......... constant fear.

**Plaintiff's statement of claim:**

- GWU's intimidation against Plaintiff violates Faculty Code, AAUP Guidelines, local and federal laws of discriminations. The long history of discrimination should be admissible in the Court to establish the motive even though it is outside the three year statute of limitation.

**Count 12.** GW breached ......... by **ostracizing** him .........( ........29D and 29E).

**Plaintiff's statement of claim:**

- GWU committed discrimination against Plaintiff violating Faculty Code, AAUP Guidelines, local and federal laws of discriminations. The long history of discrimination should be admissible in the Court to establish the motive even though it is outside the three year statute of limitation; note period of Jan 2005-2008 does not fall in that limitation.

**Count 13.** GW breached........ suspending him in Fall of 2005 ........; VP Lehman's confession........

**Plaintiff's statement of claim:**

- GWU denied Plaintiff due process and violated Faculty Code, AAUP Guidelines, and local and federal laws of discriminations. In particular, the cause of suspension originated from a tainted Feb.9, 2005 faculty meeting and GWU thus violated DC Human Rights Act of 1977, The Americans with Disabilities Act of 1990, local and federal rules on fraud as means for plotting a termination of service.

**Count 14.** GW breached ........ by **misleading** him ........ **PERP WALKING** ........ on Sept. 1st, 2005.

**Plaintiff's statement of claim:**

- Defendants violated the Faculty Code on Professional ethics and AAUP Guidelines of fair treatment to entrap Prof. Saha for Perp Walking him on Sept. 1st (Ref. to Affidavit #4, Document 25). GWU administration conspired together for this entrapment by providing Prof. Saha false information on Aug. 29 and then repeating that again on Aug. 30, 2005. Thereafter, the Defendant GWU caused False Arrest and invasion of privacy.

**Count 15.** GW breached........ by violating civil rights........on Sept. 1st, 2005 evening and Sept. 2nd ........

- **Plaintiff's statement of claim:**

- Ref. to Affidavit #4 (Document 25). GWU administration conspired together to humiliate Prof. Saha on Sept. 1st; then repeating it again on Sept. 2nd, 2005, GWU established its continued vengeance and malice against Prof. Saha for his Whistle Blowing. The Defendants caused

  (a) Violation of 42 U.S.C.-1983

  (b) False arrest and imprisonment

  (c) Invasion of Privacy in false light

**Count 16.** GW breached ........ by **DEMONSTRATING** its vengeance, its malice,.........its **Moral Bankruptcy (1996 Scandal) ........Prof. Saha suffered emotional trauma.**

**Plaintiff's statement of claim:**

- Ref. to Affidavit #4 (Document 25). By not giving Prof. Saha any instruction on Bar Notice on Sept. 1st evening, Lehman Administration, in addition to all the violations in Count 15, committed **acts of planned damage to** Plaintiff's **professional reputation,** and violated Faculty Code, AAUP Guidelines, and local and federal laws of discrimination. Also Ref. to Plaintiff's Affidavit # 1 through Affidavit #7 submitted on **GW's false declaration** with reference to Civil Rights Law suit  1: 06-cv-01493-RCL.

**Count 17.** GW breached ........ by **allowing** a procedurally illegitimate Hearing ........ rigged........ .

**Plaintiff's statement of claim:**

- See Prof. Schaffner's own statement on the notice issue of May 2nd, 2005 ECE personnel committee meeting in Section G of Complaint (Document 1); Chair Schaffner, on March 6, went on to say :

     **"We understand that is perhaps more relevant to our considerations than sort of this just traditional notice ----if he (i.e. Plaintiff Saha) didn't have notice, he lacked due process, and therefore, we can't even really revoke tenure during this proceeding ------"**

     By striking out May 2nd meeting and its vote from record, and then proceeding to recommend tenure revocation in the deliberation, Schaffner Panel contradicted the legitimacy of the deliberation and compromised professional ethics. Given all the factual irregularities associated with the Hearing, Plaintiff alleges that

- Defendants violated (1) Faculty Code, (2) AAUP Guidelines, (3) DC Human Rights Act of 1977, (4)The Americans with Disabilities Act of 1990 and (5) local and federal rules on fraud as means for plotting a termination of service.

**Count 18.** GW breached ........ time barring ........ **incomplete** record,........ and (c) refusing to produce........ **VP Lehman's October 30, 1997 letter........**

**Plaintiff's statement of claim:**

- Defendants denied the Plaintiff the Due Process and violated (1) Faculty Code and (2) AAUP Guidelines. In particular, the cause of suspension and tenure revocation attempt originated from a tainted Feb.9, 2005 faculty meeting and GWU thus also violated (3) DC Human Rights Act of 1977, (4) The Americans with Disabilities Act of 1990, and (5) local and federal rules on fraud as means for plotting a termination of service.

**Count 19.** GW breached its employment contract with Prof. Saha by falsifying a document to enhance its attempt of revocation of Prof. Saha's tenure.

**Plaintiff's statement of claim:**

- GW committed fraud and violated local and federal rules on "fraud as means for plotting a termination of service".

**Count 20.** GW breached ........ by refusing to comply with the AAUP Guidelines ........ .

**Plaintiff's statement of claim:**

- Defendants denied the Plaintiff the Due Process and violated GWU Faculty code and AAUP Guidelines governing revocation of tenure. Refer to Plaintif Exhibit R-1.

**Count 21.** GW breached ........ through defamation ........ of the **Mass Killer at the Concordia University and installed two panic buttons ........ *GWU never used these panic buttons in last one decade ...... .***

**Plaintiff's statement of claim:**

- **GWU denied the Plaintiff the Due Process and violated GWU Faculty code. GWU committed Discriminations to retaliate against a Whistle Blower. GWU willfully and maliciously caused defamation and harm to Plaintiff's professional reputation (Refer to Affidavit # 10 : Disputing the wrongful portrayal of the Plaintiff as violent, 1:06-cv-01493-RCL). GWU violated local and federal rules of discrimination as well as of defamation.**

**Count 22.** GW breached ........ by refusing ........ teaching though........Revocation attempt fell short of completion ........ .

**Plaintiff's statement of claim:**

■ It was established that Prof. Saha was suspended in Fall 2005 through conspiracy and fraudulent means. Prof. Saha's tenure was never revoked and his service was never terminated. In spite of that GWU did not allow him to participate in teaching, research and other normal activities he is entitled to as a member of faculty (Professional Responsibilities, pp.3-5 of Faculty Code, Docket 1). In doing so, GWU violated its Faculty Code and breached the employment contract.

**Count 23.** GW breached ........ causing  inconvenience and hindrance ........ (see 29D and 29E) ........ .

**Plaintiff's statement of claim:**

■ GWU's capricious acts of discrimination, harassment and retaliation violated Faculty Code, D.C. Human Rights Act and Federal Laws.

**Count 24.** GW breached ........ a false charge of Scientific Misconduct........professional reputation..... .

**Plaintiff's statement of claim:**

■ GWU's acts of malice against a Whistle Blower (i.e. Plaintiff) and VP Lehman's professional misconducts and dishonesty violated Faculty code and local and federal laws of discrimination (and retaliation).


**Count 25.** GW breached ........ by withdrawing all resources of doing research with the students.

**Plaintiff's statement of claim:**

■ GWU violated the Faculty Code (p.4) by isolating Prof. Saha from the Student community. After his 1996 Whistle Blowing,  GWU abruptly ended his undergraduate advising responsibility (he had about 110 undergraduate advisees) and took away all the graduate advisees away from him to hurt him in his resourses of doing joint research with the students. GWU's discrimination violated faculty code, D.C. Human Rights Act and federal rules of discrimination.


**Count 26.**  GW breached ........ Lehman refused to respond to a set of Interrogatories ........ .

**Plaintiff's statement of claim:**

- Schaffner Panel and GWU together denied Prof. Saha the right to a fair hearing and due process guaranteed by the Faculty Code. VP Lehman's refusal to respond to a set of Interrogatories (within the guidelines of Hearing) and Panel's no-objection to it established an unfair understanding between the two in denying Prof. Saha the due process. Both Schaffner Panel and GWU jointly violated the Faculty Code, and AAUP Guidelines; this demonstrates how Prof. Schaffner and her Panel let the Hearing to be an accessory of fraud for GWU in plotting a termination of Plaintiff's service. Jointly they breached the employment contract.

**Count 27.** GW breached ........ concerted effort in covering up the Civil Rights Violations on Sept.1st and Sept. 2nd, 2005 through a number signed false declarations/ affidavits.

**Plaintiff's statement of claim:**

- GWU violated local and federal rules in its perjury to cover up Civil Rights violation. GWU also violated local and federal rules on "fraud as means for plotting a termination of Plaintiff's service".

**Count 28.** GW breached ........ denying Saha any relief ........ Complaint of Harassment and Discrimination filed with

> (a) Vice President and General Counsel Dennis Blumer on May 30, 1996
>
> (b) President Trachtenber on November 11, 1996, and
>
> (c) Ramaker-Wooldridge investigation committee in Spring of 1997.

**Plaintiff's statement of claim:**

- Though some of the events fall outside the tree year statute of limitation, yet, the Plaintiff argues that all of the egregious misconducts of discrimination, harassment and retaliation against Plaintiff for his Whistle Blowing should be admissible in the Court to establish the motives and behavioral tendencies of the Defendants. GWU violated Faculty Code, AAUP Guidelines, DC Human Rights Act of 1977, and local and federal rules on fraud as means for plotting a termination of service.

**Count 29**. As direct and proximate consequences of Defendant's Retaliatory Actions in all of the above items (1) through (28), I suffered emotional injury, loss of enjoyment of normal life, damages to my reputation, embarrassment and humiliation. Defendants acted willfully, wantonly, maliciously, and in reckless disregard of my rights and reputation, and breached the employment contract with Prof. Saha in a naked way, thereby making themselves liable for compensatory and punitive damages.

**Plaintiff's statement of claim:**

■ GWU severely breached its employment contract with the Plaintiff and resorted to **Fraud** as means for plotting a termination of Plaintiff's service. Plaintiff further argues Defendants together violated and compromised the essence of each of the following :

    (1) Faculty Code (in termination of service, failing to provide due process, failing to follow local and federal rules of discrimination & civil rights, in initiating tenure revocation attempt)

    (2) GWU Faculty Handbook (on the matters of Annual Reports)

    (3) AAUP Guidelines (in failing to follow customary practices of academic community mandated by GWU Faculty Code)

    (4) 42 U.S.C. -1983

    (5) DC Human Rights Act of 1977

    (6) The Americans with Disabilities Act of 1990

    (7) Local and federal rules on fraud as means for retaliation and plotting a termination of service

    (8) Denial of Employee Benefits (upon fraudulent termination of service) including Health Insurance.

Thereby each of the Defendants, as charged in Official and Individual Capacity, made themselves liable for compensatory and punitive damages as demanded in the Complaint.

**Count 30**. Items (1) through (29) above convincingly establish that GW breached its employment contract with Prof. Saha by vandalizing the sense of decency, legal and moral rights that are not only imbedded in the faculty code but also guaranteed in any "civilized society" under its constitution; in the present case, the "civilized society" is the society we live in and the society which is protected by the United States Constitution.

**Plaintiff's statement of claim:**

- Plaintiff argues Defendants violated and compromised the essence of each of the eight elements mentioned in Count #29. In addition, the Defendants breached the trust the society bestowed upon them; they vandalized the sense of decency, legal and moral rights of the "civilized society" that is protected under the **United States Constitution** and , thereby, each of the defendants engaged in **Anti-American Activity**. Thus, the Defendants, as charged in **Official and Individual Capacity**, made themselves liable for compensatory and punitive damages as demanded in the Complaint.

# Conclusions

For the foregoing reasons, Plaintiff asks that the Court deny the "Motion to Dismiss" or, in the alternative, grant permission to amend the Complaint.

# United States District Court
# For The District of Columbia

-----------------------------------------------------

**Debabrata Saha,**

      **Plaintiff,**

**v.**

                             **Civil Action No. 1:08-cv-00087-RCL**

**The George Washington University,**
**Mona E. Zaghloul, Wasyl Wasylkiwskyj,**
**Edward Della Torre, Joan Schaffner, and**
**Stephen Joel Trachtenberg**

      **Defendants.**

-----------------------------------------------------


## Certificate of Service

    I hereby certify that a copy of this whole packet, dated March 31, 2008 is sent to the Counsel of six Defendants by first class mail to the following address.

                        Patton Boggs LLP
                        2550 M Street, N.W.
                        Washington, D.C. 20037-1350


Sincerely,

*Debabrata Saha*

Debabrata Saha
March 31, 2008

# United States District Court
# For The District of Columbia

-----------------------------------------------------

**Debabrata Saha,**

      **Plaintiff,**

**v.**

                                 **Civil Action No. 1:08-cv-00087-RCL**

**The George Washington University,**
**Mona E. Zaghloul, Wasyl Wasylkiwskyj,**
**Edward Della Torre, Joan Schaffner, and**
**Stephen Joel Trachtenberg**

      **Defendants.**

-----------------------------------------------------

# Affidavit B-1 :On Three year Statute of Limitation and GWU's Legal Principle

I, Debabrata Saha of 9409 Fairpine Lane, Great Falls, VA-22066 do hereby state to my knowledge, information and belief the following.

- Defendants in their Feb 20, 2008 response used "three year statute of limitation" (DC code   12-301) as the argument for excluding some of Plaintiff's 30 counts of complaints from consideration. **Here GWU chose to apply the three year limitation because it helped them eliminating some of the crucial events and evidence that establish violation of Faculty Code and Handbook, and local and federal rules of retaliatory discriminations.**

GWU's complaint for tenure revocation (Plaintiff Exhibit Q, Document 25) relied on events that date back to 1996. Yet, during hearing of the complaint, the Defendants as well as the faculty panel vigorously insisted on relying only on post April 1999 events for deliberation. The panel deliberation (Document 9, part 3, Defendant Exhibit 1) was based on *time-barred events*; the cut-off date was conveniently chosen as April 30, 1999 (page 2-of-13). **But it should be noted that GWU Faculty code doesn't allow such time barring**.

## Irony in Defendants' Positions :

      GWU wants to apply D.C. statute of limitation to exclude events and breach of contract in Saha's **External D.C. court legal proceedings**, while, upon acknowledging  that no statute of limitations apply to

**Internal Proceedings governed by GWU faculty code**, applied the notion of limitation **anyhow** to time-bar allowable events and evidence. Schaffner Panel deliberation was based on *time-barred events*.

**Legal Principle that guided GWU** : *"apply statute of limitations where it is available for use in favor of GWU, and **unlawfully** implant statute of limitations where it is not available if it benefits GWU".*

It is ironic that moral bringing up of our children are placed in the hands of such hypocritical administrators in the Capitol of the Nation. Legal principles are supposed to enlighten the moral principles of the society. Treating a patient for its secondary symptom only without addressing the root cause (which is, in this case, the issues of 1996 Whistle Blowing) can neither be a moral principle nor an acceptable legal principle. GWU vandalized the Moral fabrics of the Society. Proximity effect of these dishonest administrators and faculty members are bound to cause wounds on the moral makeup of our children. On a broader perspective, Plaintiff's stand in 1996 on the integrity of higher learning was indeed a challenge to the immoral persuasions of GWU. **Academia is supposed to be nobler than every other institution**. It is very sad that President Stephen Joel Trachtenberg, after staying at the helm for almost two decades, in his recent address to the Board of Trustee of GWU, had to acknowledge **"Dark Secrets of GWU"**. Perhaps the frauds highlighted by Plaintiff are just a few of those Dark Secrets.

A number of faculty members of GW Law School, including its Dean, guided and strengthened the above mentioned *"Legal Principle"* that guided GWU. They are all well educated by virtue of their distinguished degrees from reputed universities. Unfortunately, those degrees did not help them to apply their common sense and realize the contradictions in their actions. On the other hand, a well known gentleman lawyer, who helped in building this nation, when first elected to the Congress, wrote in the Congressional directory that his education was defective, perhaps because he had no formal university degree (unlike those Professors of GW Law School). But he had lot of common sense though Voltaire, many centuries back, found *common sense is not so common.* The point here the Plaintiff is trying to make is that observations on moral tendencies of the defendants are relevant to establish their motives. Hiring, retention, and firing process in GWU does not have any checks and balances with respect to moral behavior and tendencies of the administrators and faculty members. GWU President Stephen Joel Trachtenberg, in a one-to-one meeting in 1997, agreed to the Plaintiff on this point.

The Plaintiff respectfully request the court to consider the issue of *"Legal Principle that guided GWU "* in enlightening the moral tendencies and motives of the Defendants.

17

Plaintiff argues, in spite of three year statute of limitation in the D.C. code, events and evidence which occurred **before Jan.16, 2005** would be proper and relevant to establish the motives of Defendants in deciding the present case. Courts routinely allow background evidence as proof of unlawful intent and defendants' long term behavioral tendencies:

*McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) : "Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities;"

*Andrews v. City of Philadelphia*, 895 F.2d 1469, Third Circuit Court (1990) : "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."

Schaffner panel deliberation was based on **time-barred** events with cut-off date as April 30, 1999.

Thus all events, evidence and documents on the following issues were excluded:

*(i) 1996 Whistle Blowing on corruption and favoritism that compromised the integrity of higher learning,*
*(ii) 1997 inappropriate Police Action and Escorting Professor Saha out of his classroom, violating his civil rights,*
*(iii) Evidence of 1999 conspiracy by VP Lehman and Retaliation against Saha through a **false** charge of Scientific Misconduct which was later dropped,*
*(iv) Perjury on 1999 event that can be easily proven by existing audio tapes at the disposal of Saha, and*
*(v) Other complaints and evidence of harassment, discrimination, and retaliations filed with (former) President Trachtenberg and (former) VP and General Counsel Dennis Blumer.*

Plaintiff argues that all of the above issues, events and evidence are relevant to establish the motives of the Defendants and be admissible in the court. **The story the court should be relying upon is an uninterrupted continuous story, not a story of convenience of Defendants.**

Relevant Exhibit : Plaintiff Exhibit Q

*Debabrata Saha*
DEBABRATA SAHA

Commonwealth of Virginia
County of Fairfax , to wit :
Sworn, subscribed, and acknowledged before me by Debabrata Saha on March 26, 2008.

*Daria G McGee*
Notary Public

My Commission Expires _____
Notary Registration No. _____

DARIA G. MCGEEHAN
NOTARY ID # 121114
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES 12-31-11

**Plaintiff Exhibit O**

# *Still Teaching is noble in America !*

*by*

## Debabrata Saha
## The George Washington University
## 801 22nd Street, N.W.
## Washington, D.C. 20052
## U.S.A.
November 14, 2006

# Preface

It all started with a tear in a mild tempered student who spoke with a choked voice. This student was not treated the same way as some other privileged students and had to leave George Washington doctoral program. But his tear took me above a threshold and is partly responsible for the ten year ordeal over which we saw in 1996 an academic vandalism by Linda Salamon, a Vice President for Academic Affairs of our society and the revelation of a dirty conspiracy to cover up that vandalism by another Vice President of Academic Affairs, Donald R. Lehman. In between, so many deans and chairpersons demonstrated that in our society still loyalties to religion, color and race are so dominant that the truth apparently looses its right to be almighty and unique. But all of them definitely misunderstood the strength of the truth. The strength of the truth lies in its unique existence. The truth is the "Academic Vandalism" that was committed by the George Washington University (GWU) administration in the capitol of the nation under the nose of Bush and Clinton Presidency. It is the integrity of the academic process and the issue of fairness that called for the stand I had to take in 1996; now, ten years later, I feel it is important that I share the experience  so that the students and the teachers of American Universities get a chance to learn from it and contribute their own in strengthening the pillars of academia on which the society stands. *Still teaching is a noble profession in America !*

Following the "Academic Vandalism" came the announcement of "whistle blowing" by the President of GWU, Stephen Joel Trachtenberg, and the process of harassment and retaliation just began. In less than one decade Prof. Saha was suspended four times and his resources for research, teaching, and normal functioning of day to day life were withdrawn slowly but in very systematic way. Indeed it is  best described as an intellectual execution of oppression of minds, tenacity and will power of retaliated faculty member(s).

On November 9, 2006 The GW Hatchet, an independent newspaper of the George Washington Community, ran a story and brought the events of 1996 into public arena for the first time. But the article failed to give a complete picture. The moral side of the events and the issues of academic integrity and academic fairness for which I stood for and for which President Trachtenberg called it a Whistle Blowing are not even touched upon in the story. As a former President of a Student Union of my college days I know  the students and the academic community always appreciate a complete picture that gives the whole truth. The objective here in this paper on social enigma is to give a clear and truthful picture of the decade long events. The devil is in the details of the events. These events are representations of the society we live in.  Ten years ago, three decades after the civil right movements in this society, I wouldn't believe in my wildest dream that such pandemonium

of ostracism, retaliation and oppression can take place today in the capitol of the nation within a few blocks from the White House. Ten years back I simply couldn't imagine that, in a city which celebrates so many monuments of civil liberty and holocaust archives, I needed to expect such extreme hostility and harassment even after the President of the University declared me as Whistle Blower.

I am sorry to say but I am convinced that still there is a lot to be done in our society on civil rights issues. That's why I have decided to write this paper with explicit citations that manifest the degree of ostracism, retaliation and harassment I had to bear with. I hope these citations do not cause any hatred for any community or sect. After all we are first human beings; the religion, nationality, and skin color come next. I can not avoid giving an example to illustrate how similar we are in our inner layer though we come from different backgrounds; research shows that the information content of almost all natural languages, which are representation of our minds and emotions, are same, be it English in Europe, Tamil in India or French in African continent. The source of ostracism or racism is within us, in our human mind. It only takes different form and shape in different contexts in all society but with varying degree of propensity.

In the Fall of 2005 GWU administration initiated a process to revoke the tenure of Prof. Saha and the first step of faculty deliberation began. The panel chaired by Prof. Joan Schaffner of the Law School of GWU made this trial a lynching of all the values for which American Education System stands for. The panel even refused to consider the Academic Vandalism for their consideration and refused to include full evidential record. The panel failed to show courage in asking GWU to produce paper record that was created secretly by Lehman-Tong administration for taking action against Prof. Saha. *Schaffner panel sold its moral responsibility for its own survival with the current administration of GWU*. The deliberation of the Schaffner panel clearly points out one important short coming of GWU faculty code : **"the requirement of courage to stand for principles"** .

Lehman-Tong administration of GWU mainly brought two charges against Prof. Saha : (1) Personal neglect of professional responsibilities, and (2) Gross and Personal misconduct that destroys academic usefulness. Because of lack of evidence, the Schaffner panel had to acquit Prof. Saha of the second charge. But the panel upheld the first charge of persistent neglect of professional responsibilities which provides adequate cause for tenure revocation. Schaffner panel in a naked way failed to observe ( I strongly believe they did it intentionally to save their own job) the pandemonium of ostracism and retaliation and the degree of hostility under which a person can hardly function. **Professor Schaffner and her colleagues on the panel live in a fantasy land where the ruling class after imprisoning a man in a cage expects him to grow beautiful roses outside in their flower garden.**

ii

The GW Hatchet correctly pointed out GWU faculty code admits four possible adequate causes for tenure revocation : (a) **Incompetence** - *not a charge in Saha case*, (b)**Lack of scholarly integrity** - *not a charge in Saha case*, (c) **Persistent neglect of professional responsibilities**- *upheld charge against Saha*, and (d) **gross personal misconduct that destroys academic usefulness** -*failed charge against Saha.*

What GW Hatchet failed to point out is that VP Lehman already tried the avenue (b) of **Lack of scholarly integrity** in 1999 and had to withdraw the charge of **plagiarism** after investigation. He also tried avenue (a) of **Incompetence** in 2005 but the evidence he manipulated was found to have no merit and proved only his own incompetence.

The extreme nature of ostracism and retaliation is in the details of the events some of which are outlined later in several sections of this paper. Yet I was always available for teaching, maintaining office hours and taking care of the students. Every semester I gave extra lectures in the weekends (on average three/four two and half hour lecture) which I wasn't officially required to. In my nineteen years of teaching here at GWU, I never missed even one lecture and I am very proud of that. In spite of adverse situation created by the administration, I always managed to submit final grades within 72 hours of the exam. Even after the whistle blowing, I was available for meetings and committee work if they wanted me to do so; but unfortunately they did not ask me and I did not ask for their social interaction to make them uncomfortable. **I did not hear a single knock on my door for social interaction over a period of ten years** (except three or four knocks by Prof. Lang during his chairmanship for official matters only); more details are in the section under **Itemized List of Retaliations by GWU**. In summary, I led my professional life in the department exactly the way they wanted me to live, I did what they wanted me to do (such as teaching ) and I did not cross the boundary imposed by them to make them uncomfortable. I kept a low profile as was suggested by President Trachtenberg.

In the following I dispute the deliberation of the Schaffner panel and outline the rationales for the Appeal. Before presenting the arguments for the appeal, first a few sections have been devoted to outline some important events and actions of GWU administration in somewhat chronological manner. These sections provide the necessary background and are essential for manifestation of the degree of harassment, retaliation and ostracism imposed over last one decade. The arguments are followed by a few Appendices. Debabrata Saha : A Brief Background (Appendix A), The Time Line (Appendix B) and Chronology of Last one Decade (Appendix E) provide executive style summary of the relevant events before and after the Academic Vandalism of 1996; perhaps reading the appendices in this order will save time on part of the readers.

iii

Faculty hearing as described by the faculty code is a process open to public; it is a public hearing. **Therefore, there is no restriction of secrecy on the entire process or its finding.** Unlike the original thirty seven page document that was submitted to Ramaker-Wooldridge committee in 1997, this paper on social enigma has no problem of legitimacy in sharing with others. Most of the events and citations in this paper are from the transcripts of seven hearings that are supposed to be public. At this time, in the Fall of 2006, the second step of  faculty deliberation is about to begin. GWU Senate Dispute Resolution Committee will be taking the case in its hand.


We must remember :

*As forgiveness is divine and humane, punishment is just and essential for social balance.*

iv

# Content

Introduction : An Academic Vandalism and Failure of Schaffner Panel    1

The Academic Vandalism : 1996 Qualifying Exam Scandal    2

Unethical Actions Of VP Dr. Lehman    4

Whistle Blowing : Meeting with President Trachtenberg    5

1999 Lehman-Loew conspiracy    7

Sequence of Events that tainted the due process    8

Intimidation by VP Lehman    9

Itemized List of Retaliations by GWU    10

Arguments for the Appeal    13

     A. Shortcomings and failure of the Schaffner panel    13
     B. Perjury under oath    15
     C. Denial of due process    15
     D. Hearing : Procedurally Illegitimate    16
     E. Failure of the panel to consider conspiracy into account    17
     F. Obstruction by GWU in the hearing    18
     G. Statutory Limitation    18
     H. Answers to Panel's finding on neglect of Professional Responsibilities    19

Conclusion    24

Appendix A : Brief background of Prof. Saha    25
Appendix B : Time Line    27
Appendix C : Chronology of Events in the beginning of Fall 2005    28
Appendix D : Irresponsible and Unethical misconduct of SEAS Dean Tong    30
Appendix E : A Quick Overview :Time Line of Events over One Decade    31
Appendix F : Dear Colleague Letter of May 15, 1996    36
Appendix G : Before It Fades Away from Memory !!    37
Appendix H : Complaint for Tenure Revocation    39

v

# Introduction :
## An Academic Vandalism and Failure of Schaffner Panel

Teaching is a noble profession and any institution of learning must have the obligation of maintaining the highest standard of ethics, morals, and justice. The truth does not have to show respect to any administration, to any institution, or even to any society. Rather, society, institution, and administration have to bow down and show respect to the truth. The truth is Prof. Saha exposed an academic vandalism orchestrated and carried out by GWU administration. **The Schaffner panel failed to understand the gravity of this vandalism and failed to understand the moral implications of the scar caused by this vandalism on the American Education System.**

No administration, particularly the academic ones, should have the luxury of allowing immoral acts even under the strongest pressure from any group based on race, religion, color or ego. These are the few words that guided me through the ten year ordeal which includes four suspensions by Vice President Donald R. Lehman and labeling me as **Whistle Blower** by the highest official of GWU, President Stephen Joel Trachtenberg.

The existence of Lehman administration during Clinton and Bush presidency is a symbol of continuing immoral persuasions in GWU in the Nation's capitol. Professor Saha appealed to the faculty senate Dispute Resolution Committee not only to vindicate himself of the false charges brought against him by Lehman administration but also to eradicate the immoral persuasions in GWU.

We are here not just to teach a little bit of science, engineering, medicine, law, or arts. We must also have some qualities and sense of responsibilities, both inside and outside classroom, which are not outlined in  the faculty code but are essential for influencing the character building of our students. Though not explicitly mentioned in the faculty code, we must have a sense of commitment to maintaining ethics and integrity in all academic processes, and above all, the courage to stand up to corrupt administrators to maintain those commitments.

By signing the contract with GWU, I never admitted that I sold my conscience to GWU. It was understood that I would be bound by the terms and conditions of the faculty code *provided* any narrow interpretation of the faculty code does not conflict with the moral conscience. The faculty panel has to look into the truth and the facts that lead to this ten year ordeal. The panel has to determine whether  or not submitting annual report, not attending this and that meeting was a result of Prof. Saha's deliberate attempt of avoiding responsibilities or it was what he had to do to follow the suggestions of President

1

Trachtenberg and mitigate his higher sense of responsibility towards academia and commitment to his conscience. In other words, the panel has to determine whether Prof. Saha held the faculty code to its highest standard or bowed down to the pressure of Lehman administration which tried to have a narrow interpretation of the faculty code to support their immoral persuasions. Perhaps these immoral persuasions are no different from what, in a recent address, President Trachtenberg referred to as the **dark secrets of GWU.**

# Academic vandalism :
# 1996 GWU Qualifying Exam Scandal

**Spring'95 :** Professor Raymond L. Pickholtz of former EECS department gave undue favor to Mr. X (who never applied for admission and was never admitted into any GWU doctoral program) by allowing him to take doctoral qualifying exam. Later, with the help of Chairwoman Prof. Mona Zaghloul and Prof. Vojcic, he arranged a 'Passing Grade' for Mr. X. Reference : Plaintiff's Exhibit# 5,6,7,8 (for the sake of brevity, none of the exhibits is included here but they are public record, and the student's actual name is omitted. )

**Fall'95 :** Prof. Pickholtz allowed another doctoral student, Mr. Y, to take the doctoral qualifying exam four times in a row, though the department rule allows a maximum of two attempts. Prof. Pickholtz later even pleaded for a fifth attempt on behalf of his student.

**Spring'96 :** Prof. Zaghloul, in the capacity of the Chairwoman of EECS Department, allowed Mr. Z (a student of Prof. Robert J. Harrington) to take the doctoral qualifying exam in Telecommunications, though we had no such approved program in the School of Engineering and Applied Science (SEAS).

- I spoke against this violation of rules and violation of faculty code.
- Chairwoman Zaghloul came forward to **Lie** about all three cases to protect her involvement in the wrong doings and save her own face and the face of Prof. Pickholtz and Prof. Harrington.
- I requested for an explanation from the GWU administration about such unethical activities and violations of faculty code; I held the Blue Books of the Qualifying Exam with the hope of getting a rational explanation from the administration.

2

- As per personal suggestion of President Trachtenberg, I returned the Blue Books to Vice President and General Counsel Dennis Blumer on May 16, 1996.
- In the meantime, with the support from the offices of Prof. Zaghloul and VP for Academic Affairs, Linda Salamon, **the EECS faculty used their Democratic Power and passed all the doctoral students (more than a dozen) without looking into their answers.**

They thus saved their face without paying any respect to the fairness and integrity of the academic process. **The vandalism was thus committed through the pitfalls of Democracy. They vandalized the integrity and sanctity of the academia, they vandalized the sanctity of the George Washington University, they vandalized my moral conscience in most naked and savaged way, and still they have the audacity to claim they are the civilized western world. It is my fortune that I am neither eastern nor western, I am just a human being.**

**First degree vandalism was carried out by VP Linda Salamon, Dean Gideon Frieder, Prof. Raymond L. Pickholtz, Prof. Murray Loew, and Chair Woman Mona Zaghloul; the second degree vandalism (through assistance) was carried out by Prof. Branimir Vojcic.**

Think of the poor woman (fictitious if you wish), owner of a convenient store, who was dragged out of her store when she refused to give undue favors to the landlord and his few men. The woman was severely beaten. The store was vandalized and totally ransacked. The woman lost her self-esteem, lost her health, couldn't run the business as usual and failed to pay the rent. A year later a group of good Samaritans of the tenant association came forward to deliberate on her eviction. They examined some scars on her face, **not the vandalism itself,** and concluded the scars were not damaging enough; she should have worked harder to run the business and pay the rent. The deliberation of Schaffner panel on persistent neglect of professional responsibilities sounds no different from the deliberation of the good Samaritans. The Schaffner panel should feel lucky that GW faculty code did not require them to have **Courage** on their part !!

# Unethical Actions Of VP Dr. Lehman

## 1997

- After I brought the charges of harassment against Dr. Mona Zaghloul to President Trachtenberg through my letter of August 23, 1996, and again through letter of Nov.11, 1996, President Trachtenberg wrote me that he asked VP Dr. Lehman to look into the matters. But Dr. Lehman never communicated with me.

- In the Spring of 1997, I was assigned to teach three courses and continued to teach all courses and maintained each and every office hour till February 6, 1997.  On February 6, 1997, I went to teach the course EE-204 in the Corcoran Hall (Rm. #205) around 6:00pm. Dr. Lehman, without giving any prior notice (written or telephonic), used University Police to remove me from my class room in front of my student(s).

- After the February 6 "Police Incident", President Trachtenberg sent me copies of three letters related to my status. These three letters were written by Dr. Donald R. Lehman and addressed to me but never reached me. First two of these letters were supposed to be sent by registered mail. My question was if the office of VP Lehman did not receive the return receipts of the registered letters, why they did not try to contact me by other means. I was in the school on a regular basis, without missing a single lecture or an office hour. This raised lot of questions!!

- A copy of the third letter dated February 5, 1997 was sent by courier. It is ironic that one of my colleagues in the EECS Dept. had a copy of this confidential (!!) letter and he read it over the phone in the morning of Feb.7 even before it reached me through the President's office on the same day.

- As per February 5 letter of Dr. Lehman, I was on administrative leave, pending further investigation which he expected to be completed within 30 days. But I didn't receive any communication from Dr. Lehman within that thirty day period.

## 2005

**Suspension and Police Actions in September 2005 :** Without any prior communication, written or telephonic, VP Lehman put me on unpaid suspension effective August 29, 2005. On August 29 and August 30, I went to school and did routine things : got the teaching assignments and enrollments in my courses from the department, prepared handout etc. On September 1st, I went to give the first lecture in the Gelman library; after 10/15 minutes into the lecture, police officers entered my classroom, interrupted my lecture and then escorted me out of Gelman library. The next morning I went to my office; after 15/20 minutes, police officers came into my office, served Bar Notice prohibiting me from the campus property, took away the key of my office and escorted me to the parking area and then escorted me out. All this time I didn't know what was going on; I was told by the police officers that I had been suspended by VP Lehman and they had the instruction to escort me out. **This Police incident is a repetition of what VP Lehman did in 1997**.

4

# Whistle Blowing : Meeting with President Trachtenberg
## Highlights of May 12, 1997 meeting
### 4:25pm-5:20pm

Following are some highlights of May 12, 1997 meeting between President Stephen Joel Trachtenberg of GWU and Prof. Saha. Nobody else was present in the meeting except somebody brought coffee for us twice. I told the office of President Trachtenberg before hand that I would not record the meeting on tape as a gesture of respect to the highest office of the University I worked for. Bunch of documents were given to the office in several occasions, and, in the meeting, I gave the thirty seven page document that was already given to Ramaker-Wooldridge committee and former Vice President of Academic Affairs, Prof. Rod French. Subsequently notes on the meeting were hand written in two steps.

- Coffee offer by President Trachtenberg (SJT)

- SJT : You do not have to make love to Don Lehman

- SJT : You are a man of principle

- SJT : You blew the whistle

- SJT : You brought charges against Zaghloul, Pickholtz, Frieder, Harrington, Vojcic

- SJT : Apologizing to the same chairperson or to the same faculty is not appropriate; it does not sound reasonable.

- SJT : Meeting those faculty members whom you complained against doesn't make sense

- SJT : Respond to Don Lehman's letter mentioning points 1,2,3 ...why and where you disagree

- SJT : You tell Lehman that you don't want to work with him. You work with Acting Dean Tom Mazzuchi's office for two years

- SJT : On reporting : you don't have to report to Zaghloul

- SJT : Get you course assignments through the office of Mazzuchi

- Offer of coffee 2nd time : I said "no, thank you. It was good but strong!"

- SJT : You blew the whistle. Administration should have sent you a letter saying "thank you very much for doing a reasonably good job (in pursuing these matters). Now we will look into the matter."

- SJT : You did the most you can do. There is nothing else that you can do. It is the job of the administration. It is not your job to pursue the matter further. You are a teacher. You can not and you should not take care of every problem. You did what you should have, you should not be a vigilante. Now, it is the responsibility of the administration.

- SJT : You do not have to make any (other) promise to me. you just promise me that you will make arrangements to come back to class in the Fall and then it (the problem) will go away.

I said : OK, I will try my best through Mazzuchi's office

He said : You try for next two years and hope for the best

**Statements not in the note but in my memory :**

- SJT : You continue to press charge of racism against Harrington

- SJT : You stay home in the Summers (I interpreted that as a suggestion for not pursuing consultant job during summer months; I did not have consultant job after 1996 Qualifying Exam scandal)

- SJT : You avoid those people, avoid communicating with them

- SJT : You are a teacher; you do teaching and research

- He agreed that there was really no mechanism to check the moral behaviors and moral characters of the members of the faculty to make sure only the appropriate ones are retained in this noble profession.

- I told him about my father being jailed twice and thrown out of the school for his involvement in the freedom movement in India.

6

# 1999 Lehman-Loew conspiracy

After submitting the final grades of Fall 1998, Prof. Saha prepared the handouts of the three courses : Mon-EE203(10), Wed-EE242(10), Thurs-EE242(VA) that he was scheduled to teach for Spring 1999; then he went out of the country to visit his parents. He came back in the weekend before January 11, 1999, the first day of the class. He went to give the first lecture of EE-203(10) in Tompkins Hall on Monday evening and he was told to go to VA campus to teach EE-211, a course which he never taught before and was not in his special area. The following day Tuesday he was scheduled to teach another new course EE-248 which he never taught before (exhibit-86). Prof. Loew changed the teaching schedule once again; by the end of first week, Prof. Saha was scheduled to teach three new courses that he hadn't taught before and only one course that he taught before. Also these changes were not communicated to Prof. Saha in timely fashion; as a result when Prof. Saha failed to show up in the class, Vice President Lehman used that excuse to suspend Prof. Saha on Jan 22, 1999.

After the suspension became effective, Prof. Lehman brought charges of plagiarism and scientific misconduct against Prof. Saha to have some leverage in quieting Prof. Saha. After intervention of President Trachtenberg, investigation was launched and **Prof. Lehman was forced to drop the charge of plagiarism, and, as per Prof. Lehman, the case of Scientific Misconduct was closed.**

After the suspension on the charge of neglecting teaching responsibility, the EECS personnel committee investigated the matter and acquitted Prof. Saha of any wrong doing; the committee even asked GWU to pay salary for the months Prof. Saha was suspended. Prof. Lehman reinstated Prof. Saha but refused to pay.

Charges of plagiarism and scientific misconduct in 1999 affected Prof. Saha's research profoundly. Prof. Saha now keeps all his research related matters only confined to himself. The research on Information Theory he has been carrying out for some years is now not shared with any body but himself and he will continue to do so till he finishes the work up to his satisfaction. It should be noted Lehman testified he did not take any step to repair the professional reputation of Prof. Saha even after the case of Scientific misconduct was closed.

VP Lehman didn't stop there, he used the suspension and the charges of plagiarism and scientific misconduct to twist the arms and blackmail Prof. Saha in 1999 to sign a contract with eleven conditions which contradict the usefulness of the faculty code. For a tenured faculty member such as Prof. Saha, any attempt of replacing faculty code by a contract designed by an administrator without any due process should be considered as a violation of the faculty code. **This violation alone by Vice President Lehman should call for firing him from his administrative position.**

7

# Sequence of Events that tainted the due process

It is important that the faculty Senate Dispute Resolution Committee take a note of the sequence of events to observe the way the tenure revocation process was tainted :

(1) ECE Chair Vojcic during his tenure till Fall 2004 declined to form any subcommittee to investigate Prof. Saha.

(2) GWU administration appointed Prof. Zaghloul as interim chair after Prof. Vojcic for only six months to assist VP Lehman and Dean Tong to obtain some sort of approval of ECE faculty to build a case against Prof. Saha; the whole operation was conducted secretly without any knowledge of Prof. Saha. It should be noted that Prof. Loew offered a big hand by false representation of mental and physical ability of Prof. Saha very early in the game in February 9, 2005 meeting. This secret meeting was revealed only after strong cross-examination in the hearing.

(3) At the end of Spring 2005, the faculty resolution under false pretenses and false representation reached the table of Dean Tong and then the table of VP Lehman.

(4) During the Summer of 2005, VP Lehman orchestrated an unfair mechanism to suspend Prof. Saha in the beginning of Fall 2005 and Prof. Saha once again became a prisoner of Lehman administration for the fourth time.

(5) After suspending Prof. Saha in the beginning of Fall 2005, Lehman wrote the letter of complaint dated Sept 16, 2005 to revoke Prof. Saha's tenure. A simple straight forward reading of the complaint shows the impetus of the letter was derived from the faculty report of May 2nd, 2005 meeting.

(6) GW Counsel confessed in writing that Lehman sought faculty input for taking action against Prof. Saha.

(7) After the senate faculty panel decided to throw away May 2nd meeting from the record of the proceeding, Lehman changed the story that inspired him in initiating the tenure revocation process.

(8) In absence of May 2nd meeting from the record, the substance of merit in the letter of complaint reduces to almost nothing; one must take a look at the letter of complaint after crossing out portions that are relevant to or derived from May 2nd meeting and/or objected by the GW witness body themselves.

8

# Intimidation by
# Executive Vice President Professor Donald R. Lehman of GWU

**A Statement by Professor Debabrata Saha of the George Washington University.**

# 1999

In the Spring of 1999, Prof. Lehman suspended Prof. Saha without any pay on charges which were later found meritless by the EECS personnel committee; the committee even asked GWU to pay salary for the months he was suspended. Prof. Lehman refused to pay.

### Intimidation :

In the middle of the suspension period, Prof. Lehman brought charges of plagiarism and scientific misconduct against Prof. Saha to have some leverage in quieting Prof. Saha. After intervention of President Trachtenberg, investigation was launched and **Prof. Lehman was forced to drop the charge of plagiarism,** and, as per Prof. Lehman, the case of Scientific Misconduct was closed.

# 2005

Under false fabricated pretext during the Summer months when Prof. Saha was not even on pay roll, Prof. Lehman cooked up reason to suspend Prof. Saha in the beginning of Fall. After suspending and barring Prof. Saha from GWU campus property, Prof. Lehman got into negotiation mode and held meetings with Prof. Saha.

### Intimidation :

In one of this meetings, he pressured Prof. Saha to achieve an objective that he failed to achieve since 1997 when he took the office. With a determined but low voice he said to Prof. Saha :

*"You have to drop the charges about the exam ( The infamous Qualifying Exam Scandal of 1996)"*

The short script and the determination in Lehman's voice reminded Prof. Saha **Marlo Brando in God Father; but Brando's style, voice and delivery was much superior.**

9

# Itemized list of Retaliations by GWU

- In one morning during Christmas period of 1996, a blood-tainted copy of my own GW memorandum (the "Dear colleague letter" of May 15, 1996, Appendix F) was found at the door step of my residence at 2947 Waterford Court, Vienna, VA where me and my wife used to live with two small children.

- We moved to a different neighborhood. During the period of 1998-2003, GWU sent people to our residence at 9409 Fairpine Lane, Great Falls, VA to post open letters and memorandum on our front door, garage door, and garbage container; they also made disturbing noise on our private property.

- In the office at the Academic Center, Prof. Saha was ex-communicated and treated with social isolation. No invitation to social gathering, no invitation to any seminar, no news about hiring and new addition to faculty, no news about passing away of colleagues (I got to know passing away of Dean Liebowitz, who hired me, two/three years after his death), **not a single knock on my door for social interaction over a period of ten years** (except three or four knocks by Prof. Lang during his chairmanship for official matters only), total exclusion from thesis committees, total exclusion from contributing questions for the qualifying exams,  total exclusion from department and school committees (though in the hearing they produced only one evidence of committee assignment in one particular year), (as per statement from a faculty member) spreading rumors and gossips behind my back.

- Systematic acts of discriminations and ex-communication to ostracize Prof. Saha in his working place. After the whistle blowing, GW administration isolated Prof. Saha from advising doctoral students; most of the students were not taken care of; some of them went to other school to get Ph.D. and some of them discontinued. GW administration purposely implemented this to hurt Prof. Saha's resources to research and professional development. One of my doctoral student transferred to Univ. of Maryland and got Ph.D. from there, another student I have been told moved to Oxford, England, and a third student still around without completing thesis work.

- Before the 1996 Qualifying Exam scandal, I used to advise about 110 undergraduate students and about 55 graduate students. After the whistle blowing, GW administration took away advising responsibility of each and every student; they thus isolated me from the student community.

- **1999 Conspiracy : 1999 Lehman-Loew conspiracy ( p.7)**
- **2005 Conspiracy : Sequence of Events that tainted the due process ( p.8)**

10

- After the whistle blowing Prof. Saha has been suspended in 1997, 1999, 2003 and 2005. Four suspensions over eight years by VP Lehman shows a pattern of retaliation. Most importantly, suspensions were followed by reinstatement without due process or any apology;  in some situations VP Lehman had to drop the charges in writing. Capricious disciplinary actions of Lehman administration succeeded in keeping Prof. Saha in constant fear and worry about the timing of next Lehman striking.

- Last time Prof. Saha took sabbatical leave was in 1993-94; he is entitled to more sabbatical leave. Yet he is afraid to apply for because of capricious retaliatory actions by Lehman in his absence.

- Instead of punishing the characters behind 1996 Qualifying Exam Scandal, GW administration awarded them with Chair position **(Loew, Vojcic, Zaghloul)**

- Lehman refused to give Prof. Saha any raise in salary for a decade (1996-2006).

- GW spread rumors of possible violence and physical threat from Prof. Saha and secretly installed panic buttons in two locations to hype the rumors.

- Secretly tried to establish doubts about Prof. Saha's mental fitness. Prof. Murray Loew tried that in Spring of 1996 and was thrown out of Prof. Saha's office. Once again Loew tried that in February 9, 2005 ECE meeting that was held secretly.

- Assigning more classes to VA campus to isolate Prof. Saha from main campus and creating harassment for Prof. Saha on a regular basis in that campus. The ordeal of Virginia Campus can be best described as **intellectual execution of oppression of minds, tenacity and will power of retaliated faculty member(s).** (Appendix G)

- Harassment by abrupt changes in teaching schedule without giving any time to prepare.

- Eliminating Prof. Saha's course on Probability Theory and giving it to Prof. Pickholtz, taking away directorship of other courses. Removal from teaching a course on Information Theory (EE-241) and replacing Prof. Saha by a part-time/visiting faculty member, though Prof. Saha was the course director and had been teaching it for ten years.

- Refusal to give grade sheets for the courses he taught in the VA campus; Prof. Saha often had to create grade sheets of his own to avoid inconvenience of the students.

- Censoring mail and creating a secret mail box in VA campus to divert mail.

- Discriminating Prof. Saha through exclusion from all ECE departmental committees.

- Continued discrimination (since Fall 1993) through exclusion from the tenure personnel committee of ECE/EECS department.

- Conspiracy for retaliation : Lehman and Tong administration revealed that they have at their disposal many letters that were written for themselves only to create a record for action against Prof. Saha; the contents of the letters are false and were never shared with Prof. Saha. GWU failed to produce an important letter written by Lehman even after request from the hearing committee.

11

- Retaliation and unethical misconduct : VP Lehman refused to follow the faculty recommendation of paying Prof. Saha his salary during the suspension period of Jan.22-March31, 1999 though Lehman had to reinstate Prof. Saha after being unable to prove the validity of his allegation.

- Day-to-day harassment : (a) Lights in Prof. Saha office were not fixed for years after repeated request, (b) assigned classrooms of inadequate size and no usable board : in one semester had to use seven classrooms (on empty basis) to complete the semester (c) Prof. Saha's office was opened and used by others without his permission or knowledge; in one occasion the room walls were littered with some reddish substance that had to be cleaned and disinfected by maintenance. (d) Prof. Saha's picture was removed from ECE display board.

- In 1999, after the reorganization of former EECS Department, Prof. Saha's office was moved to another room without his knowledge; Prof. Saha, during that move, lost some important documents on 1999 personnel committee investigation.

# Arguments for the Appeal

Lehman-Tong administration of GW, hereafter mentioned as GW, in its letter of complaint of September 16, 2005 after citing concerns about Prof. Saha over the period of 1991-2005, brought mainly two charges :
　(1) Personal neglect of professional responsibilities
　(2) Gross and Personal misconduct that destroys academic usefulness

Hearing committee chaired by Prof. Schaffner acquitted Prof. Saha of the 2nd charge but finds Prof. Saha engaged in persistent neglect of professional responsibilities for an extended period which provides adequate cause for tenure revocation.

In the following I dispute the deliberation of the Schaffner panel and outline the rationales for the Appeal.

## A.　Shortcomings and failure of the Schaffner panel :

Schaffner panel arbitrarily chose only post April 29, 1999 events for primary consideration and deliberation, though GW letter of complaint includes many events from pre-1999 era. Note 136 of 192 (equivalently 71%) exhibits GW produced to poison the minds of the panel came from pre-April 29, 1999 era. It is not just a coincidence that the panel did not include even January 1999 events into its primary consideration. With such arbitrary cut-off date, they deliberately managed to exclude from consideration the following four:

(1) **The Academic Vandalism of 1996 :** orchestrated and carried out by VP Linda Salamon, Dean Gideon Frieder, Prof. Raymond L. Pickholtz, Prof. Murray Loew, and Chairwoman Mona Zaghloul with the second degree vandalism (through assistance) by Prof. Branimir Vojcic. (Reference : Plaintiff's Exhibit # 5,6,7,8).

The Schaffner panel deliberately failed to understand the gravity of this vandalism and failed to understand the moral implications of the scar caused by this vandalism on the American Education System.

(2)　**1999 Lehman-Loew conspiracy :** in which Lehman used suspension and charges of plagiarism and scientific misconduct to twist the arms of and blackmail Prof. Saha in 1999 to sign a contract with eleven conditions which contradict the usefulness of the faculty code. Not to mention, EECS personnel committee later found Lehman's charge for suspension meritless and after the intervention of President Trachtenberg, Lehman had to drop the charges of plagiarism and scientific misconduct in writing.

13

For a tenured faculty member such as Prof. Saha, any attempt of replacing faculty code by a contract designed by an administrator without any due process should be considered as a violation of the faculty code. Perhaps this violation alone should call for firing VP Lehman from his administrative position.

### (3) **Retaliation by GWU :**
An itemized list is on page-10.

### (4) **Intimidation and Unethical actions of VP Lehman :**
An account of which is on page-9 and page-4.

Without giving proper emphasis on the above events and neglecting essentially 71% of the exhibits produced by GW itself, the Schaffner panel demonstrated what Voltaire said centuries ago : *"Common sense is not so common"*. The Schaffner panel has been shy to mention "Whistle Blowing*"* even once in the entire report. **They pretended as if the vandalism did not occur in GWU in the capitol of our Nation.** Schaffner panel definitely proved they are no better than the good Samaritans who deliberated on the vandalized woman (page-3). They are lucky that faculty code did not require them to have **Courage** on their part, but the requirement of any civilized society as I understand is quite different.

It is an intent of Prof. Saha to seek the service and suggestion of the faculty senate to investigate whether the Schaffner panel through its arbitrary choice of cut-off date

(a) violated the faculty trust of carrying out an impartial hearing
(b) tainted the deliberation process and/or
(c) provided a helping hand or undue favor to the administration.

It would be useful to know if the panel is found to be negligent or involved in wrong doing, **what options, both legal and senatorial, are we left with and whether those options include tenure revocation of each member of the Schaffner panel :**

1) Joan Schaffner (Chair), Assoc. Professor of Law
2) Mark Klock, Professor of Finance
3) Ravi Achrol, Professor of Marketing
4) Guillermo Gutierrez, Professor of Medicine
5) Brian Biles, Professor of Health Policy
6) Robert Dunn, Professor of Economics

14

# B. Perjury under oath :

Prof. Saha complains that Schaffner panel allowed perjury under oath for each of the following :

(a) Don Lehman
(b) Ed Della-torre
(c) Roger Lang
(d) Murray Loew
(e) Debby Swanson
(f) Mona Zaghloul
(g) GW Counsel, Douglas Mishkin

**For the sake of brevity, nature of perjury is not outlined here but is evidenced in the transcripts of the hearing and the exhibits.**

# C. Denial of due process

(a) After 1999 **Lehman-Loew conspiracy** and subsequent suspension of Prof. Saha by Lehman, a fact finding subcommittee headed by Prof. Della-Torre was formed. Prof. Saha was given the opportunity to provide input to the committee. The committee acquitted Prof. Saha of any wrong doing; the committee even asked GWU to pay salary for the months Prof. Saha was suspended. Prof. Lehman reinstated Prof. Saha but refused to pay. **Thus in 1999 Prof. Saha was not denied the due process.**

(b) In the beginning of 2005 after Lehman administration brought Prof. Zaghloul as acting Chair of ECE for only six months to settle an old score, ground work for tenure revocation of Prof. Saha began. ECE Personnel committee held a secret meeting on February 9, 2005 in which Prof. Loew tried to establish doubts about Prof. Saha's mental fitness. This meeting was kept secret from Prof. Saha and even from the Hearing panel; it was revealed only after strong cross-examination by Prof. Saha's counsel Dr. John Karl. Through this meeting Prof. Zaghloul created a fact-finding subcommittee headed by Prof. Wasyl Wasylkiwskyj. The subcommittee included Prof. Kyriakopoulos, Loew and Della-torre. It should be noted that each member of this subcommittee was a voting member of the former EECS Department which **carried out the Academic Vandalism of 1996** under the leadership of Chairwoman Zaghloul. The subcommittee prepared its report without any input from Prof. Saha and the report was approved in another secret personnel committee meeting on May 2nd, 2005.

(c) Feb.9, 2005 meeting, the subcommittee report, and the May 2nd meeting all were kept secret from Saha till Sept. 2005 when Prof. Saha was already suspended by VP Lehman. Prof. Saha and his counsel Dr. John Karl, from the very beginning, vigorously

15

challenged the legitimacy of the Hearing because of **lack of notice of May 2nd meeting.**
They reiterated their position in March 6, 2006 Hearing (Transcript 03/06/2006 at p.397).

(d) **In March 6, 2006** hearing Chairperson Schaffner, on **the Notice Issue**, went on
to say:

*"We understand that is perhaps more relevant to our considerations than sort of
this just traditional notice ——if he didn't have notice, he lacked due process, and
therefore, we can't even really revoke tenure during this proceeding ——"* (Transcript
03/06/2006 at p.397).

(e) **On March 9,** 2006 GW Counsel Douglas Mishkin, on the importance of May
2nd meeting,  wrote :
"As is evident from their written statements (as well as from Dean Tong's responses
to Mr. Karl's questions), Executive Vice President Lehman and Dean Tong were and are
satisfied that the May 2nd meeting of the Personnel Committee provided them with
appropriate input from the Department in making their decision to file the complaint
seeking the revocation of Professor Saha's tenure. Executive Vice President Lehman will
re-affirm that sentiment if questioned about it by Mr. Karl."

(f) **On March 14**, 2006, after careful consideration of March 6, 2006 hearing, the
panel deliberated :
" the committee is striking the May2, 2005 meeting and the vote of the faculty at
that meeting from the record....."

**Thus unlike 1999 or previous fact-finding subcommittee tradition in
EECS/ECE department, this time in Spring 2005 Prof. Saha was denied the due
process.**

# D. Hearing :  Procedurally Illegitimate

(a) GW Counsel Douglas Mishkin, on the importance of May 2nd meeting, on
March 9, 2006 wrote:
"As is evident from their written statements (as well as from Dean Tong's responses
to Mr. Karl's questions), Executive Vice President Lehman and Dean Tong were and are
satisfied that the May 2nd meeting of the Personnel Committee provided them with
appropriate input from the Department in making their decision to file the complaint
seeking the revocation of Professor Saha's tenure. Executive Vice President Lehman will
re-affirm that sentiment if questioned about it by Mr. Karl."

(b) In the hearing, GW administration (Lehman, Tong and Zaghloul ) failed to provide evidence that Prof. Saha received the notice of May 2nd, 2005 meeting.

(c) After March 6 Hearing, the panel deliberated and decided to strike the May 2nd, 2005 meeting and the vote of the faculty at that meeting from the record.

(d) After striking out the May 2nd meeting and the vote in the meeting, the panel should have struck out the fact-finding report too because without the meeting and the vote of approval, the report does not have any legitimacy (in all common sense) to be treated as the **appropriate input from the Department** in making their (Tong's and Lehman's) decision to file the complaint seeking the revocation of Professor Saha's tenure. But that is exactly what Tong and Lehman did as corroborated by their statements and declaration by their counsel (see part-a above).

(e) Let us now revisit Chairperson Schaffner, on **the Notice Issue,** who went on to say :  ***"We understand that is perhaps more relevant to our considerations than sort of this just traditional notice ——if he didn't have notice, he lacked due process, and therefore, we can't even really revoke tenure during this proceeding ——"*** (Transcript 03/06/2006 at p.397).

**Thus this hearing was initiated via a fraudulent process. Therefore, the very existence of the Hearing was illegitimate.**

# E. Failure of the panel to consider conspiracy into account

Schaffner panel failed to asses the importance and the gravity of the conspiracies by the Lehman administration and key elements of the faculty which carried out the Academic Vandalism of 1996 .

(a) Schaffner panel did not want to hear about 1996-97 Academic Vandalism. See transcripts Hearing 04/03/06, p.113, 114, 119 for panel's stand and p.121 for my stand. It is ironic that the same panel allowed GWU to  produce 192 exhibits of which 136 were on 1996-97 Qualifying Exam Scandal or Academic Vandalism of 1996, i.e. 71% of exhibits on 1996-97 events. The same panel allowed GWU counsel to give a closing argument (18 pages of transcript p174-191, Hearing 04/25/06), most of which (15 pages : p175-180, 182-183, 185-191) was primarily focused on 1996-97 events (i.e. more than 80% time). Even after such elaborate focus on the Vandalism, the panel members had the audacity not to mention the word whistle blowing even once in the entire report. **Looks like GWU with the help of a few members of its faculty want to legalize  Academic Vandalism in American higher education.**

(b) the panel deliberated to strike out the May 2nd, 2005 meeting and the vote of the faculty in that meeting but failed to identify the conspiracy of a fraudulent process through

17

which Zagloul (who was brought to chair for only six months to carry out the process), Tong and Lehman initiated the process of tenure revocation of Prof. Saha.

(c) the panel was negligent to observe that all members of the 2005 fact-finding ECE subcommittee, ECE Chair woman Zaghloul, and the two "Prof. Loew and Prof. Vojcic", who tried to secretly establish lack of mental fitness of Prof. Saha in Feb.9, 2005 meeting, all come from the same pack of voting members who carried out the Academic Vandalism or the 1996 GWU Qualifying Exam Scandal.

(d) the panel failed to identify and act on too many "perjury under oath" that naturally raise the red flag of conspiracy. The most notable and shameless one is the perjury of Prof. Della-Torre. In the signed statement, dated Feb. 21, 2006, item (13) and (14), Prof. Della-Torre claimed Prof. Saha did not appear before the 1999 fact-finding subcommittee headed by him and he had virtually no contact with Prof. Saha during that period. **The fact is quite different; Prof. Saha testified to the subcommittee and many hours of taped conversation was offered for playing in front of the panel. The panel refused to hear it.** Among many other perjury under oath, another obvious red flag was the testimony of Debby Swanson; her inconsistency was so severe that GW counsel declared her unfit.

## F. Obstruction by GWU in the hearing

GW has been extremely noncooperative in complying with the requests for documents from both Schaffner panel and Counsel of Prof. Saha. These documents are key to a fair hearing and a fair deliberation. Only after hours of intensive cross-examination it was revealed that the ground work of the conspiracy started with a secret personnel committee meeting on Feb.9, 2005; if GWU were truthful and straight forward, hours of cross-examination could be avoided. On the stand almost all GW witness agreed to provide requested supporting documents but all of them failed to do so. Schaffner panel failed to take action. In April 7, 2006 letter to Prof. Schaffner, Saha's counsel John Karl expressed his frustration with the situation. Requested documents include (1) e-mails of Lehman, Tong, Korman, Zaghloul, Wasylkiwskyj, Della-torre, Loew, Kyriakopoulos (2) Notice of meetings and agenda (3) minutes of meeting (4) notes from personal book keeping (5) record of committee assignments (6) Record of circumstances that called for replacing Prof. Saha (a tenured faculty member) by part-time faculty member (7) Record of time and method of delivery of suspension letter to Prof. Saha (8) record of report and minutes of 1999 subcommittee (9) a complete response to Interrogatories to VP Lehman.

## G. Statutory Limitation

GW may not lawfully revoke Prof. Saha's tenure for alleged breaches of contract occurring prior to May, 2003. District of Columbia law prescribes a statute of limitations

18

of three years for actions for breach of contract. Kyriakopoulos v. George Washington University, 866 F.2d 438, 442 (D.C. Cir 1989)

# H. Answers to Panel's finding on neglect of Professional Responsibilities :

Schaffner Panel reported Prof. Saha's engagement in persistent neglect of professional responsibilities for an extended period which provides adequate cause for tenure revocation. Their deliberation has been overwhelmingly summarized in the following paragraph (from page-8/9 of the deliberation) :

## "Schaffner Panel Deliberation"

*"This case is an extreme case of neglect of professional duties The undisputed facts establish that at least from 2000-20005 Prof. Saha completely failed to meet all but one responsibility, the teaching of his class.*

*(1) Prof. Saha provided no service to the university nor participated in academic life.*

*(2) He attended no department meetings*

*(3) participated on no department, school, or university committee, and*

*(4) submitted no annual report or*

*(5) student evaluations of his classes. Transcript at 222-230(4/3/06).*

*(6) His colleagues all testified that they had virtually no contact with him and that, in fact, he avoided contact with them.*

*(7) Moreover, he published nothing during this time. Transcript at 230-32 (4/3/06). Prof. Saha explained that he has been working on a book since 1999 but provided no evidence of his progress even when asked by the panel to produce something. Transcript at 64-70     (4/17/06)"*

## EVENTS DURING 2000-2005 WHEN PROF. VOJCIC WAS CHAIR DO NOT SUPPORT TENURE REVOCATION

Schaffner panel seeks tenure revocation based on Professor Saha's alleged failings during the period of 2000-2005 when Prof. Vojcic was Chair, even though it was Prof. Vojcic's judgment that there was no justification for creating a Subcommittee to investigate Prof. Saha. There is no basis for overruling Vojcic's decision and it would be improper for the panel to substitute its judgment for that of Personnel Committee that met in 2002, but did not decide any action was required (GW failed to produce these notes and

minutes) or the judgment of Prof. Vojcic as Chair. See Transcript of March 6, 2006 Hearing at p. 418.

**Comment #1:   Prof. Saha provided no service to the university nor participated in academic life**

Answer : After the whistle blowing in 1996, intense retaliation by GW and unwritten but effective ex-communication policy adopted by EECS/ECE faculty made it extremely difficult for Prof. Saha to have a normal academic life. The policy forced Prof. Saha out of all activity that involved department colleagues. Except for a few, such as Prof. Lang and Prof. Korman who were on leave during 1996-97, each and every member of the EECS faculty took part in the Academic Vandalism of 1996. **President Trachtenberg in his May 12, 1997 meeting suggested Prof. Saha to avoid communication with those who were directly involved in the incident.** Prof. Saha took the suggestion seriously and concentrated primarily to teaching, research, and writing a book ; these are the things he could do without any involvement and interaction with department colleagues. He kept a low profile with the colleagues; the colleagues also preferred that low profile because it helped them doing their business as usual. However, for the students, he gave many extra lectures during the weekends. During summer months, he pursued research instead of consultancy while supporting his research expenses from his own pocket. That's how he fulfilled his responsibilities as a teacher and compensated for the service toward the department, the school and the university, without any earning from outside. To avoid unpleasant interaction with the administration he did not apply for sabbatical leave (last leave was in 1993-94), stopped taking any secretarial help or any other resources for his work, and even stopped asking for grader to grade homeworks for his courses. He decided to take additional responsibility of grading homeworks to prevent possible sabotage by the grader employed by the administration to ensure submission of final grades within 72 hours of the exam.

The life of a whistle blower in our society is not a very pleasant one, and every unpleasant event can not be proven in the court of law because of lack of evidence; however, the Itemized List of Retaliation (page-10) throws some light on Prof. Saha's situation. In spite of all that, Prof. Saha  made his best effort to serve  the university through teaching, research and service to the students.

- **Prof. Saha considers his moral stand on 'the 1996 Academic Vandalism in GWU' an important service to the students and the University community as well.**

- **Prof. Saha only changed the nature of participation in academic life, he neither ceased to participate in it nor sold his moral conscience for  participation in it.**

20

**Comment #2 : He attended no department meeting.**

Answer : Because of the unwritten but effective ex-communication policy of EECS/ECE administration, Prof. Saha hardly received any departmental announcements, including the announcements of faculty meeting. This was an unwelcome sign for Prof. Saha in taking part in normal activities.

In the beginning when Prof. Lang was the Chair for one year, Prof. Saha attended some department and school meetings, submitted annual report. Prof. Saha's testimony and the documentary record demonstrate that though the situation was not perfect yet things were well with Prof. Lang. Dean Mazzucci's testimony corroborated Prof. Saha's testimony because he was aware of no major controversy when Prof. Lang was Chair. (Transcript of April 25, 2006 Hearing at p.160).Thus Schaffner panel's inference that Prof. Saha never intended to comply with his responsibilities is incorrect, as Prof. Saha never envisioned a return to the animosity that marked the period of 1996-99 before Lang or that GWU administration would bring Prof. Vojcic as the chair after Lang.

Further, Prof. Saha did not act unreasonably in declining to attend departmental meetings when Prof. Vojcic was Chair, based on his understanding of his duties and obligations as a faculty member when he was headed by Chair who was deeply involved in the qualifying exam scandal. This understanding was informed by his discussions with President Trachtenberg.

Even if failure to attend departmental meetings were a material breach of the employment contract, the breach is mutual. The department breached its part of the agreement by failing to notify Prof. Saha of the meetings and his attendance was welcome. In light of this breach, Prof. Saha's nonattendance at departmental meetings does not constitute sufficient grounds for revocation of tenure.

**Comment #3 : participated on no department, school, or university committee**

Answer : The fact that Prof. Saha did not attend departmental committee meetings does not justify revocation of his tenure because the evidence of record leaves no doubt that Prof. Saha was not a member of any committee while Prof. Vojcic was Chair. Prof. Vojcic even admitted that at least during some of his time as Chair, he simply did not appoint Prof. Saha to any committees (Transcript of March 6, 2006 Hearing at p. 500). GW never produced any document showing Prof. Saha was appointed to any committees when Prof. Vojcic was Chair.

GW cannot revoke Prof. Saha's tenure for Prof. Saha's failure to participate in any committee to which he was not assigned or invited or of which he was unaware.

**Comment #4: submitted no annual report**

Answer : GW complains that Prof. Saha did not submit annual reports in recent years. However, GW has failed to provide any evidence that Prof. Vojcic requested that he submit such reports or that he ever reminded Prof. Saha about the annual reports. Nor has GW provided any evidence that all other faculty members submit such reports, or even that most faculty members did so. Nor GW provided any example of a faculty member whose tenure was revoked because of failure to submit annual reports.

**Comment #5: (submitted no) student evaluations of his classes**

Answer : Similarly, GW complains that Prof. Saha did not submit any student evaluations. Prof. Saha testified that he did not receive the evaluation forms. There is no evidence that GW provided Prof. Saha with the evaluation forms or ever reminded him that he should submit such forms.

Accordingly, neither the absence of annual reports nor the absence of student evaluations constitutes a proper basis for terminating Prof. Saha's tenure, particularly when Prof. Saha reasonably believed that he was following the suggestion of President Trachtenberg in keeping a low profile.

**Comment #6: His colleagues all testified that they had virtually no contact with him and that, in fact, he avoided contact with them.**

Answer :

- In the office at the Academic Center, Prof. Saha was ex-communicated and treated with social isolation. No invitation to social gathering, no invitation to any seminar, no news about hiring and new addition to faculty, no news about passing away of colleagues (I got to know passing away of Dean Liebowitz, who hired me, two/three years after his death), **not a single knock on his door or no social phone call over a period of ten years** , total exclusion from thesis committees, total exclusion from contributing questions for the qualifying exams,  total exclusion from department and school committees (though they produced only one evidence of committee assignment in one particular year), (as per statement from a faculty member) spreading rumors and gossips behind his back in the hall way.
- GW spread rumors of possible violence and physical threat from Prof. Saha and secretly installed panic button to hype the rumors.
- Secretly tried to establish doubts about Prof. Saha's mental fitness. Prof. Murray Loew tried that in Spring of 1996 and was thrown out of Prof. Saha's office. Once again Loew tried that in February 9, 2005 ECE meeting that was held secretly.

22

- Continued discrimination (since Fall 1993) through exclusion from the tenure personnel committee of ECE/EECS department.

**In spite of all these retaliations Prof. Saha was available for social interaction; yet in last ten years, nobody even once knocked at his door or made a social phone call, or took him aside in the hallway for a little chit chat .**

**Comment #7:     Moreover, he published nothing during this time. Transcript at 230-32 (4/3/06).  Prof. Saha explained that he has been working on a book since 1999 but provided no evidence of his progress even when asked by the panel to produce something. Transcript at 64-70 (4/17/06)**

Answer :

- Transcript at 64-70 (4/17/06) **does not** refer to any book writing. Also, it is quite **untrue** that the panel **ever** asked to produce something on the progress of the book. Such comments by the panel only raise the question "**did the panel do the job sincerely that they were trusted upon ?".**

- Transcript at 230-32 (4/3/06) refers to publication. It is true Prof. Saha did not publish during 1999-2005. In 1999, VP Lehman brought charges of plagiarism and scientific misconduct after Prof. Saha submitted a relatively long journal paper on a digital modulation technique that was introduced by Prof. Saha himself a decade earlier. Though after investigation, VP Lehman had to drop the charge, Prof. Saha decided not to resubmit that paper or any other new paper for publication.

Charges of plagiarism and scientific misconduct in 1999 affected Prof. Saha's research profoundly. Prof. Saha now keeps all his research related matters only confined to himself. The research on Information Theory he has been carrying out for some years is now not shared with any body but himself and he will continue to do so till he finishes the work up to his satisfaction

**Status of Book writing :**
Approximately one half of the book is already written. A chapter of the book is expected to be tied to Prof. Saha's research and therefore he decided to finish the research first and then revisit the book.

**Status of Research :**
It is an information measure (unconventional) he has been working on for some years. It may take a few more years' time to complete. Since 1920s, a few attempts have been made to establish a general measure of information  but not with any success. Prof. Saha believes he has made some progress in his approach but he does not claim any final result yet.

23

# Conclusion

GWU committed a heinous crime of academic Vandalism and a systematic assault on American Education System through its decade long cover up, retaliation and oppression, discrimination and defamation, perjury under oath by its Executive Vice President Donald R. Lehman, and awarding those who carried out the vandalism with the administrative positions. Schaffner panel failed to show courage and sold its moral responsibility for its survival with the current administration of GWU. What happened in the capitol of the nation in open day light under the nose of Bush and Clinton Presidency is a representation of the society we live in. Now it is the responsibility of the society to take back the control and give a helping hand to the American Higher Education in Washington, D.C.

# Debabrata Saha : A Brief Background

**Employed in GWU :** Since Fall 1986
**Date of Tenure :** Effective Fall 1993
**Current Position :** Associate Professor

**Professional Society :**
        Senior Member of IEEE
        Former Chairman of Washington D.C.- Northern Virginia Section of IEEE
        Information Theory Society
        Former President and Co-founder of Students' Governing Body Union, The
        University Colleges of Science and Technology, Univ. of Calcutta

**Academic Background :**

| Discipline | Degree | Institution | Major Area | Year |
|---|---|---|---|---|
| Science | B.Sc. | University of Calcutta, India | Physics (1st Class Honors) | 1976 |
| Technology | B. Tech. | University of Calcutta, India | Radio Physics & Electronics (1st Class) | 1980 |
| Applied Science | M. A. Sc. | University of Toronto, Canada | Communications | 1982 |
| Engineering | Ph. D. | University of Michigan | Computer, Information & Control Engrg. | 1986 |

**Awards and Honors :**

        1972-1975 : National Scholarship, Gov. of India
        1976-1979 : National Scholarship, Gov. of India
        1980-1982 : Rai Bahadur Jogendra Nath Ghosh Overseas Scholar, Univ. of Calcutta
        1983-1985 : University of Michigan CICE Fellowship

**Courses taught by Professor Saha in the George Washington University over the period 1986-2006 :**

*Graduate Courses :*
1) ECE-203 : Probability Theory and Stochastic Processes
2) ECE-241 : Information Theory
3) ECE-242 : Coding Theory
4) ECE-243 : Communication Theory - I
5) ECE-244 : Communication Theory - II
6) ECE-246 : Digital Communication
7) ECE-248 : Computer Networking - I
8) ECE-249 : Computer Networking - II
9) Information Theory-II (Special Topic Course, prerequisite ECE-241)

*Undergraduate Course :*
10) EE-12 : Circuit Theory (in former EECS Dept.)
11) ApSc-114/Math-112 : Engineering Mathematics
12) EECS-146 : Undergraduate Communications Lab

**Research :**
Engineering Research in the area of digital communications;
US Patents in the area of digital modulation techniques;
Supervision of Doctoral theses in the area of Digital Communications, Networking, and
      multiple-access communication
Theoretical Research in the area of Information and Probability theories.

**Appendix B**

| | |
|---|---|
| 1992-'93 | Discrimination : Chair Harrington excludes Prof. Saha from tenure personnel committee |
| Spring 94 | VP French directs Prof. Saha to submit Sabbatical Reportl to Dean Frieder, not Chair Harrington |
| | |
| Spring 96 | Saha blows whistle : Qualifying Exam Scandal |
| Fall 96 | Retaliation by GWU begins |
| Spring 97 | First Suspension by VP Lehman |
| | Pres. Trachtenberg calls Saha Whistle Blower |
| Fall 97 | 1st Reinstatement & back to teaching |
| | |
| Jan 22, 99 | Second Suspension by VP Lehman & Plagiarism charge by VP Lehman |
| March 99 | EECS Personnel Comm. finds suspension unjustified Lehman forced to drop charge of plagiarism |
| April 1, 99 | 2nd Reinstatement |
| | |
| Jan 1, 2003 | Third Suspension by VP Lehman |
| Jan 13, 2003 | 3rd Reinstatement |

Both occurred secretely without knowledge of Saha

| | |
|---|---|
| Spring 2005 | GW brings Zaghloul as interim chair for six months & secret ground work for tenure revocation begins |
| Summer 2005 | Prof. Saha not on campus & Lehman-Tong Team meets Zaghloul team to finalize the strategy |
| Sept 1, 2005 | Police action in Prof. Saha's classroom Secret entry of Dean Tong into Prof. Saha's office Fourth Suspension by VP Lehman |
| Sept 16, 2005 | Lehman-Tong team initiates Tenure revocation process |

# Time Line

Appendix C

# Chronology of Events
## in the Beginning of Fall 2005
### September 06, 2005

**August 29, Monday :**

- I went to the Department (ECE) and called our secretary Debby Swanson to find the current number of enrollments in the courses I have been assigned to teach; she informed me following :

                    ECE-203(10) : 17 students
                    ECE-243(10) : 07 students

- As per printed University schedule I had the impression of teaching a third course ECE-241(10); this is the course on Information Theory of which I am the Course director and I have been teaching the course since 1986.

- I told secretary Swanson to check with the department and scheduling office to see whether any change is possible; I would like to teach the course and would make myself available if the situation requires me to teach an extra course. I told her that I would check with her again on Tuesday or Wednesday.

- I stayed in the office roughly one and half hour during which I checked my mail and posted note about my office hours for Fall semester.

**August 30, Tuesday :**

- I went to the Department around 10am, checked the mail and confirmed with secretary Swanson that no changes have been made in the schedule. I also checked with Lawrence Cheek about the Xerox code that I would need for preparing handouts. On way out, I looked at the Bulletin board to copy down my teaching schedule, room numbers etc. once again.

**September 1st, Thursday :**

- I arrived in the classroom GEL-609 well before 7:10 p.m.; after 10 minutes or so into the lecture a police officer named Francis Williams Jr. entered the classroom and ask me to stop the lecture; I was told that I have been suspended by the University authority.

- I left the classroom and on my way out I was told that somebody brought some allegation against me. I told the police officer that I had no knowledge of the

28

suspension that he mentioned to me; I told them that I would go to the Department to check my mail to find clue or information; I checked the mail and there was no information for me there.

- I checked the ECE Bulletin board which still showed I was scheduled to teach ECE-203(10) and ECE-243(10).

- I came back home and left a message for Asst. Chief Isom informing him that still I didn't receive anything in the mail about suspension. Then immediately I spoke to Officer Williams again informing him about the failure of the University authority to inform me about the reason behind the **Police Action inside my classroom.**

**September 2nd, Friday :**
- I went to ECE department around 10 am and **checked the ECE Bulletin board which still showed I was scheduled to teach ECE-203(10) and ECE-243(10).**

- I checked the mail; spoke to secretary Swanson about the **Unethical Police Action inside my classroom** and asked her to let me know as soon as department Chairman Professor Korman arrive in the office. I found a sealed envelope on my table; I told secretary Swanson that I was waiting to open the envelope in front of Prof. Korman.

- While waiting in my office for Prof. Korman, a police officer knocked at the door. Special police officer Aaron M. Morningstar along with two other lady officers entered my room and asked me to leave the building; they conducted very professionally and performed the following tasks :
    1) Checked my GW ID, Driver License, and noted my S.S. number.
    (2) Took away my office key.
    (3) Gave me a handwritten note which suggested me to see Dean Tong and VP Lehman before going back to campus.
    (4) Served a Bar notice which prohibited me from being on Campus property (except for Doctor's appointment etc. for family).
    (5) Allowed me to make couple of calls : one to Secretary Swanson and another to Dean Tong's office; Secretary Carrol Andrade informed me that Prof. Tong will be in office around 12:30 p.m..
    6) The three officers escorted me to my car and escorted me out.

Came home; spoke to Prof. Tong around 1:20 p.m. over phone; I requested him for a meeting at his earliest and, if possible, over the weekend. He suggested that I get back to him on Tuesday (Sept.6th) around 11:30 am.

Debabrata Saha

# Irresponsible and Unethical Misconduct of SEAS Dean Tong

Timothy W. Tong, Ph.D. assumed the office of SEAS Dean in Fall of 2000, five years before he joined Lehman in bringing Fall 2005 complaint against Prof. Saha. During his five years of service in GWU, he never cared to meet Prof. Saha or offer an invitation to the SEAS faculty meeting; the only communication and/or meeting Prof. Saha had with Dean Tong was after Prof. Saha was suspended out of the school in the September of 2005.

In spite of such detachment from Prof. Saha as a member of SEAS faculty, Dean Tong did not find it distasteful or against common sense of decency to go to Prof. Saha's office room in his absence and serve the notice of suspension on his table. Prof. Saha received the notice only after the police incident in his classroom on September 1st, 2005. More distasteful is his own admission in his joint meeting with Prof. Saha and Prof. Korman that after his arrival in GWU he met each of the remaining SEAS faculty on a one-on-one basis; he only didn't care to meet Prof. Saha. In that joint meeting he handed over a letter written by him addressed to Prof. Saha; in that letter of March 28, 2002 he warned Prof. Saha of possible initiation of tenure revocation.

Exhibit # 123 is that March 28, 2002 letter of Dean Tong. Prof. Saha's testimony as well as his September 9, 2005 response clearly pointed out that content of Dean Tong's letter was false. Dean Tong demonstrated very irresponsible conduct in writing that letter. Also his admission of secret entry into Prof. Saha's office illustrates his sense of decency is quite strange! **It is not yet known whether he stole any thing from Prof. Saha's office.**

30

# A Quick Overview

## Time Line of Events over One Decade
### 1996-2006

Professor Debabrata Saha is a tenured member of faculty of the Department of Electrical and Computer Engineering in the School of Engineering and Applied Science (SEAS) of the George Washington University (GWU), Washington, D.C.

**A**llegation of discrimination by some University officials goes way back in Fall 1992 when EECS Chairman Prof. Robert Harrington excluded Prof. Saha from the tenured personnel committee in 1992-93. Discriminations and harassments by Prof. Harrington and later by Chairwoman Mona Zaghloul continued till Fall of 1996. These matters were communicated to university officials,
   (a) Dean Gideon Frieder of SEAS
   (b) Prof. Lilien F. Robinson and Prof. Joseph Pelzman of Faculty Senate
   (c) President Trachtenberg of GWU

**Result :** Apparently no actions were taken.


## Spring 95 through Spring 96 :

Prof. Saha brought to the attention of school authority through well documented cases of **"irregularities and practice of favoritism"** against some members of EECS faculty and the Chairwoman Mona Zaghloul.

**Result :** No explanation was given and no actions were taken.

**R**etaliation of Prof. Zaghloul which began in Fall'95 continued till Spring'96 when EECS Dept and SEAS together lead to the **Qualifying Exam Scandal**. Prof. Saha's "Dear Colleague" letter of May 15, 1996 (GW exhibit # 27 ) gives a brief summary of the Scandal. During the period of the ordeal, **I (Prof. Saha) was working closely with the offices of President Trachtenberg, and VP and General Counsel Dennis Blumer. I maintained all the deadlines imposed by them.**

31

# Fall 1996 :

Harassment by Chairwoman Mona Zaghloul continued to an increased level.

- Following the suggestion of the General Counsel and VP Dennis Blumer, I finally decided to bring charges of harassment against The Chairwoman, Professor Mona E. Zaghloul and sent the allegation in writing to VP Blumer on Aug.16, 1996.

- On August 23, 1996 I brought the same charge against Professor Zaghloul and sent the allegation in writing to President Trachtenberg. *In that letter I pointed out that because of continued harassment, I was afraid that it was likely that I wouldn't be able to carry out the full load of three courses that semester and Chairwoman Zaghloul would bring charge of neglecting responsibility against me.*

- Harassment by Adhoc Committee : Chairwoman Zaghloul and Dean Frieder used an adhoc committee to harass me in order to divert and suppress the issues of wrong doings of the GWU academic officials.

- In response to my letter of Aug.23, **President Trachtenberg wrote me on September 3 asserting that he had requested VP for Acad. Affairs Dr. Lehman to look into the matter. But nothing happened and Dr. Lehman never communicated with me (neither in writing nor over phone).**

# Spring 1997 :

- While VP Lehman was supposed to look into the matter, Prof. Saha was suspended by VP Lehman (details on p.4 , 1997 part of **Unethical Actions of VP Dr. Lehman**)

- In the evening of May 1st, I scheduled a meeting with President Trachtenberg on Monday, May 12 at 4:00 pm in his office.

- On May 12, I had approximately 50 min long meeting with President Trachtenberg. During this meeting President Trachtenberg called me **"the Whistle Blower"**

    In an attempt to avoid any further complication, **he suggested that I avoid communicating with a number of faculty members who were directly involved with the incident of the Qualifying Exam.**

32

The members who directly led to the scandal :
1) Dr. Raymond L. Pickholtz, former EECS faculty
2) Dr. Mona E. Zaghloul, former Chairwoman of EECS Dept.
3) Dr. Gideon Frieder, former Dean of SEAS
4) Dr. Branimir Vojcic, former EECS faculty

# Fall 1997 :

I was back to teaching after reinstatement but I was not given any report of the investigation committee that I was promised.

# Spring 1999 :

I was scheduled to teach the normal load of three courses. On the first day of class on Monday, January 11, when I arrived in Tompkins Hall to teach (EE-203), Prof. Murray Loew, Chairman of EECS Dept. posed physical threat  in entering the classroom. Subsequently,

- Vice President Lehman brought charges of plagiarism and neglect of faculty responsibility against me and suspended me without pay.

- I communicated the problem to President Trachtenberg and after his intervention into the matter two investigations were launched resulting in following :

a) **Prof. Lehman had to drop the charge of plagiarism in writing**, and, as per Prof. Lehman, the case of Scientific Misconduct was closed.

(b) **EECS faculty personnel committee found no reason to take any action against Prof. Saha.** ( In fact, on the contrary, Prof. Della Torre, in the capacity of chairperson of the fact-finding sub-committee of EECS personnel committee, stated unequivocally that the University administration has no reason for suspension and **that Prof. Saha should be paid salary**).

Finally Prof. Lehman reinstated me but after substantial financial and mental agony.

# 2000-2005 Spring :

The School had a reorganization and EECS department broke into two : ECE and CS; I was placed in ECE Dept. without my input. Chairpersons of ECE during this period were :
1) Dr. Roger H. Lang
2) Dr. Branimir Vojcic
3) Dr. Mona E. Zaghloul

Prof. Vojcic and Prof. Zaghloul are the two of the three former EECS faculty members who were directly responsible for the Qualifying Exam Scandal of 1996. The third person, Prof. Raymond L. Pickholtz is no longer working for GWU. As per suggestion of President Trachtenberg in May 12, '97 meeting, I maintained a low level interaction with Prof. Zaghloul and Prof. Vojcic.

It should be noted Lehman administration brought **Prof. Mona Zaghloul** as interim chair of ECE department **only** for six months to carry out the secret ground work for initiating tenure revocation of Prof. Saha. **The choice was perfect because Prof. Zaghloul is one of those who carried out the first degree vandalism in 1996** (p..3).

# 2005 Spring-Summer-Fall :

Chairwoman Mona E. Zaghloul, through a fact finding committee **secretly** brought charges of a series of professional negligence against me which VP Lehman and Dean Tong used as the cause for initiating the process of revoking tenure. Prof. Lehman once again suspended Professor Saha effective August 29, 2005 without any prior communication of any kind, written or telephonic. A faculty senate panel chaired by Prof. Joan Schaffner of GW Law School initiated the hearing of the case in December, 2005.

# 2006 Spring-Summer-Fall :

The hearing continued throughout the Spring semester. Prof. Saha was represented by his counsel Dr. John Karl who also teaches Law in another local University. GWU presented 192 exhibits and more than a dozen witness. Prof. Saha presented 30 exhibits and called, among others, President Trachtenberg and Vice President Lehman as witness. Panel deliberated on July 24. Following excerpts which is the "Introduction" of the deliberation summarizes the deliberation.


Decision of the Panel filed by Hearing Panel Chair : Joan E. Schaffner
*********************************************************************
I. Introduction
This Hearing Panel's (panel) mandate is to decide whether the George Washington University (University) proved, by clear and convincing evidence, adequate cause for the tenure revocation of Professor Debabrata Saha on two grounds : "persistent neglect of professional responsibilities" and/or "gross personal misconduct that destroys academic usefulness." The Panel held 30 hours of testimony and 190 exhibits. The Panel unanimously finds that (1) the University met its burden on the first ground : Professor Saha has engaged in persistent neglect of professional responsibilities for an extended

34

period and (2) the University failed to meet its burden on ground two : Professor Saha has not engaged in gross personal misconduct that destroys academic usefulness.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Note the panel, by its own admission, did not consider any of the 30 exhibits produced by Prof. Saha and considered 190 out of 192 exhibits produced by GWU.**

Within ten days of the deliberation, Prof. Saha appealed to the Faculty Senate Dispute Resolution Committee and the appeal process is under way.

**Appendix F**

The Colleagues
Dept. of Elec. Engineering and Comp. Science
The George Washington University

May 15, 1996

Dear Colleagues :

I assume that all of you are now familiar with the allegation of "practice of favoritism" against some members of faculty and administrators in this department. You received a memorandum from Prof. Zaghloul regarding my allegations. In plain English, that memorandum is full of lies; literally, lie starts with the first paragraph, and each of the four paragraphs of substance includes distortion of facts. I chose not to respond to that memo because I promised so to the higher administration involved in the investigation.

At this point, I would like to inform you that the issues are yet to be resolved by the administration. But I would like to re-confirm that I do have definite proof that Prof. Pickholtz knowingly and consciously allowed a doctoral student taking the Doctoral Qualifying Exam four times in a row. But the department continues to deny this and other allegations. Evidence shows that Prof. Pickholtz approved the fourth attempt without the approval of anybody but himself. Furthermore, his own hand-written note and e-mails will confirm that he even pleaded on behalf of the student for a fifth attempt.

In the mean time, I have been informed by the department that the students have been congratulated on passing the Qualifying Exam. What an irony !!, the students are allowed to pass the exam by a vote of Democracy, but what they wrote in the exam were not looked at !! It reminds me of a saying that human race has not come up with a system that works better than democracy; but democracy has its own pitfalls. We just witnessed such a pitfall; it is caused by the lack of patience on the part of administrators and eagerness of the administrators to save the face of a faculty member who doesn't have the moral courage to apologize for his mistaken past. As Lowell said, Democ'acy gives every man the right to be his own oppressor. In this case, indeed the democracy within the EECS department oppressed its own virtue and its own wisdom.

Sincerely,

Debabrata Saha
Department of EECS
School of Engineering and Applied Science
The George Washington University

# Before It Fades Away from Memory !!

## List of Improper Activities in the GW Virginia Campus :
### Intellectual execution of oppression of minds, tenacity and will power of retaliated faculty member(s) !!

As Directly and Personally Observed by Me : Debabrata Saha
Observation Period : Five Years (1999-2004)

- Wining and dining in my scheduled classroom : had to give lecture in a different room; a student who was working for the Navy brought me back to the classroom to point out open wine bottles on many tables. From the appearance the dinner didn't seem to be cheap after all; looked like GWU always maintains class even when it does illegal things; serving alcohol in University activities in classroom is illegal (isn't it?). In another occasion I met a person in the elevator with open bottle of liquor; it could be any thing, but had a strong smell of liquor.

- I remember another occasion when plenty of food such as baklava, cakes, cookies, drinks and plates were scattered on tables all around the room; we had to clean the room, arrange the tables and chairs before I could start the lecture.

- Frequently classrooms were locked; I and the students had to search for administrative personnel to open the room; on many days we ended up spending 10/15 minutes of lecture time in doing such things the responsibility of which lies with the administration.

- Without any list of students, I had no way of knowing whether I was dealing with a registered student, a terrorist or a spy.

- The most obscene was the refusal to give the "Grade Sheets" for almost three years or so; I had to type out the name and social security number information (collected from the students) and use that print out to submit the final grades. The Registrar's office has documentation of all these grade sheets. It is possible, though I am not claiming so, that other parties manipulated the grades and/or took credit for teaching that course; but it is just a speculation.

- Also some other behaviors, in both Foggy Bottom and Virginia Campus, raised flags in my mind, as was also once hinted by GWU President Trachtenberg, as to whether there

37

is any sort of operation that uses elements of opposite sex as students in the class to demoralize student and/or faculty member, but this is something very difficult to prove.

- In two consecutive semesters, on each and every scheduled lecture day, the tables, the chairs and everything else were intentionally kept in haphazard condition so that it took 10/15 minutes of manual labor to fix them. I had to arrive there early to take care of these things.

- On numerous occasions, when the students went out during the five minute break in the lecture, they couldn't come back because the doors were locked on all entrances.

- They fabricate the number of real committed enrollments in courses; in one semester the class ended with only one student.

- The administration, particularly the registrar, has been notified about some of these things. Nothing has been taken care of.

- The final exam of ECE-243(AL) was on May 4, Tuesday, 2004. On that day the classroom was locked; student Navneet Singh went to call logistic people; they said there was no room on the schedule for ECE-243(AL). However, after some waiting one person came and opened the door. This just represents the state of affairs there.

- It was very inconvenient and disturbing that in may occasions courses scheduled by Foggy Bottom administration to be taught in the Virginia campus was canceled by the Virginia campus administration without any prior notice to the faculty member and in some situation the course continued even though it was canceled by the Foggy Bottom administration.

February 19, 2004
May 4, Tuesday, 2004

38

# Complaint of GWU

# for

# Tenure Revocation of Prof. Saha

THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

OFFICE OF THE DEAN

SCHOOL OF ENGINEERING AND APPLIED SCIENCE

September 16, 2005

Professor Kurt Darr
Chair, Faculty Senate Dispute Resolution Committee
The George Washington University


Dear Professor Darr:

### Complaint Regarding Associate Professor Debabrata SAHA

Associate Professor Saha is a tenured faculty member of the Electrical & Computer Engineering (ECE) Department successor to the Electrical Engineering and Computer Science (EECS) Department in the School of Engineering & Applied Science (SEAS). Through this Complaint, as required under Section F.1. of the Procedures for the Implementation of the Faculty Code, we commence proceedings to dismiss Professor Saha for adequate cause.

Since AY 1991-1992 the faculty of the EECS & ECE Departments has had substantial concerns over his conduct and professional comportment both with students and with his colleagues and staff within the Department. Despite several attempts by successive chairs of the Department and a number of warnings from senior administrators, he has continued to cause disturbances both inside the classroom and within the confines of the department. These disruptions have led students in his class to complain either verbally or in writing to the current chair of ECE. Faculty and staff members in the Department have experienced similar incidents which have led to disquiet and unease. The resulting atmosphere in the Department when matters concerning Professor Saha arise, on a more or less regular basis, is tense. Moreover, Professor Saha has exhibited a pattern of flagrant disregard of his faculty responsibilities in a variety of areas, such as submitting annual reports, attending department meetings and attending meetings with his colleagues, department chairs, deans, and the Executive Vice President for Academic Affairs. Professor Saha has continued this pattern of conduct despite having agreed, as a condition to reinstatement from suspension in 1999, to comply with these requirements.

The situation is therefore that Professor Saha is unfit to perform his duties as laid out in the Faculty Code of the George Washington University because he has persistently neglected his professional responsibilities as specified in the Code. Furthermore, his gross and continued personal misconduct on a number of occasions has destroyed his academic usefulness. Consequently his removal from tenured status based on adequate cause is justified.

The following documentation and reference material supports this Complaint:

(i)     The Personnel Committee of the EECS Department voted to recommend Associate Professor Saha be reprimanded for the following (see Memorandum from the Personnel Committee of the EECS dept to Dean Frieder dated Oct 30, 1996):

(a) Failure to meet course EE241-AL at the Virginia Campus during the Fall 1996 as assigned by the department chair and notified to him in writing

(b) Failure to evaluate academic performance fairly and reasonably and to report evaluations promptly

(c) Failure to return the records of 4 seniors thereby excluding them from graduating in a timely manner

(ii)    Despite continued attempts by the faculty and the administration to encourage Professor Saha to perform his teaching, research and service duties, it became necessary for Vice President Lehman to take the unusual step of suspending him from his faculty position in October 1997. (See letter from VP Lehman to Professor Saha dated October 30, 1997). This was the first in a number of progressive disciplinary measures which were taken. Subsequent to this, Professor Saha was suspended for a second time in January 22, 1999. Professor Saha was subsequently re-instated, based on Professor Saha agreeing in writing to several conditions, (11 in all), which were imposed and which he signed on April 30, 1999. (See letter from VP Lehman to Professor Saha dated April 29, 1999).

(iii)   Despite Professor Saha's agreement to abide by the conditions in the letter of April 29, he continued his pattern of willfully refusing the reasonable directives of his chair and Dean, ignoring correspondence, failing to participate in departmental administrative committees when detailed by his chair to do so and failing to attend departmental meetings. He has submitted no annual reports, has refused to submit student evaluations of his teaching, and has unjustly criticized his colleagues and members of the administration in inappropriate ways both in front of students and, for example, by posting inflammatory open letters written by himself on the outside of his office door.

(iv)    The Personnel Committee of the ECE Department, at their meeting of May 2, 2005, unanimously passed the following resolution: "The Personnel Committee of the ECE Department accepts the findings of the Fact-Finding Subcommittee on Professor Saha that Associate Professor Saha's actions documented in their report constitute persistent neglect of his professional duties and gross personal misconduct" (see the Minutes of the Personnel Committee dated 2 May 2005 and the report of the Fact-Finding Subcommittee of the Personnel Committee on Professor Saha). The committee authorized the Interim Chair of the department, Professor Zaghloul, the Chair-Elect Professor Korman and the Chair of the Fact-Finding Subcommittee, Professor Wasylkiwskyj, to seek a meeting with the Dean of SEAS, Dean Tong and the Executive Vice President for Academic Affairs.

(v)     On June 15, 2005 the Interim Chair of the ECE department, Professor Zaghloul, the Chair-Elect Professor Korman, and the Chair of the Fact-Finding Subcommittee, Professor Wasylkiwskyj, met with the Dean of SEAS, Dean Tong, and the Executive Vice President for Academic Affairs, and presented the resolution of the ECE Personnel Committee and the report of the Fact-Finding Subcommittee as mentioned in (iv) above.

(vi)    Dr. Lehman asked Professor Saha to come to see him to discuss the matters arising from the events portrayed above. (See letters of June 27 and July 26, 2005). Voice mails were also left on his office voice mail. Professor Saha ignored Vice President Lehman's request for a meeting, and did not attend the meeting he scheduled. Therefore, as of August 29, 2005, Professor Saha was placed on suspension (see letter of that date) and informed that proceedings for the termination of his tenure would be initiated.

Additional documentation is enclosed with this letter.

Dr. Timothy W. Tong
Dean, School of Engineering and Applied Science

Dr. Donald R. Lehman
Executive Vice President for Academic Affairs

**Plaintiff Exhibit R-1**

1. GW Faculty Code 2004 : cover page & pp 18-19
2. AAUP Policy Documents & Reports, Tength Edition : cover page & p-1, pp 26-28

The George Washington University

# Faculty Code



THE GEORGE WASHINGTON UNIVERSITY
WASHINGTON DC

# 2004

# Procedures for the Implementation of the Faculty Code

## A. Governance of Departments and Schools*

The regular, active-status faculty and tenured limited service faculty of each department, school, or comparable educational division shall establish written procedures for the governance of that unit.

## B. Faculty Participation in Action Concerning Faculty Membership

1. The regular, active-status faculty of each school or comparable educational division shall establish procedures enabling an elected standing committee or committee of the whole to submit its recommendations on the allocation of regular-service, tenure-accruing appointments within that unit.

2. The regular, active-status faculty of the rank of assistant professor or higher of a department or of a nondepartmentalized school or comparable educational division shall, subject to such limitations or guidelines as may be established by the faculties of the respective schools, establish procedures enabling an elected standing committee or a committee of the whole to submit its recommendations for appointments. Recommendations for actions other than appointments concerning instructors, assistant professors, or associate professors shall be determined by the tenured members of the faculty of higher rank or of equal and higher rank, as the faculty may have determined by previously established procedures. Recommendations for actions other than appointments concerning professors shall be determined by tenured members of the rank of professor. In the College of Professional

Studies, the Dean's Council shall take the place of the elected standing committee or committee of the whole described in this paragraph 2.

3. Appointments and actions affecting renewal of appointments, promotion, tenure designation, and termination of service shall normally follow faculty recommendations. Departures from this standard shall be limited to those cases involving compelling reasons. The appropriate administrative officer shall notify the Executive Committee of the Faculty Senate of any departures from faculty recommendations and the compelling reasons therefor. The faculty or the appropriate unit thereof shall also be notified unless the Board of Trustees determines that such notification would be contrary to the best interest of the individual or individuals concerned.

4. Faculty recommendations concurred in by the appropriate administrative officers shall be transmitted by them to the President, who shall transmit them to the Board of Trustees. Variant or nonconcurring recommendations from an administrative officer, together with supporting reasons, shall be sent by that officer to the Executive Committee of the Faculty Senate through the appropriate superior administrative officers. The Executive Committee may seek information and advice and make recommendations to the faculty or the appropriate unit thereof and to the appropriate administrative officers. If concurrence cannot be obtained after opportunity for reconsideration in the light of the recommendations of the Executive Committee, the recommendations of the appropriate administrative officers, accompanied by the recommendation of the faculty and the report of the Executive Committee, shall be transmitted to the Board of Trustees through the President, except that, at its discretion, the originating faculty unit may instead elect to leave the decision to the President.

---

* In the governance of the Medical Center, all faculty eligible for membership in the Medical Center Faculty Assembly shall be eligible to participate whenever the term "regular" faculty appears in this document.



# AMERICAN ASSOCIATION
## OF
# UNIVERSITY PROFESSORS

# Policy Documents
# &
# Reports

TENTH
EDITION

Published by the American Association of University Professors
Washington, D.C.
Distributed by the Johns Hopkins University Press
Baltimore

# ACADEMIC FREEDOM, TENURE, AND DUE PROCESS

From its inception in 1915, the main work of the Association has been in the area of academic freedom and tenure. Policy in this vital area has evolved gradually but continuously since that time. In the year of its founding the Association formulated a "Declaration of Principles," a statement on academic freedom and tenure and professional responsibility, which concluded with a section enumerating desirable procedures. This statement (to be found in Appendix I in this volume) was put to immediate use by the organization's standing Committee A on Academic Freedom and Tenure in dealing with particular cases. Ten years later, the American Council on Education called a conference of a number of its constituent members, among them the AAUP, for the purpose of formulating a shorter statement that would take into account a decade's experience. The product of this effort became known as the 1925 *Conference Statement on Academic Freedom and Tenure*; it was endorsed by the Association of American Colleges (now the Association of American Colleges and Universities) in 1925 and by this Association in 1926. Beginning in 1934, the two endorsing organizations again joined in a series of conferences. The result was the present policy document, the landmark 1940 *Statement of Principles on Academic Freedom and Tenure*, which in later years has been further endorsed by more than 200 additional learned societies and educational associations, and which in 1970 was supplemented by a series of "Interpretive Comments."

Since 1940, the Association has issued other policy statements and reports that explain and develop aspects of the *Statement of Principles* and that also set forth procedural standards for academic due process in a variety of situations. The most generally used among these statements are the 1958 *Statement on Procedural Standards in Faculty Dismissal Proceedings* (developed jointly with the Association of American Colleges), the *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments*, and the *Recommended Institutional Regulations on Academic Freedom and Tenure*.

The Association, also from its inception, has assumed responsibility not only for promulgating principles and standards but also for implementing them in specific situations. Believing that unrectified departures from sound academic standards do injury to the entire academic profession, the Association in addition publishes reports of ad hoc investigating committees on specific cases at colleges and universities that raise issues of academic freedom and tenure. These reports offer helpful guidance for the understanding of later situations confronted by the Association and constitute implementation of Association policy. They also contribute to the ongoing process of education in accepted principles and practice which is the central purpose and the most important activity of the Association.

1

and to respond to the evidence. If the faculty member so requests, the evidence will be reviewed by the Faculty Committee on Academic Freedom and Tenure [or whatever other title it may have] before a final decision is made by the governing board on the recommendation of the administration. The faculty member will be given severance salary not less than as prescribed in Regulation 8.

REVIEW

f.   In cases of termination of appointment, the governing board will be available for ultimate review.

## 5. Dismissal Procedures

a.   Adequate cause for a dismissal will be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers. Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights of American citizens.

b.   Dismissal of a faculty member with continuous tenure, or with a special or probationary appointment before the end of the specified term, will be preceded by: (1) discussions between the faculty member and appropriate administrative officers looking toward a mutual settlement; (2) informal inquiry by the duly elected faculty committee [insert name of committee] which may, if it fails to effect an adjustment, determine whether in its opinion dismissal proceedings should be undertaken, without its opinion being binding upon the president; (3) a statement of charges, framed with reasonable particularity by the president or the president's delegate.

c.   A dismissal, as defined in Regulation 5a, will be preceded by a statement of charges, and the individual concerned will have the right to be heard initially by the elected faculty hearing committee [insert name of committee].[8] Members deeming themselves disqualified for bias or interest will remove themselves from the case, either at the request of a party or on their own initiative. Each party will have a maximum of two challenges without stated cause.[9]

  (1)  Pending a final decision by the hearing committee, the faculty member will be suspended, or assigned to other duties in lieu of suspension, only if immediate harm to the faculty member or others is threatened by continuance. Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures, the administration will consult with the Faculty Committee on Academic Freedom and Tenure [or whatever other title it may have] concerning the propriety, the length, and the other conditions of the suspension. A suspension that is intended to be final is a dismissal, and will be treated as such. Salary will continue during the period of the suspension.

  (2)  The hearing committee may, with the consent of the parties concerned, hold joint prehearing meetings with the parties in order to (i) simplify the issues, (ii) effect stipulations of facts, (iii) provide for the exchange of documentary or other information, and (iv) achieve such other appropriate prehearing objectives as will make the hearing fair, effective, and expeditious.

  (3)  Service of notice of hearing with specific charges in writing will be made at least twenty days prior to the hearing. The faculty member may waive a hearing or may respond to the charges in writing at any time before the hearing. If the faculty member waives a hearing, but denies the charges or asserts that the charges do not support a finding of adequate cause, the hearing tribunal will evaluate all available evidence and rest its recommendation upon the evidence in the record.

  (4)  The committee, in consultation with the president and the faculty member, will exercise its judgment as to whether the hearing should be public or private.

  (5)  During the proceedings the faculty member will be permitted to have an academic advisor and counsel of the faculty member's choice.

26

(6) At the request of either party or the hearing committee, a representative of a responsible educational association will be permitted to attend the proceedings as an observer.

(7) A verbatim record of the hearing or hearings will be taken and a typewritten copy will be made available to the faculty member without cost, at the faculty member's request.

(8) The burden of proof that adequate cause exists rests with the institution and will be satisfied only by clear and convincing evidence in the record considered as a whole.

(9) The hearing committee will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made.

(10) The faculty member will be afforded an opportunity to obtain necessary witnesses and documentary or other evidence. The administration will cooperate with the hearing committee in securing witnesses and making available documentary and other evidence.

(11) The faculty member and the administration will have the right to confront and cross-examine all witnesses. Where the witnesses cannot or will not appear, but the committee determines that the interests of justice require admission of their statements, the committee will identify the witnesses, disclose their statements, and, if possible, provide for interrogatories.

(12) In the hearing of charges of incompetence, the testimony will include that of qualified faculty members from this or other institutions of higher education.

(13) The hearing committee will not be bound by strict rules of legal evidence, and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available.

(14) The findings of fact and the decision will be based solely on the hearing record.

(15) Except for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements and publicity about the case by either the faculty member or administrative officers will be avoided so far as possible until the proceedings have been completed, including consideration by the governing board of the institution. The president and the faculty member will be notified of the decision in writing and will be given a copy of the record of the hearing.

(16) If the hearing committee concludes that adequate cause for dismissal has not been established by the evidence in the record, it will so report to the president. If the president rejects the report, the president will state the reasons for doing so, in writing, to the hearing committee and to the faculty member, and provide an opportunity for response before transmitting the case to the governing board. If the hearing committee concludes that adequate cause for a dismissal has been established, but that an academic penalty less than dismissal would be more appropriate, it will so recommend, with supporting reasons.

## 6. Action by the Governing Board

If dismissal or other severe sanction is recommended, the president will, on request of the faculty member, transmit to the governing board the record of the case. The governing board's review will be based on the record of the committee hearing, and it will provide opportunity for argument, oral or written or both, by the principals at the hearings or by their representatives. The decision of the hearing committee will either be sustained or the proceeding returned to the committee with specific objections. The committee will then reconsider, taking into account the stated objections and receiving new evidence if necessary. The governing board will make a final decision only after study of the committee's reconsideration.

### 7. Procedures for Imposition of Sanctions Other Than Dismissal

a. If the administration believes that the conduct of a faculty member, although not constituting adequate cause for dismissal, is sufficiently grave to justify imposition of a severe sanction, such as suspension from service for a stated period, the administration may institute a proceeding to impose such a severe sanction; the procedures outlined in Regulation 5 will govern such a proceeding.

b. If the administration believes that the conduct of a faculty member justifies imposition of a minor sanction, such as a reprimand, it will notify the faculty member of the basis of the proposed sanction and provide the faculty member with an opportunity to persuade the administration that the proposed sanction should not be imposed. A faculty member who believes that a major sanction has been incorrectly imposed under this paragraph, or that a minor sanction has been unjustly imposed, may, pursuant to Regulation 15, petition the faculty grievance committee for such action as may be appropriate.

### 8. Terminal Salary or Notice

If the appointment is terminated, the faculty member will receive salary or notice in accordance with the following schedule: at least three months, if the final decision is reached by March 1 (or three months prior to the expiration) of the first year of probationary service; at least six months, if the decision is reached by December 15 of the second year (or after nine months but prior to eighteen months) of probationary service; at least one year, if the decision is reached after eighteen months of probationary service or if the faculty member has tenure. This provision for terminal notice or salary need not apply in the event that there has been a finding that the conduct which justified dismissal involved moral turpitude. On the recommendation of the faculty hearing committee or the president, the governing board, in determining what, if any, payments will be made beyond the effective date of dismissal, may take into account the length and quality of service of the faculty member.

### 9. Academic Freedom and Protection against Discrimination

a. All members of the faculty, whether tenured or not, are entitled to academic freedom as set forth in the 1940 *Statement of Principles on Academic Freedom and Tenure*, formulated by the Association of American Colleges and the American Association of University Professors.

b. All members of the faculty, whether tenured or not, are entitled to protection against illegal or unconstitutional discrimination by the institution, or discrimination on a basis not demonstrably related to the faculty member's professional performance, including but not limited to race, sex, religion, national origin, age, disability, marital status, or sexual orientation.

### 10. Complaints of Violation of Academic Freedom or of Discrimination in Nonreappointment

If a faculty member on probationary or other nontenured appointment alleges that a decision against reappointment was based significantly on considerations that violate (a) academic freedom or (b) governing policies on making appointments without prejudice with respect to race, sex, religion, national origin, age, disability, marital status, or sexual orientation, the allegation will be given preliminary consideration by the [insert name of committee], which will seek to settle the matter by informal methods. The allegation will be accompanied by a statement that the faculty member agrees to the presentation, for the consideration of the faculty committee, of such reasons and evidence as the institution may allege in support of its decision. If the difficulty is unresolved at this stage, and if the committee so recommends, the matter will be heard in the manner set forth in Regulations 5 and 6, except that the faculty member making the complaint is responsible for stating the grounds upon which the allegations are based, and the burden of proof will rest upon the faculty member. If the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision against reappointment to come forward with evidence in support of their decision. Statistical evidence of improper discrimination may be used in establishing a prima facie case.

28

**Plaintiff Exhibit  R-2**
37 pages

This Exhibit is a 37 page document that was submitted
to Ramaker-Wooldridge Committee in 1997.

# A Statement to the Investigative Committee
(Committee of Prof. David E. Ramaker & Assist. VP Annie Wooldridge)
by
Debabrata Saha

I, Debabrata Saha, a member of the tenured faculty in the Dept. of Electrical Engineering and Computer Science at the George Washington University, has been verbally requested by Dr. Donald R. Lehman, current Vice President for Academic Affairs, to cooperate with an investigative committee comprised of Professor David E. Ramaker and Assist. Vice President Annie Wooldridge. I, hereby, make a statement to the committee on the issues of Corruptions and Harassments, Discriminations, and some Unethical activities of some GWU administrators and some fellow members of faculty at the George Washington University.

Most of the issues, and the events and facts that substantiate those issues are known to the GWU administrators for more than a year; in some cases more than two years. Among others, these administrators include former VP for Acad. Affairs Dr. Linda Salamon, Present VP for Acad. Affairs Dr. Donald R. Lehman. Also, at one point, I tried to seek former VP for Acad. Affairs Professor Roderick French for an impartial intermediatory role. A good background of various issues lies in two sets of documents : (i) A 110-page document (let us name it D1) which was handed over to me by the investigating committee on March 3, 1997 and (ii) A 3-page document that was handed over to me by VP and General Counsel Dennis Blumer on March 13, 1997(let us name it D2). My statement is broadly divided into three parts. the sequence of events are quite related; the three parts are (i) **Corruptions and Harassments**, (ii) **Discriminations**,and (iii) **Other unethical activities.** As per my knowledge and evidences, the following is a list of the names that I believe are involved with such activities.

1) Dr. Robert Joseph Harrington, Former Chairperson of EECS Dept.
2) Dr. Mona E. Zaghloul, Present Chairwoman of EECS Dept.
3) Dr. Raymond L. Pickholtz, EECS Dept.
4) Dr. Gideon Frieder, SEAS
5) Dr. Branimir Vojcic, EECS
6) Mr. James Rowan, Engineering Associate, EECS
7) Dr. Donald R. Lehman, VP for Acad. Affairs

1

173

# Corruptions and Harassments

The practice of favoritism and illegal activity involving doctoral qualifying exam in the Communication Group in the EECS Dept. had been a continuous problem long before May 15, 1996 when I wrote a memorandum addressing the colleagues in my department. In that memorandum, I accused Prof. Pickholtz and the Chairperson Mona Zaghloul about their direct involvement in illegal activities. Copy of the memo was sent to (i) Dean Frieder of SEAS, (ii) VP Linda Salamon (iii) VP Dennis Blumer, and (iv) President Trachtenberg.

**Record shows that till today GWU administration (up to its highest academic officer) deliberately failed to take a MORAL stand on this Highly Unethical and Illegal activity. I urge that this investigation committee look into this matter without keeping anybody out of suspicion of obstructing justice.**

*Some Relevant Background Information about Communication Group:*
Number of Full Professor : Two
Full Professor with Longest Service : Prof. Raymond L. Pickholtz, serving almost twenty four years at GWU.

Each of the two full professors are to some extent responsible for illegal activity in the doctoral qualifying exam; but Prof. Pickholtz is involved in a notorious way. Prof. Pickholtz has been with the communication group for almost a quarter of a century and for most part of this time he has been considered as the most senior member in the group; but his contribution to the development of the communication group is almost empty. In the last two decades (perhaps, a little more or a little less) he with the help of his friends has been successful in spending enormous amount of money and faculty resources in recruiting a large number of people (mostly young people who usually looks for guidance at the beginning of their career) in the group. But because of his lack of leadership, because of his inability to nurture young potential candidates, and because of his Dishonesty, almost everybody left the group for one reason or the other. The only faculty member who earned tenure and is still with the group is myself. The following is a list (may not be complete) of candidates who joined the communication group during 1980's and 1990's and then left :

2

174

1) Prof. Chang
2) Prof. Newman
3) Prof. Jabbari
4) Prof. Kakaes
5) Prof. Azizoglu
6) Prof. Barry

I discussed this particular problem of the communication group with Dr. Frieder, the Dean of SEAS on September 15, 1995 in a personal meeting with him in his own office. His comments were : "no matter how one looks into it, these are nothing but facts".

In the same Sept.15 meeting, Prof. Frieder was informed about corruptions related to qualifying exam in the communication group; he was also given a copy of an official memorandum involving a student of Prof. Pickholtz.

**The above facts are relevant because the committee will be looking into possible violation of rules and ethics committed by Prof. Pickholtz.**

3

175

# Three Illegal Events

# 1   Case of Mr. Martin Schulman:Spring'96

EECS Dept. has a master degree program in Telecommunications, but NO doctoral program in Telecommunications. In the Spring of 1996, Mr. Schulman, whose academic advisor was Prof. Robert J. Harrington, took a doctoral qualifying exam in Telecommunications. By allowing this incident, the relevant faculty members and the Chairperson of the department violated the rules of EECS and SEAS as well.

The Dept. Chairperson Mona E. Zaghloul in her April 16, 1996 letter denied such wrong doing and described the event as a clerical error on Mr. Schulman's part.

## 1.1   My Allegation :

The following facts and documents establish that Prof. Zaghloul not only acted illegally but also went on to LIE in writing to COVER UP wrong doings of hers and few others.

- Doctoral Exam was given on February 20, 1996. Approximately two weeks before the exam, I borrowed from our secretary Mrs. Marilyn Henry the folder containing the applications for doctoral qualifying exam. I found out that Mr. Schulman applied for doctoral qualifying exam in Telecommunications. His applications was approved by Prof. Harrington. I immediately told Mrs. Henry to communicate with Prof. Helgert, who was the coordinator for the exam that semester, about the problem. A few days later, Mrs. Henry told me that she communicated with Prof. Helgert and Prof. Helgert asserted her that the student will be allowed to take the exam (though we do not have any doctoral program in Telecommunication).

- On February 12, Prof. Zaghloul, in the capacity of Chair of EECS, wrote to Mr. Schulman : " This is to confirm your application to take the Doctoral Qualifying Exam (PART I) in the area of : Telecommunications"

- On February 20, when I arrived in the Marvin Center to proctor the exam, I found out that the piece of paper, which the students signed at the beginning of the exam, had number of signatures one less than the number of students taking the exam. I checked with the student proctors and I was told that the paper containing that one signature has been taken away to the EECS office.

- Then I found out which student's signature was missing. It was Mr. Schulman. I asked the student a few specific questions : His name, His S.S.#, the area in which he was taking the exam, and his advisor's name.

  His answers were :

  Name : Martin Schulman

S.S. # :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
Area : Telecommunications
Advisor : Dr. Harrington

- There is written evidence which confirms that I had this conversation with Mr. Schulman during the Exam.

At the end of the proctoring, I came back to the department, and checked with Mrs. Henry whether she has that piece of paper containing Mr. Schulman's signature; Mrs. Henry said "yes".

- Within a few days after the exam, Blue Books were distributed; the enclosed Grade Sheet had a distinct separate block for Telecommunications Exam and there was the SS # of only one student.

## 1.2    Summary :

A student applies for taking doctoral qualifying exam in Telecommunications, A faculty member (Professor Hermann Helgert)who is not the advisor of the student approves the application, The chairperson of the department confirms in writing that he would be taking doctoral exam in Telecommunications, The student come to the exam and his signature is collected on a separate sheet of paper designated for doctoral exam in Telecommunications,

5

177

during the exam the student acknowledges that he is writing the doctoral exam in Telecommunications, the department ask the faculty members to grade the Blue Book of the student and enter the grades in grade sheet for Telecommunications exam.

After all this, the Chairperson Dr. Mona Zaghloul puts in writing that it was a clerical mistake on the part of the student and our former VP for Acad. Affairs Dr. Linda Salamon approves this as clerical mistake.

Not only that, *Former VP Linda Salamon went on to stop the pay check of Prof. Saha* who tried his best to stop the illegal activity almost two weeks before the exam was given. And the present VP for Acad. Affairs Dr. Lehman sits on this matter for almost six months (ignoring written instructions from President Trachtenberg) and then *put Prof. Saha on Administrative Leave on False Convenient Pretext without making any communication (written or telephonic) with Prof. Saha or giving him any kind of prior notice.*

On February 6, 1996, Dr. Lehman, without giving any prior notice to Prof. Saha, used University Police to remove Prof. Saha from his class room (Corcoran Hall, Room # 205) in front his student(s).

I would like to question not only the morality but also legality of this heinous, barbaric, and inhumane assault on the academic values in and beyond the George Washington University. I am surprised at the unprofessional action of Dr. Lehman.

**I urge that this investigation committee not only looks into this matter but also makes sure that the moral backbone of the Administration of the George Washington University (including that of VP Dr. Lehman) is scrutinized by the President, the VP and General Counsel, and even if necessary, by the Board of Trustee.**

178

# 2    Case of Mr. Abir Hnidi: Fall'95

Mr. Abir Hnidi, S.S. #230-517-970, was a doctoral student in our department. His academic advisor was **Prof. Raymond L. Pickholtz.** Our department allows a doctoral student to take the Qualifying Exam a maximum of two times; beyond that the student needs to make a petition and needs faculty approval. Prof. Pickholtz allowed Mr. Hnidi taking the exam four times in a row. There are many students who after failing the exam twice left the program in great sadness. The conscience of Prof. Pickholtz, however, didn't stop him allowing his own student Mr. Hnidi to take the exam four times without any approval of faculty.

## 2.1    My Allegation :

Prof. Pickholtz committed an illegal act when he knowingly and consciously allowed Mr. Hnidi take the Exam four times in a row. Mr. Hnidi's application for the exam shows that Prof. Pickholtz approved the fourth attempt without the approval of anybody but himself. Neither a petition was submitted nor the matter was brought to the attention of the communication group faculty members. Furthermore, his own hand written note and E-mail confirm that he even vigorously pleaded for giving him a fifth attempt.

## 2.2    Response of Chairwoman Dr. Zaghloul :

In her April 16, 1996 letter, she wrote : ".., exam again in the Spring and Fall of 1994 and failed. All applications were approved by his advisor and the examination committee..."

## 2.3    Summary :

The fact is that it was the responsibility of Prof. Pickholtz to advise the student to write a petition so that the communication group (examination committee) could consider the case. Instead, Prof. Pickholtz and Chairwoman Zagloul (who had the final say to the application) committed the illegal act quietly thinking nobody would notice that. Thus Prof. Zaghloul not only acted illegally but also went on to LIE in writing that all applica-

tions were approved by the examination committee. This was to COVER UP her wrong doings and to offer a helping hand to Prof. Pickholtz.

# 3   Case of Mr. Sasan Rostami : Spring'95

Mr. Sasan Rostami, S.S.# 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, again a student of **Prof. Raymond L. Pickholtz**, graduated from GWU with a master degree in Spring of 1989. He then continued to take courses in GWU without being admitted into any program; in the Spring of 1995, he applied for doctoral qualifying exam and Prof. Pickholtz approved it without questioning his eligibility.. In the exam his score was lower than the lowest passing score approved by the examination committee; besides, his eligibility was called into question. EECS faculty did not take any decision on Mr. Rostami's exam in its April 26, 1995 meeting; whether he met the eligibility requirements had to be reviewed.

I pointed out to the Communication Group faculty members that he was not eligible to be considered as a candidate for the following reasons :

- He **never applied** for admission into our Doctoral Program

- Even if we count from the date from which he claims that he started taking courses for doctoral program, he already crossed the **Five Year Time Limit** that our rule allows for taking the exam

- He is probably the only **self-proclaimed doctoral student** in GWU; in Fall of 1992, in his form for registration for a course, he declared himself as a Doctoral Student. SEAS admission office called and talked to Mr. Rostami on Sept.2nd, 1992. Mr. Rostami promised to bring a copy of his application on Sept.8, 1992. But Mr. Rostami didn't show up; SEAS admission office again called him on Sept.29, 1992. Again, he didn't show up. SEAS admission office called him again on October 12, 1992 and left a message to call back. Till the end of April (April 26, 1995) he did not submit any application for admission. I personally reviewed his academic folder before going to the faculty meeting on April 26, 1995 to present the results to the faculty (as I was the coordinator for the exam).

## 3.1   Illegal Action Promoted by Prof. Branimir Vojcic

I was absent in the May 25, '95 EECS faculty meeting. It is my understanding from my discussion with Prof. Vojcic that he presented the result of Mr.

**181**

Rostami to the faculty and the faculty voted to pass Mr. Rostami. The eligibility of Mr. Rostami was not called into question, though Prof. Vojcic knew from my memorandum and a few personal discussions about this matter that officially and legally Mr. Rostami had never been a doctoral student in GWU. Prof. Vojcic was thus able to return a favor to his Teacher and now colleague, Professor Raymond L. Pickholtz. This year Professor Vojcic applied for tenure in our department; I hope this unethical action on his part is examined by proper authority as part of the tenure evaluation process. Though the faculty voted on the issue, but it was Prof. Vojcic (and Prof. Pickholtz who was present in the meeting) who knowingly presented facts far from truth.

## 3.2   Response of Chairwoman Dr. Zaghloul :

In her April 16, 1996 letter, in an attempt to cover up and defend Professor Pickholtz and Mr. Rostami, she wrote : "....Mr. Rostami reapplied and a letter of admission was issued in the Spring of 1995 semester...."

## 3.3   My Response:

**Again,** Prof. Zaghloul **presented another** lie **in writing**. It is definite that he was not admitted into our doctoral program till the end of April of 1995 when I received his academic folder from the SEAS office. I received a call from the student in late June of 1995 and we had a conversation during which I suggested that he should talk to his advisor. I continued to keep his academic folder under lock and key in my office till late Summer, that year, and nobody from SEAS requested me for the file. On August 25, 1995 I provided Prof. Zaghloul a set of documents copied form his academic folder to assert that Mr. Rostami was not an admitted student in our doctoral program; Prof. Zaghloul never responded.

10

# An Assault On Academia Through Democracy

On April 4, 1996, and again on April 9, 1996 I requested the EECS administration to give a logical explanation for recent illegal activity (Schulman case). I was given absolutely no response. I continued to hold the Blue Books of the Qualifying Exam ( which I graded almost immediately after I received them) in a sealed envelope. On April 10, 1996 I contacted the office of President Trachtenberg and, thereafter, I followed the instruction and suggestion from that office. I returned the Blue Books to VP and General Counsel Dennis Blumer on May 16 (one day before the deadline imposed by IVP Linda Salamon) and then participated in a meeting with VP Blumer on May 20. In that important meeting we discussed various issues of corruptions and discriminations; VP Blumer took 5/6 pages of hand written notes during that meeting.

- **In the mean time Prof. Zaghloul through a vote of democracy made an heinous assault on our academic system by passing all the students who took the Qualifying Exam in the Spring of 1996 without looking at what they students wrote in the exam. Perhaps, such slanderous act has never been committed by any administration in the history of the education system in the United States. Not to mention, the VP for Academic Affairs at GWU was directly involved in committing such unethical, immoral, and criminal act.**

- **Note that the Blue Books were returned two weeks before the end of the semester. The eagerness of Prof. Zaghloul and VP Linda Salamon to save the face of the administration and the faculty members involved in illegal activity was so much that they couldn't wait for the issues to be resolved and Blue Books to be returned. Note that having faculty meeting towards the end of May is not unusual in our department.**

11

**183**

# Harassment By Administration in EECS and SEAS

The harassment from the office of Prof. Zaghloul started immediately after I decided to raise my voice against her direct involvement and direct support to illegal activity in EECS department.

- On May 8, 1996 EECS administration reconfirmed in writing my appointment as an Undergraduate Advisor for the Fall of 1996 and the Spring of 1997. On May 9, the next day Prof. Zaghloul retaliated against me for raising my concern against her involvement in illegal activity; she took the Advising position away from me without any explanation, consultation, and inference.

- On May 29, IVP Linda Salamon, following the suggestion from the EECS Chairperson's office, demanded that I return five academic folders; she accused me of holding **two graduation folders** which are usualy taken care of ASAP basis. Though absolutely there was no truth to the fact that I was holding two graduation folders, I returned all five folders to the office of the President late in the evening on May 30, 1996 (one day before the deadline imposed by IVP Linda Salamon); President Trachtenberg and Dean Gideon Frieder was present at the President's office at that time.

- **Removal From Teaching :** I have been teaching the course on Information Theory (EE-241) for last ten years since I joined GWU in 1986. This is also an area of my expertise and active area of research. I also offered a 2nd higher level course on Information Theory and it ran very well. In the Fall of 1995, I had almost fifty MS and doctoral students attending my class. In the Fall of 1996, after I brought the allegations of corruptions, Prof. Zaghloul removed me from teaching this course (both of the two sections at Foggy Bottom Campus) and replaced me by a part-time (visiting!) faculty member, though I am the course director for the course. As course director, I am supposed to get the first preference in teaching the course.

  1. First time I decided to speak against this harassment and retaliation was on July 30, 1996 when I communicated to the EECS administration through a letter sent to Mrs. Marilyn Henry. I

also proposed discussion with the Chairwoman on this issue and was waiting in my office during 3:30-5:00 pm on August 12. But Prof. Zaghloul didn't show any interest in having any discussion, though she was present in her office during that period.

2. After some consultation with the office of the General Counsel and VP Dennis Blumer, I finally decided to bring charges of harassment against The Chairperson, Professor Mona E. Zaghloul of EECS Department and sent the allegation in writing to VP Dennis Blumer.

3. On August 23, 1996 I brought the same charge against The Chairperson, Professor Mona E. Zaghloul of EECS Department and sent the allegation in writing to President Trachtenberg.

4. On August 23, 1996, as per suggestion from a few concerned colleagues, I brought this matter to the attention of my colleagues in the EECS Department.

5. President Trachtenberg answered back to me on September 3 asserting me that he has requested VP for Acad. Affairs Dr. Lehman to look into the matter. But nothing happened and Dr. Lehman never communicated with me (neither in writing nor over phone).

6. On November 11, 1996 , I again communicated to President Trachtenberg letting him know about continued harassment, and got a quick response from him on November 13.

7. For convenience and continuity, all my communications (after August 16, 1996) to President Trachtenberg and General Counsel VP Blumer are retyped (not reproduced). These letters also give a chronological description of the sequence of events.

8. In the Spring of 1997, I was assigned to teach three courses and continued to teach all courses and maintained each and every office hour till February 6, 1997. In the evening of February 6, 1997, I went to teach the course EE-204 in the Corcoran Hall (Rm.#205) around 6:00pm. Dr. Lehman, without giving any prior notice (writen or telephonic), used University Police to remove me from my class room in front my student(s).

13

185

- **Elimination of Course**

I have been teaching the course on Probability Theory and Stochastic Process (EE-204) for last ten years, and I am also the course director for this course. After I raised the issues of corruptions, this course has been eliminated without any input and without any knowledge of mine.

- **Denial of Raise in Salary**

  I have denied any raise in salary for this year; this never happened since I joined GWU in 1986. This is a direct retaliation against me.

- **Threat of Revoking Tenure**

  Dr. Gideon Frieder as Dean of SEAS gave written threat to revoke my tenure.

- **Harassment by Adhoc Committee**

Dr. Zaghloul and Dr. Frieder used an adhoc committee to harass me to divert and suppress the issues of corruptions and harassments.

14

186

**Previous Incident of Harassment :**

In the Fall semester of 1995, in my Information Theory (EE-241) course, I had almost fifty students. Prof. Zaghloul and her assistant Mr. James Rowan together created disruptions in teaching that course by refusing to arrange a classroom of required size. The disruptions continued for three weeks and we got a bigger room only after severe protests from a large number of students and some intervention of Dean Frieder. Students' painful experiences are revealed in their e-mails and letters which are enclosed with this statement (marked Students' Statements).

15

Professor Stephen Joel Trachtenberg
President, The George Washington University
Washington, D.C. 20052

August 23, 1996

Dear Professor Trachtenberg :

I would like to bring charges of harassment against Prof. Mona E. Zaghloul of EECS Department. For more than a year, Prof. Zaghloul, through her administration, has been constantly harassing me in an attempt to suppress my voice against continued corruptions, favoritism and discriminations practiced by her in our department. Earlier, I brought these issues to the attention of Vice President Blumer; a copy of the letter is enclosed.

Calculated moves of harassment on the part of Prof. Zaghloul has brought me to a position this Fall semester when, I am afraid, I will not be able to carry the full load, which is equivalent to three course load. I have been warned by several colleagues in the department that Prof. Zaghloul, through constant harassments, has been trying to put me over an edge so that I make a mistake and the administration find ways to bring charges of negligence in duties and responsibilities. Following your suggestion that you gave earlier, I have tried my best to resolve these issues of corruption and harassment through the office of Mr. Blumer. But he hasn't returned my phone call.

In this situation, I feel the need of an urgent communication with you before the classes start so that I can rule out the possibility of a situation where Prof. Zaghloul or any member of the administration may bring allegation of negligence in duties.

I would like to request you for an immediate attention to this matter.
Sincerely,
Debabrata Saha
Dept. of EECS
Encl.
1. Copy of letter dated Aug.16, 1996
2. Copy of letter dated May 15, 1996

16

**188**

Professor Stephen Joel Trachtenberg
President, The George Washington University
Rice Hall, 2121 Eye Street, N.W.
Washington, D.C. 20052

November 11, 1996

Dear Professor Trachtenberg :

Thank you for your letter of September 3, 1996 in response to the charges of harassment that I brought against Prof. Mona E. Zaghloul of EECS Department. For your quick reference, I have enclosed copies of three relevant correspondences. At this point, I would like to let you know that the harassment continues to grow even stronger. The new elements in the harassment game are denial of any raise in my salary, and a written threat from Dr. Gideon Frieder about revoking my tenure.

Enclosed is a summary of the highlights of harassments and discriminations that I have been subjected to over a period of time. However, the following two are the latest ones.

(1) Professor Donald R. Lehman in his letter of October 31, 1996 notified me that there will be absolutely no raise in my salary for the year of 1997. Such incidence never happened in the past during my employment in GWU. I consider this action to be a direct consequence of raising my voice against corruptions in EECS Department and SEAS as well. I would like to request for your attention to this matter so that this issue is resolved before the year 1997 begins.

(2) In a recent letter, Dr. Gideon Frieder threatened me about the possibility of revoking my tenure. He and a group of faculty in EECS are quite active in that direction.

In the context of the enclosed memo dated May 15, 1996 on Doctoral Qualifying Exam, it is very important to know that Dr. Gideon Frieder knew the issues of favoritism and corruptions practiced by Prof. Pickholtz as early as in September, 1995. Meeting was arranged in his own office and official memorandum was given to him. Dr. Frieder did nothing on that matter. If he acted with a sense of responsibility, Spring '96 dilemma of Doctoral Qualifying Exam could have been avoided.

Dr. Frieder not only remained inactive, he also denied his knowledge of the issue of corruption to the office of Vice President for Academic Affairs. A letter dated April 30, 1996 from the office of Vice President for Academic Affairs directly refers to such denial of Dr. Frieder. Dr. Frieder received

17

**189**

a copy of that letter and he never raised any objection. This constitutes a deliberate lie on the part of Dr. Frieder to cover up his lack of sense of responsibility. My concern is whether we should trust the education of our next generation in the hands of an administrator who shows little respect for basic morals and whose lack of administrative ability led to the Spring '96 dilemma of Doctoral Qualifying Exam.

As per your suggestion, details of the corruption issues and some of the harassment issues were handed over to the office of General Counsel during my hour long meeting with Vice President Blumer; during that meeting pages of notes were taken as to what the fine details were.

I was hoping for some follow-up steps that would deter the intensity of harassments and bring the wrong doings of the faculty members in SEAS to the light On the contrary, the threats and harassments have only increased. Denial of any raise in my salary and the threat of revoking tenure are just indications of that. I shall be anxiously waiting for another month to observe the effects of the directives that you gave to Vice President Lehman and Assoc. Vice President Susan B. Kaplan through your letter of Sept.3, 1996. I would appreciate if I be notified of the developments, if any.

Sincerely,
Debabrata Saha
Dept. of EECS
Ph: (202) 994-7175 (Office)
    (703) 938-6307 (Home)
Home Address : 2947 Waterford Court, Vienna, VA-22181

18

190

### Summary : Highlights of Harassment and Discrimination Issues
### November 11, 1996

1. The directorship of the Communications Laboratory

2. Dismissal from Undergraduate Advising Position

3. Removal from teaching a course on Information Theory (EE-241) which I have been teaching for ten years and replacing me by a part-time/visiting faculty member. I am the course director of EE-241.

4. Eliminating a course on Probability Theory and Stochastic Process (EE-204) of which I am the course director; I have been teaching the course for ten years.

5. Denial of any raise in salary

6. Written threat from Dr. Gideon Frieder to revoke my tenure.

7. Use of an adhoc committee by Dr. Zaghloul and Dr. Frieder to harass me to divert and suppress the issues of corruptions and harassments.

**191**

Professor Stephen Joel Trachtenberg,
President, The George Washington University,
Rice Hall, 2121 Eye Street, N.W.
Washington, D.C. 20052

February 10, 1997

Dear Professor Trachtenberg :

This is to acknowledge that I received your letter of February 7, 1997 along with copies of three letters which were written by Dr. Donald R. Lehman but never reached me. Your letter does not refer to the incident of February 6, Thursday. Without any prior notice or indication, that Thursday evening the University administration used Police to remove me from my classroom in front of my student. Perhaps, we the teachers belong to such an inferior class of the society that we should not question the legality of this incident. *This incident is so unfortunate for The George Washington University that I do not find any word to describe it. Let the incident speak for itself!*

Now it appears that Dr.Lehman has been having great difficulty in communicating with me though I sit in a building across the road, and this semester I never canceled my regular office hours and lectures. The performance of the communication protocol of Dr. Lehman's office is quite unacceptable compared to that of yours and Vice President Blumer's office. So, I have decided to give Dr. Lehman a courtesy call today. After I received your letter on last Friday, Vice President Blumer returned my call and mentioned to me that he would bring the original issues of corruptions and harassments to the attention of Dr. Lehman. I do appreciate the return call of Vice President Blumer. Till any further development, I shall devote one hundred percent of my time to my ongoing research as part of my academic responsibilities.

Sincerely,
Debabrata Saha
Dept. of EECS
cc: Vice President Blumer
    Colleagues

20

**192**

Professor Stephen Joel Trachtenberg
President, The George Washington University
Rice Hall, 2121 Eye Street, N.W.
Washington, D.C. 20052

March 7. 1997

Dear Professor Trachtenberg :

After the February 6 "Police Incident", in which Dr. Lehman used University Police to remove me from my classroom, you sent me copies of three letters related to my status. These three letters were written by Dr. Donald R. Lehman but never reached me. It is ironic that one of my colleagues in the EECS Dept. had a copy of Dr. Lehman's February 5 confidential (!!) letter and he read it to me over the phone even before it reached me through your office on February 7.

As per February 5 letter of Dr. Lehman, I have been on administrative leave, pending further investigation. He went on to say :"... I expect that the investigation will be completed within 30 days and I will keep you informed of any unforeseen delay or changes in the anticipated schedule." Yesterday was the end of the thirty day period. But still I haven't yet received any communication (neither letter nor telephone call) from Dr. Lehman. In order to help Dr. Lehman in communicating with me, I gave him a courtesy call on February 10, but he did not return my call. At this point, I am seriously concerned about the communication ability of Dr. Lehman as an administrator, and anxious about my status.

I would appreciate it very much if you kindly let me know my status at your earliest. Till any further development, I shall devote one hundred percent of my time to my ongoing research as part of my academic responsibilities.

Thank you for the Birthday card that I received from your office this week.

Sincerely,
Debabrata Saha
Dept. of EECS

21

**193**

Vice President Dennis Blumer
General Counsel
The George Washington University
Washington, D.C. 20052

March 7, 1997

Dear Dr. Blumer:

After the February 6 "Police Incident", in which Dr. Lehman used University Police to remove me from my classroom, President Trachtenberg sent me copies of three letters related to my status. These three letters were written by Dr. Donald R. Lehman but never reached me. It is ironic that one of my colleagues in the EECS Dept. had a copy of Dr. Lehman's February 5 confidential (!!) letter and he read it to me over the phone even before it reached me on February 7 through the office of the President.

As per February 5 letter of Dr. Lehman, I have been on administrative leave, pending further investigation. He went on to say :"... I expect that the investigation will be completed within 30 days and I will keep you informed of any unforeseen delay or changes in the anticipated schedule." Yesterday was the end of the thirty day period. But still I haven't yet received any communication (neither letter nor telephone call) from Dr. Lehman. In order to help Dr. Lehman in communicating with me, I gave him a courtesy call on February 10, but he did not return my call. At this point, I am seriously concerned about the communication ability of Dr. Lehman as an administrator, and anxious about my status.

Following my earlier conversation with you, I am staying away from the campus and devoting one hundred percent of my time at home on my ongoing research. I hope I am doing what I am supposed to do, and making no misinterpretation of February 5 letter. I would appreciate your thought on this matter.

Sincerely,
Debabrata Saha
Dept. of EECS

22

194

# Discriminations

The act of discrimination was committed by **Prof. Robert Joseph Harrington** in the capacity of the Chairperson of EECS Department.

# First Incident

I observed his intent of discrimination right before I applied for tenure in September 1991. A week or ten days before I submitted the materials to his office for tenure evaluation, I had a short meeting with him in his office about my tenure evaluation. That time while he was explaining to me about the tenure committees, he told me that in the following year (provided I get tenure) I would not be in the tenure evaluation committee though he included Prof. Rotenstreich (with a similar status) in my tenure evaluation committee.

This intent of discrimination became a reality in the following year (1992). The following two memos describe the situation in detail.

23

To : Prof. Robert J. Harrington, Chairman, EECS
From : Debabrata Saha, EECS
Re : Personnel Committee matters
Date : November 4, 1992

As per my discussions with you yesterday afternoon, I understand that you did not include me in the 1992-93 personnel committee for tenure and promotion in the department of Electrical Engineering and Computer Science, and you do not intend to include me in the remaining part of the academic year of 1992-93. In case I misunderstood you, I would appreciate if you kindly respond to this memo at your earliest.

On my part, I pointed out to you that in a similar situation in the previous year, another faculty with his 1991-92 tenure status identical to my tenure status in 1992-93 did not only serve in the personnel committee which evaluated my application for tenure and promotion, but also served as a member of a sub-committee in charge of fact findings. During our discussions, I hope, I made this fact clear to you when I was seeking possible legitimate explanation for difference in the treatment of two colleagues under your own chairmanship in both situations.

24

196

To : The Personnel Committee for Tenure and Promotion, EECS
From : Debabrata Saha, EECS
Re : Personnel Committee matters
Date : November 4, 1992

First of all I would like to take this opportunity to inform you that I felt deeply honored at the recommendation for promotion and tenure that you put forward for me in the Fall of 1991. You may recall that the same personnel committee that recommended me included our good colleague, Prof. Shmuel Rotenstreich. Prof. Rotenstreich is a good friend of mine and I do respect him as my colleague. However, his presence in that personnel committee has raised a serious ethical issue which I feel so strongly about.

According to my understanding, the tenure status of Prof. Rotenstreich in the academic year of 1991-92 was identical as my tenure status in the academic year of 1992-93. But, as per my conversation with the chairman of our department, Prof. Harrington, I am not on this year's personnel committee. I had a discussion with him on this issue, but he failed to give me any explanation for the difference in the treatment of two colleagues under his own chairmanship in both situations. I fail to understand why uch a discrimination should be allowed in an academic institution and what is the basis of this discrimination.

Again, I would reiterate that I have been given absolutely no explanation by the chairman which may help me understand such differential treatment. Therefore, I am appealing to you, the collective leadership of the department to look into this matter and resolve this serious ethical issue before the scheduled personnel committee meeting is held on Friday, November 6,1992. I strongly believe that this issue can be resolved satisfactorily by the intervention of the collective leadership without me resorting to higher authority or other means. If this issue cannot be resolved before Nov.6, I would like to request you to postpone the meeting till it is resolved. I hope you understand the gravity of this ethical issue and make every effort to resolve it so that I do not have to resort to other means. I shall be available for discussions.

I do firmly believe that I should be given equal opportunity to contribute in the faculty development; it is not only my equal right, but also an ethical issue which I do intend to stand by now and in the years to come, for me as well as for others.

Enclosure

25

**197**

# Second Incident

During the Spring semester of 1994, I was on sabbatical leave. Before the leave began, I had the directorship of seven courses : EE-143, 146, 147, 204, 205, 241, and 247. During my absence of only two months (January and February), the then Chairman Prof. Robert Joseph Harrington took away the directorship of 4 of the 7 courses without any rationale and without any consultation with me.

I expressed my dismay at that decision through a memo dated March 10, 1994. Though at that time I was out of the country, nevertheless, I was able to meet the deadline of Prof. Harrington given in his memo dated Feb.18, 1994. But, I never received back any answer.

*I took this matter to the next Chairperson Dr. Mona E. Zaghloul, Dean Frieder, Senate Ethics Committee (as per suggestion of Dean Frieder), Senate Executive Committe, and then to VP for Acad. Affairs Dr. Linda Salamon. The matter was not resolved. Then as per suggestion of President Tracht-enberg, I discussed this matter with VP Blumer in detail in our meeting on May 20,1996(see the meeting notes D2).*

I feel that this sort of conduct on the part of any Chairperson (and associated decision makers, if any) is not only deplorable but also unethical, non-academic, and detrimental to the academic integrity of any institute of learning. I believe that this action violated my right to academic freedom. And clearly, I have been denied the right to being fairly treated based on qualifications and commitments. **In the September of 1994,** when Prof. Mona Zaghloul took over the office of the Chairperson, I approached her about this problem (memo dated September 30, 1994), but again **I was denied any answer or any response.** In the mean time, in the Fall of 1995, she handed over the responsibility of the lab **to a newly hired faculty member** in spite of my objection. **Note that this new faculty member joined our department only the Fall of 1995.** After this hand over of the lab, when I told her about my decision of addressing the Senate Ethics Committee, she softened her stand and discussed the issue with me in a meeting on October 31st, 1995. In that meeting she acknowledged that what Prof. Harrington did was wrong but she refused to undo her decision (toward the beginning of the meeting, Dr. Zaghloul stopped the meeting and brought in Prof. Pickholtz without my consent. This is the same faculty member who allowed his student to take the exam four times in a row. I let

26

198

Prof. Pickholtz stay for five minutes or so, and then "threw him out" of the meeting.).

The following four letters written to (1) Dr. Zaghloul, (2) Dr. Robinson, (3)Dr. Pelzman, and (4) President Trachtenberg describes the chronology of the events.

27

**199**

To : Prof. Mona Zaghloul, Chairperson, EECS
From : Deb Saha, EECS
Re : Course Directorship : Your Memo Dated September 23, 1994
Date : September 30, 1994

I assume that the revised list distributed by you is mostly due to the decisions taken by the previous administration of Prof. Robert Joseph Harrington. With respect to this list, I would like to bring the following to your attention.

Please note my sabbatical began in January, 1994. In December of 1993, I had the directorship of seven courses : EE-143, 146, 147, 204, 205, 241, and 247. During my absence of only two months (January and February), the then Chairman Prof. Robert Joseph Harrington took away the directorship of 4 of the 7 courses without any rationale and without any consultation with me. I expressed my dismay at that decision through a memo dated March 10 (a copy of which is enclosed); but, I never received back any answer. Please note that Communications Lab (EE-146) was going through major changes and renovations at that time (please see the enclosed materials). In my opinion, this sort of conduct on the part of any Chairperson (and associated decision makers, if any) is not only deplorable but also unethical and non-academic. I believe that this sort of action violates the right to academic freedom.

I strongly feel that, in the best interest of the Communications Lab, change in the directorship of EE-146 (and \ EE-143) is not desirable. Also, EE-203 is not my area of expertise; looks like it was handed over to me (without any academic merit) just as we randomly distribute donuts among children. I am reluctant to take the responsibility of EE-203.

**200**

Professor Lilien F. Robinson
Chair, Faculty Senate Committee on
Professional Ethics and Academic Freedom
The George Washington University
Washington, D.C. 20052

November 16,1995

Dear Professor Robinson :

I would like to bring the attention of your committee on Professional
Ethics and Academic Freedom to an incident which, I believe, has violated
my right to academic freedom, and the right to being fairly treated based on
qualifications and commitment alone.

It is more than a year I have been trying very patiently different avenues
to resolve the issue within our department, so that I can avoid bringing allega-
tion against two colleagues of mine to any authority outside the department.
But I am very frustrated to say that all my attempts resulted in no solution.
Therefore, at this point, I am compelled to address the Senate Committee
on Professional Ethics and Academic Freedom.

During the Spring semester of 1994 I was on sabbatical leave. Before the
leave began, I had the directorship of seven courses : EE-143, 146, 147, 204,
205, 241, and 247. During my absence of only two months (January and
February), the then Chairman Prof. Robert Joseph Harrington took away
the directorship of 4 of the 7 courses without any rationale and without
any consultation with me. I expressed my dismay at that decision through
a memo dated March 10, 1994 (a copy of which is enclosed); but, I never
received back any answer. In particular, the Communications Lab (EE-146)
was going through major changes and renovations at that time. As director
of EE-146, I was actively engaged in this renovation with due approval of the
academic curriculum committee. We introduced new experiments in the lab
even in the semester just before the directorship was taken away from me.
Enclosed documents will confirm that such renovations were going on.

I feel that this sort of conduct on the part of any Chairperson (and as-
sociated decision makers, if any) is not only deplorable but also unethical,
non-academic, and detrimental to the academic integrity of any institute of
learning. I believe that this action violated my right to academic freedom.
And clearly, I have been denied the right to being fairly treated based on
qualifications and commitments.

29

In the September of 1994, when Prof. Mona Zaghloul took over the office of the Chairperson, I approached her about this problem (memo dated September 30, 1994), but again I was denied any answer or any response. In the mean time, in the Fall of 1995, she handed over the responsibility of the lab to a newly hired faculty member in spite of my objection. Note that this new faculty member joined our department only this Fall semester. After this hand over of the lab, when I told her about my decision of addressing the Senate Ethics Committee, she softened her stand and discussed the issue with me in a meeting on October 31st, 1995. In that meeting she acknowledged that what Prof. Harrington did was wrong but she refused to undo her decision.

I, therefore, would like to request your committee on Professional Ethics and Academic Freedom to look into this matter. My allegation is that both Prof. Robert Joseph Harrington and Prof. Mona Zaghloul violated my right to academic freedom. They fell short of their obligation to treat a colleague based on his/her qualifications and commitments alone. And by refusing to discuss what transpired their actions regarding the lab, they fell short of minimum civic decency that one colleague should always have towards another, irrespective of whether it is mentioned in the faculty code or not.

I would like you to understand that my objective in pursuing this matter is not just getting back the directorship of the lab. It is a matter of principle and matter of academic integrity by virtue of which we, including you and the members of your committee, are parts of this institute of learning.

Looking forward to your consideration.

Sincerely,

Debabrata Saha

Dept.of Elec.Eng. and Comp.Sc.

The George Washington University

Washington, D.C. 20052

Tel.:(202) 994-7175

Fax :(202) 994-0227

e-mail : saha@seas.gwu.edu

c: Members, Faculty Senate Committee on

Professional Ethics and Academic Freedom

Prof. Gideon Frieder, Dean, SEAS

Prof. Linda Salamon, Vice President for Academic Affairs

30

**202**

Professor Joseph Pelzman
Chair, Faculty Senate Executive Committee
The George Washington University
Washington, D.C. 20052

December 4,1995

Dear Professor Pelzman:

I would like to bring the attention of your committee to an incident which, I believe, has violated my right to academic freedom, and the right to being fairly treated based on qualifications and commitment alone. I believe that violation of these rights is profound enough to bring the matter to your attention. Recently, I wrote to Professor Lilien F. Robinson, Chairperson of Senate Committee on Professional Ethics and Academic Freedom. Prof. Robinson feels that "since she does not have any role of adjudication", this matter should be addressed by the Senate Executive Committee. A copy of the materials that I sent her is enclosed herewith.

It is more than a year I have been trying very patiently different avenues to resolve the issue within our department, so that I can avoid bringing allegation against two colleagues of mine to any authority outside the department. But I am very frustrated to say that all my attempts resulted in no solution. Therefore, as per suggestion of Prof. Robinson, I am compelled to address the Senate Executive Committee.

During the Spring semester of 1994 I was on sabbatical leave. Before the leave began, I had the directorship of seven courses : EE-143, 146, 147, 204, 205, 241, and 247. During my absence of only two months (January and February), the then Chairman Prof. Robert Joseph Harrington took away the directorship of 4 of the 7 courses without any rationale and without any consultation with me. I expressed my dismay at that decision through a memo dated March 10, 1994 (a copy of which is enclosed); but, I never received back any answer. In particular, the Communications Lab (EE-146) was going through major changes and renovations at that time. As director of EE-146, I was actively engaged in this renovation with due approval of the academic curriculum committee. We introduced new experiments in the lab even in the semester just before the directorship was taken away from me. Enclosed documents will confirm that such renovations were going on.

I feel that this sort of conduct on the part of any Chairperson (and associated decision makers, if any) is not only deplorable but also unethical, non-academic, and detrimental to the academic integrity of any institute of

31

**203**

learning. I believe that this action violated my right to academic freedom. And clearly, I have been denied the right to being fairly treated based on qualifications and commitments only.

In the September of 1994, when Prof. Mona Zaghloul took over the office of the Chairperson, I approached her about this problem (memo dated September 30, 1994), but again I was denied any answer or any response. In the mean time, in the Fall of 1995, she handed over the responsibility of the lab to a newly hired faculty member in spite of my objection. Note that this new faculty member joined our department only this Fall semester. After this hand over of the lab, when I told her about my decision of addressing the Senate Ethics Committee, she softened her stand and discussed the issue with me in a meeting on October 31st, 1995. In that meeting she acknowledged that what Prof. Harrington did was wrong but she refused to undo her decision.

I, therefore, would like to request your committee to look into this matter. My allegation is that both Prof. Robert Joseph Harrington and Prof. Mona Zaghloul violated my right to academic freedom. They fell short of their obligation to treat a colleague based on his/her qualifications and commitments. And by refusing to discuss what transpired their actions regarding the lab, they fell short of minimum civic decency that one colleague should always have towards another, irrespective of whether it is mentioned in the faculty code or not. And, as a matter of faculty code, faculty role in University Decision Making (which includes active role in the development, revision, or elimination of curricular offerings of each department, college, or school) has been clearly and intentionally neglected.

I would like you to understand that my objective in pursuing this matter is not just getting back the directorship of the lab. It is a matter of principle and matter of academic integrity by virtue of which we, including you and the members of your committee, are parts of this institute of learning.

Looking forward to your consideration.

Sincerely,

Debabrata Saha

Dept.of Elec.Eng. and Comp.Sc.

The George Washington University

Washington, D.C. 20052

Tel.:(202) 994-7175

c: Members, Faculty Senate Executive Committee

32

204

Prof. Stephen J. Trachtenberg, President and Ex-officio, Senate Exec.Comm.
Prof. Gideon Frieder, Dean, SEAS

33

Professor Stephen J. Trachtenberg
President, The George Washington University
Washington, D.C. 20052

April 10, 1996

Dear Professor Trachtenberg :

I talked to Ms. Betsy Francisco of your office and requested for a meeting with you on two ethical issues that have kept me very busy for almost a year. Ms. Francisco suggested that I provide you with some background material. Enclosed are two sets of materials on the two issues and a list of the documents enclosed.

On one of the two issues, I had been following the suggestions of Professor Gideon Frieder for last eight months. As per his suggestion, first I addressed the Senate Ethics Committee, and later the Senate Executive Committee. But neither of the two committees looked into the moral issues and the matter still remains unresolved. Now I would like to bring this matter to your attention.

The second issue is on the corruption in our department administration leading to the discrimination among students and the practice of favoritism by faculty members. I have been trying to correct this problem but the administration refuses to hear it.

The objective of my proposed meeting with you is to get advice from you in resolving these matters without further wastage of time and energy. I hope that you will find some time to meet me.

Sincerely,
Debabrata Saha
Dept.of Elec.Eng. and Comp.Sc.
The George Washington University
Washington, D.C. 20052
Tel.:(202) 994-7175

34

## List Of Documents

Set I.
1. My letter of February 1, 1996 to Professor Frieder and Professor Pelzman: my response to the letter from Senate Executive Committee.
2. Letter of January 26, 1996 from Professor Pelzman.
3. My letter of December 4, 1995 addressing the Senate Executive Committee
4. My letter of November 16, 1995 to Professor Lilien F. Robinson, Chair of Faculty Senate Committee on Professional Ethics and Academic Honesty.
5. Five EECS internal memoranda.
6. Some documentation of Communications Design Laboratory Experiments.
Set II.
A set of two EECS internal correspondences.

# Unethical Actions Of VP Dr. Lehman

- After I brought the charges of harassment against Dr. Mona Zaghloul to President Trachtenberg through my letter of August 23, 1996, and again through letter of Nov.11, 1996, President Trachtenberg wrote me that he asked VP Dr. Lehman to look into the matters. But Dr. Lehman never communicated with me.

- In the Spring of 1997, I was assigned to teach three courses and continued to teach all courses and maintained each and every office hour till February 6, 1997. In the evening of February 6, 1997, I went to teach the course EE-204 in the Corcoran Hall (Rm.#205) around 6:00pm. **Dr. Lehman, without giving any prior notice (written or telephonic), used University Police to remove me from my class room in front my student(s).**I would like to question not only the morality but also legality of this heinous, barbaric, and inhumane assault on the academic values in and beyond the George Washington University. I am surprised at the unprofessional action of Dr. Lehman.

- After the February 6 "Police Incident", President Trachtenberg sent me copies of three letters related to my status. These three letters were written by Dr. Donald R. Lehman and addressed to me but never reached me. First two of these letters were supposed to be sent by registered mail. My question is if the office of VP Lehman did not receive the return receipts of the registered letters, why they did not try to contact me by other means. I was in the school on a regular basis, without missing a single lecture or an office hour. This is not believeable and acceptable to me. **This raises lot of questions !!!!**

- A copy of the third letter dated February 5, 1997 was sent by courier. It is ironic that one of my colleagues in the EECS Dept. had a copy of this confidential (!!) letter and he read it to me over the phone in the morning of Feb.7 even before it reached me through the President's office on the same day.

- As per February 5 letter of Dr. Lehman, I have been on administrative leave, pending further investigation. He went on to say :"... I expect that the investigation will be completed within 30 days and I will keep

36

208

you informed of any unforeseen delay or changes in the anticipated schedule". But I didn't receive any communication (neither letter nor telephone call) from Dr. Lehman within that thirty day period. **This raises not only communication and administrative ability of Dr. Lehman, but also his sense of responsibilty.**

37

**Plaintiff Exhibit R-3**
**14 pages**

This Exhibit includes following items :

**Record of Three Students :**

1. Sasan Rostami (five pages)
2. Martin Schulman (three pages)
3. Abir Hnidi (three pages)

&

4. **Handwritten Response of Ray Pickholtz to Saha's Memo dated Feb. 1st, 1995**
   (two pages)



**The George Washington University**

WASHINGTON DC

**DEPARTMENT OF ELECTRICAL ENGINEERING AND COMPUTER SCIENCE**

March 7, 1994

Sasan Rostami
19115 Stedwick Dr
Gaithersburg, Md 20879

Dear Susan Rostami:

A review of your academic record reveals that you have received one grade of C or below. You are reminded that graduate students who receive two grades of F, or three grades of C or below, are barred from further enrollment in graduate courses. You are also reminded that graduate students must maintain a minimum Grade Point Average (GPA) of 3.00 in order to graduate. Please consult with your advisor.

Sincerely,

Robert J. Harrington
Professor and Chairman

RJH:bje

```
AMI, SASAN                                          PRINT DATE: 10/08/92
NUMBER: 553839          SSN: 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            BIRTH DATE: 01/03/61
```

**DEGREE(S) AWARDED BY THE GEORGE WASHINGTON UNIVERSITY**
DEGREE:    61 - M.S. MAY 7, 1989
MAJOR:     143 - COMMUNICATIONS

| DEPT | COURSE | COURSE TITLE | HRS | GRADE | PTS | SEM QPI |
|------|--------|--------------|-----|-------|-----|---------|
| | | **=======> SPRING 1985 <========** | | | | |
| | | DIVISION:  23 - SCHOOL OF ENGINEERING & APPLIED SCIENCE | | | | |
| | | DEGREE:    61 - M.S. | | | | |
| | | MAJOR:     143 - COMMUNICATIONS | | | | |
| EE | 204-12 | STOCHASTIC SIGNALS AND NOISE | 3 | A | 12.00 | |
| | | | 3 | | 12.00 | 4.000 |
| | | **========> FALL 1985 <=========** | | | | |
| EE | 243-11 | COMMUNICATION THEORY 1 | 3 | A | 12.00 | |
| | | | 3 | | 12.00 | 4.000 |
| | | **========> SPRING 1986 <========** | | | | |
| UNIV | 992-10 | LEAVE OF ABSENCE | | | | |
| | | **========> FALL 1986 <=========** | | | | |
| EE | 246-10 | DIGITAL COMMUNICATION | 3 | B | 9.00 | |
| EE | 241-10 | INFORMATION THEORY | 3 | A | 12.00 | |
| | | | 6 | | 21.00 | 3.500 |
| | | **========> SPRING 1987 <========** | | | | |
| EE | 242-11 | CODING THEORY | 3 | A | 12.00 | |
| EE | 208-10 | DIGITAL IMAGE PROCESSING | 3 | A | 12.00 | |
| | | | 6 | | 24.00 | 4.000 |
| | | **========> FALL 1987 <=========** | | | | |
| EE | 248-11 | COMPUTER COMMUNICTN NETWORKS 1 | 3 | A | 12.00 | |
| EE | 277-10 | SATELLITE COMMUNICATNS SYSTEMS | 3 | B | 9.00 | |
| | | | 6 | | 21.00 | 3.500 |
| | | **========> SPRING 1988 <========** | | | | |
| EE | 244-12 | COMMUNICATION THEORY 2 | 3 | A | 12.00 | |
| EE | 249-11 | COMPUTER COMMUNICATION NETWK 2 | 3 | A | 12.00 | |
| | | | 6 | | 24.00 | 4.000 |
| | | **========> FALL 1988 <=========** | | | | |

```
THIS IS AN UNOFFICIAL TRANSCRIPT PRINTED FOR: SISERW
PAGE     1 - CONTINUED ON NEXT PAGE
```

212



STUDENT INFORMATION SYSTEM
STUDENT RECORD DISPLAY

RD12000

SSN#: 461453973    SN: 553839    NAME: SASAN ROSTAMI

BILLING ADDRESS: L
LOCAL ADDRESS:
)9115 STEDWICK DR
GAITHERSBURG                    MD 20879
TELEPHONE (DAY): 3014285931
TELEPHONE (EVE): 3019638507

PE..NENT ADDRESS:
19115 STEDWICK DR
GAITHERSBURG                    MD 20879
TELEPHONE (DAY):
TELEPHONE (EVE):

PRESS ENTER TO VIEW ADDITIONAL DIRECTORY INFORMATION

213

# GEORGE WASHINGTON UNIVERSITY
## School of Engineering and Applied Science
### Department of Electrical Engineering and Computer Science

### APPLICATION-4

### DOCTORAL CANDIDATES TAKING THE
### DOCTORAL QUALIFYING EXAMINATION - PART 2
### IN YOUR MAJOR AREA OF CONCENTRATION

### (Spring Semester Only)

**MAJOR AREA** (check one)

\_\_\_\_ COMPUTER SCIENCE          \_\_\_\_ ENERGY CONVERS.,
                                        POWER & TRANSMISSION

✓ COMMUNICATIONS               \_\_\_\_ MEDICAL ENGINEERING

\_\_\_\_ ELECTROPHYSICS             \_\_\_\_ SYSTEM SCIENCE, NETWORKS &
                                        CONTROLS

Are you required to take an oral examination? Yes\_\_\_ No ✓ ?

**INSTRUCTIONS:** *Please print. Fill out all blanks completely. Please fill out the Masters Application Form for your Minors. Return no later than the last day of Registration.*

STUDENT'S NAME: **SASAN          ROSTAMI**

SOCIAL SECURITY NUMBER **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** STUDENT NO. **553839**

HOME ADDRESS: **20429  CABANA  DRIVE**
**GERMANTOWN,  MD    20876**

TELEPHONE: HOME: **(301)916-2950** BUSINESS: **(301)428-5937**

ADMISSION DATE: **1989 ?** ACADEMIC ADVISOR: **Dr. Pickholtz**

IS THIS YOUR FIRST ATTEMPT? **Yes**

**IF THIS IS NOT YOUR FIRST ATTEMPT,** INDICATE THE SEMESTER YOU LAST TOOK THE EXAM:

SEMESTER PREVIOUSLY TAKEN:_____ ATTEMPT:_____

DID YOU RECEIVE YOUR MASTERS DEGREE FROM GWU? **Yes** If yes, when **'89** ?

IF YOUR MS DEGREE WAS FROM GWU, DID YOU RECEIVE SUPERIOR PASS ON YOUR MASTERS COMPREHENSIVE **Yes**

ARE YOU AN ON-CAMPUS STUDENT? **Yes** IF OFF-CAMPUS,

WHAT IS YOUR LOCATION? _____

ARE YOU ENROLLED IN: \_\_\_EE OR CS 299 \_\_\_EE OR CS 300 \_\_\_ LEAVE OF ABSENCE

### PLEASE TURN OVER AND COMPLETE THE
### REMAINING PART OF THE APPLICATION

214

**Courses Completed:**

| COURSE NO. | COURSE NAME | GRADE | INSTRUCTOR'S NAME | SEMESTER | YEAR |
|---|---|---|---|---|---|
| EE 257 | Spread spect Com | A | Dr. Vojcic | Fall | 94 |
| EE 148 | Sim. of Comm Sys. | A | " Vojcic | Sp. | 9~ |
| EE 258 | Radio comm I | A | " Schnider | Fall | 93 |
| EE 223 | Optical Comm. | A | " Aziz | Sp. | 93 |
| APSC 211 | Anal. Meth. I | B | | Fall | 92 |
| APSC 213 | " " II | B | | Fall | 92 |
| EE 217 | Neural Net. | B | Dr. Szu | Sp. | 92 |
| EE 346 | Telecom protocols | A | Dr. Helgert | Fall | 91 |
| EE 248 | Det. + Est. | B | " Donaldson | Fall | 91 |
| EE 259 | Radio Comm II | B | " Schnider | Sp. | 91 |

Handwritten margin notes:
EE 251 Switched TlC  Dr. Mehorta  A  Sp. 90
EE 247 Comm. Syst. Dr. Mehort  A  Sp. '89

I INTEND TO TAKE THE DSC QUALIFYING EXAMINATION PART II DURING THE

Spring SEMESTER 19 95

# I UNDERSTAND THAT I MUST BE REGISTERED FOR A COURSE OR 1 CREDIT OF CONTINUOUS RESEARCH DURING THE SEMESTER IN WHICH I TAKE THE EXAM.

STUDENT'S SIGNATURE _Sasan Rostan_ DATE: 1/17/95

ADVISOR'S SIGNATURE _____ DATE: 1/21/95

**NOTICE TO ADVISOR:** Student should bring two copies of this form to you - one for the office and one for your file. After the exam is administered, your copy should be turned into the office with the information below completed. In addition, a brief description of the exam must be attached.

First attempt:  Date administered:_____    Result:_____

Advisor's signature:_____

Signature of exam committee members (at least two required in addition to Advisor):

_____    _____

*A copy of these results with the brief description of the exam will be submitted to the Computer Science Committee for final approval.*

215



February 12, 1996

175TH ANNIVERSARY 1821-1996

Martin Schulman     DEPARTMENT OF ELECTRICAL ENGINEERING AND COMPUTER SCIENCE
1105 Criton St.
Herndon. VA  22070

Dear Mr. Schulman:

This is to confirm your application to take the Doctoral Qualifying Exam (PART I) in the area of:

Telecommunications

Please note the following information:

1.  Report to the Marvin Center. Room 405, February 20, 1996.

2.  Arrive by 8:40 am. The exam will begin at 9:00 am and end at 5:00 pm.

3.  PLEASE BRING YOUR OWN WRITING MATERIALS (pencils, etc) -BLUEBOOKS WILL BE PROVIDED.

4.  NO books. tables. notes. programmable calculators, or tables will be allowed in the exam room. You will be asked to sign a statement certifying that you have neither given nor received help during this exam.

5.  Prepare your lunch. snacks. beverages. etc.. as you will not be permitted to leave the room for lunch during the examination.

6.  Examinations will not be graded until the end of the semester. PLEASE DO NOT CALL THE DEPARTMENT. FACULTY MEMBERS. OR THE EXAM COORDINATOR. YOU WILL BE NOTIFIED BY MAIL OF YOUR RESULTS.

7.  Students may withdraw from taking the Examination without penalty anytime prior to the distribution of the exam. A written letter confirming this withdrawal is necessary.

Thank you for your cooperation and GOOD LUCK!

Sincerely,

Mona E. Zaghloui
Professor and Chair

216

# GEORGE WASHINGTON UNIVERSITY
## School of Engineering and Applied Science
### Department of Electrical Engineering and Computer Science

## APPLICATION - 2

## DOCTORAL CANDIDATES TAKING THE MASTERS COMPREHENSIVE EXAMINATION IN YOUR MAJOR AREA OF CONCENTRATION (DSC QUALIFYING EXAM - PART I)

**MAJOR AREA** (check one)

_____ COMPUTER SCIENCE

_____ ENERGY CONVERS., POWER & TRANSMISSION

_____ COMMUNICATIONS

_____ MEDICAL ENGINEERING

_____ ELECTROPHYSICS

__X__ TELECOMMUNICATIONS & COMPUTERS

_____ SYSTEM SCIENCE, NETWORKS & CONTROLS

---

**INSTRUCTIONS:** *Please print. Fill out all blanks completely. Return no later than the last day of Registration!!!*

STUDENT'S NAME: MARTIN SCHULMAN

SOCIAL SECURITY NUMBER 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    STUDENT NUMBER _____

HOME ADDRESS: 1105 CRITON ST

HERNDON VA 22070

TELEPHONE: HOME: 703-742-3698   B        703
ACADEMIC ADVISOR: DR HARRINGTON          742 3698
IS THIS YOUR FIRST ATTEMPT? YES

IF THIS IS NOT YOUR FIRST ATTEMPT, INDICATE TOOK THE EXAM:
SEMESTER PREVIOUSLY TAKEN: _____

LIST YOUR MINOR AREAS: 1) EMGT
                        2) CSCI

ARE YOU AN ON-CAMPUS STUDENT? NO

WHAT IS YOUR LOCATION? LOUDON C

ARE YOU ENROLLED IN: ____ EE OR CS 299 ____        ____ LEAVE OF ABSENCE

## PLEASE TURN OVER AND COMPLETE THE REMAINING PART OF THE APPLICATION

217

## MASTERS COMPREHENSIVE EXAMINATION
### (DSC QUALIFYING EXAMINATION - PART I) APPLICATION

## CONTINUED

**Courses Completed:**

| COURSE NO. | COURSE NAME | GRADE | INSTRUCTOR'S NAME | SEMESTER YEAR |
|---|---|---|---|---|
| EE 249 | TELECOM NETWORKS 2 | A | VOJCIC | SPR 93 |
| EE 346 | COMPUTER NETWORKING | A | HELGERT | FALL 92 |
| EE 348 | ADV COMPUTER NETWORK | A | HELGERT | SPR 93 |
| EE 299 | INDEP STUDY | A | HELGERT | FALL 92 |
| EE | SPREAD SPECTRUM | B | VOJCIC | SPR 95 |
| EMGT 150 | INTRO TO ENG MGT | B | MURRAY | FALL 92 |
| EMGT 211 | ENG MGT 1 | A | PROCKO | SPR 94 |
| EMGT 212 | ENG MGT 2 | A | PROCKO | SUM 94 |
| CSCI 232 | FORMAL LANGUAGES AUTOMATA | A | - | FALL 94 |
| CSCI 252 | S/W DEVELOPMENT | A | - | FALL 93 |

I INTEND TO TAKE THE WRITTEN PORTION OF THE MASTER OF SCIENCE
COMPREHENSIVE EXAMINATION DURING THE
_____ FALL SEMESTER ___X___ SPRING SEMESTER :  **96**  YEAR

STUDENT'S SIGNATURE _____  DATE: 1/26/96

ADVISOR'S SIGNATURE _____  DATE: 1/29/96

**PLEASE USE THIS SPACE FOR ADDITIONAL COURSES:**

**COMPLETE THE NEXT SHEET ONLY IF THIS IS YOUR SECOND ATTEMPT**

218

**GEORGE WASHINGTON UNIVERSITY**
School of Engineering and Applied Science
Department of Electrical Engineering and Computer Science

### APPLICATION - 2

## DOCTORAL CANDIDATES TAKING THE MASTERS COMPREHENSIVE EXAMINATION IN YOUR MAJOR AREA OF CONCENTRATION (DSC QUALIFYING EXAM - PART I)

**MAJOR AREA** (check one)

____ COMPUTER SCIENCE

✓ COMMUNICATIONS

____ ELECTROPHYSICS

____ ENERGY CONVERS., POWER & TRANSMISSION

____ MEDICAL ENGINEERING

____ TELECOMMUNICATIONS & COMPUTERS

____ SYSTEM SCIENCE, NETWORKS & CONTROLS

**INSTRUCTIONS:** *Please print. Fill out all blanks completely. Return no later than the last day of Registration!!!*

STUDENT'S NAME: HNIDI, ABIR

SOCIAL SECURITY NUMBER: 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 STUDENT NUMBER ____

HOME ADDRESS: P.O. Box 45
Fairfax, VA 22030

TELEPHONE: HOME: 703-385-7616 BUSINESS: 703-715-7152

ACADEMIC ADVISOR: Prof. Pickholtz

IS THIS YOUR FIRST ATTEMPT? No

IF THIS IS NOT YOUR FIRST ATTEMPT, INDICATE THE SEMESTER YOU LAST TOOK THE EXAM:

SEMESTER PREVIOUSLY TAKEN: Spring 94     ATTEMPT: 3rd

FAILED 3RD TIME

LIST YOUR MINOR AREAS:  1)____
                        2)____

ARE YOU AN ON-CAMPUS STUDENT? No ____ IF OFF-CAMPUS.

WHAT IS YOUR LOCATION? Ashburn, VA

ARE YOU ENROLLED IN: ✓ EE OR CS 299 ____ EE OR CS 300 ____ LEAVE OF ABSENCE

**PLEASE TURN OVER AND COMPLETE THE REMAINING PART OF THE APPLICATION**

219

## MASTERS COMPREHENSIVE EXAMINATION
### (DSC QUALIFYING EXAMINATION - PART I) APPLICATION

#### CONTINUED

**Courses Completed:**

| COURSE NO. | COURSE NAME | GRADE | INSTRUCTOR'S NAME | SEMESTER | YEAR |
|---|---|---|---|---|---|
| EE-247- | | A | | | |
| EE-346- | | A | | | |
| EE-348- | | A | | | |
| EE-277- | | A | | | |
| EE-258 | | B | | | |
| DR-277- | | B | | | |
| DR-200- | | B | | | |
| CS-227- | | C | | | |
| EE-347- | | A | | | |
| CS-297- | | B | | | |

I INTEND TO TAKE THE WRITTEN PORTION OF THE MASTER OF SCIENCE COMPREHENSIVE EXAMINATION DURING THE

___✓___ FALL SEMESTER _____ SPRING SEMESTER :     **94** YEAR

I UNDERSTAND THAT I MUST BE REGISTERED FOR A COURSE OR 1 CREDIT OF CONTINUOUS RESEARCH DURING THE SEMESTER IN WHICH I TAKE THE EXAM.

STUDENT'S SIGNATURE _____ DATE: 7/20/94

ADVISOR'S SIGNATURE _____ DATE:_____

**PLEASE USE THIS SPACE FOR ADDITIONAL COURSES:**

**COMPLETE THE NEXT SHEET ONLY IF THIS IS YOUR SECOND ATTEMPT**

220

**SECOND ATTEMPT APPLICATION**
**MASTER'S COMPREHENSIVE EXAMINATION**
**(PhD QUALIFYING EXAM PART I)**

STUDENT NAME: HNiDi, ABiR

EXPLAIN WHY YOU BELIEVE YOU FAILED YOUR FIRST ATTEMPT
Because I didn't have enough preparation in the area of Communications & Coding theory.

WHAT SUBJECT AREAS DO YOU AND YOUR ADVISOR BELIEVE WERE WEAKNESSES ON THE FIRST ATTEMPT?
1. Communications theory
2. Coding theory.

DESCRIBE THE PLAN OF STUDY YOU HAVE FOLLOWED TO REMEDY THESE WEAKNESSES:
1- Take a course about Communications & Coding theory.
2- Join a study group.
3- Meet regularly & work on previous exams.
4- Enhance & increase my knowledge in Queuing theory.

ADVISOR'S APPROVAL: _____

221

THE GEORGE WASHINGTON UNIVERSITY
DEPT. OF ELECTRICAL ENGINEERING AND COMPUTER SCIENCE

Memorandum

To :        Professor Helgert, Pickholtz, and Vojcic, EECS
From :      Deb Saha, Co-ordinator of Doctoral Qualifying Exam in Communications
Re :        Spring Exams, and Two other issues
Date :      February 1st, 1995

Issue # 1 :

    Doctoral student, Mr. Jeff M. Willey (SSN # 046382798) chose
Communications as one of his MINOR areas and took the Part-I of Doctoral
Qualifying Exam in last Fall semester. His score is 56.25 out of a total of
100; it is the 2nd highest score in that exam. But because of a typing mistake
on the Data Sheet, we considered his area of concentration as Communications
and declared him "FAILED" in the Exam. Recently, Prof. Zaghloul brought this
incident to my attention. We, therefore, need to reconsider the case.
Following our requirements in the past, Mr. Willey doesn't require a
"Superior" Pass in the minor exam.

    My personal opinion : since 56.25 is a respectable number, we should pass
him. However, I need input from all of you for a decision.  *I agree*

Issue # 2 :

    Mr. Abir Hnidi (SSN # 230517970) who failed the Part-I of Doctoral
Qualifying Exam for the THIRD time wrote a petition to the Chairman asking for
a permission to appear at the Exam for the FOURTH time.

    In fact, after failing the exam second time, he needed approval of the
Communications Committee for his third attempt. He did not seek for that
approval; on the top of that, he failed the exam.

    I suggest that we deny the approval for the Fourth attempt. I need your
input. Please respond at your earliest.

*my first inclination is to deny this
but Mr. Hnidi established that he was ill
during the exam and ... I think that he
has potential. In view of this, and in spite
of the bad precedent, I would vote of giving him
one more chance with close scrutiny CPk*

222

**Issue # 3 :**     **Doctoral Qualifying Exam : Part-II**
                    **Scheduled on Wednesday, February 22, 1995**

In order to maintain a balance among all essential areas, I suggest that each of us submit three questions in areas as outlined below.

1.  Prof. Helgert :      **Two questions in Networking**
                         **One question in Coding Theory**

2.  Prof. Pickholtz :    **One question in Networking**
                         **one question in Communications Theory**
                         **One question in Information Theory**

*I have given you the*

3.  Prof. Vojcic :       **Two questions in Communication Theory**
                         **One question in Probability Theory**

4.  Deb Saha :           one question in Probability Theory
                         **One question in Information Theory**
                         **One question in Coding Theory**

Please submit the questions in sealed envelope to Yvonne in room T-634 by Monday, February 13 ( thare are two week-ends before February 13).


**Issue # 4 :**     **Doctoral Qualifying Exam : Part-I**
                    **Scheduled on Wednesday, February 22, 1995**

In the past, many of us talked about changing the format and reducing the length of the Part-I exam. Perhaps, we can reduce the length in both time and the number of questions. But, definitely, we need to examine the students in all fundamental areas.

Occasionally, we give four problems in our two and half hour final exam; that means less than 40 minutes for each problem. If we maintain the same time limits for each problem, and ask students to answer only SIX out of TEN problems (instead of 8 out of 12/14 problems), then the exam will require 6 x 40 minutes, or 4 hours. Or, if you feel that four hours is not enough, we can add another hour to make it a 5 hour exam. Please, give me your comments at your earliest.     *I strongly agree with this!*

In any case, I need problems for this exam too. Please follow the above breakdown and submit three problems each. Again, please submit the questions in sealed envelope to Yvonne in room T-634 by Monday, February 13 ( thare are two week-ends before February 13).

*d.k.!*

223